UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------------- x

MICHAEL SCHILLER, *et al.*,

                                                            04-CV-7922 (RJS) (JCF)

                                                  Plaintiffs,

            -against-

CITY OF NEW YORK, *et al.*,

                                                  Defendants.

------------------------------------------------------------------- x
------------------------------------------------------------------- x

RNC CONSOLIDATED CASES                          (RJS) (JCF)

------------------------------------------------------------------- x


**DEFENDANTS' MEMORANDUM OF LAW IN SUPPORT OF THEIR
MOTION FOR SUMMARY JUDGMENT TO DISMISS PLAINTIFFS'
FALSE ARREST CLAIMS AT CHURCH AND FULTON STREETS**


                              MICHAEL A. CARDOZO
                              Corporation Counsel of the
                              City of New York
                              *Attorney for Defendants*
                              100 Church Street
                              New York,  New York 10007
                              Tel:  (212) 788-1817
                              Fax: (212) 788-9776


            *Of Counsel*:         Fred M. Weiler, Esq.
                                Cheryl L. Shammas, Esq.
                                Peter G. Farrell, Esq.


Dated:    New York, New York
          October 3, 2011

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ................................................................................... iii

PRELIMINARY STATEMENT ............................................................................ 1

STATEMENT OF FACTS ................................................................................... 5

SUMMARY JUDGMENT STANDARD ...................................5**Error! Bookmark not defined.**

ARGUMENT

    POINT I

        THE FALSE ARREST CLAIMS OF THE
        PLAINTIFFS AT CHURCH AND FULTON
        STREETS MUST BE DISMISSED BECAUSE THEIR
        ARRESTS WERE SUPPORTED BY PROBABLE
        CAUSE ......................................................................................6

        A.    Probable Cause Standard ........................................6

                Group Arrests.......................................................... 9

        B.    Chief Monahan And Inspector Galati Were
                Reasonable In Their Beliefs That The Group At
                Church And Fulton Streets Was Obstructing
                Pedestrian And Vehicular Traffic In Violation Of
                N.Y. Penal Law §240.20(5) ...................................10

        C.    Chief Monahan And Inspector Galati Were Not
                Required To Have "Personal Knowledge" Of The
                Acts Committed By Each Individual In The
                Group At Church And Fulton Streets In Order To
                Arrest The Group ...................................................14

        D.    Chief Monahan And Inspector Galati Were
                Reasonable In Their Beliefs That The Group At
                Church And Fulton Streets Failed to Disperse In
                Violation Of N.Y. Penal Law §240.20(6)..............20

        E.    Chief Monahan And Inspector Galati Were
                Reasonable In Their Beliefs That The Group At
                Church And Fulton Streets Was Parading

**Page**

Without A Permit, In Violation Of N.Y.C. Administrative Code § 10-110..................................22

F.    Chief Monahan and Inspector Galati Were Reasonable In Their Beliefs That The Group At Church And Fulton Streets Obstructed Governmental Administration In Violation Of Penal Law §195.05................................................25

G.    Plaintiffs' Engagement in First Amendment Activity Did Not Shield Their Unlawful Conduct................................27

POINT II

DEFENDANTS ARE ENTITLED TO QUALIFIED IMMUNITY..............................................................29

A.    The Law Concerning What Police May Do When Confronted With A Large, Disorderly Crowd Was Not "Clearly Established" At The Time Of Plaintiffs' Arrests................................................31

B.    Chief Monahan Is Entitled to Qualified Immunity Because He Had "Arguable" Probable Cause To Arrest Plaintiffs................................................33

CONCLUSION................................................................35

# TABLE OF AUTHORITIES

**Cases**
                                                                                                        **Pages**

*Alhovsky v. Paul,*
   406 Fed. Appx. 535, 536 (2d Cir. N.Y. 2011) ...................................................................33

*Alhovsky v. Ryan,*
   658 F. Supp. 2d 526 (S.D.N.Y. 2009)...........................................................................34

*Allen v. City of New York,*
   03 Civ. 2829, 2007 U.S. Dist. LEXIS 15 (S.D.N.Y. Jan. 3, 2007)...............................23, 24, 25

*Allen v. City of New York,*
   480 F. Supp. 2d 689 (S.D.N.Y. 2007)............................................................................27

*Anderson v. Creighton,*
   483 U.S. 635 (1987).................................................................................................30, 31

*Anderson v. Liberty Lobby, Inc.,*
   477 U.S. 242 (1986)...................................................................................................6

*Arbeitman v. District Court of Vermont,*
   522 F.2d 1031 (2d Cir. 1975)......................................................................................28

*Ashcroft v. al-Kidd,*
   131 S. Ct. 2074 (2011)...............................................................................................30

*Baker v. McCollan,*
   443 U.S. 137 (1979)..................................................................................................9

*Bancroft v. City of Mt. Vernon,*
   672 F. Supp. 2d 391 (S.D.N.Y. 2009)...........................................................................34

*Beal v. City of New York,*
   No. 92 Civ. 0718, 1994 U.S. Dist. LEXIS 5269 (S.D.N.Y. Apr. 22, 1994) ............................33

*Berger v. Schmitt, et al.,*
   91 Fed. Appx. 189, 190 (2d Cir. 2004)..........................................................................27

*Bernard v. United States,*
   25 F.3d 98 (2d Cir. 1994)............................................................................................7

*Bernini v. City of St. Paul,*
   2010 U.S. Dist. LEXIS 115024 (D. Minn. Oct. 28, 2010)....................................................34

**Cases**                                                                 **Pages**

*Brinegar v. United States,*
   338 U.S. 160 (1949) ........................................................................................19

*Broughton v. State,*
   37 N.Y.2d 451 (1975) ........................................................................................6

*Burns v. City of New York,*
   791 N.Y.S.2d 851 (2d Dep't 2005). ........................................................................7

*Carr v. District of Columbia,*
   587 F.3d 401 (D.C. Cir. 2009) .................................................................. passim

*Celotex Corp. v. Catrett,*
   477 U.S. 317 (1986) ........................................................................................5

*Concepcion v. City of New York,*
   05 Civ. 8501 (S.D.N.Y. Apr. 22, 2008) (RJS)(JCF) ..............................................15

*County of Sacramento v. Lewis,*
   523 U.S. 833 (1998) ........................................................................................30

*Cox v. Louisiana,*
   379 U.S. 536 (1969) ....................................................................................20, 28

*Cox v. New Hampshire,*
   312 U.S. 569 (U.S. 1941) ..............................................................................28, 29

*Cunniham v. New York City,*
   2007 U.S. Dist. LEXIS 69801 (S.D.N.Y. 2007) ................................................21

*Decker v. Campus,*
   981 F. Supp. 851 (S.D.N.Y. 1997)...................................................................7, 28

*Devenpeck v. Alford,*
   543 U.S. 146 (2004) ...................................................................................7, 8, 25

*Donovan v. Briggs,*
   250 F. Supp. 2d 242 (W.D.N.Y. 2003) ..............................................................8

*Esmont v. City of New York,*
   371 F. Supp. 2d 202 (E.D.N.Y. 2005) ..............................................................27

*Graham v. Connor,*
   490 U.S. 386 (1989) ........................................................................................7

**Cases**                                                                                    **Pages**

*Harlow v. Fitzgerald,*
  457 U.S. 800 (1982) ....................................................................................................30

*Heicklen v. Toala,*
  2010 U.S. Dist. LEXIS 14344 (S.D.N.Y. Feb. 18, 2010) ........................................7

*Hunter v. Bryant,*
  502 U.S. 224 (1991) ....................................................................................................30

*Illinois v. Gates,*
  462 U.S. 213 (1983) ......................................................................................................8

*Jaegly v. Couch,*
  439 F.3d 149 (2d Cir. N.Y. 2006) ..............................................................................25

*Jeffreys v. Rossi,*
  275 F. Supp. 2d 463 (S.D.N.Y. 2003) ..........................................................................6

*Jenkins v. City of New York,*
  478 F.3d 76 (2d Cir. 2007) ..........................................................................................33

*Johnson v. The City of New York,*
  2008 U.S. Dist. LEXIS 78984 (S.D.N.Y. Sept. 29, 2008) .......................................26

*Jusick v. City of New York,*
  07 Civ. 7683 (S.D.N.Y. Apr. 22, 2008) .....................................................................15

*Kerman v. City of New York,*
  261 F.3d 229 (2d Cir. 2001) ..........................................................................................7

*Lennon v. Miller,*
  66 F.3d 416 (2d Cir. 1995) ....................................................................................26, 33

*Lowth v. Town of Cheektowaga,*
  82 F.3d 563 (2d Cir. 1996) ............................................................................................7

*Lyons v. City of Seattle,*
  214 Fed. Appx. 655, 2006 U.S. App. LEXIS 31707 (9th Cir. Dec. 21, 2006) ..........9, 15, 18

*Malley v. Briggs,*
  475 U.S. 335 (1986) ..............................................................................................30, 31

*Marcavage v. City of New York,*

**Cases**          **Pages**

2010 U.S. Dist. LEXIS 107724 (S.D.N.Y. Sept. 29, 2010) ..................................................27

*Martinez v. Simonetti*,
202 F.3d 625 (2d Cir. 2000) .........................................................................................8

*McCullough v. Wyandanch Union Free Sch.*,
187 F.3d 272 (2d Cir. 1999) ........................................................................................31

*Miloslavsky v. AES Engineering Society, Inc.*,
808 F. Supp. 351 (S.D.N.Y. 1992) .............................................................................7, 8

*Palmieri v. Town of Babylon*,
2006 U.S. Dist. LEXIS 27694 (E.D.N.Y. Jan. 6, 2006) ...........................................13

*Panetta v. Crowley*,
460 F.3d 388 (2d Cir. 2006) ..........................................................................................9

*Pearson v. Callahan*,
555 U.S. 223 (2009) .....................................................................................................30

*People v. Barrett*,
179 Misc. 2d 261 (Bx. Crim. Ct. 1998) ......................................................................27

*People v. Bezjak, et al.*,
812 N.Y.S.2d 829 (N.Y. Crim. Ct. 2006) ..............................................................13, 28

*People v. Brunner*,
248 A.D.2d 241, 671 N.Y.S.2d 214 (1st Dep't. 1998) ................................................8

*People v. Carter*,
621 N.Y.S.2d 797 (N.Y. Crim. Ct. 1994) ...................................................................14

*People v. Galpern*,
259 N.Y. 279 (1932) ...............................................................................................20, 21

*People v. Graham*,
865 N.Y.S.2d 259 (2d Dept. 2007) ..............................................................................27

*People v. Hanson*,
178 Misc.2d 932 (Dist. Ct. Nassau Co. 1998) ............................................................21

*People v. Jackson*,
2007 N.Y. Slip Op. 5283U (N.Y. Crim. Ct. 2007) .....................................................13

**Cases**                                                                                          **Pages**

*People v. James,*
   7 Misc.2d 363, 793 N.Y.S.2d 871 (N.Y. Crim. Ct. 2005.....................................13, 23

*People v. Julia Cohen,*
   2005 NY Slip Op 50128[U] (N.Y. Crim. Ct. 2005)............................................13

*People v. Kunz,*
   128 N.Y.S.2d 157 (N.Y. City Ct. 1954).........................................................29

*People v. Maher,*
   137 Misc.2d 162, 520 N.Y.S.2d 309 (N.Y. Crim. Ct. 1987) .......................14, 20, 29

*People v. Pettigrew,*
   332 N.Y.S.2d 33 (Dist. Ct. 1st Dist. 1972) ....................................................29

*People v. Tavares,*
   2009 N.Y. Slip Op. 51863U (N.Y. Crim. Ct. Aug. 26, 2009) ...................................13

*People v. Todaro,*
   26 N.Y.2d 325 (1970) ........................................................................21, 22

*People v. Weaver,*
   2011 NY Slip Op 745 (N.Y. 2011) ................................................................21

*People v. Wilson,*
   2011 N.Y. Slip Op. 50222U (App. Term, Feb. 16, 2011).........................................13

*Phelps v. City of New York,*
   2006 U.S. Dist. LEXIS 42926 (S.D.N.Y. June 27, 2006)...........................................8

*Posr v. Killackey,*
   2003 U.S. Dist. LEXIS 12755 (E.D.N.Y. July 25, 2003) ...................................12-13

*Prowisor v. Bon-Ton, Inc.,*
   426 F. Supp. 2d 165 (S.D.N.Y. 2006)..............................................................8

*Ricciuti v. N.Y.C. Transit Authority,*
   124 F.3d 123 (2d Cir. 1997)........................................................................9

*Rodriguez v. City of New York,*
   535 F. Supp. 2d 436 (S.D.N.Y. 2008)..............................................................9

*Saucier v. Katz,*

**Cases**                                                                          **Pages**

533 U.S. 194 (2001) ....................................................................................30

*Schumann v. New York*,
  270 F. Supp. 730 (S.D.N.Y. 1967) ......................................................20

*Scott v. Harris*,
  550 U.S. 372 (2007) ......................................................................5, 6

*Matter of Shannon B.*,
  70 N.Y.2d 458, 522 N.Y.S.2d 488 (1987) ............................................20

*Singer v. Fulton County Sheriff*,
  63 F.3d 110, 118 (2d Cir. 1995) .......................................................6, 7, 8

*State of New York v. Bloom*,
  831 N.Y.S.2d 355 (1st Dept. 2006) .....................................................25

*Taylor v. City of Syracuse*,
  2009 U.S. Dist. LEXIS 29571 (N.D.N.Y. April 7, 2009) ..........................7

*United States v. Nelson*,
  2011 U.S. Dist. LEXIS 36484 (S.D.N.Y. Mar. 30, 2011) ........................13

*Warmoth v. Johannes*,
  1999 U.S. Dist. LEXIS 2728 (D.Conn. Feb. 23 1999) ........................33-34

*Washington Mobilization Unit v. Cullinane*,
  566 F.2d 107 (D.C. Cir. 1977) ................................................... passim

*Weyant v. Okst*,
  101 F.3d 845 (2d Cir. 1996) ...........................................................6, 7

*Whren v. United States*,
  517 U.S. 806 (1996) ........................................................................8

*Wilder v. Village of Amityville, et al.*,
  288 F. Supp. 2d 341 (E.D.N.Y. 2003) .................................................27

*Young v. County of Fulton*,
  160 F.3d 899 (2d Cir. 1998) ............................................................31

**Cases**                                                                                      **Pages**

**Statutes**

Criminal Penal Law § 70.10(2) ....................................................................................13

Fed. R. Civ. P. 56(c) .............................................................................................1, 5

N.Y. Penal Law §240.20(5) ............................................................................ passim

N.Y. Penal Law §240.20(6) .................................................................4, 10, 20, 21

N.Y. Penal Law §195.05 ......................................................................................5, 25

N.Y. Admin. Code §10-110 ............................................................................ passim

NYC Charter § 435(a) ..............................................................................................26

Rules of the City of New York, Title 38, §19-02 .....................................................23

# PRELIMINARY STATEMENT

Defendants submit this memorandum of law in support of their motion for summary judgment, pursuant to Rule 56 of the Federal Rules of Civil Procedure, to dismiss plaintiffs' claims of false arrest and false imprisonment.[1]  These cases arise out of arrests made on August 31, 2004 at Church and Fulton Streets during the time when the City of New York ("City") hosted the Republican National Convention ("RNC").  Over the course of the RNC, hundreds of thousands of protesters engaged in anti-war, labor, human rights, and other demonstrations, marches, and parades throughout the City.  Most of these persons did so lawfully and were not arrested.  At other times, however, protesters became disorderly and disruptive to the public.  Out of the hundreds of thousands of people who protested during the week of the RNC, approximately 1,800 persons were arrested because of their unlawful conduct; and out of those 1,800 persons, the vast majority were arrested on August 31, 2004.

It is undisputed that August 31, 2004 was designated as "A-31" by groups intent on coming to the City to disrupt the City and the Convention.  The groups that planned A-31 referred to themselves as the A-31 Coalition.  "A-31" was widely publicized as a "day of civil disobedience," a "day or rage," or "a day of chaos."  The goal of A-31 was to coordinate large-scale civil disobedience to overwhelm the police and disrupt Convention proceedings and city life.  Accordingly, on August 31, 2004, the NYPD was on a heightened state of alert for large-scale disruptions, violence, and property damage throughout the City.

Against this backdrop, and as part of the A-31 Coalition, the New York chapter of the War Resisters League ("WRL") also intended to engage in civil disobedience on August 31,

---

[1] Defendants also submit this brief in the following RNC cases:  *Abdell v. City of New York*, 05 CV 8453; *Macnamara v. City of New York*, 04 CV 7921; *Pagoda v. City of New York*, 05 CV 7546; *Meehan v. City of New York*, 05 CV 5268; and *Botbol v. City of New York*, 05 CV 1572.

2004. The WRL planned an anti-war march from the vicinity of the World Trade Center to Madison Square Garden. A parade permit was never sought or obtained for this march. The unpermitted march was to protest the war in Iraq and its stated goal was to conduct a "die-in" on the floor of the Convention. (A "die-in" is a civil disobedience method by which individuals lie down and pretend to be dead as a means of protest). In addition to publicizing this "die-in" at the end of the march, WRL's flyers and promotional materials told marchers, and the NYPD knew before the march began, that if marchers were stopped by the police at any point before reaching the Garden, they would conduct a "die-in" wherever stopped. Those materials also explicitly stated that there was no permit for the march.

Though Christopher Dunn of the NYCLU advised the NYPD earlier that day that the WRL march would be a small affair, Chief Terence Monahan ("Chief Monahan") and Inspector Thomas Galati ("Inspector Galati") encountered hundreds of people assembled near the intersection of Church and Fulton Streets. Chief Monahan and Inspector Galati spoke with WRL member Ed Hedemann ("Hedemann"), who held himself out to them as the march's leader and organizer; indeed, Hedemann routinely attended meetings and organized demonstrations for the WRL.

Hedemann told Chief Monahan and Inspector Galati that the intended route of the unpermitted march was eastward on Fulton Street to Broadway, then northward on Broadway to Madison Square Garden. Although Hedemann said they intended to march on the sidewalk, Chief Monahan and Inspector Galati cautioned Hedemann that it would be dangerous for marchers to proceed northbound on Broadway against the flow of vehicular traffic, and, instead, offered the marchers an alternative route northbound, Church Street (where the vehicular traffic flowed northbound). This alternative route would allow the cars approaching from the south the

2

ability to see the marchers and avoid hitting them in the event they stepped off the sidewalk and onto the roadway.  Likewise, cars approaching from the south could avoid hitting those pedestrians who stepped into the roadway to avoid the oncoming marchers, and also avoid hitting any police officers walking in the roadway alongside the marchers.  The same would not be true if the marchers proceeded on the sidewalk *against* the flow of traffic on Broadway. Hedemann and the group, however, refused to consider the proposed safer route and insisted on going east on Fulton Street and then northbound on Broadway, against the flow of vehicular traffic.

Given the dangers to both marchers and pedestrians presented by the WRL's route, Chief Monahan and Inspector Galati told Hedemann that the marchers would be subject to arrest unless they complied with the following terms and conditions:  (1) they stayed on the sidewalk and walked no more than two abreast, (2)  they did not obstruct pedestrian or vehicular traffic, and (3) they  crossed with the traffic lights.  Chief Monahan also explicitly raised the concern that the marchers not hold a large banner horizontally because it would obstruct pedestrian traffic, creating an unsafe condition.  Hedemann assured Chief Monahan and Inspector Galati that the group would follow all of the NYPD's directives, and further told them that he had even designated individuals who would also ensure that the marchers would do so. Hedemann also assured Chief Monahan and Inspector Galati that the banner would be held in compliance with police directives.

Prior to the start of the march, Inspector Galati and other officers announced, by bullhorn, to the entire group assembled that the march did not have a permit and repeated to the group the warnings and conditions previously given to Hedemann.  The NYPD repeated these warnings once marchers began crossing Church Street.

Despite the warnings to Hedemann, assurances from Hedemann of group compliance, and the announced warnings to the marchers both in advance and during the march, the group violated the NYPD's directives and conditions from the moment the march began. The marchers failed to walk single file or two abreast while marching; they crossed against the traffic lights; they obstructed vehicular traffic; and they obstructed the northern sidewalk of Fulton Street, forcing pedestrians onto the street to avoid the oncoming mass of people. Moreover, despite Hedemann's earlier assurances to the police about the large banner, marchers turned the banner across the width of the sidewalk, similarly obstructing pedestrian traffic. Accordingly, Chief Monahan stopped the march minutes after it began – before the march reached Broadway – and loudly gave a dispersal order.  When the group remained on the northern sidewalk of Fulton Street and did not respond to Chief Monahan's order, the NYPD confined the group of marchers with orange fencing and arrested them.

Plaintiffs bring this action against defendants claiming a variety of constitutional violations arising from their arrests and detentions, including false arrest.  As will be shown below, plaintiffs' false arrest claims must be dismissed because the undisputed record shows that police had probable cause to arrest plaintiffs as a group that was (1) committing disorderly conduct in violation of Penal Law §240.20(5) and §240.20(6), (2) parading without a permit in violation of New York City Administrative Code § 10-110, and (3) obstructing governmental

administration in violation of Penal Law §195.05.[2]   In addition, defendants are entitled to qualified immunity and governmental immunity.[3]

## STATEMENT OF FACTS

Defendants respectfully refer the Court to Defendants' Local Civil Rule 56.1 Statement of Undisputed Facts, submitted herewith, for a recitation of the complete set of undisputed facts.

## SUMMARY JUDGMENT STANDARD

Federal Rule of Civil Procedure 56 mandates that summary judgment "should be rendered if the pleadings, the discovery and disclosure materials on file … show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c)(2). Rule 56(c) "mandates the entry of summary judgment . . . against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The "facts must be viewed in the light most favorable to the nonmoving party only if there is a 'genuine' dispute as to those facts." *Scott v. Harris*, 550 U.S. 372, 380 (2007) (citing Fed. R. Civ. P. 56(c)). "The mere existence of a scintilla of

---

[2] On this motion, defendants address whether probable cause existed to arrest the entirety of the group (versus individuals within the group). Therefore, we do not include those additional, undisputed facts that would further support the arrests of various individuals, *e.g.*, the fact that a particular officer saw a particular plaintiff engage in unlawful conduct.

[3] In addition to moving for summary judgment on plaintiffs' false arrest claims, defendants also move for summary judgment, with Your Honor's permission, on plaintiffs' claims challenging the constitutionality of the City's No-Summons and Fingerprinting policies in place during the RNC. That motion is submitted separately. Also submitted separately are defendants' motion for summary judgment on false arrest claims brought by plaintiffs arrested at East 16th Street (Union Square).

evidence supporting the non-movant's case is . . . insufficient to defeat summary judgment." *Jeffreys v. Rossi*, 275 F. Supp. 2d 463, 473 (S.D.N.Y. 2003), *aff'd*, 426 F.3d 549 (2d Cir. 2005).

To sustain their burden of establishing the existence of a genuine dispute, plaintiffs must instead produce admissible evidence that would permit the finder of fact to properly proceed to a verdict in their favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986). Further, "[w]hen opposing parties tell two different stories, one of which is blatantly contradicted by the record so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." *Scott*, 550 U.S. at 380. Defendants respectfully submit that, even viewing the evidence in the light most favorable to plaintiffs, there are no genuine issues of material fact warranting the trial of plaintiffs' claims of false arrest. Accordingly, it is respectfully submitted that defendants' motion for summary judgment should be granted dismissing plaintiffs' false arrest claims.

## ARGUMENT

## POINT I

### THE FALSE ARREST CLAIMS OF THE PLAINTIFFS AT CHURCH AND FULTON STREETS MUST BE DISMISSED BECAUSE THEIR ARRESTS WERE SUPPORTED BY PROBABLE CAUSE

**A.**   **Probable Cause Standard**

Under New York law, a plaintiff claiming false arrest must show, *inter alia*, that the defendant intentionally confined him without his consent and without justification. *Weyant v. Okst*, 101 F.3d 845, 852 (2d Cir. 1996) (citing *Broughton v. State*, 37 N.Y.2d 451 (1975)). However, "[t]he existence of probable cause to arrest constitutes justification and 'is a complete defense to an action for false arrest,' whether that action is brought under state law or under §

1983." *Id.*, 101 F.3d at 852 (quoting *Bernard v. United States*, 25 F.3d 98, 102 (2d Cir. 1994)).[4]

"Probable cause exists if the arresting officer had 'information sufficient to support a reasonable

belief that an offense has been committed' by the person to be arrested." *Heicklen v. Toala*, No.

08 Civ. 2457, 2010 U.S. Dist. LEXIS 14344, at *10 (S.D.N.Y. Feb. 18, 2010), *aff'd*, 378 Fed.

Appx. 1 (2d Cir. April 20, 2010) (quoting *Burns v. City of New York*, 791 N.Y.S.2d 851, 852 (2d

Dept 2005)).

   "The test here is not whether defendant's conduct was reasonable but whether it 'was

clearly unreasonable' under the circumstances." *Decker v. Campus*, 981 F. Supp. 851, 859

(S.D.N.Y. 1997) (quoting *Lowth v. Town of Cheektowaga*, 82 F.3d 563, 572 (2d Cir. 1996)).

The existence of probable cause will depend upon "the reasonable conclusion to be drawn from

the facts known to the arresting officer at the time of the arrest." *Devenpeck v. Alford*, 543 U.S.

146, 152 (2004).   "All that is needed is the mere probability of criminal activity based on the

totality of the circumstances to satisfy the Fourth Amendment." *Taylor v. City of Syracuse*, No.

05 Civ. 750 (GTS), 2009 U.S. Dist. LEXIS 29571, at *15 (N.D.N.Y. April 7, 2009); *see also*

*Kerman v. City of New York*, 261 F.3d 229, 235 (2d Cir. 2001) ("For Fourth Amendment

purposes, the reasonableness of an officer's belief must be assessed in light of the particular

circumstances confronting the officer at the time.") (citing *Graham v. Connor*, 490 U.S. 386, 397

(1989)).   Accordingly, it is not necessary to show "evidence 'beyond a reasonable doubt,' the

standard required for criminal conviction." *Miloslavsky v. AES Eng'g Soc'y, Inc.*, 808 F. Supp.

351, 354-55 (S.D.N.Y. 1992); *see also Illinois v. Gates*, 462 U.S. 213, 244 (1983) (Probable

---

[4]  A § 1983 claim for false arrest under the Fourth Amendment is "substantially the same as a
claim for false arrest under New York law." *Weyant*, 101 F.3d at 852.  As such, to the extent that
plaintiffs also assert state law claims for false imprisonment, those claims should similarly be
dismissed. *See, e.g., Singer v. Fulton County Sheriff*, 63 F.3d 110, 118 (2d Cir. 1995) (dismissing
false imprisonment claims where there was probable cause for the arrest).

cause "requires only a probability or a substantial chance of criminal activity, not an actual showing of such activity."); *People v. Brunner*, 671 N.Y.S.2d 214, 242 (1ˢᵗ Dep't. 1998) ("Probable cause to arrest did not require proof beyond a reasonable doubt of the elements of disorderly conduct.").

Thus, the "standard for establishing probable cause for an arrest is not a particularly stringent one." *Donovan v. Briggs*, 250 F. Supp. 2d 242, 253 (W.D.N.Y. 2003), *aff'd*, 86 Fed. Appx. 469 (2d Cir. 2004); *see also Miloslavsky*, 808 F. Supp. at 354-355 ("The standard of probable cause requires only the probability of criminal activity"); *Phelps v. City of New York*, 04 Civ. 8570 (DLC), 2006 U.S. Dist. LEXIS 42926, at *6 (S.D.N.Y. June 27, 2006) ("The requirement of probable cause does not create a high bar for law enforcement."). Police need only make a "*prima facie* showing of criminal activity." *Miloslavsky,* 808 F. Supp. at 354-55.

In addition, the probable cause inquiry is an objective one and the subjective beliefs or motivations of the arresting officer are irrelevant. *Devenpeck*, 543 U.S. at 153; *Whren v. United States*, 517 U.S. 806, 813 (1996); *Martinez v. Simonetti*, 202 F.3d 625, 633 (2d Cir. 2000). As such, "motivation is not a consideration in assessing probable cause." *Singer*, 63 F.3d at 119; *see also Prowisor v. Bon-Ton, Inc.*, 426 F. Supp. 2d 165, 172 (S.D.N.Y. 2006) ("The existence of probable cause is objective – the officer's subjective belief at the time of arrest is irrelevant – and determined by the totality of the circumstances. Therefore, a probable cause determination must be made by examining what the officer knew at the time of the arrest and whether the officer was reasonable in relying on that knowledge") (citations omitted).

Moreover, plaintiff's proclamations of innocence prior to his arrest is irrelevant and will not defeat probable cause. "Once a police officer has a reasonable basis for believing there is probable cause, he is not required to explore and eliminate every theoretically plausible claim of

innocence before making an arrest." *Ricciuti v. N.Y.C. Transit Auth.*, 124 F.3d 123, 128 (2d Cir. 1997) (citing *Baker v. McCollan*, 443 U.S. 137, 145-46 (1979)). "'[T]he fact that an innocent explanation may be consistent with the facts alleged . . . does not negate probable cause,' and an officer's failure to investigate an arrestee's protestations of innocence generally does not vitiate probable cause." *Panetta v. Crowley*, 460 F.3d 388, 396 (2d Cir. 2006) (internal citations omitted); *see also Rodriguez v. City of New York*, 535 F. Supp. 2d 436, 442 (S.D.N.Y. 2008) (noting the officer "was not required to make a full investigation into plaintiff[s'] state of mind" because "[o]nce plaintiffs pushed [the officer], a person of reasonable caution could have believed that plaintiffs had committed a crime").

**Group Arrests**

Similarly, where it reasonably appears to the police that a large group is engaging in unlawful conduct, the police have probable cause to arrest the entire group. *See Carr v. District of Columbia*, 587 F.3d 401, 408-09 (D.C. Cir. 2009), *rehear'g denied*, 599 F.3d 653 (2010) (reversing district court's finding that police lacked probable cause to arrest entire protest group). Indeed, officers have probable cause to arrest an entire group of individuals if the group is observed violating the law "*even if specific unlawful acts cannot be ascribed to specific individuals.*" *Carr,* 587 F.3d at 406 (emphasis added) (also noting that while "it is possible that an entirely innocent person would be mistaken for [being part of the unlawful group . . . it should be borne in mind that the legal issue is probable cause, not ultimate conviction"); *Washington Mobilization Unit v. Cullinane*, 566 F.2d 107, 121 (D.C. Cir. 1977) (holding that police cannot be expected to "single out individuals" that are part of an obstructive group; "they may deal with the crowd as a unit"); *Lyons v. City of Seattle*, 214 Fed. Appx. 655, 658 (9th Cir. Dec. 21, 2006) (holding that police had probable cause to arrest the group because there was a "fair probability" that plaintiffs were part of the unlawful group).

9

**B.     Chief Monahan And Inspector Galati Were Reasonable In Their Beliefs That The Group at Church And Fulton Streets Was Obstructing Pedestrian And Vehicular Traffic In Violation Of N.Y. Penal Law §240.20(5)**

New York's disorderly conduct statute, Penal Law § 240.20, provides as follows:

A person is guilty of disorderly conduct when, with intent to cause public inconvenience, annoyance or alarm, or recklessly creating a risk thereof:

. . .

5.   He obstructs vehicular or pedestrian traffic;

(McKinney's 2011).  Based upon the totality of the circumstances, Chief Monahan and Inspector Galait were reasonable in their beliefs that the group was committing disorderly conduct by obstructing  pedestrian and vehicular traffic on Church and Fulton Streets  in violation of P.L. §240.20(5).  The march at Church and Fulton Streets was organized by the WRL in connection with the A-31 Coalition, a collection of groups that planned on committing civil disobedience on August 31, 2004.  (Defendants' 56.1 Statement of Undisputed Facts ("56.1") at ¶¶ 9-11).  The NYPD was aware of the possibility of city-wide disorder on August 31, 2004.  (56.1 at ¶¶ 6-7).

While the NYPD expected the WRL march to be a small event (56.1 at ¶ 29), hundreds of people assembled at Church and Fulton Streets in order to participate in the march. (56.1 at ¶¶ 30, 107).  Before the march began, police had numerous discussions with the march's leader and organizer, Ed Hedemann.  (56.1 at ¶¶ 31-61, 63-72).  Hedemann told Chief Monahan and Inspector Galati of the group's plans to parade eastward on Fulton Street, then march northward on Broadway to Madison Square Garden, to culminate in a "die-in" on the floor of the Garden.  (56.1 at ¶¶ 32-33, 44-46).  Despite the WRL's plan to march, they never sought or obtained a permit for the march.  (56.1 at ¶¶ 17-19)

Chief Monahan and Inspector Galati told Hedemann  about the dangers to the marchers and the public if the march proceeded on the narrow sidewalks of Fulton Street and against the flow of vehicular traffic on Broadway.  (56.1 at ¶¶ 37, 41, 51).  In response, they

offered Hedemann a different route that would be safer – up Church Street – but Hedemann refused to consider any alternative and insisted that the march proceed up Broadway. (56.1 at ¶¶ 35-38, 41-43).

Accordingly, both Chief Monahan and Inspector Galati reminded Hedemann that the march lacked a permit (as the WRL's flyers so stated) and told him that the marchers would have to abide by certain conditions or be subject to arrest. (56.1 at ¶ 49-54). These conditions included (1) that the marchers stay on the sidewalk and walk no more than two abreast, (2) that marchers not obstruct pedestrian or vehicular traffic, and (3) that marchers had to cross with the traffic lights. (56.1 at ¶¶ 51-54). Chief Monahan and Inspector Galati also warned Hedemann that a large white banner should not be stretched widthwise across the sidewalk or it would obstruct pedestrian traffic (56.1 at ¶ 72). Hedemann repeatedly assured both Chief Monahan and Inspector Galati that the marchers would comply with all of these conditions (56.1 at ¶¶ 55-58, 67-68, 72), and that he had "peacekeepers," the equivalent of marshals, who would assist in ensuring compliance (56.1 at ¶61). Chief Monahan and Inspector Galati believed that Hedemann was agreeing to the conditions on behalf of all the marchers. (56.1 at ¶¶ 59-61).

As an extra layer of precaution, Inspector Galati addressed the assembled marchers by bullhorn, advising them that they would be subject to arrest if they did not comply with the instructions and conditions given by the NYPD. (56.1 at ¶ 75(c)). Galati announced to the group that (1) the march was unpermitted (56.1 at ¶ 75(b)); (2) the group would have to walk single file or two abreast so as to not block pedestrian traffic (56.1 at ¶ 75(d)); (3) if the group blocked pedestrian or vehicular traffic, arrests would be made (56.1 at ¶ 75(e)); and (5) the group could not cross against the traffic lights (56.1 at ¶ 75(f)). Other NYPD officers repeated these warnings by bullhorn (56.1 at ¶¶ 76-80), and officers gave similar warnings to the group once the

march began.  (56.1 at ¶¶ 95-96).  Police were clear in their message:  If any of the conditions precedent to the march were broken, the participants would be arrested.  (56.1 at ¶ 75(c)).  These warnings are all captured on videotape footage defendants submit with this motion.

Nevertheless, despite the assurances by Hedemann and despite repeated warnings by police, the marchers breached the warnings and conditions set forth by the NYPD.  (56.1 at ¶¶ 112-116).  They failed to walk single file or two abreast while crossing Church Street and as they headed down the sidewalk on Fulton Street, blocking the entire width of the sidewalk of Fulton Street.  (56.1 at ¶ 113, 115).  As a result, pedestrians on that sidewalk of Fulton Street approaching from the opposite direction had to step into the roadway to avoid the oncoming mass of marchers.  (56.1 at ¶ 115).  Marchers also obstructed vehicular traffic in the roadways of Church Street (56.1 at ¶ 111) and Fulton Street (56.1 at ¶ 116).  Moreover, despite Hedemann's promise about keeping the large banner perpendicular to the sidewalk, marchers stretched it across the sidewalk as they proceeded down Fulton Street, also obstructing pedestrian traffic.  (56.1 at ¶ 57, 101, 114-115).  All of this transpired in the face of NYPD warnings that many plaintiffs admit to having heard before the march or while marching.  (56.1 at ¶¶ 82-87, 88-93, 96-97).  Again, this conduct is captured on videotape that defendants submit with this motion.

Given the group's obstructive conduct, as well as their clear defiance of the warnings to march in an orderly fashion, Chief Monahan and Inspector Galati had probable cause to arrest the group for obstructing pedestrian and vehicular traffic in violation of Penal Law § 240.20(5). *See, e.g., Posr v. Killackey*, No. 01 Civ. 2320 (LTS),  2003 U.S. Dist. LEXIS 12755, at *3-4 (E.D.N.Y. July 25, 2003) (dismissing false arrest claim where plaintiff stood in the doorway of a courthouse where the obstruction was during business hours and for about "two minutes"); *People v. Wilson*, 2011 N.Y. Slip Op. 50222U (App. Term, Feb. 16, 2011) (affirming conviction

under § 240.20(5) where defendant stopped pedestrians and begged them for money, thereby forcing several pedestrians into the roadway); *People v. Tavares*, 2009 N.Y. Slip Op. 51863U (N.Y. Crim. Ct. Aug. 26, 2009) (finding reasonable cause for arrest under P.L. § 240.20(5) where defendant screamed on the sidewalk while running, causing pedestrians to walk around him) (*cited in United States v. Nelson*, No. 10 Cr. 414 (PKC), 2011 U.S. Dist. LEXIS 36483 (S.D.N.Y. Mar. 30, 2011)); *People v. Jackson*, 2007 N.Y. Slip Op. 5283U (N.Y. Crim. Ct. 2007) (upholding reasonableness of arrest where criminal defendant yelled and screamed while standing with at least ten other people, obstructing pedestrian traffic); *People v. Bezjak, et al.*, 812 N.Y.S.2d 829 (N.Y. Crim. Ct. 2006) (finding "Critical Mass" bicyclist guilty of obstruction for riding throughout Manhattan with a group of 50-100 other Critical Mass riders, spread across the entire roadway, during evening rush hour); *People v. Julia Cohen*, 2005 NY Slip Op 50128[U], at *2 (N.Y. Crim. Ct. 2005) (finding reasonable cause[5] to arrest 2004 RNC Critical Mass bicyclist for violating § 240.20(5) where criminal defendant rode among other cyclists on 7th Avenue and 34th Street on the evening of August 27, 2004, thereby causing impediment to vehicles and pedestrians who were trying to pass); *People v. James*, 793 N.Y.S.2d 871 (N.Y. Crim. Ct. 2005) (finding reasonable cause to arrest under P.L. 240.20(5) where 2004 RNC criminal defendant was with over 100 other people on the evening of August 31, 2004, walking on the street and sidewalk from 17th Street towards 5th Avenue blocking vehicular and pedestrian traffic and causing public inconvenience); *People v. Maher*, 520 N.Y.S.2d 309 (N.Y. Crim. Ct. 1987) (finding protester guilty of disorderly conduct under § 240.20(5) for blocking the sidewalk

---

[5] The reasonable cause standard under state law is comparable to the probable cause standard under federal law. *See* Criminal Penal Law § 70.10(2) (defining reasonable cause). "'[R]easonable cause" under New York State Law is considered to be the equivalent of 'probable cause' under the Fourth Amendment." *Palmieri v. Town of Babylon*, No. 01 Civ. 1399 (SJ), 2006 U.S. Dist. LEXIS 27694, at *30 (E.D.N.Y. Jan. 6, 2006).

of East 30th Street at 10:50 A.M. – where there was a regular flow of pedestrians on the block at any given time); *People v. Carter*, 621 N.Y.S.2d 797 (N.Y. Crim. Ct. 1994) (arrestee properly convicted under § 240.20(5) based on his standing and yelling in the street on 11th Ave. between West 27th & 28th Streets – which was "heavy with vehicular traffic" during evening rush hour at 6:40 P.M. – even though obstruction lasted "only a few seconds").

Once Chief Monahan observed the group defy Inspector Galati's repeated warnings, which resulted in the group blocking pedestrian and vehicular traffic on Church and Fulton Streets, there was probable cause to arrest plaintiffs for violation of § 240.20(5).[6] Accordingly, plaintiffs' false arrest claims must be dismissed.

## C.   Chief Monahan And Inspector Galati Were Not Required To Have "Personal Knowledge" Of The Acts Committed By Each Individual In The Group At Church And Fulton Streets In Order To Arrest The Group

Plaintiffs will undoubtedly argue that Chief Monahan and Inspector Galati were required to show that each and every single person who was arrested was observed engaging in unlawful conduct, *i.e.*, that he had "personal knowledge" of the acts of each member of the group of arrested persons.  This alleged requirement, however, is contrary to law, and further would postulate an impossible burden on police.  Where, as here, group conduct – even in the form of mass demonstration – becomes unlawful, the police have probable cause to arrest the entire group they observe "*even if specific unlawful acts cannot be ascribed to specific individuals.*" *Carr*, 587 F.3d at 406, (emphasis added); *see also Cullinane*, 566 F.2d at 121 (holding that police cannot be expected to "single out individuals" that are part of an obstructive group; "they

---

[6] Inspector Galati testified at his deposition that the decision to arrest plaintiffs at Church and Fulton Streets was a joint "command decision" (56.1 at ¶ 130).  Each of defendants' arguments as to why Chief Monahan would have probable cause to arrest the group (and is entitled to qualified immunity) apply to Inspector Galati.

may deal with the crowd as a unit"); *Lyons*, 214 Fed. Appx. at 658 (holding that police had probable cause to arrest the group because there was a "fair probability" that plaintiffs were part of the unlawful group).[7]

As the D.C. Circuit has reasoned:

> A requirement that the officers verify that each and every member of a crowd engaged in a specific [unlawful] act would be practically impossible in any situation involving a large [obstructive group], particularly when it is on the move . . . To satisfy appellees' suggested standard of proof would require virtually as many officers as [lawbreakers] – and even then it is doubtful that it could be met. Paradoxically, appellees read the statute so as to make it unenforceable in situations where it is most needed.

*Carr*, 587 F.3d at 408.

In *Washington Mobilization Unit v. Cullinane*, the class plaintiffs were demonstrators who participated in, and were arrested at one or more of seven demonstrations occurring between 1969-1971.  566 F.2d at 110.  The tenor of each demonstration was either violent or obstructive of pedestrian or vehicular traffic.  *Id.* at 111-15.  At trial, plaintiffs successfully obtained a decree enjoining the municipality from, among other things, using police lines and sweeps of groups of demonstrators and enforcing its "move on" statute on grounds that such measures maximized chances of arresting innocent persons (i.e., those who were not guilty of violence or obstruction, or of bystanders who were not participants in the demonstrations), and therefore, were violative of demonstrators' First Amendment rights.  *Id.* at 111.  The district court also enjoined the

---

[7] The irrelevance of "personal knowledge" to the question of probable cause has also been recognized by this Court in these RNC cases. *See, e.g., Concepcion v. City of New York*, 05 Civ. 8501 (S.D.N.Y. Apr. 22, 2008) (RJS)(JCF) (ordering that an admission by defendants that they lack personal knowledge of an individual's conduct "does not preclude the defendants from presenting evidence that a plaintiff was within the group of individuals allegedly engaged in unlawful activity or from arguing that such evidence is sufficient to demonstrate probable cause."); *Jusick v. City of New York*, 07 Civ. 7683  (S.D.N.Y. Apr. 22, 2008) (RJS)(JCF) (same)

municipality from making "mass arrest" of groups, absent a written record of probable cause at the time of arrest.  *Id.*

On appeal, the D.C. Circuit reversed and remanded, upholding the right of police to arrest protest groups *en masse* – without requiring them to "single out" each unlawful individual, which the Court found would be "unrealistic." *Id.* at 120-121.  As the Court stated:

> It is the tenor of the demonstration as a whole that determines whether the police may intervene; and if it is substantially infected with violence *or obstruction* the police may act to control it as a unit . . . . Confronted with a mob *the police cannot be expected to single out individuals; they may deal with the crowd as a unit*.

*Id.* at 120 (emphasis added).  The court further stated that probable cause determinations that "the group as a whole was violating the law" may certainly be shown by police testimony. *Id.* at 121 (finding district court erred in "cutting off" prosecutor's entitlement to show probable cause for mass arrest). [8]

More recently, in *Carr v. District of Columbia*, plaintiffs commenced a class-action suit under § 1983 against the District of Columbia, alleging violations of their Fourth Amendment rights in connection with their arrests at a non-permitted march in which participants in the march were rioting and rejoicing in the riots.  587 F.3d at 402.  During the march, some individuals within the march began to commit riotous acts, while others in the group responded by cheering and celebrating. *Id.* at 403-404.  According to police, the celebration came from

---

[8] Notably, New York County Assistant District Attorney Gary Galperin, noticed for deposition by plaintiffs in theses RNC cases, testified that, "[t]here could be some situations where a police officer and we in turn could charge someone with a particular offense even if the police officer did not specifically make eye contact or visually observe each defendant.  For example, if we know 50 people are blocking an intersection and if we know the 50 people who were apprehended and arrested were all part of the blockage, it wouldn't be necessary necessarily for a police officer to have made eye contact with each of the 50 people as long as we can say with reasonable cause that each of the 50 people were part of the blockage." (56.1 at ¶ 157).

"'what appeared to be everyone in the group.'" *Id.* at 407-408. To the police, the mob "acted uniformly in celebrating the destructive acts of individual protestors." *Id.* at 406.

Police platoons were called and police lines were set up both in front of, and behind the march, to barricade the group and effectuate arrests. *Id.* at 404. Approximately 65-70 members of the group, however, managed to run off into a nearby alley. *Id.* Police followed those people into the alley and arrested them for rioting.[9] *Id.* No order to disperse was given prior to the arrests. *Id.* Although some plaintiffs admitted that some marchers engaged in property destruction, others denied knowledge of the property destruction by others, and further, challenged the police officers' characterization of the group's response to it. *Id.* at 405. Plaintiffs also argued that police either herded them into the alley, or that they entered the alley in order to disperse from the group. *Id.*

Plaintiffs moved for summary judgment, which the district court granted, holding that officers "'lacked particularized' grounds to believe that *every one* of the seventy persons arrested committed the crime of rioting because the officers could not possibly have observed each one's behavior." *Id.* (emphasis in original). The D.C. Circuit reversed, and stated that such a standard would "postulate an impossible burden" on police, who are only required "to form a reasonable belief that the entire crowd is acting as a unit and therefore all members of the crowd violated the law." *Id.* at 408. The Circuit Court instead found that (1) police may, in fact, lawfully arrest "an entire group of individuals if the group is observed violating the law even if specific unlawful

---

[9] At the time, the commanding officer believed that she had probable cause to arrest the group for rioting. *Carr,* 587 F.3d at 404. Nevertheless, she charged the group with the lesser charge of Parading Without a Permit in order to expedite release procedures. *Id.*

acts cannot be ascribed to specific individuals"; and (2) police could have had reasonable grounds to believe that everyone arrested was part of the unlawful group.[10] *Id.*

Similarly, the validity of group arrests has been upheld by the 9th Circuit. *See, e.g., Lyons*, 214 Fed. Appx. 655, 2006 U.S. App. LEXIS 31707 (9th Cir. Dec. 21, 2006) (holding that police had probable cause to arrest demonstrators who "stood with the group and took part in its collective [unlawful] conduct," and thus, police "had no reason to believe that the plaintiffs were strangers (or even latecomers) to the protest").

Under the standard set forth by the D.C. Circuit Court in *Washington Mobilization Unit* and *Carr*, and the 9th Circuit in *Lyons*, Chief Monahan clearly had probable cause to arrest the entire group of marchers at Church and Fulton Streets for a number of offenses, regardless of knowing the specific details of each individual in the group.  Chief Monahan reasonably believed that plaintiffs were engaging in unlawful conduct as a cohesive unit (56.1 at ¶ 133-134) based on the following facts: (1) Hedemann had held himself out as the march's leader or organizer, agreeing to NYPD's conditions on behalf of all the marchers (56.1 at ¶¶ 31, 59) and also telling Chief Monahan and Inspector Galati that he had designated individuals ("peacekeepers") who would make sure that the marchers uniformly complied with NYPD's directives (56.1 at ¶¶ 60-61); (2) Inspector Galati and other officers had given instructions by bullhorn, both before and during the march, to the marchers *as a group* (56.1 at ¶¶ 75-80, 95-96); and (3) once the march began, Chief Monahan had walked alongside the moving mass of marchers and observed them acting as a group and blocking pedestrian and vehicular traffic on Church and Fulton Streets (56.1 at ¶¶ 102, 115).  The fact that neither Chief Monahan nor officers under his command

---

[10] The D.C. Circuit remanded the case to the district court for further fact-finding as to (1) whether officers had the appropriate vantage point to see the entire crowd; and (2) the measures taken by police to mitigate indiscriminate arrests. 587 F.3d at 409.

could say what any *particular* plaintiff was doing before his or her arrest is legally irrelevant: "if police have probable cause to believe that the group they are arresting is committing or has committed a crime, no more is necessary." *Carr*, 587 F.3d at 409-410. To require otherwise would hobble NYPD from making large-scale arrests, because, as the D.C. Circuit held in *Carr*, that "would require virtually as many officers [to observe the unlawful conduct] as [lawbreakers]." *Id.* at 408.

Notably, Chief Monahan took additional measures to ensure that the NYPD arrested only the group that had engaged in the unlawful conduct he observed. Specifically, once Chief Monahan decided to arrest the group, he had officers seal off Fulton Street from Church Street to Broadway to prevent people from wandering into the group (56.1, at ¶¶ 137, 140-142). In addition, officers released credentialed media representatives and others whom they believed had not been part of the march. (56.1, ¶¶ 150-151).[11]

In sum, Chief Monahan and Inspector Galati had probable cause to arrest plaintiffs as part of the group that they reasonably believed had engaged in unlawful conduct, regardless of whether they or any of the officers under their command could identify the individual specifics of each and every person in the group.

---

[11] Under the standard set forth in the D.C. Circuit, the court recognizes that it is possible that "an entirely innocent person" would be mistaken for a lawbreaker. *Carr*, 587 F.3d at 408. "[B]ut that would not rebut probable cause for that person's arrest." *Carr*, 599 F.3d at 653 ("[W]e are doubtful that any one of the marchers [that appeared to be part of the group] should be considered innocent."). "[I]t should be borne in mind that the legal issue is probable cause, not ultimate conviction, [which] requires [only] a reasonable belief of guilt, not a certitude." *Carr*, 587 F.3d at 408 (citing *Brinegar v. United States*, 338 U.S. 160, 175 (1949)). Thus, group arrests are constitutional, even in the face of First Amendment activity. *See Washington Mobilization Unit v. Cullinane*, 566 F.2d at 120 (police may impose restrictions to further a legitimate government interest even though such restrictions may result in the arrest of "demonstrators who were not guilty of violence or obstruction, or of bystanders who were not participants in the demonstrations").

**D.    Chief Monahan And Inspector Galati Were Reasonable In Their Beliefs That The Group At Church And Fulton Streets Failed To Disperse In Violation Of N.Y. Penal Law §240.20(6)**

In addition to having probable cause to arrest plaintiffs for violating P.L. §240.20(5), police also had probable cause to arrest the plaintiffs for violating subsection (6) of P.L. §240.20.  Penal Law §240.20(6) provides that one is "guilty of disorderly conduct when, with intent to cause public inconvenience, annoyance or alarm, or recklessly creating a risk thereof [he] congregates with other persons in a public place and refuses to comply with a lawful order of the police to disperse." (McKinney's 2011).

As discussed above, it is well-established that the police have a responsibility to keep the streets and sidewalks open to all.  *Cox v. Louisiana*, 379 U.S. 536, 554-55 (1969); *Matter of Shannon B.*, 70 N.Y.2d 458, 462, 522 N.Y.S.2d 488, 490 (1987) ("Among other functions, the police in a democratic society are charged with … the control of pedestrian and vehicular traffic…."); *People v. Maher*, 137 Misc.2d 162, 166, 520 N.Y.S.2d 309 (N.Y. Crim. Ct..1987) ("The control of travel on the streets is a clear example of governmental responsibility to insure" the "existence of an organized society maintaining public order, without which liberty itself would be lost in the excess of anarchy"); *Schumann v. New York*, 270 F. Supp. 730, 733 (S.D.N.Y. 1967) ("[c]ontrol of crowds is a legitimate police function").

In the performance of their duties to prevent disorder, police may give reasonable directions. *People v. Galpern*, 259 N.Y. 279, 281-282 (1932).  And courts will not second-guess the judgment of police officers in their issuances of orders unless "the circumstances show conclusively that the police officer's direction was *purely arbitrary* and was not calculated in any way to promote the public order." *People v. Todaro*, 26 N.Y.2d 325, 328-329 (1970) (emphasis added) (construing P.L. § 240.20(6)) ("The courts cannot weigh opposing considerations as to the wisdom of the police officer's directions when a police officer is called upon to decide

20

whether the time has come in which some directions are called for") (quoting *Galpern*, 259 N.Y. at 281-282) (*cited in People v. Weaver*, 2011 NY Slip Op 745 (N.Y. 2011); *People v. Hanson*, 178 Misc.2d 932, 937 (Dist. Ct. Nassau Co. 1998) ("[a]n individual's refusal to obey a police order to disperse can only be justified when the circumstances show conclusively that the police officer's direction was purely arbitrary and not calculated in any way to promote the public order"); *People v. Grant*, 126 Misc.2d 18, 20-21 (Crim. Ct. Bx. County 1984) (same).

Failure to obey the lawful orders of police can result in "interfer[ence] with the public order and lead to a breach of the peace." *Galpern*, 259 N.Y. at 281-82.  As such, New York courts recognize that disobedience of a lawful police order to disperse, without more, is sufficient to establish probable cause for the criminal defendant's arrest. *See, e.g., Cunniham v. New York City*, No. 04 Civ. 10232, 2007 U.S. Dist. LEXIS 69801, at *11 (S.D.N.Y. 2007) (dismissing plaintiffs' false arrest and false imprisonment claims upon finding that "plaintiffs' defiance of the officer's lawful orders was undisputed evidence of their disorderly conduct in violation of New York Penal Law Section §240.20" and thus, provided sufficient probable cause for their arrests).

At Church and Fulton Streets, plaintiffs were congregated with others as part of the march. (56.1 at ¶ 107).  In an effort to keep the streets and sidewalks open to all, Chief Monahan yelled a dispersal order to the group after stopping the march: "You are now blocking pedestrian traffic; if you do not disperse, you will be placed under arrest." (56.1 at ¶ 124).  No one dispersed, despite being given an opportunity to do so.  (56.1 at ¶¶ 128-129).  Given the group's disregard of police warnings and its conduct in blocking the entire width of the Fulton Street sidewalk, Chief Monahan's dispersal order was a lawful one, rather than "purely arbitrary and . . . not calculated in any way to promote the public order." *Todaro*, 26 N.Y.2d at 328-329.

Accordingly, Chief Monahan and Inspector Galati reasonably believed that they had probable cause to arrest plaintiffs for disorderly conduct under §240.20(6).

**E.   Chief Monahan And Inspector Galati Were Reasonable In Their Beliefs That The Group At Church And Fulton Streets Was Parading Without A Permit, In Violation Of N.Y.C. Administrative Code §10-110**

Probable cause also existed to arrest plaintiffs for parading without a permit, *i.e.*, for violating §10-110 of the Administrative Code of the City of New York ("§10-110"). §10-110 provides in relevant part:

> a.   Permits. A procession, parade or race shall be permitted upon any street or in any public place only after a written permit therefore has been obtained from the police commissioner…

*   *   *

> c.   Violations.  Every person participating in any procession, parade or race, for which a permit has not been issued when required by this section, shall, upon conviction thereof, be punished by a fine of not more than twenty-five dollars, or by imprisonment for not exceeding ten days, or by both such fine and imprisonment.

(McKinney's 2011).

A.C. §10-110 explicitly requires a permit for a "procession" or "parade." It is undisputed that the WRL never sought a permit for their march, as their own flyers and press releases noted, and that the City never issued the WRL a permit for the march.  (56.1 at ¶¶ 17-19).  Indeed, police officers announced several times to the group that it did not have a permit for the march.  (56.1 at ¶¶ 75(b), 76-80, 95).  These announcements were made before the march began and as the march started, not just to people assembled at the front of the march but also to others at the rear of the march.  *Id*.  Moreover, some plaintiffs have acknowledged that they knew before they arrived at Church and Fulton Streets that there was no permit for the march. (56.1 at ¶ 20).

Since it is indisputable that there was no permit for the march, the only issue left for consideration is whether it was reasonable for defendants to believe that what they observed constituted a "procession, parade or race upon a street or in a public place." Notably, the definition of "procession" and "parade" as used in §10-110 includes a "march" or "similar event of any kind."[12]

The WRL march was indisputably a "procession" or "parade" within the meaning of §10-110. Video footage of the WRL march clearly depicts a solid mass of hundreds of people steadily streaming across Church Street and moving down the Fulton Street sidewalk, wearing costumes and carrying signs or banners. (56.1 at ¶¶ 106-109). Based upon this video footage, which captures what police officers observed at the scene, it was objectively reasonable for defendants – as it would have been for any casual observer of the march – to conclude that plaintiffs were engaged in a procession, parade, march or a similar type of event in violation of §10-110.

Similarly, there can be no dispute that the procession, parade, or march took place on a "street" or "public place" within the meaning of the statute. Church Street and the sidewalks of Fulton Street are obviously "public places" and fall within §10-110. *See Allen v. City of New York*, 03 Civ. 2829, 2007 U.S. Dist. Lexis 15, at *19-20 (S.D.N.Y. Jan. 3, 2007) ("Inasmuch as section 10-110 requires a permit for any procession in any 'public place' – a term that indisputably includes sidewalks – and the marchers did not have a permit, the text of section 10-110 provided probable cause to justify the arrest of the plaintiffs"). In addition, to the extent

---

12 A.C. § 10-110 is read in conjunction with Title 38, Chapter 19 of the Rules of the City of New York "Rules for Processions and Parades." *People v. James*, 793 N.Y.S.2d 871, 877 (N.Y. Crim. Ct. 2005). On August 31, 2004, under Title 38, §19-02 of the Rules of the City of New York, "parade or procession" was defined as "any march, motorcade, caravan, promenade, foot or bicycle race, or similar event of any kind, upon any public street or roadway."

the Rules of the City of New York limit the application of §10-110 to streets and roadways (to the exclusion of all public places), under existing case law, whether a plaintiff was on the sidewalk does not remove them from the parameters of §10-110. *See Allen*, 2007 U.S. Dist. LEXIS 15, at *20-22 (in rejecting plaintiffs' argument that the terms "public street or roadway" as used in RCNY §19-02 do not include the sidewalk, the court held that "while plaintiffs may be correct that the term 'street' should not be read to include sidewalks and that a court may one day definitively so rule, a reasonable police officer would be equally justified in concluding that a court might definitively rule otherwise").[13] Accordingly, the fact that plaintiffs were marching on the Fulton Street sidewalk rather than the roadway does not defeat probable cause for violating §10-110.

In sum, because there is no dispute that plaintiffs were marching or parading in the street or a public place, Chief Monahan and Inspector Galati had probable cause to arrest plaintiffs for parading without a permit in violation of §10-110. *See James*, 367 N.Y.S.2d at 877 (court found that the criminal complaint was facially sufficient where it (1) identified the criminal defendant as having been part of a parade, procession or race; (2) alleged that such parade, procession or race took place on a public street or roadway; and (3) alleged that the

---

[13] The court in *Allen* did not reach the issue of whether probable cause existed or not for the arrests of plaintiffs for parading without a permit, instead granted the arresting officers qualified immunity:

> there is a strong – and perhaps even meritorious – argument that Section 10-110 applied to the conduct engaged in by the plaintiffs inasmuch as there is no dispute that they were conducting a march on a public sidewalk. Thus a reasonable officer reasonably could have believed that Section 10-110 required a permit for the type of activity in which plaintiffs were engaged and that, because they did not have a permit, they were subject to arrest.

*Allen,* 2007 U.S. Dist. LEXIS 15, at *35-36.

parade, procession or race did not have a permit issued by the police commissioner); *State of New York v. Bloom*, 831 N.Y.S.2d 355 (1st Dept. 2006) (conviction for parading without a permit upheld where defendant admitted that neither he nor the other marchers had a permit to parade); *see also Allen*, No. 03 Civ. 2829, 2007 U.S. Dist. Lexis 15, at *19-22 (finding that a march of 100-200 participants who were carrying signs, chanting, that were walking close to each other, was sufficient for a reasonable police officer to conclude that a "procession" under §10-110 was underway). Accordingly, defendants are entitled to summary judgment on plaintiffs' false arrest claims.

**F.     Chief Monahan And Inspector Galati Were Reasonable In Their Beliefs That the Group At Church And Fulton Streets Obstructed Governmental Administration In Violation Of N.Y. Penal Law §195.05**

In addition to having probable cause to arrest the group for violating P.L. §240.20(5), P.L. §240.20(6), and Admin. Code §10-110, police also had probable cause to arrest the group at Church and Fulton Streets for Obstruction of Governmental Administration, in violation of P.L. §195.05. Where, as here, there was probable cause to arrest for *some* crime – regardless of the crime articulated by the arresting officer – plaintiffs' false arrest claim is barred. *Jaegly v. Couch*, 439 F.3d 149, 153 (2d Cir. N.Y. 2006) ("a claim for false arrest will not lie so long as the arresting officer had probable cause to arrest the plaintiff for *some* crime) (emphasis added) (relying on *Devenpeck*, 543 U.S. at 154-55); *see also Allen*, No. 03 Civ. 2829, 2007 U.S. Dist. Lexis 15, at *16-17 ("it does not matter whether a particular charge on which a defendant relies to justify the arrest was one with which a plaintiff was originally charged"). Thus, regardless of the actual charges placed against plaintiffs here, police had probable cause to arrest the group for the additional violation of P.L. §195.05.

A person is guilty of Obstructing Governmental Administration ("OGA") when "he intentionally obstructs, impairs or perverts the administration of law or other governmental

function or prevents or attempts to prevent a public servant from performing any official function, by means of intimidation, physical force or interference or by means of any independently unlawful act." New York Penal Law §195.05. (McKinney's 2011). "An officer has probable cause to arrest for obstructing governmental administration where a person refuses to comply with an order from a police officer." *Johnson v. The City of New York*, 05 Civ. 7519, 2008 U.S. Dist. LEXIS 78984, at *26-27 (S.D.N.Y. Sept. 29, 2008).

During the WRL march, plaintiffs committed OGA by refusing to comply with various orders given by Inspector Galati, Chief Monahan, and other officers both before and during the march. As explained in detail already, those orders were that the marchers walk no more than two abreast, not block pedestrian or vehicular traffic, cross with traffic lights (56.1 at ¶¶ 75-81, 95, 96), and – once Chief Monahan, observing the obstruction on the Fulton Street sidewalk, stopped the march – disperse from the block (56.1 at ¶¶ 124-128). Plaintiffs' failure to comply with each of these directives (56.1 at ¶¶ 110-116, 129) interfered with the NYPD's duty to control pedestrian traffic,[14] and the violation of any one of those orders was an independent basis providing probable cause to arrest for OGA. *See Lennon v. Miller*, 66 F.3d 416, 424 (2d Cir. 1995) (finding probable cause to arrest where plaintiff refused to follow officer's order to leave her vehicle); *Berger v. Schmitt, et al.*, 91 Fed. Appx. 189, 190 (2d Cir. 2004) (affirming summary judgment for defendants on probable cause and qualified immunity for OGA where plaintiff was ordered by officers to leave the scene but defied orders); *Allen v. City of New York*, 480 F.Supp.2d 689, 713 (S.D.N.Y. 2007) (probable cause to arrest for obstruction of

---

[14] Under the New York City Charter, "[t]he police department and force shall have the power and it shall be their duty to preserve the public peace, and to regulate, direct, control and restrict the movement of pedestrian traffic for the facilitation of traffic and the convenience of the public as well as the proper protection of human life and health[.]" NYC Charter § 435(a).

governmental administration where plaintiff repeatedly refused the correction officers' direct orders to move into the dormitory area); *Marcavage v. City of New York*, No. 05 Civ. 4949 2010, U.S. Dist. Lexis 107724, at *30 (S.D.N.Y. Sept. 29,  2010) (RJS) (finding that "Plaintiffs' repeated refusal to follow lawful dispersal orders created probable cause to arrest Plaintiffs for obstruction of governmental administration pursuant to N.Y. Penal Law § 195.05 and NYC Charter § 435(a)"); *Wilder v. Village of Amityville, et al.*, 288 F.Supp.2d 341, 344-45 (E.D.N.Y. 2003) (granting summary judgment to officers on probable cause and qualified immunity to arrest for OGA where plaintiff failed to move after being ordered to do so by the police); *Decker v. Campus,* 981 F.Supp. 851, 858-60 (S.D.N.Y. 1997) (granting summary judgment for officer on probable cause and qualified immunity to arrest for OGA where plaintiff failed to comply with [officer's] instructions to 'step back' from the scene of an accident [and] obstructed the duties of [] government officials"); *Esmont v. City of New York*, 371 F. Supp. 2d 202, 211-12 (E.D.N.Y. 2005) (Sifton, J.) (finding probable cause to arrest for OGA where plaintiff refused to move from her driveway); *People v. Graham*, 865 N.Y.S.2d 259, 262  (2d Dept. 2007) (probable cause to arrest defendant for OGA, where after routine traffic stop, the defendant became uncooperative and refused several direct requests to remain standing or seated in one place); *People v. Barrett*, 179 Misc. 2d 261, 262-263 (Bx. Crim. Ct. 1998) (a complaint charging OGA is facially sufficient where defendant refused to move through magnetometer, thus preventing others in line from entering the courthouse and interfering with court officer's official function).

**G.**     **Plaintiffs' Engagement In First Amendment Activity Did Not Shield Their Unlawful Conduct**

The fact that a person cloaks himself in First Amendment activity has no bearing on the reasonableness of an arrest under the Fourth Amendment. *See, e.g., Heicklin*, 2010 U.S. Dist. LEXIS 14344, at *12 ("The First Amendment is not an absolute shield against a disorderly

conduct charge.") (citation omitted); *Cox v. New Hampshire*, 312 U.S. 569, 574 (U.S. 1941) (A person may not "ignore the familiar red traffic light" simply because he is engaged in social protest); *Cox v. Louisiana.*, 379 U.S. 536, 554-55 (U.S. 1965) ("Nor could one, contrary to traffic regulations, insist upon a street meeting in the middle of Times Square at the rush hour as a form of freedom of speech or assembly"); *People v. Bezjak*, 812 N.Y.S.2d 829, 840 (N.Y. Crim. Ct 2006) ("When conduct, even taking the form of protest, interferes with vehicular or pedestrian traffic, arrests for disorderly conduct are appropriate and constitutional.").

Indeed, it is well-settled that municipalities have the right – and, in fact, the duty – to regulate the flow of traffic on the streets and sidewalks – even when faced with First Amendment activity. *Cox v. Louisiana*, 379 U.S. at 554-55 ("Governmental authorities have the duty and responsibility to keep their streets open and available for movement."). As the U.S. Supreme Court in *Cox v. Louisiana* stated:

> The rights of free speech and assembly, while fundamental in our democratic society, still do not mean that everyone with opinions or beliefs to express may address a group at any public place and at any time. The constitutional guarantee of liberty implies the existence of an organized society maintaining public order, without which liberty itself would be lost in the excesses of anarchy. The control of travel on the streets is a clear example of governmental responsibility to insure this necessary order.

379 U.S. at 554-555; *see also Arbeitman v. District Court of Vermont*, 522 F.2d 1031 (2d Cir. 1975) ("A state may properly legislate to prevent persons from blocking sidewalks and obstructing traffic . . ., and demonstrators may not insist upon the right to cordon off a street or entrance to a public building") (citations omitted); *Bezjak*, 812 N.Y.S.2d at 840 ("It is well-settled that municipalities have the authority to impose regulations in order to assure the safety and convenience of the people in the use of public highways and such regulation is not inconsistent with civil liberties").

Therefore, plaintiffs' engagement in First Amendment activity does not shield their unlawful conduct nor does it undermine the reasonableness of their arrests under the Fourth Amendment. *See, e.g.*, *Cox v. New Hampshire*, 312 U.S. at 574 (upholding constitutionality of arrest protest group for parading on the public sidewalk); *People v. Maher*, 137 Misc.2d 162, 520 N.Y.S.2d 309 (N.Y. Crim. Ct. 1987) (upholding protester's conviction under P.L. § 240.20(5) for sidewalk demonstration); *People v. Pettigrew*, 332 N.Y.S.2d 33 (Dist. Ct. 1st Dist. 1972) (convicting defendant of violating P.L. § 240.20(5) where defendant, with one other individual, attracted a crowd in connection with their demonstration activity on the public sidewalk, causing an obstruction to both vehicular and pedestrian traffic); *People v. Kunz*, 128 N.Y.S.2d 157 (N.Y. City Ct. 1954) (finding defendant guilty of disorderly conduct during sidewalk demonstration).

## POINT II

### DEFENDANTS   ARE   ENTITLED   TO QUALIFIED IMMUNITY

As shown above, police had probable cause to arrest the group for its unlawful conduct, including for violations of P.L. § 240.20, A.C. § 10-110, and P.L. § 195.05. As such, plaintiffs' Fourth Amendment rights were not violated. Nevertheless, regardless of whether the arrests were reasonable, it is respectfully submitted that defendants are entitled to qualified immunity. Government officials performing discretionary functions, generally are shielded "from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)); *Ashcroft v. al-Kidd*, 131 S. Ct. 2074, 2080 (2011). Qualified immunity recognizes that "it is inevitable that law enforcement officials will in some cases reasonably but mistakenly [take actions that may be later found unlawful]; in such case those officials – like other officials who

act in ways they reasonably believe to be lawful – should not be held personally liable." *Anderson v. Creighton*, 483 U.S. 635, 641 (1987). The qualified immunity doctrine "gives ample room for mistaken judgments" by protecting "all but the plainly incompetent or those who knowingly violate the law." *Hunter v. Bryant*, 502 U.S. 224, 228-29 (1991) (quoting *Malley v. Briggs*, 475 U.S. 335, 341 (1986)). This accommodation for reasonable mistakes exists because "officials should not err always on the side of caution" because they fear being sued. *Id.* at 229.

The two questions involved in a qualified immunity inquiry are: (1) whether a plaintiff has alleged or established facts which establish that the official's conduct violated a constitutional right (*County of Sacramento v. Lewis*, 523 U.S. 833, 841 (1998)); and (2) whether the right was "clearly established" at the time of the alleged incident that a reasonable official would have known his or her conduct was unlawful (*Saucier v. Katz*, 533 U.S. 194, 201-02 (2001)). The Supreme Court has held, however, that judges have "discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first . . ." *Pearson*, 555 U.S. at 236.

In analyzing prong one of the qualified immunity analysis, if no constitutional right has been violated based on the established allegations, there is no need for further inquiry concerning qualified immunity. *Saucier*, 533 U.S. at 201. As for prong two, "[a] right is clearly established if (1) the law is defined with reasonable clarity, (2) the Supreme Court or the Second Circuit has recognized the right, and (3) 'a reasonable defendant [would] have understood from the existing law that [his] conduct was unlawful.'" *Young v. County of Fulton*, 160 F.3d 899, 903 (2d Cir. 1998). "The question is not what a lawyer would learn or intuit from researching case law, but what a reasonable person in the defendant's position should know about the constitutionality of the conduct." *McCullough v. Wyandanch Union Free Sch.*, 187 F.3d 272, 278

(2d Cir. 1999); *see also Pearson*, 555 U.S. at 244-25 ("If judges [could] disagree on a constitutional question, it is unfair to subject police [officials] to money damages for picking the losing side of the controversy."). In other words, where reasonably competent officials could disagree as to whether the conduct at issue would violate clearly established rights, the qualified immunity defense is available. *Malley v. Briggs*, 475 U.S. 335, 341 (1986).

While "clearly established" does not mean that there must be a case directly on point, "existing precedent must have placed the statutory or constitutional question beyond debate." *Anderson v. Creighton*, 483 U.S. 635, 640 (1987). The Supreme Court has repeatedly told lower courts "not to define clearly established law at a high level of generality." *Ashcroft*, 131 S. Ct. at 2084. For example, the general proposition, "that an unreasonable search or seizure violates the Fourth Amendment is of little help in determining whether the violative nature of particular[ized] conduct is clearly established." *Id.* (citing *Saucier*, 533 U.S. at 201-02); *see also Anderson*, 483 U.S. at 640 ("The contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right."). In other words, "if the law did not put the [official] on notice that his conduct would be clearly unlawful, summary judgment based on qualified immunity is appropriate." *Saucier*, 533 U.S. at 202. "For executive officers in general . . . qualified immunity represents the norm." *Anderson*, 483 U.S. at 642.

## A.   The Law Concerning What Police May Do When Confronted With A Large, Disorderly Crowd Was Not "Clearly Established" At The Time Of Plaintiffs' Arrests

Here, even if the Court were to find that a Fourth Amendment violation occurred (which it did not), Chief Monahan would nonetheless be entitled to qualified immunity because the plaintiffs' allegations do not implicate a "clearly established" right. As of August 26, 2004 (the first day of the RNC), the law regarding what police may constitutionally do was not clearly established *vis-à-vis* large, non-violent demonstrations which have become obstructive of the

31

rights of others.  There were no decisions in either the Second Circuit or U.S. Supreme Court which prohibited the police from arresting unlawful groups where they were unable to single out each lawbreaker in the group.  Further, there were no decisions within the Second Circuit or U.S. Supreme Court that provided police with "fair warning" as to how they may handle group arrests under the Fourth Amendment.  The handful of reported decisions concerning probable cause to make group arrests arose out of the D.C. Circuit, and even those cases – which are distinguishable from the facts here – failed to provide fair notice to police on how they may handle group arrests.  As discussed above, the most analogous case at the time of the RNC was *Washington Mobilization Unit v. Cullinane*, and that case clearly permitted police to effectuate *en mass* arrests without the "unrealistic" requirement of "singling out" each unlawful individual. 566 F.2d at 120-121.

Therefore, in view of the fact that:  (1) the law regarding group arrests at the time of the RNC was not defined with reasonable clarity; (2) neither the Supreme Court nor the Second Circuit had recognized the alleged right of members of an unlawful group to be "singled out" by police; and (3) a reasonable officer would not have understood that his conduct was unlawful given the totality of facts and circumstances (as more fully discussed above), it is respectfully submitted that Chief Monahan's decision to arrest the group – even though he did not see the specific acts of each person in the group – was not "clearly unlawful."  *Saucier*, 533 U.S. at 202.

**B.**    **Chief Monahan Is Entitled To Qualified Immunity Because He Had "Arguable"**
**Probable Cause To Arrest Plaintiffs**

In addition to the fact that the law regarding group arrests was not clearly established, Chief Monahan[15] is entitled to qualified immunity because he had "arguable" probable cause to arrest plaintiffs.  Arguable probable cause exists if "officers of reasonable competence could disagree on whether the probable cause test was met." *Alhovsky v. Paul*, 406 Fed. Appx. 535, 536 (2d Cir. 2011); *Jenkins v. City of New York*, 478 F.3d 76, 87 (2d Cir. 2007); *Lennon v. Miller*, 66 F.3d 416, 423-24 (2d Cir. 1995).

In the context of group arrests, the Second Circuit has acknowledged the reasonableness of mistakes that officers can face.  *See, e.g., Beal v. City of New York*,  No. 92 Civ. 0718, 1994 U.S. Dist. LEXIS 5269 (S.D.N.Y. Apr. 22, 1994), *aff'd,* No. 95-7344, 1995 U.S. App. LEXIS 39833 (2d Cir. Nov. 21, 1995)  (affirming qualified immunity in arrest of plaintiff who was seen as part of a riotous group, *even though police did not specifically see plaintiff engage in unlawful conduct*); *Warmoth v. Johannes*, No. 3:97 Civ. 1980, 1999 U.S. Dist. LEXIS 2728 (D.Conn. Feb. 23, 1999) (granting qualified immunity to officers in false arrest claim where plaintiff was arrested under Connecticut's disorderly conduct statute for congregating with a group of young people in a public area and refused to disperse, despite plaintiff's claims that he

---

15    Chief Monahan is entitled to qualified immunity for his reasonable decision to arrest the group.  In addition, should the Court find that other officers were involved in the arrest decision, they are entitled to qualified immunity for the same reasons.  Further, officers who made arrests at the direction of their superiors are similarly entitled to qualified immunity because there is no "evidence tending to show that it was objectively unreasonable for [them] to disbelieve [their] superior officer[s] or to question [their] good faith" and thus, they were "entitled to rely upon the officer in deciding whether there was probable cause to process plaintiff's arrest."  *See Beal v. City of New York,* No. 92 Civ. 0718, 1994 U.S. Dist. LEXIS 5269 (S.D.N.Y. Apr. 22, 1994) *aff'd* No. 95-7344, 1995 U.S. App. LEXIS 39833 (2d Cir. Nov. 21, 1995) (finding probable cause and also granting qualified immunity to officer who processed plaintiff's arrest at the direction of the lieutenant).

was not associated with any other persons congregating in the area); *see also Bernini v. City of St. Paul*, No. 09 Civ. 2312, 2010 U.S. Dist. LEXIS 115024, at *14 (D. Minn. Oct. 28, 2010) (granting qualified immunity to officers involved in mass arrest of riotous group).

Here, based on the totality of circumstances confronting police at Church and Fulton Streets, it was objectively reasonable for Chief Monahan to believe that he was not violating clearly established law by arresting the group of marchers at Church and Fulton Streets. In addition, officers of reasonable competence could disagree about whether probable cause existed to arrest plaintiffs based on the group's unlawful conduct. Accordingly, should the court find that probable cause was lacking for plaintiffs' arrest, Chief Monahan is nonetheless entitled to qualified immunity.[16]

---

[16] Similarly, and for the reasons cited herein, to the extent that plaintiffs also assert state law claims of false imprisonment and *respondeat superior*, the individual defendants and The City of New York are protected by the good faith and governmental immunities. "New York law grant[s] government officials qualified immunity on state-law claims except where the officials' actions are undertaken in bad faith or without a reasonable basis." *Alhovsky v. Ryan*, 658 F. Supp. 2d 526, 535 (S.D.N.Y. 2009)). Immunity will extend to governmental officers where their "official action[s] involve[ed] the exercise of discretion even if resulting from negligence or malice." *Bancroft v. City of Mt. Vernon*, 672 F. Supp. 2d 391, 408 (S.D.N.Y. 2009) (alterations added) (quoting *Lynch v. City of Mount Vernon*, 567 F. Supp. 2d 459, 470 (S.D.N.Y. 2008)). Similarly, "[m]unicipalities are immune from liability based on the discretionary acts of their employees – including police officers – provided the actions of the officers were not inconsistent with acceptable police practice." *Bancroft*, 672 F. Supp. at 408.

## CONCLUSION

By reason of the foregoing, defendants respectfully request that this Court grant their motion to dismiss plaintiffs' claims of false arrest, and award defendants costs, fees and such other and further relief as the Court deems just and proper.

Dated:      October 3, 2011
               New York, New York

> MICHAEL A. CARDOZO
> Corporation Counsel of the City of New York
> *Attorney for Defendants*
> 100 Church Street
> New York, N.Y. 10007
> Tel:  (212) 788-1817
> Fax: (212) 788-9776
>
> By: _____
> Fred M. Weiler, Esq.
> Cheryl L. Shammas, Esq.
> Peter G. Farrell, Esq.