UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------ x

MICHAEL SCHILLER, et al.,

                        Plaintiff,

      -against-

THE CITY OF NEW YORK, et. al,

                   Defendants.

------------------------------------------------------------------ x

CONSOLIDATED RNC CASES

------------------------------------------------------------------ X

**DECLARATION OF**
**CARL R. HOLMBERG**

**04-Civ-7922 (RJS)(JCF)**

**(RJS)(JCF)**

        **CARL R. HOLMBERG**, declares under penalty of perjury and pursuant to 28 USC § 1746, that on the basis of personal knowledge and upon a review of the selections of the record provided to me that the following statements are true and correct:

        1.    I submit this declaration in support of Defendants' motion for summary judgment and to set forth my expert opinion that: (i) the New York City Police Department's (the "NYPD's" or the "Department's") policy of not issuing summonses to individuals engaged in criminal conduct that was related to the 2004 Republican National Convention (the "RNC") in favor of custodial arrest (where they would either receive a desk appearance tickets if qualified or be arraigned) (the "No-Summons Policy"); and (ii) a related policy implemented by the NYPD that all RNC arrestees were to be fingerprinted as part of their arrest processing (the "Fingerprinting Policy") (collectively the "Policies") were both appropriate and best practices for an event like the RNC.

**My Qualifications**

      2.    I worked for the United States Park Police Department in Washington, D.C. for thirty-five years where I achieved the rank of Assistant Chief of Police. During my tenure at the U.S. Park Police Department I had vast experience with policing demonstrations that involved elements of civil disorder and unlawful conduct. I also received formal civil disturbance training the United States Army Military Police School.

      3.    My complete background, (including demonstrations at which I was the Incident Commander), work experience, and writings are contained in my Curriculum Vitae, which is annexed as **Exhibit A** and is incorporated by reference into this declaration.

      4.    The materials I reviewed to assist in preparing this declaration are listed in **Exhibit B**, annexed hereto and include the complete depositions of Chief of Department Joseph Esposito and Commissioner Cohen, and the approximately 600-pages of intelligence reports which I understand have been referred to as the "End User Reports."

      5.    I have been qualified as a Police Practices Expert in the District Court for the Southern District of New York and provided my Expert Report and testified as a Police Practices Expert at trial in *Burley, et al. v. City of New York, et al.*, (S.D.N.Y. 2003) 03 Civ. 735 (WHP)(FM).

**Methodology**

      6.    The expert opinion and information that follows is based on my approximately forty years of experience, training and knowledge in law enforcement

service in the specific area of disorder and disorder control and my ten years of consulting experience that followed on the same subjects.   My expertise has been augmented by fieldwork, study of the relevant texts, training and evaluations of law enforcement agencies in the United States, all of which comprised a large portion of my work experience for the last fifty years, including at the highest executive levels of law enforcement.   I also authored the *United States Park Police Guideline Manual* and co-authored *Managing Civil Actions in Threat Incidents*, one of the modern seminal texts on civil disorder and the control of it.   In addition I have taught numerous courses in civil disorder and disorder control.

**Disorder Requires Immediate Police Response**

7.   Because police departments are responsible for maintaining law and order to protect the community, certain precautions must generally be taken to at least attempt to prevent disorder during large scale demonstrations. During the 1999 World Trade Organization meetings in Seattle, this did not occur, and violence and disorder resulted.

8.   In some instances demonstrators (and especially at large scale demonstrations) present a conflict with the safety of the community, e.g., marching/parading on sidewalks and urban streets, sidewalks and thoroughfares.  When this occurs the local police forces must consider issues of safety as paramount.   The safety of the jurisdiction's citizens, as well as the safety of demonstrators and police officers must always be a priority for police commanders.   Thus, certain precautions are necessary to prevent activities that threaten safety.

9.      Best generally accepted police practices require law enforcement organizations to establish and use protocols in order to keep areas safe for citizens.  For example, urban sidewalks present a challenge in this regard.   Allowing both demonstrators and ordinary, non-demonstrating citizens to use sidewalks simultaneously obviously requires that there be sufficient space for both types of users or chaos and injury is likely to result.   Un-planned, unpermitted, "pop-up" protest activity greatly exacerbates this safety problem. For obvious safety reasons, ordinary non-protesting citizens should not be forced into the street where potentially deadly conflict with both regular vehicular and emergency vehicular traffic is either likely or possible to occur.

10.      In addition, it has been my experience that when smaller numbers of ordinary pedestrians face larger numbers of demonstrators using the same sidewalk, the ordinary pedestrians will attempt to remove themselves from the path of the larger group.   They will most often move into the street rather than potentially entrapping themselves against buildings or engaging in a confrontation for sidewalk space.  This can present an obvious safety issue for the police since violations, such as blocking pedestrian traffic, can quickly produce non-acceptable safety conflicts between demonstrators, non-involved pedestrians and motor vehicles.

11.      Demonstrators who are in the street and blocking vehicular traffic pose comparable safety risks because they are in the direct path of motor vehicles.  Until that condition is cleared, traffic stoppage or congestion also threatens the mobility of emergency response vehicles such as police, fire and ambulances further exacerbating the dangers posed.

4

12.     NYPD's immediate attention to disorder during the RNC, is entirely consistent with national standards for the quelling of a disorder. A slow or perceived lack of immediate attention to disorder by authorities does nothing to quell the disorder. In fact, quite the contrary. In my experience disorder situations generally escalate and either additional people join the disorder or those involved increase their disorderly and illegal activities if no action is undertaken to stop them promptly. This has occurred in many areas such as in Los Angeles, California after the Rodney King incident and in Seattle, Washington during the 1999 World Trade Organization Conference ("WTO").

13.     Thus, disorder situations must receive immediate attention from local authorities if the disorder is not to spiral out of control. When disorder creates a safety hazard, immediate police action is required to eliminate the disorder creating the safety problem. Police practices favoring custodial arrest under such circumstances address this type of safety hazard.

14.     For example, on the first day of the 1971 May Day protests in Washington, D.C., while arrests were made, most of the disorderly persons involved in the attempts to "Shut Down the Government" were not *immediately* arrested. This allowed those disorderly persons to continue to employ hit and run tactics against motoring citizens and government workers for several additional hours. Had the police at the 1971 May Day protests in Washington D.C. taken immediate action to arrest those engaging in disorderly conduct, they would have prevented the continuation and escalation of disorders. Similarly, had law enforcement authorities taken immediate action to arrest lawbreakers at the 1999 WTO, they could have prevented the continuation

5

of the disorder, rioting and violence for which the 1999 WTO has become infamous. The No-Summons Policy was both reasonable and consistent with generally accepted best police practices at large scale events such as the RNC to prevent such disorder.

**Intelligence And Planning Is Required To Police Large-Scale Events**

15.     Based on my many years of experience, I have found that decisions based on intelligence gathering and analyses are among the best approaches for police planners and commanders to utilize in order to plan appropriately. Indeed, intelligence is an integral part of all police operations.

16.     More specifically, my experience has shown that pre-event intelligence gathering is not only a beneficial tool in police planning for protest activity, but absolutely essential as well. In those instances where there is an indication that disorder is possible, intelligence gathering can provide the necessary information needed to plan for the prevention of that potential disorder, rioting and violence. Good quality intelligence gathering is not only necessary but critical to effective operations.

17.     My experience personally observing the 1999 WTO Conference in Seattle, Washington, leads me to conclude that the absence of robust intelligence gathering, analysis and sharing led directly to the riots, violence and disorder with which that event has become almost synonymous. Outside agencies hesitated to share their

intelligence with the Seattle Police Department due to the perceived requirement that the Seattle Police Department was required to distribute that intelligence to the community through the City Council. Without the cooperation of the full intelligence community, Seattle police operations were hindered by the resultant lack of information.

18.     The April 2000 International Monetary Fund/World Bank ("IMF/WB") in Washington, D.C. stands in stark contrast.   Prior to that event demonstrators targeted several locations to block roadways using Locking Devices, Sleeping Dragons and Tripods thereby disrupting peak hour traffic throughout Washington, D.C. and Northern Virginia.[3]   Because Intelligence Units gathered information ahead of time, police commanders during that event were able to prevent such planned traffic blockades from being successful and thus prevented the planned

---

[3] "Locking Devices" are generally handmade from 3 foot sections of 4 or 5 inch diameter plastic or metal pipe with a re-bar type rod epoxied through the center. Demonstrators use these by inserting their arm into the pipe and locking it in place with a chain and carabineer. The device or demonstrator is then attached to a fixed object or another locking device. These have been produced with chicken wire, tar and duct tape coverings to slow the police attempts to defeat these devices. Locking devices can also be bicycle type "U" locks generally fastened around the demonstrator's neck and to other demonstrators similarly equipped or a fixed object. Some have been found with epoxy in the locking mechanism. They have generally been used for blocking entrances.
    "Sleeping Dragons" are a series of occupied Locking Devices. "Tripods" are basically just that. Three support poles attached together at the top with some type of platform at the top. Demonstrators use these to block traffic or entrances. Usually the demonstrator is secured at the top with a rope to prevent their being removed by police. They are also known as Malaysian Teepees.

disruptions and disorder. Indeed, this intelligence gathering activity was paramount in preventing disorder and emergencies and in keeping the community at large safe.

19.     My review of the NYPD's End-User Reports leads me to conclude that the intelligence gathered by the NYPD in preparation for the RNC in August was equally critical in ensuring that the 2004 RNC went off without major disruptions. It is also my opinion that this intelligence gathering activity was not only reasonable, but also absolutely necessary for the protection of the greater New York City community.  The information contained in the End-User Reports and the knowledge of prior disorder in other cities, at similar large scale events, either alone or together, warranted the adoption of the Policies as discussed below:

**The NYPD's Decision To Adopt The No-Summons Policy Was Both Reasonable and Consistent with Generally Accepted Police Practices for Large Scale Events And Was Warranted In Light of the Intelligence and/or Prior Disorder At Similar Large Scale Events**

20.     There are a number of sound reasons for a law enforcement organization to adopt a policy of not issuing summonses when large scale disorders are anticipated.  The issuance of a summons usually takes place at the location where the violation occurred and the release of that person also usually takes place there. The end result is that the person who has committed the violation is issued a summons and released at the same location.  Under normal situations this is an acceptable practice. However, when this violation is committed by a large number of individuals, simultaneously at the same location and disorder results, the release of the violators at the scene of the disorder does nothing to stop the disorder. Releasing violators near or at the same location of the disorder allows the released violators to immediately rejoin the

disorder and continue the very criminal activity for which they were arrested (Esposito Depo. 958:23-25, 959:2-17).

21.    As explained by the NYPD Chief of Department Joseph Esposito, the immediate release of arrestees on the street in the vicinity of the disorder in which they were engaged by using a summons can easily cause a revolving door problem with continuous violations by the same persons which continues the disorder.  (Esposito Depo 87: 20-25, 88: 2-5, 184:8-11, 194 9:13, 729:22-25, 730:2-8, 1801:13-25, 1802:2-14). Such a  process generally does nothing to stop the disorder, but rather ensures that it will continue.

22.    Indeed, I witnessed this very phenomena during the demonstrations and illegal conduct that took place at the Central Intelligence Agency (CIA) headquarters in Langley, Virginia in May 1987.   These demonstrations and resulting violations were incited in part by Lisa Fithian, a well-known activist and trainer. (Bates 102558). During those demonstrations, protestors attempted to block both the North and South entrances to the CIA facility.  The police response was handled by two different police agencies. Virginia authorities arrested those at the South entrance. These arrestees were taken three blocks away and released with a citation/summons.  Those individuals then returned and repeated the offense thereby perpetuating the disorder. Those on the North side were arrested by the United States Park Police under my command.   They were then transported to an arrest processing center, and after processing, if eligible, were released with a violation notice similar to New York's Desk Appearance Ticket, or, if ineligible, presented to a court for arraignment – the same procedure used by the NYPD during the RNC.

23.    The ensuing difference between the North and South entrances to the CIA facility was as stark as night and day. At the North entrance the disorder was immediately quelled, there was no continuing criminal activity, and the entrance was immediately available for its proper purpose.  In contrast, the disorder at the South entrance continued for hours later.  This illustrates why removing offenders from the disorder site is the preferred method of prisoner processing in mass arrest situations. Disorder is usually ended immediately with the removal of the offenders.

24.    The NYPD's End-User Reports indicate that several activist organizations were contemplating taking part in activities designed to shut down the RNC and prevent the RNC from holding their scheduled activities (Bates No. 102644). These Reports also contained intelligence that activist organizations also planned to shut down the entire City of New York during the Convention if possible (Bates Nos. 102627, 102653, 102655).

25.    As noted above, this has been a modern trend in the goals of demonstrators and their activities since the Seattle, Washington WTO conference in 1999. Indeed, the Seattle demonstrators were successful in shutting down several events scheduled by the WTO and were successful in shutting down large parts of Seattle's commercial hub during the peak Christmas shopping period. In effect, unlawful demonstrators effectively shut down not only the WTO, they shut down much of downtown Seattle.

26.    Indeed, as was the case with the 2004 RNC, this was the stated goal of demonstrations in other cities that I observed after Seattle, i.e., in Washington, D.C. at the IMF/WB conference, in Philadelphia for the 2000 RNC, and reportedly in Los

Angeles for the 2000 DNC. It is now a continuing theme for demonstrations in cities holding events that catch the attention of larger groups of demonstrators.

27.     The 2004 RNC in the City of New York was no different in this regard. Quite obviously, merely issuing summons to protestors lying in the streets, conducting die-ins and/or who are otherwise taking actions that block pedestrian or vehicular traffic, is futile. The resulting disorder and safety issues will not be abated, but only continue.

28.     In addition to the general ongoing terrorist threats to New York City in the wake of 9/11, the NYPD obtained intelligence reports regarding the possibility of terrorist acts specifically in connection with the RNC. (Bates Nos. 102520, 102585). The NYPD's intelligence unit identified certain animal rights groups, who reportedly planned to attend the 2004 RNC demonstrations, as having been involved in previous bombings. Indeed, the NYPD's Chief of Department Joseph Esposito identified the threat of terrorism as one of the reasons for the No-Summons Policy. (Esposito Depo 183:11-12, 17-25, 2-20).

29.     In light of the intelligence known to the NYPD prior to the 2004 RNC, and the attractiveness of a target like New York City, which at the time would have contained large numbers of the nation's most important leaders, all reasonable methods for detecting and deterring such terrorism should have been planned for and in effect during the RNC. In my expert police opinion, the NYPD's No-Summons Policy was one of these reasonable methods of detection and deterrence.

30.     In addition to the above, the NYPD identified known criminals in the End-User Reports. One such individual was a fugitive and known animal rights

activist who was wanted in connection with two bombings. (Bates 102589). Obviously, all wanted fugitives should be arrested and held accountable for their crimes. The No-Summons Policy helped to insure that arrest processing for Desk Appearance Tickets (DATs) or On-Line processing incorporated stricter identification processes than would otherwise have occurred. This was entirely appropriate, and in accordance with best police practices, the facts known to the NYPD through their open source intelligence gathering, and the risk that existed during those few days in 2004 in New York City.

31.     The Intel developed by the NYPD also generated reports of activist groups who were preparing for confrontations with the NYPD. For example, the NYPD had information that Anarchists were undertaking martial arts training (Bates Nos. 102623, 102596, 102598) and that Direct Action tactics to shut down the RNC were being developed (Bates Nos. 102592 – 102595).

32.     As a matter of appropriately handling potential disorder the NYPD's decision not to issue summons for RNC related arrests was consistent with generally accepted best police practices. It is my further opinion that the NYPD quite properly anticipated that RNC-related demonstrations had the potential to  result in several mass arrests situations and that under these circumstances, as stated above, it was reasonable for the NYPD to establish the No-Summons Policy.

**The NYPD Had Valid Reasons To Adopt The Fingerprinting Policy**

33.     The issue of identification is important under normal conditions however, it becomes critical in incidents where arrestees have received training or been advised to provide either false or no identification. This was the case in New York City during the RNC. The NYPD through open source intelligence gathering learned that

groups and individuals were being advised by well-known (to law enforcement) activist organizers, such as Lisa Fithien, to carry no identification (Bates No. 102556). Black Bloc and anarchist tactics included carrying no identification and using fake names and social security numbers. (Bates Nos. 102563. 102566). These tactics of carrying no identification or using false identification aids in one of the activists' primary goals – to bog down the criminal justice system and bring the City to a halt.

34.    False identification has been a growing concern for law enforcement across the nation. Armed with intelligence regarding the use of false identification, such as business credentials for businesses within the secured perimeter (Bates Nos. 102719, 102721), and with reports that false identification was used by a news reporter to obtain a position within Buckingham Palace prior to a visit by President George W. Bush (Bates No. 102564), the NYPD, as a matter of sound police practice, should have taken, and did in fact take, reasonable and  necessary precautions to counter the use of false identification, or no identification, prior to the RNC.

35.    To cite just one example, recently a student at the University of Maryland[4] (not a professional forger) was arrested for the production and sale of counterfeit Maryland driver's licenses. His product was of exceptional quality. The fake licenses he was producing contained the actual photograph of the person who purchased the document. It included most of the true information of the holder. It even included the

---

[4] Mr. Teddy Michaels, a student at the University of Maryland, was arrested and indicted for producing and selling high quality falsified Maryland drivers licenses out his dorm room.  Michaels highlighted his ability to mimic individual "state holograms and the machine-readable magnetic strips" (features that were added to identification documents in the mid-1990s to thwart increasing skilled counterfeiters) using his HP Pavillion laptop computer and an Eltron P500CM printer. Reported by ABC News on 5/7/11; see also http://articles.baltimoresun.com/2011-05-05/news/bs-md-umd-studentindicted-20110505.

Motor Vehicle Administration hologram in the correct format and had the magnetic strip on the reverse. These phony drivers licenses were being sold for between $100 and $170 per "license." These "licenses" were very difficult for even local law enforcement officers to detect as being fraudulent. Presented to out of state law enforcement officials, they almost certainly would have gone undetected by the naked eye.

36.     Thus, best police practices generally should and do require the incorporation of some sort of biometric identification verification procedure during arrest processing to help combat this problem, as well as to check wanted status. In addition, procedures such as fingerprinting assist in the subsequent prosecution of arrestees, as well as greatly increase the chances that an arrestee from an out-of state jurisdiction will comply with judicial requirements that they return to the jurisdiction for whatever court proceedings may be scheduled, as well as safeguarding the public by not releasing those with outstanding warrants back into the community.

37.     In summary, best police practices incorporate arrest processing procedures that incorporate fingerprinting. Indeed the public's knowledge that such practices are in effect actually helps reduce or stop disorders from occurring. While they do take more time and are more expensive, protocols such as fingerprinting are among the most reliable methods of identification as well as (i) assist in subsequent prosecutions, (ii) assist in assuring subsequent requisite court appearance by arrestees, especially in cases when arrestees are from out-of-state jurisdictions, and (iii) help prevent the unintentional release of wanted fugitives.

### Conclusion

      38.    For the detailed reasons set forth above, based on my review of all the materials made available to me and my fifty years of experience in the field of law enforcement generally and disorder control specifically, it is my expert opinion that during the 2004 Republican National Convention the NYPD's decisions to adopt and implement the Policies were professional, responsible and in accordance with reasonable and generally accepted best police practices for maintaining order in situations involving large numbers of protesters in the post-Seattle WTO and post-9/11 environment.

CARL R. HOLMBERG

Dated:      Mechanicsville, Maryland
            October 3, 2011

# EXHIBIT A

# CARL R. HOLMBERG
*Curriculum Vitae*

I graduated from The United States Army Provost Marshall Generals School at Fort Gordon, Georgia, November 1960. I served with the District of Columbia Army National Guard from 1960 through 1966. During that time I was activated for major demonstrations and special events such as Presidential Inaugurations and the 1963 March on Washington during which Dr. Martin Luther King, Jr. made his famous "I Had a Dream" speech.

I joined the United States Park Police in August 1965. I supervised police functions during the riots in the aftermath of the assassination of Dr. Martin Luther King, Jr. in 1968, and continuing through my formal retirement in December 2000. During my career with U.S. Park Police Department I was called upon to train the entire Department in the basics of crowd control. My assignments with the Department included: Sergeant during the 1971 Anti-War and Racial Discrimination March on Washington where the goal of the demonstrators was to "Shut Down the Government;" Supervisor, Special Operations Force; Commander (Lieutenant) SWAT Unit, Motorcycle Unit, Canine and Special Events Teams; National Park Service Law Enforcement Specialist (Captain) Atlanta, Georgia; Commander (Major) U.S. Park Police Training Branch (2 years) and Special Forces Branch (10 years); Acting Commander (Deputy Chief) Operations Division and Commander (Deputy Chief) Administrative Services Division; Assistant Chief of Police and Acting as Chief of Police on several occasions.

Physical security and VIP protection have been major components of these positions. The development of physical security protection plans include those at facilities such as the Statue of Liberty on Liberty Island, the Washington Monument, Lincoln and Jefferson Memorials in Washington D.C. and many smaller sites. VIP protection has been ongoing and includes several hundred Presidential activities and approximately 100 visits of heads of state and associated demonstrations.

I provided logistical arrangements and/or command functions of the United States Park Police forces at many public events including:  the National Bi-Centennial Celebrations, Inaugural Ceremonies for the President of the United States (Presidents Nixon through Clinton, inclusive). I was the Incident Commander at many demonstrations including the attempted takeover of the *International Monetary Fund and World Bank; *Desert Shield and *Desert Storm Demonstrations and *Victory Celebrations, *KKK demonstrations in Washington, DC, Philadelphia, Pa. and a White Supremacy Demonstration at the Martin Luther King Jr. National Historic Site in Atlanta Georgia; Gay, Bisexual, Lesbian and Transgender March on Washington, the attempted closure by demonstrators of the *CIA. Many if not all special events such as National Christmas Tree Lighting Ceremonies, *July 4th National Celebrations and annual ethnic festivals all of which required crowd control measures to be taken. I was the incident

commander at over 20 White House Sidewalk demonstrations where non-violent civil disobedience resulted in mass arrests. (* Denotes mass arrest situations.)

My formal civil disturbance training began in The United States Army Military Police School and continuing through my military police service. After graduation from the United States Park Police Basic School (which included civil disturbance control and incorporated specialized units and equipment), I attended the United States Army Military Police Civil Disturbance Orientation Course (SEADOC). I then proceeded through the FBI SWAT School and the U.S. Secret Service Dignitary Protection program, both of which included elements of crowd control. In addition, I took several college level human rights and civil liberties courses at American University along with many other seminars and programs that included aspects of managing crowds and demonstrations.

I was the United States Park Police coordinator for the establishment of a medical assistance program and the Memorandum Of Understanding between the Department of Defense, Uniformed Services University of the Health Sciences and the United States Park Police that resulted in the CONTOMS Training Program and set up the necessary protocols to provide on-scene medical personnel (trauma surgeons, nurses, paramedics and Emergency Medical Technicians) at large scale events in Washington, D. C. This provided immediate, professional, on-scene medical assistance for any injured police officers. This also resulted in the United States Park Police being the only resource capable of detecting the presence of biological and chemical agents in Washington, D. C. during the Desert Shield and Desert Storm demonstrations and celebrations.

The Central and East European Law Initiative (CEELI) is funded by the United States Information Agency and the United States Agency for International Development. The CEELI is a project of the American Bar Association designed to support law reforms underway in Central and East European and the independent states of the former Soviet Union. In 1993 I was invited by the American Bar Association to participate in a CEELI project to design policy and regulations for the independent state of Belarus in the area of freedoms of expression for incorporation into the new Belarus constitution. My participation concentrated on analyzing the three relevant presidential decrees and then drafting the initial documents dealing with freedoms of expression, which never before had been experienced by citizens of that country.

After my initial drafts were completed I requested other members of the group to meet with me and discuss the draft. I also requested and obtained the assistance of attorneys who had many years of litigation experience dealing with First Amendment rights. One, Mr. Richard G. Robbins, Esq. was from the Solicitor's Office of the Department of the Interior, and the other, Mr. Arthur Spitzer, Esq., was from the American Civil Liberties Union. Together, we edited my drafts and as a group produced a final product that was eventually incorporated into the new proposed Belarusian Constitution.

In late 1997, I was invited to serve as a Co-Chairman on Attorney General Janet Reno's Civil Disorder Initiative. This was a group of approximately 30 law enforcement, firefighter and legal experts from around the nation. The purpose of the Civil Disorder Initiative was to create a national training course for disorder control. Since the U.S. Army's Civil Disturbance Orientation Course was shelved in the late 1970's there had no longer been a national training standard or training course for handling civil disturbances. The objective of creating such standards and training was achieved and approved by the Department of Justice, the Office of Justice Programs and the Office of Domestic Preparedness. This course, Managing Civil Actions in Threat Incidents (MCATI), is ongoing and has been taught around the nation and presented in several large cities that faced upcoming large demonstrations of the type that was faced in Seattle for the World Trade Organization (WTO) conference in 1999.

I was dispatched by the United States Department of Justice and the United States Park Police to observe the demonstrations associated with the WTO Conference in Seattle, Washington in November/December of 1999. This turned into a 5-day period of turmoil in that city. Well-organized and trained demonstrating groups were more than a match for the city's police forces and command. Many valuable observations were made that were not only incorporated into preparations for similar demonstrations planned for Washington, D.C. (IMF/WB April, 2000), but were also included in the MCATI training modules which have been taught around the country since that time. I assisted other cities in the preparations to prevent similar embarrassing failures in the maintenance of public order. I also served as a member on the Department of Justice, Civil Disorder Initiative Panel, at the 2000 International Association of Chiefs of Police Convention in San Diego, California.

I have provided civil disturbance training to many police organizations through instruction sponsored by the United States Park Police, the FBI National Academy at Quantico, Va., and the MCATI programs developed through the U.S. Department of Justice. I authored, edited or contributed information to the majority of the modules within the two 40-hour courses. (Basic and Command Level Courses) I provided civil disturbance training for the Philadelphia, Pennsylvania Police Department in preparation for the 2000 Republican National Convention, for the Honolulu, Hawaii Police Department in preparation for Pacific Rim Economic Conference in that city and in the State of Georgia in preparation for the Fair Trade of the Americas Act Conference in Atlanta, the G-8 Summit at Sea Island, Georgia in 2004; and Salt Lake City, Utah for the Winter Olympics. I have also provided similar training in many cities across the country. (Dekalb County, GA; Brownsville and Waco, TX; Seattle, WA; Raleigh, NC; Phoenix, AZ; University of Maryland at College Park; Westchester, NY; Nashville, TN; Albuquerque, NM; Harrisonburg, VA; Indianapolis, IN and others)

I presently serve as a consultant to the Civil Disturbance Initiative of the Office of Domestic Preparedness, U.S. Department of Homeland Security and as an advisor to the Management of the United States Park Police in Washington, D.C.

Since retiring from the U.S. Park Police Department as the Assistant Chief of Police in December 2000, I have been a police consultant to the United States Department of Justice after being invited to serve as a Co-Chairman on Attorney General Janet Reno's Civil Disorder Initiative. After developing three training courses I served as a presenter and evaluator for the training being presented around the country in the area of disorder control.  I also presented law enforcement disorder control training in the following areas:

History of Riotous Behavior and Lessons Learned

Planning, Training and Intelligence

Community and Media Relations

Demonstrator tactics

Incident Command System

Personal Protective equipment

Doctrinal Concepts

Team Tactics

Force Multipliers

Command Post Exercises

The training courses that I have co-developed and presented in the area of disorder control are methods used by most well-managed and modern law enforcement agencies in this country. The development of the National Incident Management System (NIMS) and the Incident Command System (ICS) was accomplished in the late 1970's. Their use was mandated by Homeland Security Presidential Directive #5 (Attachment A) and was further defined in the Homeland Security release dated March 1, 2004 (Attachment B). The ICS is recognized as the command and control system to be used for most incidents. When multiple agencies are involved this system assists in areas of planning, command, communications, operations and finance. This system has been successfully used all over this country by federal, state and local organizations in both firefighting and law enforcement. It was used by authorities in New York City for the Republican National Convention in August 2004 which was declared an NSSE. (See Colgan 94:21.)  These concepts have been incorporated into the training that I co-developed and presented for the United States Department of Justice.

I have also evaluated Law Enforcement agencies including Police Deaprtments in Honolulu, Hawaii and in Philadelphia, Pennsylvania regarding their preparedness for upcoming events and was dispatched to observe the police and demonstrator activities associated with the World Trade Organization conference (WTO) in Seattle Washington in 1999. Since retirement I have also been privately retained for the purpose of presenting Disorder Control Training in the following areas of the country:

Baltimore, Maryland

Philadelphia Pennsylvania

Atlanta, Georgia

Rochester County, Virginia

Seattle, Washington

Brownsville, Texas

Phoenix, Arizona

Salt Lake City, Utah

Honolulu, Hawaii

Waco, Texas

Indianapolis, Indiana

Nashville, Tennessee

Harrisonburg, Virginia

University of Maryland

Fort McCoy, Wisconsin

Winston Salem, North Carolina

Westchester County, New York

Albuquerque, New Mexico

Des Moines, Iowa

Atlanta, Georgia, (FTAA)

**Writings:**

I have authored the following:

- United States Park Police Guideline Manual -- *SWAT, Equipment, Operations and Tactics

- United States Park Police Guideline Manual – Canine Operations

- United States Park Police Guideline Manual - Honor Guard

- United States Park Police Guideline Manual – Force Member Funeral Procedures

- United States Park Police Guideline Manual –Mass Arrests

- History of Demonstrations and Lessons Learned – MCATI

- Mass Arrest Procedures – MCATI

- Doctrinal Concepts of Crowd Management – MCATI

In addition, I have co-authored the following:

- Department of the Interior Law Enforcement Policy Manual

- National Park Service Law Enforcement Guideline Manual

* A Restricted Publication

**Awards:** (not all inclusive)

- Department of Interior Valor Award

- Red Cross Life Saving Award of Merit

- District of Columbia Police Association Life Saving Award

- Superior Performance Award (5 Clusters)

- Unit Award Citations (5 Clusters)

- Over 75 written commendations

**National Disorder Assignments (outside normal areas of responsibility)**

| | |
|---|---|
| Yosemite National Park | Civil Disorder (3) |
| Mt. Rushmore Nat'l. Monument | Demonstrations, Civil Disorder, Bombing (3) |

| | |
|---|---|
| Death Valley Nat'l. Monument | Rock Concert (disorder expected) |
| Cape Code Nat'l Seashore | Rock Concert (disorder expected) |
| Minute Man Nat'l. Park | Demonstrations, Bi-Centennial Kickoff |
| Rocky Mountain Nat'l. Park | Demonstrations |
| Philadelphia Nat'l. Historic Park | KKK Demonstrations |
| Martin Luther King Natl. Hist. Site | White Supremacist Demonstration |
| Philadelphia, Pennsylvania | RNC (and demonstrations) |
| Observer Seattle, Washington | World Trade Conference/demonstrations |
| March on Washington, D.C. | 1971 May Day March on Washington, D.C. |

**Incident Commander at Demonstrations/Special Events**

| | |
|---|---|
| *IC Inaugural Celebrations and Demonstrations[7] | 5 |
| *IC Demonstrations with attendance of 100,000+ | 20+ |
| *IC Demonstrations with attendance of 250,000+ | 4 |
| *IC KKK/White Supremacy Demonstrations | 4 |
| Vietnam War Demonstrations | 40+ |
| Civil Rights Demonstrations | 40+ |
| *IC Equal Rights Amendment Demonstrations | 10 |
| *Bicentennial Celebrations/Demonstrations | 1 ¾+ years |
| *IC Desert Shield/Storm Demonstrations (2.5 mo.) | 50+ |
| *IC Desert Storm Victory Celebration | 10 days |
| *IC NATO 50th Anniversary | 5 days |
| *IC 2000 Washington, DC IMF/WB Conference/demonstration | 5 days |

---

[7] A "*" denotes areas under the administrative control of the National Park Service such as the National Mall, The Washington Monument, Lincoln and Jefferson Memorials, The Ellipse, Lafayette Park and the White House Sidewalk and areas outside of the Washington, D.C. metropolitan area.

# **EXHIBIT B**

In order to render my expert opinion in the foregoing Report, in addition to the materials cited in the Report itself, and in addition to my fifty years of experience in law enforcement and disorder control, I reviewed the following documents and materials that are specific to this assignment:

**Video Tapes of Civil Disorder**

    1.      Americas Most Wanted: Riots 8/00

    2.      Not My President, Indy Media 1/20/01

    3.      Cincinnati Riot 4/11-13/01

    4.      FTAA Quebec City 4/20/01 tape 1, 2 &3

    5.      May Day World Wide 5/01/01

    6.      Disorder Control; Asbury Park 7/01, Baltimore 7/18/01, Genoa 7/20/01 Genoa Riots 7/20-21/01

    7.      Ch. 58 9/7/01 Various Police Riots/Other Incidents

    8.      World Eco Forum 1/28/02

    9.      FTAA Miami 11/10-20/03

    10.    Battle in Seattle

    11.    Mount Pleasant Riot

**DVDs**

    12.    Fulton Street #72 TARU Brennan

    13.    Union Square #86 TARU Marini

**Written Materials**

    14.    Deposition of David Cohen (all dates)

    15.    Deposition of John J. Colgan (all dates)

    16.    Deposition of Joseph Esposito (all dates)

    17.    Deposition of Thomas Graham (all dates)

    18.    Deposition of John B. McManus (March 9, 2011)

    19.    Declaration in Support of Petition for Writ of Mandamus (January 22, 2010)

20.   Declaration of Deputy Commissioner David Cohn (June 6, 2007)

21.   RNC and Terrorist Threat briefing (Cohen Exhibit 3, January 20, 2011)

22.   NYPD Intelligence Program RNC (Cohen Exhibit 2, December 17, 2010)

23.   NYPD Disorder Control Guidelines

24.   NYPD Command Level Instructors Guide "Civil Disorder" Police Academy 14-2004

25.   NYPD Legal Guidelines for the RNC (March 10, 2004)

26.   Critique of Mobile Reserve Sector

27.   Patrol Guide 213-06 Large Scale Arrest Processing Procedures, Multi-Agency Coordination Center Briefing Sheets (16 pages)

28.   Patrol Guide 208-08 Fingerprintable Offences

29.   Redacted Intelligence End User Reports (Bates 102515 – 103117)