UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------- x

MICHAEL SCHILLER, et al.,

          Plaintiff,

    -against-

THE CITY OF NEW YORK, et. al,    **04-Civ-7922 (RJS)(JCF)**

       Defendants.

------------------------------------------------------------------- x

CONSOLIDATED RNC CASES    **(RJS)(JCF)**

------------------------------------------------------------------- x


### DEFENDANTS' MEMORANDUM OF LAW IN SUPPORT OF THEIR MOTION FOR SUMMARY JUDGMENT TO DISMISS ALL OF PLAINTIFFS' CLAIMS BASED ON THE NO-SUMMONS POLICY AND FINGERPRINTING POLICY

       MICHAEL A. CARDOZO
    Corporation Counsel of the City of New York
        *Attorney for Defendants*
        100 Church Street
      New York, New York  10007
       Tel: (212) 788-1570


   *Counsel for Defendants:* Jeffrey A. Dougherty
          Peter G. Farrell
          Fred M. Weiler


Dated: New York, New York
   October 3, 2011

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ................................................................................. iv

PRELIMINARY STATEMENT ............................................................................ 1

STATEMENT OF FACTS ................................................................................... 4

ARGUMENT

I.   THE RULE 56 STANDARD FOR SUMMARY
     JUDGMENT ........................................................................................ 4

II.  DEFENDANTS ARE ENTITLED TO SUMMARY
     JUDGMENT ON PLAINTIFFS' FOURTH
     AMENDMENT CLAIMS. ................................................................... 5

     A.  There Is No Constitutional Right To A
         Summons As A Matter Of Law. ..................................................... 5

     B.  It Is Not Unconstitutional To Fingerprint
         Incident To Arrest .......................................................................... 8

III. DEFENDANTS ARE ENTITLED TO SUMMARY
     JUDGMENT ON PLAINTIFFS' FIRST
     AMENDMENT CLAIMS. ................................................................... 9

     A.  Plaintiffs Cannot Show that the Policies Posed
         A Substantial Burden on First Amendment
         Activity. ....................................................................................... 10

     B.  If the Court Finds That The Policies Posed a
         Burden on First Amendment Rights Warranting
         Review, the Intermediate Scrutiny Standard
         Applies Because The Policies Are Based On
         Illegal Conduct And Not the Content or
         Message of any First Amendment Activity. ................................ 13

     C.  The Policies Were Adopted To Address A
         Tripartite Threat of Terrorism, Anarchist
         Violence, and Widespread Civil Disobedience. .......................... 14

         Terrorism .................................................................................... 17

         Anarchist Violence & Destruction of Property ........................... 18

**Page**

Widespread, Continuous Unlawful Activity Geared At Shutting Down the City and the RNC ................................................................. 20

False Identification and No Identification ......................... 21

D.   The Policies Were Designed To Combat The Threats Identified. ...................................................... 21

E.   The Law Recognizes The Reasons That The City Adopted The Policies Serve Significant And Compelling Governmental Interests Unrelated to Suppressing First Amendment Activity. ....................................................... 25

F.   The Conclusions Made and the Measures Taken In Responding to The Intelligence Information Are Entitled to Significant Deference. .................................................... 30

G.   There Was A Reasonable Fit Between The Policies And The Governmental Interests They Advanced And The Policies Did Not Burden More Speech Than Necessary. ............................. 31

H.   Defendants Are Entitled To Summary Judgment On Plaintiffs' First Amendment Retaliation Claims Based On The Policies. .................. 34

IV.   DEFENDANTS ARE ENTITLED TO SUMMARY JUDGMENT ON PLAINTIFFS' FOURTEENTH AMENDMENT CLAIMS. ....................................... 39

A.   Plaintiffs' Equal Protection Claim Coalesces With Their First Amendment Claim And Therefore Should Be Dismissed. ......................... 39

B.   Plaintiffs' Cannot Establish They Were "Similarly Situated" to A Proper Comparative Group. ..................................................... 40

C.   Plaintiffs' Equal Protection Claim Fails Because They Cannot Establish Any Impermissible Motivation. .............................. 43

**Page**

    D.  Any Substantive Due Process Claim Based On
The No Summons Policy Fails As A Matter Of
Law. ............................................................................... 45

V.   DEFENDANTS ARE ENTITLED TO SUMMARY
JUDGMENT ON PLAINTIFFS' CLAIMS
REGARDING N.Y.C.P.L. § 160.10 ....................................... 46

    A.  § 160.10 of the N.Y.S. Criminal Procedure Law
Does Not Provide A Basis For Either A
Federal or State Law Claim. .............................................. 46

    B.  Violation Of § 160.10 Does Not Give Rise To
A Federal Claim Cognizable Under § 1983. ...................... 47

    C.  Under New York State Law, No Claim Exists
For Money Damages For A Violation Of CPL
§ 160.10. ........................................................................... 48

    D.  Assuming *Arguendo* A Provate Right of Action
For Money Damages Exists Under CPL §
160.10, Defendants Did Not Violate The
Statute . ............................................................................. 52

    E.  Defendants Kelly, Esposito And The City Are
Entitled To Governmental Immunity. ................................ 54

VI.  DEFENDANTS ARE ENTITLED TO
QUALIFIED IMMUNITY ..................................................... 56

NO PERSONAL INVOLVEMENT ........................................................ 59

REMAINING STATE LAW CLAIMS ................................................... 60

CONCLUSION ...................................................................................... 60

**TABLE OF AUTHORITIES**

<u>Cases</u>        <u>Pages</u>

*African Trade & Info. Ctr. v. Abromaitis,*
294 F.3d 355 (2d Cir. 2002) ............................................................................ 40, 59

*Albright v. Oliver,*
510 U.S. 266 (1994) .......................................................................................... 46

*Allen v. City of N.Y.,*
03-cv-2829, 2007 U.S. Dist. LEXIS 15 (S.D.N.Y. Jan. 3, 2007) ...................... 36

*Anderson v. City of N.Y.,*
06-cv-5363 2011 U.S. Dist. LEXIS 106619 (E.D.N.Y. Sept. 20, 2011) .......... 43, 44

*Anderson v. Creighton,*
483 U.S. 635 (1987) .......................................................................................... 58

*Anderson v. Liberty Lobby,*
477 U.S. 242 (1986) .......................................................................................... 4

*Anderson-Haider v. State of New York,*
29 Misc.3d 816 (Ct. Cl. 2010) ......................................................................... 52

*Aretakis v. Durivage,*
07-cv-1273, 2009 U.S. Dist LEXIS 7781 (Feb. 3, 2009) ................................. 45

*Ashcroft v. al-Kidd,*
131 S. Ct. 2074 (2011) ..................................................................................... 57, 59

*Atwater v. City of Lago Vista,*
532 U.S. 318 (2001) .......................................................................................... 6

*Baker v. City of New York,*
01 Civ. 4888, 2002 U.S. Dist. LEXIS 18100 (S.D.N.Y., Sept. 26, 2002) .......... 28

*Baker v. McCollan,*
443 U.S. 137 (1979) .......................................................................................... 48

*Balsam v. Delma Engineering Corp.,*
90 N.Y.2d 966 (1997) ....................................................................................... 55

*Bellamy v. Mt. Vernon Hosp.,*
07 Civ. 1801 (Scheindlin, J.)
2009 U.S. Dist. LEXIS, 54141, at *27-28 (S.D.N.Y. June 26, 2009) ............... 60

**Cases**                                                             **Pages**

*Big Apple Food Vendors' Ass'n v. City of New York,*
    168 Misc.2d 483 (N.Y.Sup.Ct. 1995) ................................................................ 28

*Bizzarro v. Miranda,*
    394 F.3d 82 (2d Cir. 2005) ................................................................................ 44

*Boy Scouts of America v. Dale,*
    530 U.S. 640 (2000) .......................................................................................... 11

*Bryant v. City of N.Y.,*
    99-cv-11237, 2003 U.S. Dist. LEXIS 21642 (S.D.N.Y. Dec. 2, 2003) .................. 39

*Bryant v. City of New York,*
    404 F.3d 128 (2d Cir. 2005) .............................................................................. 46

*Burke v. Town of East Hampton,*
    99-cv-5798, 2001 U.S. Dist. LEXIS 22505 (E.D.N.Y. March 16, 2001) ........... 41-42

*Burns Jackson Miller Summit & Spitzer v. Lindner,*
    59 N.Y.2d 314 (1983) ........................................................................................ 49

*Camac v. Long Beach City Sch. Dist.,*
    2011 U.S. Dist. LEXIS 79997 (E.D.N.Y. July 22, 2011) ...................................... 42

*Cameron v. Johnson,*
    390 U.S. 611 (1968) .......................................................................................... 11

*Carew-Reid v. Metro. Transp. Auth.,*
    903 F.2d 914 (2d Cir. 1990) .............................................................................. 33

*Cea v. Ulster County,*
    309 F. Supp. 2d 321 (N.D.N.Y. 2004) ................................................................ 60

*Celotex Corp. v. Catrett,*
    477 U.S. 317 (1986) ............................................................................................ 4

*Christian Legal Soc'y Chapter of the Univ. of Cal. v. Martinez,*
    130 S. Ct. 2971 (2010) ...................................................................................... 31

*Church of the American Knights of the Ku Klux Klan v. Kerik,*
    356 F.3d 197 (2d Cir. 2004) .............................................................................. 30

*City of Cleburne v. Cleburne Living Ctr.,*
    473 U.S. 432 (1985) .......................................................................................... 41

**Cases**                                                                                          **Pages**

*Clark v. Community for Creative Non-Violence,*
   468 U.S. 288 (1984)..................................................................................... 27

*Cobb v. Pozzi,*
   363 F.3d 89 (2d Cir. 2003)......................................................................... 37, 39

*Connell v. Signoracci,*
   153 F.3d 74 (2d Cir. 1998).......................................................................... 36

*County of Sacramento v. Lewis,*
   523 U.S. 833 (1998)..................................................................................... 58

*Cox v. Louisiana,*
   379 U.S. (1965).............................................................................................. 12

*Cuffy v. City of New York,*
   69 N.Y.2d 255 (1987)................................................................................... 55

*Curley v. Village of Suffern,*
   268 F.3d 65 (2d Cir. 2001)......................................................................... 35, 36

*D'Amico v. City of N.Y.,*
   132 F.3d 145 (2d Cir. 1998)........................................................................ 38

*Davis v. Mississippi,*
   394 U.S. 721 (1969)..................................................................................... 8

*De Long v. County of Erie,*
   60 N.Y.2d 296 (1983).................................................................................. 55

*Dinler v. City of New York,*
   607 F.3d 923 (2d Cir. 2010)................................................................. 19, 41, 46, 51

*Esgro v. Serkiz,*
   06-cv-0365, 2007 U.S. Dist. LEXIS 5026 (N.D.N.Y Jan. 23, 2007) ...................... 7

*Estate of Morris v. DaPolito,*
   297 F. Supp. 2d 680 (S.D.N.Y. 2004)........................................................ 42

*Fighting Finest, Inc. v. Bratton,*
   95 F.3d 244 (2d Cir. 1996).......................................................................... 12, 13

*Five Borough Bicycle Club v. City of N.Y.,*
   483 F. Supp. 2d 351 (S.D.N.Y 2007)........................................................ 27

| Cases | Pages |
|---|---|

*Geagan v. City Univ. of N.Y.,*
   2011 U.S. Dist. LEXIS 89018 (S.D.N.Y. July 14, 2011) ........................................................ 40

*Gentile v. Nulty,*
   769 F. Supp. 2d 573 (S.D.N.Y. 2011) ........................................................................ 40, 42

*Gold Diggers, LLC v. Town of Berlin,*
   469 F. Supp. 2d 43 (D. Conn. 2007) ........................................................................ 28

*Graham v. Connor,*
   490 U.S. 386 (1989) ........................................................................ 46

*Grandal v. City of New York,*
   966 F. Supp. 197 (S.D.N.Y. 1997) ........................................................................ 48

*Griffin v. Kelly,*
   *92-cv-8623,* 1994 U.S. Dist. LEXIS 153 (S.D.N.Y. Jan. 11, 1994) ........................ 48

*Grossi v. City of New York,*
   2009 U.S. Dist. LEXIS 110695 (E.D.N.Y. Nov. 3, 2009) ........................................ 39

*Haddock v. City of New York,*
   75 N.Y.2d 478 (1990) ........................................................................ 55

*Harlen Associates v. Incorporated Village of Mineola,*
   273 F.3d 494 (2d Cir. 2001) ........................................................................ 43

*Harlow v. Fitzgerald,*
   457 U.S. 800 (1982) ........................................................................ 57

*Hill v. Colorado,*
   530 U.S. 703 (2000) ........................................................................ 27

*Holder v. Humanitarian Law Project,*
   130 S. Ct. 2705 (2010) ........................................................................ 26, 30, 31

*Holmes v. Poskanzer,*
   08-cv-14750, 342 Fed. Appx. 651, 2009 U.S. App. LEXIS 15976 (2d Cir. 2009) ................ 39

*Hous. Works v. Kerik,*
   283 F.3d 471 (2d Cir. 2002) ........................................................................ 14

*Humanitarian Law Project v. Reno,*
   205 F.3d 1130 (9th Cir. 2000) ........................................................................ 26

**Cases**                                                                                                    **Pages**

*Hunter v. Bryant,*
    502 U.S. 224 (1991) ...................................................................................................... 57

*In Re Integrated Resources,*
    851 F. Supp. 556 (S.D.N.Y. 1994) .......................................................................... 52

*In the Matter of World Trade Center Bombing Litigation,*
    2011 NY Slip Op 6501, 2011 N.Y. LEXIS 2971 (Sept. 22, 2011) ........................ 57

*Int'l Action Ctr. v. City of New York,*
    587 F.3d 521 (2d Cir. 2009) ..................................................................................... 33

*Itzkowitz & Sons, Inc. v. Geraghty,*
    139 Misc. 163 (N.Y. Co. Sup. Ct. 1931) ................................................................. 29

*Jackson v. N.Y.C. Transit Authority,*
    30 A.D.3d 289, 818 N.Y.S.2d 32 (1st Dep't 2006) ................................................ 56

*Jock v. Ransom,*
    05-cv-1108, 2007 U.S. Dist. LEXIS 47027 (N.D.N.Y. June 28, 2007) .................. 43

*Kempkes v. Downey,*
    No. 07-cv-1298, 2008 U.S. Dist. LEXIS 25981 (S.D.N.Y. Mar. 31, 2008) ............ 40

*LeClair v. Saunders,*
    627 F.2d 606 (2d Cir. 1980) ..................................................................................... 45

*Leibin v. Town of Avon,*
    08-cv-266, 2010 U.S. Dist. LEXIS 78791 (D. Conn. Aug. 4, 2010) ........................ 7

*Lino v. City of New York,*
    32 Misc.3d 1207A (N.Y.Sup.Ct. June 24, 2011) ..................................................... 52

*Lisa's Party City, Inc. v. Town of Henrietta,*
    185 F.3d 12 (2d Cir. 1999) ................................................................................. 41, 44

*Lizardo v. Denny's Inc.,*
    270 F.3d 94 (2d Cir. 2001) ....................................................................................... 43

*Lowman v. Town of Concord,*
    93-cv-0636, 1995 U.S. Dist. LEXIS 3041 (W.D.N.Y. Mar. 7, 1995) ....................... 7

*Lyng v. Int'l Union,*
    485 U.S. 360 (1988) ....................................................................................... 11, 12, 13

**Cases**                                                                                                    **Pages**

*Macnamara v. City of New York,*
  04 Civ 9216, (2011 U.S. Dist. LEXIS 53829 (S.D.N.Y. May 19, 2011) ........................ 1, 9, 34

*MacWade v. Kelly,*
  460 F.3d 260 (2006) ................................................................................................ 26, 31

*Malley v. Briggs,*
  475 U.S. 335 (1986) ................................................................................................ 58, 59

*Mangango v. Cambariere,*
  04-cv-4980, 2007 U.S. Dist. LEXIS 72595 (S.D.N.Y. Sept. 27, 2007) ................................ 42

*Marcavage v. City of New York,*
  05 Civ. 4949, 2010 U.S. Dist. LEXIS 107724 (S.D.N.Y. 2010) ...................................... 16, 27

*McCullough v. Wyandanch Union Free Sch.,*
  187 F.3d 272 (2d Cir. 1999) ........................................................................................ 58

*McDermott v. City of New York,*
  00–cv-8311, 2002 U.S. Dist. LEXIS 2893 (S.D.N.Y. Feb. 25, 2002) ...................................... 7

*Mei v. City of New York,*
  06 Civ. 00296, 2006 U.S. Dist. LEXIS 75871 ................................................................ 56

*Menotti v. City of Seattle,*
  409 F.3d 1113 (9th Cir. 2005) ................................................................................ 27, 29

*Mich. Dep't of State Police v. Sitz,*
  496 U.S. 444 (1990) .................................................................................................... 31

*Minor v. Clinton Co. N.Y.,*
  541 F.3d 464 (2d Cir. 2008) .......................................................................................... 45

*Neilson v. D'Angelis,*
  409 F.3d 100 (2d Cir. 2005) .......................................................................................... 43

*New York v. Ferber,*
  458 U.S. 747 (1982) .................................................................................................... 11

*Pearson v. Callahan,*
  555 U.S. 223 (2009) ................................................................................................ 57, 58

*Pope v. State,*
  19 A.D.3d 573, 796 N.Y.S.2d 548 (2d Dep't 2005) .......................................................... 57

**Cases**                                                                                          **Pages**

*Richardson v. N.Y. City Health & Hosps. Corp.,*
    05-cv-6278, 2009 U.S. Dist. LEXIS 25247 (S.D.N.Y. March 25, 2009) ............................. 36

*Sands v. City of N.Y.,*
    04-cv-5275, 2006 U.S. Dist. LEXIS 72111 (E.D.N.Y. Oct. 3, 2006) ...................................... 7

*Sanitation & Recycling Indus. v. City of New York,*
    107 F.3d 985 (2d Cir. 1997)................................................................................................ 28

*Saucier v. Katz,*
    533 U.S. 194 (2001)................................................................................................. 58, 59

*Schiller v. City of New York,*
    No. 04 CV 7922, 2008 U.S. Dist. LEXIS 4253 (S.D.N.Y. Jan. 23, 2008) .............................. 48

*Sengmany Savatxath v. Stoeckel,*
    10-cv-1089, 2011 U.S. Dist. LEXIS 49834 (N.D.N.Y May 10, 2011) ................................... 42

*Sheehy v. Big Flats Community Day, Inc.,*
    73 N.Y.2d 629 (1989) ............................................................................................... passim

*Show v. Patterson,*
    955 F. Supp. 182 (S.D.N.Y. 1997)...................................................................................... 60

*Silverstein v. Lawrence Union Free Sch. Dist.*
    No. 15, 10-cv-993, 2011 U.S. Dist. LEXIS 34200 (E.D.N.Y. Feb. 16, 2011) ....................... 42

*Smart v. City of New York,*
    08-cv-2203, 2009 U.S. Dist. LEXIS 30241 (S.D.N.Y. Mar. 30, 2009)................................... 7

*Sparks v. Seltzer,*
    380 Fed. Appx. 26 (2d Cir. 2010)................................................................................. 11, 12

*Sweeney v. Leone,*
    3:05-cv-871, 2006 U.S. Dist. LEXIS 57358, at *40 (D. Conn. July 31, 2006) ...................... 40

*Sylvester v. City of New York,*
    385 F. Supp. 2d 431 (S.D.N.Y. 2005)................................................................................. 52

*Tabbaa v. Chertoff,*
    2005 U.S. Dist. LEXIS 38189 (W.D.N.Y. Dec. 21, 2005),
    *affirmed,* 509 F.3d 89 (2d Cir. 2007) ....................................................................... passim

*Thom v. New York Stock Exchange,*
    306 F. Supp. 1002 (S.D.N.Y. 1969).................................................................................... 8

**Cases**             **Pages**

*Turner Broad. Sys. v. FCC,*
  520 U.S. 180 (1997)................................................................. 15, 32

*U.S. v. Alameh,*
  341 F.3d 167 (2d Cir 2003)..................................................... 44

*U.S. v. Armstrong,*
  517 U.S. 456 (1996)................................................................. 44

*U.S. v. Flores-Montano,*
  541 U.S. 149 (2004)................................................................. 26

*U.S. v. McFadden,*
  238 F.3d 198 (2d. Cir. 2001).................................................. 7

*U.S. v. Rickenbacker,*
  309 F.2d 462 (2d Cir. 1962).................................................... 44

*Uhr v. East Greenbush Central School Dist.,*
  94 N.Y.2d at 40...................................................................... 50, 52

*United for Peace and Justice v. City of N.Y.,*
  243 F. Supp. 2d 19 (S.D.N.Y. 2003)..................................... 28, 31

*United States v. Amerson,*
  483 F.3d 73 (2d Cir. 2007)...................................................... 8

*United States v. Kelly,*
  55 F.2d 67 (2d Cir. 1932)........................................................ 8, 44

*United States v. Marzzarella,*
  614 F.3d 85 (3d Cir. 2010)...................................................... 32

*United States v. O'Brien,*
  391 U.S. 367 (1968)................................................................. 15, 32

*United States v. Ortiz,*
  05 CR 6076, 2007 U.S. Dist. LEXIS 21267 (W.D.N.Y. Mar. 23, 2007) .................. 7

*United States v. Ortiz-Gonzalbo,*
  1997 U.S. App. LEXIS 34511 (2d Cir 1997) ......................... 8

*Virginia v. Moore,*
  553 U.S. 164 (2008)................................................................. 5, 28, 45, 48

**Cases**                                                                    **Pages**

*Ward v. Rock Against Racism,*
   491 U.S. 781 (1989)..................................................................................... 14

*Watson v. City of New York,*
   92 F.3d 31 (2d Cir. 1996).......................................................................... 48, 52

*Wayte v. United States,*
   470 U.S. 598 (1985)..................................................................................... 44

*Williams v. Schultz,*
   *06-cv-1104,* 2008 U.S. Dist. LEXIS 112729 (N.D.N.Y. Oct., 16, 2008) ............ 44

*Williams v. Smith,*
   781 F.2d 319 (2d Cir. 1986)........................................................................ 60

*Williams v. Town of Greenburgh,*
   535 F.3d 71 (2d Cir. 2008)........................................................................ 35

*Young v. County of Fulton,*
   160 F.3d 899 (2d Cir. 1998)....................................................................... 58

*Younger v. Harris,*
   401 U.S. 37 (1971)..................................................................................... 13

*Zambrana v. N.Y.C. Transit Authority,*
   14 A.D.3d 23, 786 N.Y.S.2d 488 (1st Dep't 2004) ....................................... 56

**Statutes**

28 U.S.C. §1367(c)(1)...................................................................................... 52

42 U.S.C. §1983....................................................................................... 46, 47, 59

Fed. R. Civ. P. 56............................................................................................ 1,4

Local Rule 56.1..................................................................................... passim

N.Y. Crim. Proc. Law §130.60......................................................................... 52

N.Y. Crim. Proc. Law §140.10.......................................................................... 8

N.Y. Crim. Proc. Law §140.20(1) ............................................................... 47, 51

N.Y. Crim. Proc. Law §150.70......................................................................... 52

N.Y. Crim. Proc. Law §160.10.................................................................. passim

**Cases**                                                                **Pages**

N.Y. Crim. Proc. Law § 160.10[2] ................................................................. 53

N.Y. Crim. Proc. Law § 160.10[2](a-b) ....................................................... 53

N.Y. Crim. Proc. Law § 160.50 ............................................................. 47, 50, 51

N.Y. Crim. Proc. Law § 160.55 ..................................................................... 50

N.Y. Crim. Proc. Law § 720.35 ..................................................................... 51

N.Y. Crim. Proc. Law § 940 ................................................................... 48, 51

N.Y. Educ. Law § 905 ................................................................................. 51

N.Y. Gen. Oblig. Law § 11-101 .................................................................. 49

N.Y. Penal Law § 240.37 ............................................................................ 52

N.Y. Penal Law § 260.20(4) ........................................................................ 56

Defendants respectfully submit this memorandum of law in support of their motion for summary judgment pursuant to Fed.R.Civ.P. 56 to dismiss Plaintiffs' federal and state law claims regarding the No Summons and Fingerprinting Policies because there is no genuine issue of material fact at issue and Defendants are entitled to summary judgment as a matter of law.

## PRELIMINARY STATEMENT

During the 2004 Republican National Convention in New York City ("the RNC" or the "Convention"), the New York City Police Department (the "NYPD") implemented a policy of not issuing summonses to individuals engaged in criminal conduct that was related to the RNC in favor of custodial arrest (during which they would either receive a desk appearance ticket if qualified or be arraigned) (the "No-Summons Policy").[1]  A related policy implemented by the

---

[1] It appears that Plaintiffs in 42 cases allege the No-Summons Policy was unconstitutional and include Plaintiffs in: *Abdell v. City of New York,* 05-cv-8453; *Adams v. City of New York* 05-cv-9484; *Araneda v. City of New York* 05-cv-9738; *Bastidas v. City of New York* 05-cv-7670; *Biddle v. City of New York* 05-cv-1570; *Botbol v. City of New York* 05-cv-1572; *Bunim v. City of New York* 05-cv-1562; *Coburn v. City of New York* 05-cv-7623; *Cohen v. City of New York* 05-cv-6780, *Concepcion v. City of New York* 05-cv-8501; *Crotty v. City of New York* 05-cv-7577; *Dinler v. City of New York* 04-cv-7921; *Drescher v. City of New York* 05-cv-7541; *Dudek v. City of New York* 04-cv-10178; *Eastwood v. City of New York* 05-cv-9483; *Epstein v. City of New York* 05-cv-1563; *Galitzer v. City of New York* 05-cv-7669; *Garbini v. City of New York* 05-cv-1565; *Greenwald v. City of New York* 05-cv-1566; *Grosso v. City of New York* 05-cv-5080; *Jusick v. City of New York* 07-cv-7683; *Kennedy v. City of New York* 07-cv-7678; *Lalier v. City of New York* 05-cv-7580; *Lee v. City of New York* 05-cv-5528; *Macnamara v. City of New York* 04-cv-9216; *Manders v. City of New York* 07-cv-7752; *Meehan v. City of New York* 05-cv-5268; *Moran v. City of New York* 05-cv-1571; *Pagoda v. City of New York* 05-cv-7546; *Phillips v. City of New York* 05-cv-7624; *Pickett v. City of New York* 05-cv-1567; *Portera v. City of New York* 05-cv-9985; *Rigby v. City of New York* 07-cv-7751; *Ryan v. City of New York* 05-cv-1564; *Schiller v. City of New York* 04-cv-7922*; Sikelianos v. City of New York* 05-cv-7673*; Sloan v. City of New York* 05-cv-7668; *Stark v. City of New York* 05-cv-7579; *Tikkun v. City of New York* 05-cv-9901; *Tremayne v. City of New York* 05-cv-1568; *Winkleman v. City of New York* 05-cv-2910; and *Xu v. City of New York* 05-cv-7672.

NYPD was that all RNC arrestees were to be fingerprinted as part of their arrest processing (the "Fingerprinting Policy") (collectively the "Policies").[2]

The Policies were adopted in direct response to intelligence information obtained by the NYPD's Intelligence Division indicating the City faced a tripartite threat during the RNC of terrorism, anarchist violence and widespread civil disobedience. The intelligence also revealed that the City and the RNC were going to be a focal point of protests and that hundreds of thousands of demonstrators were expected. NYPD Commissioner of Intelligence David Cohen led the process of gathering and analyzing this intelligence information.

Commissioner Cohen and the NYPD were also aware of prior high profile events that had been the target of wide spread disorder in other cities. The quintessential example of the kind of disorder that could occur had occurred just a few years earlier in Seattle during the 1999 World Trade Organization Conference. That event became known as the "Battle of Seattle" because of the disastrous civil disorder and chaos that resulted when large-scale demonstrations spiraled out of control. Both the threats to the 2004 RNC and New York City combined with the history of disorder at similar events were discussed by Commissioner Cohen and members of the intelligence division with Police Commissioner Raymond Kelly and Chief of Department Joseph Esposito.

Specifically, experience and the intelligence suggested that: (1) the City would be a more appealing target for a terrorist attack during the RNC due to the high-profile and symbolic nature of a national political convention and the influx of high-ranking government officials, delegates, demonstrators and others expected for the RNC; (2) known and convicted violent criminals

---

[2] It appears that Plaintiffs in 40 cases allege the Fingerprinting Policy was unconstitutional. The same Plaintiffs making allegations regarding the No-Summons Policy identified in note 1 *supra* allege the Fingerprinting Policy was unconstitutional, **excluding** *Botbol v. City of New York* 05-cv-1572; and *Lalier v. City of New York* 05-cv-7580.

would come to the City during the RNC to carry out acts threatening public safety and property; (3) large numbers of people would engage in continuous unlawful activity geared at shutting down the City and the RNC and bringing both to a halt; and (4) many individuals, including people coming from out of state, who were intent on engaging in criminal behavior and participating in widespread civil disobedience were going to utilize false identification or not carry identification to confuse law enforcement and elude prosecution.

It was in direct response to these threats, the overall tripartite threat environment, and the experiences of disorder in other cities when hosting similar high profile events that the NYPD adopted the No Summons and Fingerprinting Policies. The Policies were in effect for a total of 7 days starting a few days prior to and continuing through the Convention.

Plaintiffs in these consolidated RNC cases allege that the Policies violated their rights under the First, Fourth, and Fourteenth Amendments. As demonstrated below, (i) the Policies were constitutional under the Fourth Amendment because Supreme Court precedent dictates that there is no constitutional right to a summons and that fingerprinting incident to arrest is not an infringement of constitutional rights; (ii) the Policies did not burden First Amendment activity because they were aimed at conduct, -- illegal conduct -- and not speech; (iii) the Policies advanced important, significant, substantial and compelling governmental interests, and there was a reasonable fit between the Policies and the interests they advanced; (iv) the record is devoid of any evidence of animus or retaliation behind the Policies and, to the contrary, illustrates that the City took considerable efforts to foster free expression during the RNC; (v) the equal protection claims coalesce with the First Amendment claims and are otherwise deficient because there is no evidence of a similarly situated comparative group; (vi) substantive due process is an improper framework to analyze the constitutionality of the Policies; and (vii)

Plaintiffs' state law claims also fail.  Additionally, Defendants are entitled to both qualified immunity and governmental immunity.  Accordingly, defendants should be granted summary judgment on all of Plaintiffs' claims arising out of the Policies.

## STATEMENT OF FACTS

For a complete statement of relevant undisputed facts, Defendants respectfully refer the Court to their Rule 56.1 Statement.

## ARGUMENT

### I.     The Rule 56 Standard For Summary Judgment

Defendants seek summary judgment pursuant to Rule 56(c) of the Federal Rules of Civil Procedure.  Under Rule 56(c), summary judgment is warranted when, viewing the evidence in a light most favorable to the non-movant, the Court determines that there is no genuine issue of material fact and the movant is entitled to a judgment as a matter of law.  Fed. R. Civ. P. 56; *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986).  In order to defeat a motion for summary judgment, the Court must be satisfied that evidence exists that would allow the finder of fact to reasonably find for the party opposing the motion.  The factual dispute must be material and genuine in order to defeat the summary judgment motion.  *Anderson v. Liberty Lobby,* 477 U.S. 242, 247-48 (1986).  Summary judgment is mandated where a party that bears the burden of proof fails to make a showing sufficient to establish the *prima facie* elements of a claim.  *See Celotex Corp.*, 477 U.S. at 322-23.  The complete failure of proof concerning an essential element of the non-moving party's case necessarily renders all other facts immaterial.  *Id.*  "One of the purposes of the summary judgment rule is to isolate and dispose of factually unsupported claims or defenses, and we think it should be interpreted in a way that allows it to accomplish this purpose." *Id.* at 323-24.

After seven years of exhaustive discovery in the Consolidated RNC cases, the RNC Plaintiffs cannot establish the essential elements of their claims regarding the No-Summons and Fingerprinting Policies.  Accordingly, Defendants' motion for summary judgment on Plaintiffs' First, Fourth and Fourteenth Amendment claims and on the related state law claims should be granted.

## II.   DEFENDANTS ARE ENTITLED TO SUMMARY JUDGMENT ON PLAINTIFFS' FOURTH AMENDMENT CLAIMS.

### A.   There Is No Constitutional Right To A Summons As A Matter Of Law.

Defendants are entitled to summary judgment on Plaintiffs' Fourth Amendment claim regarding the No Summons Policy because as a matter of law there is no constitutional right to a summons.  In *Virginia v. Moore*, 553 U.S. 164 (2008) the police arrested and searched defendant Moore for driving with a suspended license.  553 U.S. at 166-67.  Significantly, under Virginia state law, the officers should have issued Moore a summons instead of arresting him.  *Id.* at 167.  Despite the state law's clear mandate to the contrary, the Supreme Court found the arrest constitutional under the Fourth Amendment.  *Id.* at 173-76.  The Supreme Court stated, "[w]e conclude that warrantless arrests for crimes committed in the presence of an arresting officer are reasonable under the Constitution[.]"  *Id.* at 176.  In support of its holding, the Supreme Court emphasized that "[a]rrest ensures that a suspect appears to answer charges and does not continue a crime, and it safeguards evidence and enables officers to conduct an in-custody investigation."  *Id.* at 173. [3]

---

[3] Notably, these <u>exact</u> governmental interests – ensuring a suspect appears to answer the charges against him or her and preventing continuous criminal behavior -- informed the decision to adopt the Policies during the RNC.  Defendants' Statement of Facts Pursuant to Local Rule 56.1, dated October 3, 2011 at ¶¶ 62, 80-135, 173-195, 216-226) (hereinafter all numbered citations refer to paragraphs in Defendants' 56.1 Statement); *see also infra* Section III (D-E).

The Supreme Court reached a similar conclusion in an earlier decision.  In *Atwater v. City of Lago Vista*, 532 U.S. 318 (2001), the Supreme Court affirmed an order granting summary judgment to defendants in a § 1983 case.  *Id.* at 325.  In *Atwater*, a Texas mother who was driving a pick up truck with her small children in the front seat (none of whom were wearing seatbelts) was pulled over for a seatbelt violation and subjected to custodial arrest.  *Id* at 323-325.  Atwater was "handcuffed," placed in a squad car and taken to a police station, where she was directed to "remove her shoes, jewelry, and eyeglasses, and empty her pockets."  *Id.* at 324.  Officers also "took Atwater's "mug shot" and placed her "in a jail cell" until she was "taken before a magistrate and released."  *Id.*  Even though the seatbelt violation at issue was only punishable by a *de minimis* fine, the Supreme Court determined that both <u>custodial arrest</u> and <u>the processing inherent with custodial arrest</u> were reasonable under the Fourth Amendment.  *Id.* at 323.  The *Atwater* Court held that the "arrest satisfied constitutional requirements" because there was "no dispute" that the police had "probable cause" to believe that a crime had been committed in their presence and the police were "accordingly authorized (not required, but authorized) to make a custodial arrest without balancing costs and benefits or determining whether or not [the] arrest was in some sense necessary."  *Id.* at 354.  Additionally, the Supreme Court noted that while the "arrest was surely humiliating, … it was no more harmful to . . . privacy or . . . physical interests than the normal custodial arrest."  *Id.* (internal quotations omitted).

The Second Circuit and its district courts similarly recognize that warrantless arrests for minor violations of the law are proper.  *See, e.g., Bryant v. City of New York*, 404 F.3d 128, 136-39 (2d Cir. 2005) (in a § 1983 case involving arrests at a demonstration, the Second Circuit held that a desk appearance ticket, an early release mechanism similar to a summons, is not required

under New York law and "issuance of a DAT for the release of an arrestee immediately upon completion of the post-arrest administrative procedures is not constitutionally required."); *U.S. v. McFadden*, 238 F.3d 198, 203-4 (2d. Cir. 2001) (affirming denial of motion to suppress a firearm and finding officers had probable cause to arrest McFadden for riding his bicycle on the sidewalk which is a traffic infraction); *Leibin v. Town of Avon*, 08-cv-266, 2010 U.S. Dist. LEXIS 78791, at *36 (D. Conn. Aug. 4, 2010) (relying on *Atwater* and indicating custodial arrest was proper where officer had probable cause to arrest for failing to drive in a single lane); *Smart v. City of New York*, 08-cv-2203, 2009 U.S. Dist. LEXIS 30241, at *13-14 (S.D.N.Y. Mar. 30, 2009) (holding a custodial arrest for double parking was reasonable under the Fourth Amendment "[e]ven though such a violation may be reasonably characterized as a 'minor' offense"); *United States v. Ortiz*, 05 CR 6076, 2007 U.S. Dist. LEXIS 21267, at *14-19 (W.D.N.Y. Mar. 23, 2007) (denying motion to suppress tangible evidence when underlying seizure was valid based on officer's observation of conduct amounting to a violation of open container law); *Esgro v. Serkiz*, 06-cv-0365, 2007 U.S. Dist. LEXIS 5026, at *5-6 , (N.D.N.Y Jan. 23, 2007) (dismissing Fourth Amendment claims based, *inter alia*, on custodial arrest stemming from police officer observing plaintiff ride his bicycle against traffic, thereby violating the Vehicle and Traffic Law of New York State); *Sands v. City of N.Y.*, 04-cv-5275, 2006 U.S. Dist. LEXIS 72111, at *13-15 (E.D.N.Y. Oct. 3, 2006) (granting defendants summary judgment on false arrest claim in a § 1983 case where police observed plaintiff litter -- a Health Code violation -- by tearing up a parking ticket she was issued and tossing it on the ground); *McDermott v. City of New York*, 00–cv-8311, 2002 U.S. Dist. LEXIS 2893, at *18-22, (S.D.N.Y. Feb. 25, 2002) (granting defendants' 12(b)(6) motion in a § 1983 case and rejecting plaintiff's challenge to police officer's right to effect a custodial arrest for an open container offense); *Lowman v. Town of*

*Concord*, 93-cv-0636, 1995 U.S. Dist. LEXIS 3041, at *11 (W.D.N.Y. Mar. 7, 1995) (granting defendants' motions for summary judgment in a § 1983 case in which plaintiff alleged he was subject to a warrantless arrest for fishing without a license).

Finally, custodial arrest for minor offenses is also authorized by New York law which states a police officer may arrest a person for "any offense when he has reasonable cause to believe that such as person has committed such offense in his presence." CPL § 140.10. Thus, there is no constitutional right to a summons under federal or state law and Plaintiffs' claims under the Fourth Amendment must be dismissed.

### B.   It Is Not Unconstitutional To Fingerprint Incident To Arrest

It is also well established that fingerprinting an individual incident to arrest does not violate the Fourth Amendment.   *See Davis v. Mississippi*, 394 U.S. 721, 727 (1969); *United States v. Ortiz-Gonzalbo*, 1997 U.S. App. LEXIS 34511, at *7-8 (2d Cir. 1997) *see also United States v. Kelly*, 55 F.2d 67, 70 (2d Cir. 1932) (rejecting argument that fingerprinting should be limited to instances involving serious crimes and finding no constitutional right to be free from fingerprinting after arrest); *United States v. Amerson*, 483 F.3d 73, 86 n.14 (2d Cir. 2007) (citing decision in *Kelly* approvingly, "[m]any of the arguments that this Court made seventy-five years ago in upholding the constitutionality of fingerprinting of arrestees – the modern technology of that day – apply equally in our own time to DNA identification.").   "Fingerprinting involves none of the probing into an individual's private life and thoughts that mark an interrogation or a search." *Davis*, 394 U.S. at 727; *Thom v. New York Stock Exchange*, 306 F.Supp. 1002, 1007-1008 (S.D.N.Y. 1969) ("The day is long past when fingerprinting carried with it a stigma or any

implication of criminality").  Accordingly, plaintiffs' "fingerprinting claims" that are premised upon a violation of the Fourth Amendment must be dismissed.[4]

### III.   DEFENDANTS ARE ENTITLED TO SUMMARY JUDGMENT ON PLAINTIFFS' FIRST AMENDMENT CLAIMS.

The RNC Plaintiffs contend that the Policies violated their rights of free speech and association under the First Amendment.  The RNC Plaintiffs appear generally to allege that the Policies singled out for punishment those individuals engaged in or associated with constitutionally protected First Amendment activities.[5]  Plaintiffs also contend that the City failed to articulate or provide evidence of any legally sufficient justifications for the Policies. Plaintiffs now ask this Court to infer that the Policies were implemented to punish and deter their First Amendment protected activity.  As set forth below, Plaintiffs First Amendment claim fails for two reasons.  First, Plaintiffs cannot meet their threshold requirement and show the Policies placed a "direct and substantial" burden on First Amendment activity because the Policies were directed at unlawful <u>conduct</u> and not speech or free association.  Second, assuming the Policies did place a "direct and substantial" burden on First Amendment activity (which they did not), the Policies were justified because they serve "significant," "substantial," "important" and even "compelling" governmental interests.

---

[4] Plaintiffs' "fingerprinting" claims based upon the alleged violation of §160.10 of the N.Y.S. C.P.L. are addressed *infra* in Part V of this Brief.

[5] Some RNC Plaintiffs testified at their depositions that they were not engaged in any First Amendment protected activity preceding their arrests.  Therefore, these plaintiffs lack standing to pursue any First Amendment claim because they have not suffered any cognizable First Amendment injury.  *See MacNamara v. City of New York*, 04 Civ 9216, (2011 U.S. Dist. LEXIS 53829, at *38-40 (S.D.N.Y. May 19, 2011) (Sullivan, J.) (holding that because plaintiff Ali-Khan was arrested while rollerblading for recreation and exercise she did not suffer any cognizable First Amendment injury).  Defendants do not assert these individual plaintiff-specific arguments in this initial round of briefing (similar to the agreement regarding the probable cause briefing). If necessary, Defendants will make arguments related to specific plaintiffs in subsequent briefing or at trial.

### A.  Plaintiffs Cannot Show that the Policies Posed A Substantial Burden on First Amendment Activity.

Plaintiffs contend the No-Summons and Fingerprinting Policies violated their First Amendment rights by denying them the ability to attend and participate in demonstrations.  Thus, as a threshold matter, the Court must consider whether the Policies presented a cognizable burden on First Amendment rights.  *See Sparks v. Seltzer*, 380 Fed. Appx. 26, 27 (2d Cir. 2010) ("to establish a First Amendment violation, a plaintiff must as a threshold matter show that her rights have been burdened or restricted"); *Tabbaa v. Chertoff*, 509 F.3d 89, 101 (2d Cir. 2007) (where plaintiffs allege government action violated First Amendment activities, "[t]he first question we must answer, then, is whether and to what extent defendants' actions burdened that right.") (citing *Boy Scouts of America v. Dale*, 530 U.S. 640, 657-59 (2000)); *Fighting Finest, Inc. v. Bratton*, 95 F.3d 244, 228 (2d Cir. 1996) ("to be cognizable the interference with [Plaintiffs'] [First Amendment] rights must be direct and substantial or significant.") (citing *Lyng v. Int'l Union*, 485 U.S. 360, 367 (1988)).

The Policies neither regulated speech nor directly inhibited free association.  They also did not target any speech or association based on content.  Instead, the Policies were directed at <u>conduct</u> and were limited in their application to individuals who engaged in unlawful conduct.[6]  Unlike most regulations triggering First Amendment scrutiny, there was no proscriptive element to the Policies at issue here.  Indeed, the No-Summons and Fingerprinting Policies did not prohibit any type of protest or demonstration, or any free speech or association.[7]  Moreover, the

---

[6] The Policies favored custodial arrest and fingerprinting rather than issuing summonses -- both of which are constitutionally reasonable law enforcement decisions under the Fourth Amendment and well-established Supreme Court authority.  *See infra.*

[7] Even laws prohibiting conduct, which are intertwined with expression do not abridge constitutional liberty when the activity bears no necessary relationship to the freedom to distribute information or opinion.  *See Cameron v. Johnson*, 390 U.S. 611, 617 (1968)

Supreme Court has held that even when accompanied by speech or association, unlawful conduct is beyond the reach of First Amendment protection. *New York v. Ferber,* 458 U.S. 747, 761-62 (1982) ("It rarely has been suggested that the constitutional freedom for speech…extends its immunity to speech or writing used as an integral part of conduct in violation of a valid criminal statute.").   "The rights of free speech and assembly, while fundamental in our democratic society, still do not mean that everyone with opinions or beliefs to express may address a group at any public place and at any time [and] [t]he constitutional guarantee of liberty implies the existence of an organized society maintaining public order, without which liberty itself would be lost in the excesses of anarchy." *Cox v. Louisiana*, 379 U.S. 536, 554 (1965).   Accordingly, Plaintiffs cannot make their threshold showing.

At most, the Policies extended the time Plaintiffs were in police custody for their unlawful conduct.  But, "[t]he Supreme Court has held that, consonant with the First Amendment, the government may engage in some conduct that incidentally inhibits protected forms of association." *Fighting Finest, Inc. v. Bratton*, 95 F.3d 244, 228 (2d Cir. 1996) (dismissing complaint for failure to state a First Amendment claim where there was no cognizable interference with associational rights) (citing *Lyng v. Int'l Union*, 485 U.S. 360 (1988) other citations omitted).

Even when a challenged law or policy "might make it more difficult for individuals to exercise their freedom of association, this consequence does not, without more, result in a violation of the First Amendment." *Fighting Finest, Inc.* 95 F.3d at 228.  Instead the violation or burden to First Amendment rights "must be direct and substantial or significant." *See id*.

---

(upholding constitutionality of Mississippi anti-picketing statute, which criminalized  picketing in such a manner as to obstruct or unreasonably interfere with free ingress or egress to and from any courthouses or other public buildings).

(quoting *Lyng*, 485 U.S. at 366, 367 & n.5 (1988)); *Sparks v. Seltzer*, 380 Fed. Appx. 26, 27 (2d Cir. 2010) (affirming district court decision granting defendants' summary judgment on First Amendment speech and associational rights claim where plaintiff could not establish the threshold that his First Amendment rights were burdened or restricted by the challenged policy, "a plaintiff must as a threshold matter show that her rights have been burdened or restricted.").

When a government regulation or policy is not directed at speech or association it does not rise to the level of a "direct and substantial" burden on First Amendment rights.  Indeed, in *Lyng*, the Supreme Court found that a law refusing food stamp benefits to striking workers did not infringe the associational rights of those individuals and their unions where it did not "prevent the members … from associating together nor burden in any significant manner their ability to do so."  485 U.S. at 228.  Similarly, in *Fighting Finest, Inc.*, the Second Circuit held that the decision to withdraw official NYPD recognition of a boxing team and prohibit it from posting its notices on police premises did not "directly and substantially interfere" with the rights of its members to exercise their freedom of association because that rule "did not prevent the members of [the boxing team] from associating together nor burden in any significant manner their ability to do so."  95 F.3d at 228.  (internal citations and quotations omitted).

Here, the Policies were not a "direct and substantial" burden on First Amendment rights. Indeed, one was not subject to the Policies unless one was believed to have broken the law.  The lack of a "direct and substantial" burden is highlighted by the fact that the No-Summons and Fingerprinting Policies in no way interfered with the First Amendment rights of the nearly 800,000 demonstrators who exercised their First Amendment rights without arrest.  (56.1 ¶¶ 7-12, 227-93).  Thus, it was <u>only</u> if you engaged in unlawful activity and were arrested that you became subject to the Policies and could not demonstrate (while in custody) as the other 800,000

persons in fact had done without being arrested.[8]  (56.1 ¶¶ 165-172, 229-30).  Indeed, any effect

custodial arrest had on an RNC arrestees' First Amendment activities was a collateral

consequence of their unlawful acts and at best incidental.  Accordingly, Plaintiffs have not met

their threshold showing of a "direct and substantial burden" and therefore Defendants should be

granted summary judgment on Plaintiffs' First Amendment claims.

**B. If the Court Finds That The Policies Posed a Burden on First Amendment Rights Warranting Review, the Intermediate Scrutiny Standard Applies Because The Policies Are Based On Illegal Conduct And Not the Content or Message of any First Amendment Activity.**

If the Court disagrees and finds that Plaintiffs have made the necessary threshold

showing that the No-Summons and Fingerprinting Policies posed a burden on their First

Amendment rights then the Policies should be examined under the intermediate scrutiny test.

Regulations that "do not seek to regulate messages or distinguish between different types of

speech[,]" yet may have "an incidental effect on some speakers or messages but not others," are

deemed content-neutral and are subject to intermediate scrutiny.  *See Int'l Action Ctr. v. City of

New York*, 587 F.3d 521, 526 (2d Cir. 2009) (New York City parade regulation banning new

parades along 5th Avenue was content-neutral and therefore subject to intermediate scrutiny,

which it satisfied) (citing *Ward v. Rock Against Racism*, 491 U.S. 781, 791, (1989); *Hous. Works

v. Kerik*, 283 F.3d 471, 480 (2d Cir. 2002) (finding regulation banning sound amplified rallies

near City hall as content neutral "even if it has an incidental effect on some speakers or messages

but not others").

---

[8] Moreover, any allegation that the Policies "chilled" or inhibited  First Amendment expression is not only belied by the 800,000 individuals who demonstrated in New York City but is also constitutionally insufficient.  *See Younger v. Harris*, 401 U.S. 37, 51 (1971) (reversing finding that California Criminal Syndicalism Act was unconstitutionally vague and overbroad where plaintiffs lacked standing,"[t]he existence of a chilling effect, even in the area of First Amendment rights, has never been considered a sufficient basis, in and of itself, for prohibiting state action.") (internal quotations omitted).

Significantly, there is no evidence in the record that the Policies were adopted or applied because of the content of speech occurring during the RNC or because of any disagreement with any particular message. Instead, the Policies were adopted based on the intelligence information the NYPD received and analyzed in advance of the RNC, which indicated that there were distinct threats to public safety and threats of widespread disorder and continual unlawful conduct geared at shutting down the City and the Convention. (56.1 ¶¶ 41-226). Accordingly, because individuals were <u>only</u> subject to this policy based on their <u>conduct</u> (illegal activity) and <u>not the content of their speech</u>, the Policies should be subject to intermediate scrutiny. Under the intermediate scrutiny test the Policies must (1) advance "important governmental interests unrelated to the suppression of free speech"; and (2) "not burden substantially more speech than necessary to further those interests." *See, e.g., Turner Broad. Sys. v. FCC*, 520 U.S. 180, 189 (1997) (requiring the regulation to serve an "important governmental interests unrelated to the suppression of free speech" and "not burden substantially more speech than necessary to further those interests") (citing *United States v. O'Brien*, 391 U.S. 367, 377 (1968) for intermediate scrutiny standard applicable to content neutral regulations).

### C. The Policies Were Adopted To Address A Tripartite Threat of Terrorism, <u>Anarchist Violence, and Widespread Civil Disobedience.</u>

It was a matter of public record that groups of all persuasions would converge on New York City to engage in protest activity and the City would experience a volume of protest activity that it had not experienced in decades. (56.1 ¶¶ 7-12). Initial estimates suggested over 500,000 demonstrators were expected to come to the City in addition to the President of the United States, the First Lady, the Vice President, the delegates, and the media covering this national event which was one of the very first large-scale events the City hosted after the 9/11 terrorist attacks. (56.1 ¶¶ 4-5, 7-12, 14, 229). Moreover, it was widely realized that based on the

number of expected protestors and the various political and social views that would be expressed that emotions would run high at the "highly charged" RNC demonstrations. (56.1 ¶¶ 10-12); *see also Marcavage v. City of New York*, 05 Civ. 4949, 2010 U.S. Dist. LEXIS 107724, at *14 (S.D.N.Y. 2010) (Sullivan, J.) (recognizing tone of RNC demonstrations as "highly charged").

In order to prepare for policing the Convention and to ensure the public safety of the people who live and work in New York, as well as the demonstrators and those involved in the Convention, the NYPD Intelligence Division, under the leadership of Commissioner David Cohen began to gather and analyze intelligence information about potential threats facing the City.[9] (56.1 ¶21).  The Intelligence Division gathered information from both non-confidential, open-sources, such as the internet and from confidential sources.[10]  (56.1 ¶ 24).  Much of the open-source information was widely and publicly disseminated and advertised.  (56.1 ¶¶ 24-28). Based on the Commissioner Cohen's assessment of the intelligence information he concluded that the City faced a tripartite threat during the RNC of: (1) international terrorism; (2) anarchist violence; and (3) wide-spread civil disobedience.  (56.1 ¶¶ 46-51).

---

[9] David Cohen has served as the NYPD's Deputy Commissioner of Intelligence since early 2002. In that capacity, he has overall responsibility for the operation of the NYPD Intelligence Division, including the gathering and analysis of information about potential criminal activity and terrorism.  Prior to joining the NYPD, he served for 35 years with the United States Central Intelligence Agency ("CIA") holding positions in both its analysis and operational arms.  As the Director of the CIA's Directorate of Operations from 1995-1997, he was responsible for the Agency's worldwide collection of raw, unevaluated intelligence.  As Associate Deputy Director of the Directorate of Intelligence from 1991-1995, he provided daily leadership for the CIA's analysis program, including the substantive review of all CIA political, economic and military assessments prepared for the President of the United States and his senior national security advisors. (56.1 ¶¶ 22-23); *see also MacWade v. Kelly*, 460 F.3d 260, 266 (2d Cir. 2006) (crediting Cohen's expertise in the field of ant-terrorism and noting Cohen established the "CIA's first terrorism analysis program … bore responsibility for the agency's worldwide counter-terrorism operations [and] created the CIA's Al Qaeda Osama bin Laden unit.")

[10] As this Court is aware, the City is <u>not</u> relying on the confidential intelligence in these cases. All references to "intelligence" herein is to the open-source information.

This information regarding the three-part threat of terrorism, anarchist violence and widespread civil disobedience was documented in 600-pages of reports prepared by Commissioner Cohen and his staff. (hereinafter the "End-User Reports").  (56.1 ¶¶ 41-45).  In addition to providing the End-User Reports to Police Commissioner Raymond Kelly and Chief of Department Joseph Esposito,[11] Commissioner Cohen and his staff conveyed intelligence information through oral briefings.  (56.1 ¶¶ 30, 40-45, 51, 54, 60-61).  Thus, the NYPD decision-makers were fully aware of the threats posed in hosting the 2004 RNC.  (56.1 ¶¶ 42-45, 54, 62-148).

Commissioner Cohen also had knowledge and experience in analyzing prior large-scale events which encompassed similar threats.  (56.1 ¶¶ 32-38, 47).  For example, Commissioner Cohen had scrutinized the 1999 event colloquially known as "The Battle of Seattle," where extremist and anarchist elements overwhelmed law enforcement and thereby successfully shut down the World Trade Organization's Ministerial Conference in Seattle, Washington. Commissioner Cohen also analyzed the violent protests during the Free Trade of the Americas meeting in Miami, Florida in 2003.  (56.1 ¶¶ 33-36, 40).  Based upon Cohen's analysis of those events, it was evident that it only takes a small number of extremist elements to trigger spiraling disorder, massive property damage, and violence at large-scale demonstrations.  (56.1 ¶ 38).

---

[11] Chief Esposito, the Chief of Department, is the highest-ranking uniformed member of the NYPD.  He is responsible for directing and controlling the daily operations of the seven major enforcement bureaus within the NYPD.  Chief Esposito's tenure with the NYPD began in 1968 and he has served as Commanding Officer of the Strategic and Tactical Command (S.A.T. COM), where he was in charge of all Patrol, Housing, Narcotics and Detective Operations in the Brooklyn North area.  He has also served as the Commanding Officer of the 34th Precinct, 66th Precinct and the 83rd Precincts.  Chief Esposito has earned some of the Department's highest medals and commendations, which include the Combat Cross, Medal of Valor and the Medal for Exceptional Merit.  Chief Esposito's substantial experience in planning for and policing demonstrations included the February 2002 Anti-War demonstration and the 2003 WEF demonstration, among numerous others. (56.1 ¶ 31).

Similarly, Chief Esposito was also aware of the danger and propensity for civil disorder to spiral out of control at demonstrations and events such as the Battle of Seattle and the Free Trade of the Americas Meeting in Miami.  (56.1 ¶¶ 39-40).  Additionally, Chief Esposito had knowledge and experience in policing events in New York City, such as the large anti-war demonstrations occurring in 2002 and 2003. (56.1 ¶ 31).

Specific details of each of the major threats faced during the RNC are set forth below.

**<u>Terrorism</u>**

Commissioner Cohen testified that during the RNC, the City was "in the midst of probably the most intense terrorism environment … in the period up until then facing New York City."  (56.1 ¶¶ 63-79).  The fact that the City was hosting the RNC, a national political convention, intensified the already existing terrorist threat because the RNC made the City an even more attractive target due to the symbolic nature of this national political convention, it's inherent media attention and the large number of individuals who gathered to either attend, support or demonstrate during the Convention.[12]   (56.1 ¶¶ 19-20, 70-73).   The RNC's designation as a National Special Security further highlighted these risks.[13]  (56.1 ¶¶ 15-17, 146-48).

---

[12] It was estimated that 800,000 people came to participate in protest activities during the RNC and because the City anticipated large-scale, continuous demonstration activity it was believed that RNC related demonstrations were also a prime target for terrorist attack.  (56.1 ¶¶ 73, 76, 229).

[13] NSSE status is declared by the United States Department of Homeland Security for certain events, usually because an event may seem like an attractive target for terrorists or assassins due to the event's visibility or political connection.  (56.1 ¶¶ 15-17, 146-48).  Chief Esposito explained that the NYPD felt due to the NSSE designation, people with criminal histories and "some of the people, who attempted to burn down Seattle [during the WTO protests]," and "shut down other political conventions" or shut down the "G8 … and other World Economic Forums" were likely to come to the RNC and attempt similar unlawful conduct.  (56.1 ¶ 147).  The NYPD also believed the RNC's status as a NSSE heightened the risks of continuous criminal activity geared to shut down the City and the RNC.  (56.1 ¶¶ 146-48).

The intelligence specifically indicated that Madison Square Garden would be a prime target for terrorist attack, as well as transportation hubs, major hotels and other major buildings in the City.  (56.1 ¶ 74-75, 77).  Indeed, any large gathering, including RNC demonstrations were at risk for  terrorist attack.  (56.1 ¶ 75).  The intelligence also suggested that there was the possibility that "weapons of mass destruction" may be used to carry out a terrorist attack or "that vehicle borne improvised explosive devices" or other "hazardous materials, including chemical and biological weapons" would be used during the RNC and at RNC-related events and venues. (56.1 ¶¶ 69, 71-72).  The severity of these threats was overlaid by the fact that in the time period immediately preceding the RNC, Shahawar Matin Siraj and James Elshafay were arrested for plotting to bomb the Herald Square Subway station, just one block away from Madison Square Garden where the 2004 Republican National Convention was to be held.   (56.1 ¶  65). Furthermore, in late July 2004, just 30 days before the RNC, the NYPD learned about detailed surveillance of New York City terrorist targets including the New York Stock Exchange and the Citigroup headquarters located in Midtown Manhattan. (56.1 ¶¶ 78-79).

**Anarchist Violence & Destruction of Property**

In addition to the threat of international terrorism, intelligence suggested that the City and Convention related venues also faced a distinct threat of anarchist violence.  (56.1 ¶¶ 80-97). Intelligence indicated that known groups and criminals, who had been convicted, sentenced and incarcerated for "violent acts" including "bombings," were expected to come to the City during the RNC.  (56.1 ¶¶ 83-86).  Moreover, these individuals were expected to disrupt the City through violent acts and "engage in criminal conduct that could significantly endanger public safety."  (56.1 ¶ 88-89).  The intelligence information provided to Chief Esposito and the NYPD indicated that a range of criminal activity was possible during the RNC which included attacks

on civilians, business and destruction of property.  (56.1 ¶¶ 96-97).  It included widely discussed

plans among certain radical groups who were conducting martial arts training to prepare them for

direct confrontations with law enforcement during the RNC.  (56.1 ¶ 91).  Other extremist groups

flouted plans to use Molotov cocktails, nail bombs, and "Super-Soakers" filled with flammable

liquids, chemical irritants, homemade pepper spray, and urine. [14]  (56.1 ¶¶ 92-93).  Accordingly,

the NYPD was concerned that even a small extremist element could trigger spiraling violence at

large political demonstrations.  (56.1 ¶¶ 38, 80-95); *see also Dinler v. City of New York*, 607 F.3d

923, 929 (2d Cir. 2010) (in decision granting Defendants' petition for a writ of mandamus in this

litigation, the Second Circuit credited Commissioner Cohen's research and analysis of security

threats at other large events, including the protests in Seattle and Miami and his conclusion that

---

[14] Commissioner Cohen analyzed the record of major protest activity connected to large-scale events around the world between 1999 and 2004.  With few exceptions, this history is one of extreme violence, vandalism and unlawfulness that substantially obstructed the normal functioning of daily life in the host cities and undermined the opportunity for lawful protest to proceed.  Specific instances illustrate this point: (i) **Davos, Switzerland** hosted the World Economic Forum in January 2000, where an estimated 1,300 people participated in protests, which resulted in fires, vandalism, smashed storefront windows and property damage; (ii) **Quebec City, Canada** hosted the Free Trade of the America's Summit in April 2001, where protests turned violent, extremists took control of the streets, tore down walls and barriers around the summit – delaying the event, threw Molotov cocktails and projectiles resulting in fires, broken windows and property damage.  Anarchists arrested were found in possession of gas masks, bullet proof vests, shields, chains, hammers, helmets and explosives; (iii) **Genoa, Italy** hosted the G8 summit in July 2001, where an estimated 200,000 protesters descended on the city.  Protests turned into riots where anarchists wearing gas masks, helmets, body armor and carrying shields directly confronted law enforcement, tore down fencing, set fires and then surrounded and took control of police vehicles.  The G8 riots claimed one life, caused 500 people to suffer injuries and cost the city of Genoa approximately $45 million in property damage; (iv) **San Francisco, California** – in March 2003 several thousand people engaged in an anti-war march in which protestors shut down more than 40 intersections, blocked entrances to government buildings and attempted to "take" the Bay Bridge.  The city was forced to reroute buses and shut down the historic F-line trolleys.  Some protestors fired bolts from slingshots at police officers and vandalized police vehicles; and (v) **Cancun, Mexico** held the World Trade Origination conference in 2003, where several thousand people engaged in protest and some clashed with police while attempting to break through security fences to storm beachfront resorts.  Police were attacked with sticks, metal bars and stones and were forced to use tear gas.  (56.1 ¶ 37-39).

"even a small extremist element could trigger spiraling violence at large political demonstrations" and the NYPD's recognition that they "needed a strategy to avoid disorder and violence during the RNC.").

### Widespread, Continuous Unlawful Activity Geared At Shutting Down the City and the RNC

Intelligence gathered by and analyzed by the NYPD indicated that "many people" were coming to the City to engage in "continuous and repetitive unlawful activity" for the purpose of "shutting down the City" and "shutting down the Convention." (56.1 ¶¶ 98-120, 176). The continuous unlawful conduct expected ranged from repetitious violations to misdemeanors, and even felonies escalating in acts of violence. (56.1 ¶¶ 98-100, 187). The intelligence identified numerous tactics that would be used to achieve these ends. These tactics included blocking City streets and thoroughfares, blocking entrances to buildings, preventing delegates from entering Madison Square Garden, their hotels, attending Broadway theaters, dining at restaurants and attending other Convention venues. (56.1 ¶¶ 108-110, 111-118). Tactics geared at shutting down Madison Square Garden or preventing delegate access to the Garden during the RNC also posed a distinct concern because, if successful, it could have resulted in the Republican Party being unable to legally nominate their candidate for the 2004 Presidential election and ensure his name was placed on the ballot. (56.1 ¶¶ 6, 104-110).

Intelligence also identified specific plans for large-scale coordinated civil disobedience including plans for swarms of bicyclists to weave through City streets, run red lights, disobey traffic laws and obstruct the flow of vehicular and pedestrian traffic. (56.1 ¶¶ 115-18). Additionally, intelligence revealed a coordinated day of large scale civil disobedience was planned for August 31, 2004, and designed to overwhelm the police and disrupt convention

- 20 -

proceedings and City life.  (56.1 ¶¶ 121-23).  This day was touted as "A31" (based on it's

8/31/04 date) and became widely advertised as a day of "Direct Action."[15]  (56.1 ¶¶ 121-23).

### False Identification and No Identification

Based on the intelligence gathered, the NYPD was anticipating large numbers of people

from outside the City, outside the state and even from "other parts of the world" coming to the

City to participate in RNC related events and demonstrations.  (56.1 ¶¶ 210-11).  Intelligence

also suggested that many individuals who were intent on committing unlawful conduct at RNC-

related events and demonstrations were being directed not to bring any identification or to

present false identification to law enforcement.  (56.1 ¶¶ 124-135).  The intelligence indicated

that the purpose behind this tactic was to try to avoid criminal prosecution, "jam up the criminal

justice system," and to "deceive the Criminal Justice Bureau" and law enforcement.  (56.1 ¶¶

127-129, 212).  The intelligence also indicated that terrorists, fugitives from the law, and

individuals with criminal records were likely to use false identification or attempt to hide their

identities.  (56.1 ¶¶ 130-35).  These concerns were exacerbated by the ease in which false

identification and fake driver's licenses were available at the time of the RNC and could be

generated with ease by computer software which had the ability to mimic holograms on state

driver's license with exactitude.  (56.1 ¶¶ 136-145; Declaration of Brian M. Jenkins ("Jenkins

Decl.").

### D.  The Policies Were Designed To Combat The Threats Identified.

The NYPD believed that the Policies would help combat the distinct threats facing the

City and the RNC.  (56.1 ¶¶ 62-120, 124-135, 173-226).  The Policies addressed the terrorist

---

[15] Intelligence information provided to the Chief Esposito indicated "Direct Action can best be described as large-scale civil disobedience, which *incorporates a physical resistance* that often results in conflict with the police."  (56.1 ¶ 122) (emphasis in the original).

threat because information indicated that terrorists could initially be "involved with lesser offenses" including summons eligible offenses.  (56.1 ¶ 133, 173).  There was also a "substantial risk" that individuals who pose terrorist threats or engage in acts of violence would not be carrying any identification or would be carrying false identification. (56.1 ¶ 134-35). Accordingly, prudent policing dictated there was a compelling need to accurately identify anyone in police custody during the RNC who was engaged in RNC-related unlawful conduct. (56.1 ¶¶ 173, 200-226).  The Policies served that need through fingerprinting those in custody thereby allowing the NYPD to ascertain whether they had a suspected or known terrorist or wanted criminal in their custody.

The Policies also addressed the threats of anarchist violence and destruction of property because they were directed at the very targets of these activities.  Indeed, based on the ill-fated lessons of Seattle, Miami and other cities plagued by anarchist threats, it was crystal-clear that a handful of extremist elements could turn an initially peaceful protest into one fraught with spiraling violence.   (56.1 ¶¶ 32-40, 46-51; Declaration of Carl R. Holmberg ("Holmberg Decl.")).   The extraordinary number of demonstrators expected to engage in RNC demonstrations – nearly one million people – exacerbated this threat because if anarchist objectives were brought to fruition any one of the countless protests expected during the RNC could have erupted into conflict overwhelming law enforcement resulting in disorder, property damage, grave injury and even death.  (56.1 ¶ 29).  The Policies provided for custodial arrest which can effectively stop this kind of escalating disorder either before it begins or at a very early stage. (56.1¶¶ 149-60, 173-195).  This strategy would efficiently thwart extremist elements from inciting an entire crowd into violence and destruction.

The Policies further served the City's interest in preventing continuous unlawful conduct geared at shutting down the City and the Convention. That is because the intelligence suggested that it was "very likely" that people who were not "removed" from the scene would "just continue" in their "illegal activity" until they had achieved their goals of shutting down a given City block, street, building or RNC venue. (56.1 ¶¶ 101-120, 180). Unlike issuing summonses, custodial arrest clears the unlawful activity and removes law breakers from the scene thereby preventing them from either continuing to engage in unlawful conduct or immediately returning to do so. (56.1 ¶¶ 175-195). Indeed, police practices expert, Carl R. Holmberg explains the law-enforcement value in expeditiously clearing an unlawful condition because it forestalls escalating disorder and quashes the likelihood of continuous unlawful conduct.[16] (Holmberg Decl.).

It was also important to stop and clear the blockage to the City's thoroughfares for several reasons. (56.1 ¶¶ 115-120, 175-99). First, congestion and blockage on City streets posed a very serious threat because among other things it would thwart the mobility of emergency vehicles such as ambulances, fire and police vehicles thus endangering City residents, tourists, demonstrators, delegates, and everyone else present in the City during the RNC. The need for ready access was intensified by the threat environment facing the City which encompassed potential terrorist attacks, bombings, use of vehicle borne explosives, and chemical and biological weapons – not to mention anarchist factions trained in martial arts, potentially yielding

---

[16] More specifically, Holmberg states "issuance of a summons usually takes place at the location where the violation occurred so that person is released at the same location, which may be an acceptable practice under normal circumstances but when large groups of people simultaneously commit violations and disorder results, the release of the violators at the scene does nothing to stop the disorder or address an unlawfully blocked street or hazardous condition." Holmberg further explained that "this can rapidly become dangerous because, in my experience, disorder situations generally escalate and additional people either join in the disorder or those involved increase their disorderly and illegal activities if no action is undertaken to stop them." (Holmberg Decl. at ¶ 20).

nail bombs and flammable liquids, who were intent on confronting law enforcement.  (56.1 ¶¶ 41-120).  Keeping streets open was also essential for the delegates and those attending the Convention (including the President) to get to and from Madison Square Garden, their hotels, and to attend RNC events at hotels, theaters and venues around the City.  Finally, keeping streets open and ensuring the orderly flow of traffic similarly allowed the public to get to where they needed to go whether it be restaurants, theaters, shops, appointments, sightseeing, or getting to their homes to see their families and loved ones.

The Policies also addressed the threats the City was facing regarding people coming from outside New York who were intent on engaging in unlawful acts during the RNC.  (56.1 ¶¶ 200-226).  Custodial arrest and fingerprinting alleviated the NYPD's concern that they may not be able to properly identify out of state individuals who engaged in unlawful conduct because it was believed that determining whether "an out of city, out of state, out of country IDs were in fact valid or not valid would have been a tremendous undertaking" during the RNC and a patently ineffective use of police time and resources considering the threat environment present during the Convention.  (56.1 ¶¶ 209).  Additionally, custodial arrest and fingerprinting addressed the Department's concerns about false identification and no identification because fingerprinting, a biometric identification procedure, allowed the NYPD the best chance to ensure individuals in custody were who they claimed to be.  (56.1 ¶¶ 200-214; Jenkins Decl. ¶¶ 31-34, 62-63).  The best identification achieved another interest by ensuring the ability to obtain successful criminal prosecutions which are contingent upon accurate identification.  (56.1 ¶¶ 215-226).  Intelligence information provided to Chief Esposito also specifically suggested that out of state residents intent on engaging in unlawful conduct posed an even higher risk of averting prosecution because they would be unlikely to return to New York if they were only issued a summons.

(56.1 ¶¶ 215-218).   Therefore, the Policies raised the likelihood that these arrestees and those attempting to avert prosecution through utilizing false identification would return to answer for their unlawful acts.

All of the foregoing interests advanced by the Policies are unrelated to suppressing First Amendment activity and instead, as detailed above, are tied to serving important and compelling governmental interests.  That compelling evidence must be confronted against the lack of any evidence in the record indicating that the Policies were adopted based upon an animus against First Amendment rights.

### E.  The Law Recognizes The Reasons That The City Adopted The Policies Serve Significant And Compelling Governmental Interests Unrelated to <u>Suppressing First Amendment Activity.</u>

All of the reasons for adopting the Policies set forth above are widely recognized as "significant," "substantial," and "compelling" governmental interests. First, the City's interests in protecting its citizens, demonstrators and Convention attendees alike from terrorism and violence are indisputably vital.   Indeed, many Courts, including the Supreme Court and the Second Circuit have recognized these interests as compelling in the context of various constitutional challenges to government acts and regulation.   *See, e.g. Holder v. Humanitarian Law Project*, 130 S.Ct. 2705, 2724-2730 (2010) (determining law prohibiting material support to designated foreign terrorist organizations constitutional under heightened First Amendment scrutiny and finding "the Government's interest in combating terrorism is an <u>urgent objective</u> of the highest order") (emphasis added); *U.S. v. Flores-Montano*, 541 U.S. 149, 153 (2004) ("It is axiomatic that the United States, as sovereign, has the inherent authority to protect, and a <u>paramount</u> interest in protecting, its territorial integrity.") (emphasis added); *MacWade v. Kelly*, 460 F.3d 260, 271-72 (2006) (determining NYPD policy of conducting bag searches of subway

passengers constitutional and recognizing the government interest in combating terrorism is immediate and substantial); *Tabbaa v. Chertoff*, 509 F.3d 89, 103 (2d Cir. 2005) (finding search, interrogation, photographing, and fingerprinting of attendees of Islamic conference constitutional under the First Amendment and recognizing that protecting the nation from terrorism as a "compelling" state interest unrelated to the suppression of ideas) (emphasis added); *Humanitarian Law Project v. Reno*, 205 F.3d 1130, 1135 (9th Cir. 2000) ("[T]he government has a legitimate interest in preventing the spread of international terrorism, and there is no doubt that that interest is substantial") (emphasis added).

Second, combating threats to public safety, ensuring the flow of pedestrian and vehicular traffic, and maintaining public order in one of the busiest cities in the world are "significant" and "substantial" governmental interests and must be so credited under well-established judicial authority.  *See, e.g.  Hill v. Colorado*, 530 U.S. 703, 727-28 (2000) (recognizing "substantial" governmental interest "in controlling the activity around certain public and private places" and protecting the public from confrontational and harassing conduct) (emphasis added); *Clark v. Community for Creative Non-Violence,* 468 U.S. 288, 296-99 (1984) (government's "substantial interest" in maintaining the parks in the heart of the Capital in an attractive and intact condition, readily available to the millions of people who wish to see and enjoy them by their presence) (emphasis added); *Menotti v. City of Seattle*, 409 F.3d 1113, 1131 (9th Cir. 2005) ("No one could seriously dispute that the government has a significant interest in maintaining public order; indeed this is a core duty that the government owes its citizens.") (emphasis added); *Marcavage*, 05-cv-4949, 2010 U.S. Dist. LEXIS 107724, at *14 (S.D.N.Y. 2010) (this Court recognized that the already "significant" City interest in "keeping its public spaces safe and free of congestion" was further "amplified" by the "highly charged" tone of RNC demonstrations and the "50,000

participants [in the Convention]" and the hundreds of thousands of protesters) (internal citation and quotations omitted) (emphasis added); *Five Borough Bicycle Club v. City of N.Y.*, 483 F.Supp.2d 351, 374-75 (S.D.N.Y 2007) (Kaplan, J.) (denying plaintiffs' motion for preliminary injunction alleging parade regulations and permitting requirements violated First Amendment and crediting <u>significant</u> governmental interest in preventing safety hazards and enforcing traffic regulations to prevent disruption); *Five Borough Bicycle Club,* 684 F.Supp.2d 423, 451 (S.D.N.Y. 2010) (denying First Amendment claim challenging same parade regulations after bench trial and acknowledging "the City's <u>valid and substantial</u> interest in securing the orderly use of public roadways for the safety and convenience of travelers") (emphasis added); *United for Peace and Justice v. City of N.Y.*, 243 F.Supp.2d 19, 26-28 (S.D.N.Y. 2003) (recognizing "<u>significant</u>" governmental interest in regulating street activity and preserving public order and safety, which warranted the denial of a parade permit) (emphasis added); *Baker v. City of New York*, 01 Civ. 4888, 2002 U.S. Dist. LEXIS 18100, at *23-24 (S.D.N.Y., Sept. 26, 2002) (where an NYPD Lieutenant testified that the NYPD's "major concern [with respect to First Amendment vendors] was the flow of pedestrian and vehicular traffic, public safety", the court held this was clearly a <u>significant</u> governmental interest); *Big Apple Food Vendors' Ass'n v. City of New York*, 168 Misc. 2d 483, 490-491 (N.Y.Sup.Ct. 1995) (internal citations omitted) (the City is vested with "broad power to regulate the use of the city streets and to provide by local law for the good government of the city and the preservation and promotion of the health, safety and general welfare of its inhabitants").

Third, preventing continuous unlawful conduct and taking measures to control criminal acts has been recognized as a "compelling" governmental interest. *See*, *e.g.*, *Moore*, 553 U.S. at 173 (2008) (approvingly noting that "[a]rrest ensures that a suspect appears to answer charges

and <u>does not continue a crime</u>) (emphasis added); *Sanitation & Recycling Indus. v. City of New York*, 107 F.3d 985, 998-1000 (2d Cir. 1997) (determining licensing and regulatory requirements did not violate First Amendment associational rights and finding a compelling governmental interest in terminating continuous criminal enterprise, "[w]e think it beyond question that the government has a <u>compelling</u> interest in combating crime, corruption and … evils that eat away at the body politic") (emphasis added); *Gold Diggers, LLC v. Town of Berlin*, 469 F. Supp. 2d 43, 64-65 (D. Conn. 2007) (finding "<u>compelling</u>" governmental interest in reducing criminal and public health concerns) (emphasis added).

Fourth, ensuring the Convention itself was not shut-down through continued unlawful conduct is also a recognized important interest.  *See Menotti*, 409 F.3d at 1131-32 (recognizing the City of Seattle "had an interest in seeing that the WTO delegates had the opportunity to conduct their business at the chosen venue for the conference; a city that failed to achieve this interest would not soon have the chance to host another important international meeting.").

Finally, the City's interest in fingerprinting arrestees and identifying those in their custody is recognized as significant.  *Tabbaa v. Chertoff*, 2005 U.S. Dist. LEXIS 38189, at *48 (W.D.N.Y. Dec. 21, 2005) affirmed, 509 F.3d 89 (2d Cir. 2007) (finding the government had a <u>compelling</u> interest in identifying and investigating those who were associated with criminal activity, "the government has an equally <u>compelling</u> interest in identifying and investigating individuals who may have been in contact with or associated themselves, whether knowingly or unknowingly, with such individuals.") (emphasis added); *Itzkowitz & Sons, Inc. v. Geraghty*, 139 Misc. 163 (N.Y. Co. Sup. Ct. 1931) ("[t]he use of finger-prints as a means of identification dates back many years and in 1891 was adopted as the system of identification in criminal courts in England. Since that time there has been a gradual adoption of finger-printing as a means of

identification by banks and other corporations, passport bureaus of foreign governments and the civil service commission in New York City, all as a certain protection against impersonation"); Hoover, *The Role of Identification in Law Enforcement: A Historical Adventure*, 46 St John's L Rev 613 ("[f]ingerprinting has a vital role in identification in law enforcement and fingerprinting can well be given credit for not only bringing the guilty to justice but assuring that misidentification will not ensnare the innocent").  The Policies directly served these interests because instead of being issued summonses, RNC arrestees were processed for desk appearance tickets ("DATs") if they qualified and the identification check for issuing a DAT is more thorough than what is required to issue a summons and specifically requires fingerprints to be taken.[17]  (56.1 ¶¶  151-52, 161-64).  Fingerprinting allowed the NYPD to know exactly who was in their custody and whether that person was wanted or had outstanding warrants, which was especially important in light of the threat environment, the potential for anarchist elements during the RNC and the City's heightened susceptibility to a terrorist attack. (56.1 ¶¶ 161-64).

Considering the governmental interests served by the Policies makes it abundantly clear that none of the interests were related to suppressing First Amendment activity.  Any burden the Court finds was imposed on Plaintiffs' First Amendment activity as a result of the Policies (which Defendants' assert was none) must be balanced against these compelling and substantial interests.  In commenting on that balance, the Second Circuit asserted "the individual's right to speech must always be balanced against the state's interest in safety, and its right to regulate conduct that it legitimately considers potentially dangerous."  *Church of the American Knights of the Ku Klux Klan v. Kerik*, 356 F.3d 197, 209 (2d Cir. 2004) (reversing district court finding that anti-mask statute violated the First Amendment and remanding with instructions to enter

---

[17] Fingerprints were also required for arraignment and those RNC arrestees who did not qualify for DATs were arraigned.  (56.1 ¶ 153, 161-63).

summary judgment for defendants).   Considering the interests at stake that balance clearly weighs in favor of Defendants.

### F.   The Conclusions Made and the Measures Taken In Responding to The Intelligence Information Are Entitled to Significant Deference.

The decisions made by Commissioner Kelly and Chief Esposito in developing a strategy to defend the City against these serious dangers and threats by adopting the Policies warrants considerable deference.   The Supreme Court aptly asserted that "when it comes to collecting evidence and drawing factual inferences in th[e] area [of assessing terrorist threats] … respect for the Government's conclusions is appropriate."   *See Holder*, 130 S.Ct. at 2727; *Christian Legal Soc'y Chapter of the Univ. of Cal. v. Martinez*, 130 S.Ct. 2971, 2976 (2010) (in the context of analyzing the bases of decisions challenged under the First Amendment, cautioning courts "to resist substituting their notions" in areas outside the realm of their expertise).   The Supreme Court further noted that when the government is seeking to "prevent imminent harms" in the context of security interests, it "is not required to conclusively link all the pieces in the puzzle before we grant weight to its empirical conclusions."   *Holder*, 130 S.Ct. at 2728.

Significantly, courts including the Second Circuit have specifically credited the expertise of Commissioner Cohen in analyzing threats of terrorism and violence facing the City of New York and in the appropriateness of the NYPD's response to those threats.   *See MacWade*, 460 F.3d at 274 (noting the district court credited the expertise and testimony of Commissioner Cohen concerning deterrent effect of NYPD's subway baggage search program and asserting "Counter-terrorism experts and politically accountable officials have undertaken the delicate and esoteric task of deciding how best to marshal their available resources in light of the conditions prevailing on any given day … [w]e will not - and may not - second-guess the minutiae of their considered decisions") (citing *Mich. Dep't of State Police v. Sitz*, 496 U.S. 444, 453 (1990)).

Here the decision by the Police Commissioner and Chief Esposito to implement the Policies in response to the perceived threats similarly should be credited with substantial deference.  *See id.; United for Peace and Justice v. City of N.Y.*, 243 F.Supp.2d 19, 26-28 (S.D.N.Y. 2003) (where policing decisions were made based on safety risks posed by a large scale demonstration, "[t]he Court gives great weight to Chief Esposito's judgment, which is based on 25 years of experience with such events … [t]he Court will not second guess or substitute its judgment for that of the NYPD.")

### G. There Was A Reasonable Fit Between The Policies And The Governmental Interests They Advanced And The Policies Did Not Burden More Speech Than Necessary.

Assuming *arguendo*, that the Policies burdened Plaintiffs' First Amendment rights in a manner warranting First Amendment review, which we have previously shown they did not, the Policies satisfy the second component of the intermediate scrutiny test because they did "not burden substantially more speech than necessary" to further the governmental interests they advanced.[18]  *Turner Broad Sys.*, 520 U.S. at 189 (citing *O'Brien*, 391 U.S. at 377).  The No-Summons Policy was only in effect during the time that the City faced an enhanced threat environment of terrorism, anarchist violence and widespread civil disorder that was unique to the time period of the RNC.  (56.1 ¶¶ 151-53, 172).

---

[18]  In *United States v. Marzzarella*, 614 F.3d 85, 97-98 (3d Cir. 2010), the Third Circuit succinctly summarized the intermediate scrutiny test:

> intermediate scrutiny is articulated in several different forms [and] [a]lthough these standards differ in precise terminology, they essentially share the same substantive requirements.  They all require the asserted governmental end to be more than just legitimate, either significant, substantial, or important and they generally require the fit between the challenged regulation and the asserted objective be reasonable, not perfect. The regulation need not be the least restrictive means of serving the interest, but may not burden more speech than is reasonably necessary.  614 F.3d at 97-98 (internal citations and quotations omitted).

The Policies were not simply directed at demonstrations and instead were directed at "all illegal activity directly related to the RNC." (56.1 ¶¶ 151-53, 165-72). Indeed, you were only arrested and subject to the Policies if you engaged in an RNC-Related unlawful act. For purposes of determining whether conduct was "RNC-related" and subject to the Policies, the NYPD focused on "the illegal activity" to "determine[ ] [if it] was geared toward the RNC" and not the fact that it occurred at a demonstration. (56.1 ¶166). Chief Esposito explained that criminal acts were "RNC-related" if the criminal activity or violation of law revolved around the RNC or was in connection to the RNC. (56.1 ¶ 167). Chief Esposito further explained that "RNC-related" conduct was linked to the intelligence that was gathered about anticipated unlawful conduct during the RNC and if certain anticipated unlawful conduct "materialized" it "would have been considered RNC related." (56.1 ¶¶ 168-71). Thus, the crucial distinction in determining whether unlawful conduct was "RNC-related" and therefore subject to the Policies was the intelligence information which distinguished these very unlawful acts as being imbued with potential rampant civil disobedience, attempts to shut down the City and the RNC, attacks on police and City businesses and even acts of terrorism. (56.1 ¶¶ 165-71).

Therefore, any burden to First Amendment rights the Policies may have posed was thus *de minimis*. That is because the Policies only applied to unlawful conduct that, based on the intelligence gathered, was the direct target of the threats – RNC related unlawful conduct – conduct geared at shutting down the City and the Convention; conduct with the potential to explode into anarchist violence and aggressive confrontations with law enforcement; and conduct with the propensity to destroy property and risk human lives. (56.1 ¶¶ 151-53, 165-72). Thus, the Policies were limited in scope and application to address these serious concerns and their associated governmental interests. *See Carew-Reid v. Metro. Transp. Auth.*, 903 F.2d 914,

917 (2d Cir. 1990) ("[I]f the scope of the regulation is not substantially broader than required to secure the governmental interest, the regulation is not invalid simply because a court, second-guessing the decisions of the governmental body, discerns some less-restrictive alternative to the regulation."); *Int'l Action Ctr. v. City of New York*, 587 F.3d 521, 527-528 (2d Cir. 2009) (finding restriction on parades was "narrowly tailored" where the regulation "promotes a significant government interest that would not be satisfied as well without it").

Moreover, any burden RNC arrestees may have suffered as a result of the Policies is of their own making because it was unlawful conduct that subjected them to arrest. The Second Circuit's holding in *Tabbaa* suggests that in the context of a First Amendment challenge, fingerprinting does not pose an unlawful burden. 509 F.3d at 105. In *Tabbaa*, the Second Circuit stated: "[w]e do not believe the extra hassle of being fingerprinted and photographed - for the sole purpose of having their identities verified - is a significant additional burden that turns an otherwise constitutional policy into one that is unconstitutional." *Id.* The same analysis should apply with respect to the Policies, which furthered numerous governmental interests, all of which have been widely recognized as "compelling," "substantial" or "significant."

Finally, the Policies were also "narrowly tailored" because they did not burden First Amendment rights of those demonstrating or gathered at the RNC as a whole. The City of New York experienced an unprecedented level of demonstration activity during the RNC. (56.1 ¶¶ 7, 229). Indeed, nearly 800,000 people exercised their First Amendment rights without arrest or being subject to the Policies. Compare those 800,000 against the 1,800 people arrested. (56.1 ¶¶ 229-30). RNC arrestees were less than 0.002% of all RNC demonstrators. The demonstrations which occurred in New York City during the RNC also celebrated a vast marketplace of ideas and political and social viewpoints relevant at that time in American history. (56.1 ¶¶ 227-28,

251-93).  This powerful evidence leads to the conclusion that the Policies had little to no effect on the Free Speech and Association which was celebrated during the RNC.

As discussed above it is beyond dispute that: (i) both common sense and controlling Supreme Court and Second Circuit authority dictate that the interests served by the Policies are significant, important and compelling; (ii) none of the governmental interests are related to the suppression of First Amendment activity; (iii) the record in the Consolidated RNC Cases is wholly devoid of any evidence of animus against First Amendment expression; and (iv) there is a reasonable fit between the Policies and the governmental objectives they advanced. Accordingly, the Policies are constitutional under the First Amendment and Defendants are entitled to summary judgment.

### H. Defendants Are Entitled To Summary Judgment On Plaintiffs' First Amendment Retaliation Claims Based On The Policies.

Some RNC Plaintiffs also contend a First Amendment retaliation claim based on the No-Summons and Fingerprinting Policies.[19]  Plaintiffs cannot establish the *prima facie* elements of a First Amendment retaliation claim.  In order to prevail on this claim, Plaintiffs must prove: (1)

---

[19] It appears that Plaintiffs in the following 35 RNC cases allege a retaliation claim: *Bastidas v. City of New York* 05-cv-7670; *Biddle v. City of New York* 05-cv-1570; *Botbol v. City of New York* 05-cv-1572; *Bunim v. City of New York* 05-cv-1562; *Coburn v. City of New York* 05-cv-7623; *Cohen v. City of New York* 05-cv-6780; *Concepcion v. City of New York* 05-cv-8501; *Crotty v. City of New York* 05-cv-7577; *Drescher v. City of New York* 05-cv-7541; *Dudek v. City of New York* 04-cv-10178*; Epstein v. City of New York* 05-cv-1563; *Galitzer v. City of New York* 05-cv-7669; *Garbini v. City of New York* 05-cv-1565; *Greenwald v. City of New York* 05-cv-1566; *Grosso v. City of New York* 05-cv-5080; *Jusick v. City of New York* 07-cv-7683; *Lee v. City of New York* 05-cv-5528; *Lalier v. City of New York* 05-cv-7580; *Macnamara v. City of New York* 04-cv-9216; *Manders v. City of New York* 07-cv-7752; *Meehan v. City of New York* 05-cv-5268; *Moran v. City of New York* 05-cv-1571; *Pagoda v. City of New York* 05-cv-7546; *Phillips v. City of New York* 05-cv-7624; *Pickett v. City of New York* 05-cv-1567; *Portera v. City of New York* 05-cv-9985; *Rigby v. City of New York* 07-cv-7751; *Ryan v. City of New York* 05-cv-1564; *Sikelianos v. City of New York* 05-cv-7673; *Sloan v. City of New York* 05-cv-7668; *Stark v. City of New York* 05-cv-7579; *Tikkun v. City of New York* 05-cv-9901; *Tremayne v. City of New York* 05-cv-1568; *Winkleman v. City of New York* 05-cv-2910; *Xu v. City of New York* 05-cv-7672.

they "ha[ve] an interest protected by the First Amendment; (2) defendants' actions were motivated or substantially caused by his exercise of that right; and (3) defendants' actions effectively chilled the exercise of his First Amendment right." *Williams v. Town of Greenburgh,* 535 F.3d 71, 76 (2d Cir. 2008) (dismissing First Amendment retaliation claim and quoting *Curley v. Village of Suffern,* 268 F.3d 65, 73 (2d Cir. 2001) for standard ); *Curley,* 268 F.3d at 73 (holding "[s]pecific proof of improper motivation is required in order for plaintiff to survive summary judgment on a First Amendment retaliation claim" and affirming denial of First Amendment claim where plaintiff "proffered no evidence of defendants' motive beyond the allegation in his amended complaint that defendants acted …because of his First Amendment protected activities."); *see also Connell v. Signoracci,* 153 F.3d 74, 79 (2d Cir. 1998); *Richardson v. N.Y. City Health & Hosps. Corp.,* 05-cv-6278, 2009 U.S. Dist. LEXIS 25247, at *56-57 (S.D.N.Y. March 25, 2009) (Sullivan, J.) (denying retaliation claim and holding "[p]laintiff cannot recover on the theory that she was arrested in retaliation for engaging in protected speech … [i]ndeed, because defendants had probable cause to arrest plaintiff, an inquiry into the underlying motive for the arrest need not be undertaken.") (internal citation and quotation omitted); *Allen v. City of N.Y.,* 03-cv-2829, 2007 U.S. Dist. LEXIS 15, at *71-72, (S.D.N.Y. Jan. 3, 2007) (applying *Curley* for First Amendment retaliation standard in case regarding retaliatory excessive detention claims); *Bryant v. City of N.Y.,* 99-cv-11237, 2003 U.S. Dist. LEXIS 21642, at *39-41 (S.D.N.Y. Dec. 2, 2003) (delineating *Curley* as proper First Amendment retaliation standard for retaliation claim based on denial of desk appearance tickets).

Plaintiffs' retaliation claims fail because they cannot establish a genuine issue of material fact regarding any allegedly improper motive.[20]   Indeed, after seven years of extensive discovery the record is completely devoid of any evidence suggesting the Policies were motivated or substantially caused by an exercise of First Amendment activity.   Instead, the record indicates the Policies were adopted in direct response to severe and pervasive threats facing the City and in order to further significant and important governmental interests wholly unrelated to the First Amendment.   *See* Points D-G *supra*.

Moreover, the record establishes that the City took considerable efforts to permit and even facilitate lawful First Amendment expression.  (56.1 ¶¶ 227-293).   For example, as set forth in an RNC Executive Summary, one of the primary "missions" of the NYPD during the RNC was to facilitate the rights of others to peaceably protest against the RNC.   (56.1 ¶ 231).   That core mission was also set out in training materials, utilized in connection with RNC planning and preparation and disseminated to ranking members of the NYPD.   (56.1 ¶¶ 231-49).   Further, the City issued numerous parade and sound permits during the RNC facilitating expression of political and social ideas.   (56.1 ¶¶ 227, 228-29, 256-77).

One of these events was the United For Peace and Justice ("UFPJ") march which took place on Sunday, August 29, 2004.   (56.1 ¶¶ 227, 27-72).   Hundreds of thousands of marchers participated in this march that snaked along 7th Avenue to Madison Square Garden, then east on 34th Street onto 5th and 6th Avenues, and southbound to Broadway and Union Square Park.   (*Id.*).

---

[20]   As referenced in note 5, *infra*, based on their deposition testimony, certain Plaintiffs contend they were not engaged in any First Amendment activity and therefore lack standing to pursue this claim.  Other plaintiffs have testified that they continued to engage in First Amendment activity subsequent to their arrests and therefore were not "chilled."  Defendants do not assert these plaintiff-specific arguments in this initial round of briefing (similar to the agreement regarding the probable cause briefing).  If necessary, Defendants will make arguments related to specific plaintiffs in subsequent briefing or at trial.

The UFPJ march lasted for many hours and continued with facilitation by the NYPD.  (*Id.*).

Numerous other marches (some with a permit and others without) and demonstrations also took

place during the RNC and were facilitated by the NYPD, many of which were captured on video.

(56.1 ¶¶ 256-293).  The NYPD also established a demonstration zone in the vicinity of MSG

which was operative 24-hours a day wherein thousands of people engaged in First Amendment

expression.[21]  (56.1 ¶¶ 251-55).  All of this undisputed evidence confirms that the NYPD did not

act with a retaliatory motive but instead fostered a diverse marketplace of ideas that comprised

the political, social and economic ideals of our Nation during the time of the 2004 Republican

National Convention in New York City.

Because Plaintiffs cannot point to any direct evidence of a discriminatory intent or First

Amendment animus they instead will likely ask the Court to infer an insidious or retaliatory

motive. This type of argument has been flatly rejected by the Second Circuit and district courts

alike because conclusory assertions cannot raise a triable issue of fact regarding a retaliation

claim.  *See Cobb v. Pozzi*, 363 F.3d 89, 108 (2d Cir. 2003) (holding that a First Amendment

retaliation claim cannot be based on "conclusory assertions of retaliatory motive" rather,

"[plaintiff] must produce some tangible proof to demonstrate that [his] version of what occurred

was not imaginary") (internal citation omitted); *D'Amico v. City of N.Y.*, 132 F.3d 145, 149 (2d

---

[21] In order to accommodate the expected volume of protest activity, the NYPD closed Eighth
Avenue to vehicular traffic and created a demonstration zone, which began at Eighth Avenue and
31st Street and extended south.  The demonstration zone encompassed the entire width of the
Eighth Avenue roadway and people were permitted to engage in expressive activity within that
area at any time during the RNC.  The NYPD monitored the space both to ensure that the area
was safe for everyone who wished to participate and to extend the area southward along Eighth
Avenue to accommodate additional protestors as necessary.  The NYPD also issued sound
permits and arranged for the placement of a stage at the northern end of the demonstration area
for any group that chose to use it during an event or protest.  The demonstration zone was used
by thousands of individuals during the RNC. *Marcavage v. City of New York*, 2010 U.S. Dist.
LEXIS 107724, 5-6 (S.D.N.Y. Sept. 29, 2010) (discussing RNC demonstration zone).

Cir. 1998) (holding that a party opposing summary judgment "may not rely on mere conclusory allegations nor speculation, but instead must offer some hard evidence showing that its version of the events is not wholly fanciful"); *Tabbaa v. Chertoff*, 2005 U.S. Dist. LEXIS 38189, at *44 (W.D.N.Y. Dec. 21, 2005) (finding no evidence of First Amendment animus or intention to suppress speech or punish free association where the record established that purpose of the policy was to "verify the identity" through fingerprinting of each individual returning from the Islamic conference "to ensure that they were not on any terrorist watch list or attempting to bring prohibited items across the border.") affirmed, 509 F.3d 89 (2d Cir. 2007); *Bryant*, 2003 U.S. Dist. LEXIS 21642, at *43 (granting defendants' summary judgment on First Amendment claim alleging an improper motivation behind the decision to deny demonstrator arrestees desk appearance tickets and rejecting plaintiffs' argument challenging the sufficiency of the NYPD's reasons as a pretext for an insidious motive to suppress speech because arguing pretext did "not provide the type of evidence tending to establish the crucial link between the denial of desk appearance tickets and Plaintiffs' exercise of First Amendment rights."), affirmed, 404 F.3d 128 (2d Cir. 2005).

Finally, even assuming Plaintiffs can raise a question of fact suggesting the exercise of First Amendment activity motivated or substantially caused the City to adopt the Policies, their retaliation claim will still fail because the record in this case indicates the NYPD would have nevertheless adopted the Policies because of the threat environment faced during the RNC. Under such circumstances, Plaintiffs cannot establish a question of material fact regarding motive. *See Holmes v. Poskanzer*, 08-cv-14750, 342 Fed. Appx. 651, 653, 2009 U.S. App. LEXIS 15976, at *4 (2d Cir. 2009) ("[r]egardless of any retaliatory motive, the plaintiff cannot prevail if a defendant can show he or she would have taken the same action even in the absence

of the allegedly improper reason.") (emphasis added); *Grossi v. City of New York*, 2009 U.S. Dist. LEXIS 110695, *22-23 (E.D.N.Y. Nov. 3, 2009) (same). Therefore, Defendants should be granted summary judgment.

IV.   **DEFENDANTS ARE ENTITLED TO SUMMARY JUDGMENT ON PLAINTIFFS' FOURTEENTH AMENDMENT CLAIMS.**

Plaintiffs claim that the Policies violated their rights under the Fourteenth Amendment equal protection clause because they were allegedly treated differently based on their engaging in First Amendment activity during the RNC. Specifically, Plaintiffs allege that they were unlawfully subject to selective enforcement by being denied summonses and fingerprinted because they were engaging in First Amendment protected expression.

A.   **Plaintiffs' Equal Protection Claim Coalesces With Their First Amendment Claim And Therefore Should Be Dismissed.**

The lynchpin to Plaintiffs' equal protection claim is their allegation that it was their First Amendment activity that caused the NYPD to treat them differently – not issue them summonses and require fingerprinting. The case law is clear, however, that where the equal protection claim is dependent upon the First Amendment claim the two claims "coalesce." *See African Trade & Info. Ctr. v. Abromaitis*, 294 F.3d 355, 363-64 (2d Cir. 2002) (claims coalesced because complaint alleged deprivation of equal protection was "punish[ment]" for plaintiffs' exercise of their First Amendment rights); *Cobb v. Pozzi*, 363 F.3d 89, 110 (2d Cir. 2004) (finding selective prosecution and retaliation claims "coalesce[d]" and holding that because evidence of First Amendment retaliation claim failed to show that defendants disciplined plaintiffs based on First Amendment activity, plaintiffs' selective prosecution claim also failed); *Gentile v. Nulty*, 769 F. Supp. 2d 573, 582-583 (S.D.N.Y. 2011) ("[W]here plaintiff's First Amendment claims have already been dismissed, and plaintiff's equal protection claims are based on alleged retaliation for

the exercise of his First Amendment rights [those claims] coalesce [and both therefore] fail[ ].");

*Geagan v. City Univ. of N.Y.*, 2011 U.S. Dist. LEXIS 89018, at *50-51 (S.D.N.Y. July 14, 2011)

(where First Amendment retaliation claim failed because, *inter alia*, allegations of retaliatory

motive were wholly speculative, the court also denied the equal protection claim finding

"[plaintiff's] equal protection claim consequently must suffer the same fate as her First

Amendment claim"); *Kempkes v. Downey*, No. 07-cv-1298, 2008 U.S. Dist. LEXIS 25981, at

*20 (S.D.N.Y. Mar. 31, 2008) (Karas, J.) (when claims coalesce, "[if] the First Amendment

claim has failed, the equal protection claim fails, too."); *Sweeney v. Leone*, 3:05-cv-871, 2006

U.S. Dist. LEXIS 57358, at *40 (D. Conn. July 31, 2006) ("[t]he Court's holding that Plaintiff's

speech is not constitutionally protected . . . requires that summary judgment be granted on

Plaintiff's selective enforcement claim, to the extent that the claim is based on alleged retaliation

for his speech.").  Accordingly, because Plaintiffs' First Amendment claims fail for the reasons

discussed *supra*, Plaintiffs' equal protection claims should also be dismissed.

### B.  Plaintiffs' Cannot Establish They Were "Similarly Situated" to A Proper Comparative Group.

In the event the Court does not find that Plaintiffs' equal protection claim coalesces with

their First Amendment claim, this claim should still be dismissed.  The equal protection clause of

the Fourteenth Amendment directs that all persons similarly situated be treated alike.  "In order

to establish a violation of equal protection based on selective enforcement, the plaintiff must

ordinarily show (1) the person, compared with others similarly situated, was selectively treated;

and (2) that such selective treatment was based on impermissible considerations such as race,

religion, intent to inhibit or punish the exercise of constitutional rights, or malicious or bad faith

intent to injure a person." *Lisa's Party City, Inc. v. Town of Henrietta*, 185 F.3d 12, 16 (2d Cir.

1999) (internal quotations omitted) (affirming dismissal of equal protection claim on summary

judgment based on failure to show issue of material fact requiring trial and citing *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 439 (1985) for equal protection standard).

Plaintiffs' cannot satisfy the "similarly situated" prong of their *prima facie* case. Plaintiffs must demonstrate that they were treated differently from persons who are similarly situated in all material aspects.  In determining whether individuals are "similarly situated" the appropriate inquiry is "whether a prudent person, looking objectively at the incidents, would think them roughly equivalent and the protagonists similarly situated … the cases must be fair congeners … [i]n other words, <u>apples should be compared to apples</u>."  *Burke v. Town of East Hampton*, 99-cv-5798, 2001 U.S. Dist. LEXIS 22505, at *22 (E.D.N.Y. March 16, 2001) (emphasis added); *see also Mangango v. Cambariere*, 04-cv-4980, 2007 U.S. Dist. LEXIS 72595, at *15-16 (S.D.N.Y. Sept. 27, 2007); *Estate of Morris v. DaPolito,* 297 F.Supp.2d 680, 686 (S.D.N.Y. 2004) (dismissing claim because plaintiff failed to provide evidence of similarly situated element of equal protection theory).  Notably, some courts have held that the similarly situated prong requires plaintiff to prove that another person's circumstances are "*prima facie* identical." *Gentile*, 769 F.Supp.2d at 580.

In this case, the record is devoid of any evidence of a similarly situated group.  Instead, Plaintiffs make the conclusory assertion in their contention interrogatory responses and pleadings that they were "similarly situated" to individuals who were engaged in minor criminal offenses during the time period of the RNC and were issued summonses and not fingerprinted.  This proposed comparative group is insufficient as a matter of law for at least two reasons.[22]

---

[22] Notably, Plaintiffs in *Dinler* and *Schiller* do not appear to clearly identify ***any*** group to whom they compare themselves in their pleadings or contention interrogatory responses and for that reason their equal protection claim should be dismissed as a matter of law on that basis.  *Camac v. Long Beach City Sch. Dist.*, 2011 U.S. Dist. LEXIS 79997, at *45-46 n. 9 (E.D.N.Y. July 22, 2011) (dismissing 14th amendment equal protection claim because of *inter alia* failure to

First, the suggestion that various unknown individuals were issued summonses under various unknown circumstances can never support the necessary deduction that these people were similarly situated to the facts and circumstances surrounding the arrests of RNC Plaintiffs. "[A] court can properly grant summary judgment where it is clear that no reasonable jury could find the similarly situated prong met." *Harlen Associates v. Incorporated Village of Mineola*, 273 F.3d 494, 499 n. 2 (2d Cir. 2001) (affirming of summary judgment in favor of the defendants on equal protection claim); *Lizardo v. Denny's Inc.*, 270 F.3d 94, 101-02 (2d Cir. 2001) (affirming summary judgment for defendants and district court's determination that plaintiffs, who were minority restaurant patrons, failed to offer evidence from which a jury could conclude that they were similarly situated to proposed comparative group of Caucasian restaurant patrons).

Second, there is no evidence in the record that any proposed comparative class was <u>not</u> engaged in First Amendment activity prior to being issued a summons.  Considering Plaintiffs anchor their equal protection claim on being discriminated against <u>because</u> of their First Amendment activity it is axiomatic that any comparable group must not be so engaged.  Here, the pivotal component of an appropriate "similarly situated" comparison must necessarily evidence that First Amendment expression was targeted by the decision to apply the Policies. *Anderson v. City of N.Y.*, 06-cv-5363 2011 U.S. Dist. LEXIS 106619, at *33-34 (E.D.N.Y. Sept. 20, 2011) (Matsumoto, J.) (denying selective enforcement claim based on race where "black" plaintiff could not "demonstrate that similarly situated individuals of a different race were not

---

adequately identify similarly situated class); *Sengmany Savatxath v. Stoeckel*, 10-cv-1089, 2011 U.S. Dist. LEXIS 49834, at *14-15 (N.D.N.Y May 10, 2011) (dismissing equal protection claim due to failure to identify similarly situated group); *Silverstein v. Lawrence Union Free Sch. Dist. No. 15*, 10-cv-993, 2011 U.S. Dist. LEXIS 34200, at *27-28 (E.D.N.Y. Feb. 16, 2011) ("[t]he Amended Complaint identifies no similarly situated individuals, let alone comparators with a high degree of similarity, nor can such individuals be inferred. For all these reasons, the Equal Protection claim should be dismissed.")

subjected to the offensive conduct.") (internal punctuation and citations omitted).   This methodology of analyzing equal protection claims has been endorsed by the Second Circuit: "the first legal question that arises in equal protection cases is whether the similarity between the circumstances of the plaintiff and those of the comparators tends to prove that [the factor at issue, such as] race [ . . . ] national origin, [or the exercise of First Amendment rights] was a factor in the differ[ing] treatment." *Jock v. Ransom*, 05-cv-1108, 2007 U.S. Dist. LEXIS 47027, at *13 (N.D.N.Y. June 28, 2007) (quoting *Neilson v. D'Angelis,* 409 F.3d 100, 105 (2d Cir. 2005).   Because the record cannot establish whether or not the nebulously defined group of people who received summonses during the RNC were engaged in First Amendment activity, Plaintiffs' claim is doomed to failure and must be dismissed.

### C.  Plaintiffs' Equal Protection Claim Fails Because They Cannot Establish Any Impermissible Motivation.

Plaintiffs also cannot establish any discriminatory intent or motivation.[23]  In considering discriminatory motive, "plaintiffs must prove that 'the disparate treatment was *caused by* [an] impermissible motivation …[t]hey cannot merely rest on a showing of disparate treatment." *Anderson*, 06-cv-5363 2011 U.S. Dist. LEXIS 106619, at *34 (finding no evidence that defendants acted with purposeful discrimination and quoting *Bizzarro v. Miranda*, 394 F.3d 82, 87 (2d Cir. 2005).  Indeed, "[d]iscriminatory purpose implies more than intent as awareness of consequences [and] it implies that the decision-maker selected or reaffirmed a particular course

---

[23]      Notably, district courts have found the lack of evidence on the similarly situated component of an equal protection claim to also evidence a lack of discriminatory intent.  *See Williams v. Schultz*, 06-cv-1104, 2008 U.S. Dist. LEXIS 112729, *18-19 (N.D.N.Y. Oct., 16, 2008) (denying equal protection claim because plaintiff adduced no evidence establishing or even plausibly suggesting plaintiff was treated differently than similarly situated others and thus, finding no evidence of discriminatory intent) (accepted and adopted by 2008 U.S. Dist. LEXIS 82393 (N.D.N.Y. Oct. 16. 2008). Plaintiffs' failure to meet the similarly situated prong is therefore relevant to the Court's consideration of whether Plaintiffs can establish discriminatory intent.

of action at least in part because of, not merely in spite of, its adverse effects upon an identifiable group." *Wayte v. United States*, 470 U.S. 598, 604-610 (1985).  Absent a showing "that the Government prosecuted [someone] *because of* his protest activities" a "claim of selective prosecution fails." *Id.*  Plaintiffs cannot meet this "deliberately rigorous" standard, *see U.S. v. Alameh*, 341 F.3d 167, 173 (2d Cir 2003) (quoting *U.S. v. Armstrong*, 517 U.S. 456, 468 (1996)), because there is no evidence that the City adopted or implemented the Policies "because of" their exercise of First Amendment rights.  *See* Point V(F, H), *supra*; *Lisa's Party City, Inc. v. Town of Henrietta*, 185 F.3d 12, 17-18 (2d Cir. 1999) (affirming denial of summary judgment on equal protection claim where facts proffered in support of selective enforcement claim failed to evidence impermissible motive and instead were "conjecture and speculation").

At most, Plaintiffs will argue that others received summonses for similar charges. Putting aside for a moment the fact that there is no evidence of whether these others were also engaged in First Amendment activity and thus not a comparable group for purposes of the equal protection analysis, such evidence alone cannot show discriminatory intent.  *See LeClair v. Saunders*, 627 F.2d 606, 608 (2d Cir. 1980) ("mere failure to prosecute other offenders is not a basis for finding a denial of equal protection") (citing *U.S. v. Rickenbacker*, 309 F.2d 462 (2d Cir. 1962)); *Aretakis v. Durivage*, 07-cv-1273, 2009 U.S. Dist LEXIS 7781, at *79-80 (Feb. 3, 2009) (citing *LeClair* for same principle); *see also Minor v. Clinton Co. N.Y.*, 541 F.3d 464, 474 (2d Cir. 2008) (denying equal protection claim arising from property foreclosure where the record did not support conclusion of discrimination against plaintiffs compared to similarly situated taxpayers where evidence offered to show motive was amount of money defendant county retained from surplus from tax foreclosures which is a practice that has been approved by the Supreme Court).  In *Minor*, the Second Circuit held evidence of a practice approved by the

Supreme Court (retention of surplus tax) could not evidence a discriminatory motive.  A similar analysis is appropriate here because evidence that one is subject to custodial arrest and fingerprinting for a minor offense is Constitutional under *Virginia v. Moore*, 128 S.Ct. 1598 (2008) and *U.S. v. Kelly*, 55 F.2d 67 (2d Cir. 1932) and therefore, cannot alone evidence discriminatory intent.

### D.  Any Substantive Due Process Claim Based On The No Summons Policy Fails As A Matter Of Law.

Plaintiffs also allege that the No-Summons Policy violated their substantive due process rights under the Fourteenth Amendment.  This claim fails because the substantive due process clause is not the proper analytical framework to determine the constitutionality of the Policies.[24]

In *Albright v. Oliver*, 510 U.S. 266, 275 (1994) the Supreme Court held that "substantive due process," has "scarce and open-ended guideposts," and "where a particular Amendment provides an explicit textual source of constitutional protection against a particular sort of government behavior, that Amendment, not the more generalized notion of substantive due process, must be the guide for analyzing these claims." 510 U.S. at 273 (quoting *Graham v. Connor*, 490 U.S. 386, 395 (1989)); *see also Albright*, 510 U.S. at 276 (Justice Scalia, concurring) ("the more generalized notion of 'substantive due process' . . . cannot be used to impose additional requirements upon such of the States' criminal processes as are already addressed (and left without such requirements) by the Bill of Rights" (quoting *Graham v. Connor*, 490 U.S. at 395)); *Cf. Bryant v. City of New York*, 404 F.3d 128, 135-136 (2d Cir. 2005) (holding that "the Fourth Amendment provides the proper analytical framework" for analyzing

---

[24] It appears that Plaintiffs in 32 cases allege the No-Summons Policy violated the substantive due process clause, which include Plaintiffs in *MacNamara, Portera, Coburn, Phillips, Sloan, Galitzer, Bastidas, Xu, Sikelianos, Drescher, Concepcion, Manders, Jusick, Rigby, Bunim, Kalra, Ryan, Garbini, Greenwald, Pickett, Tremayne, Biddle, Moran, Crotty, Stark, Pagoda, Meehan, Bell, Cohen, Dudek, Lee,*and  *Starin*.

the constitutionality of the decision to deny desk appearance tickets to demonstrator arrestees and finding the decision to favor online arrest processing as reasonable).

Accordingly, because the Policies can be examined under the Fourth Amendment, the First Amendment and the Fourteenth Amendment equal protection clause, they should not also be subject to scrutiny under the substantive due process clause.   Accordingly, Plaintiffs' substantive due process claims should be dismissed as a matter of law.

## V. DEFENDANTS ARE ENTITLED TO SUMMARY JUDGMENT ON PLAINTIFFS' CLAIMS REGARDING N.Y.C.P.L. § 160.10

### A. § 160.10 of the N.Y.S. Criminal Procedure Law Does Not Provide A Basis For Either A Federal or State Law Claim.

Plaintiffs' claim that the act of fingerprinting RNC arrestees whose top charge was a violation ran afoul of New York Criminal Procedure Law ("CPL") §160.10.  Plaintiffs assert that the alleged violation of §160.10 is either a basis to find a violation of the U.S. Constitution,[25] or the basis for a claim under state law.[26] As set forth below, the act of fingerprinting RNC arrestees whose top charge was a violation does not give rise to a cause of action for money damages under either federal or state law.

---

[25] *MacNamara* 2d Am. Complt.  ¶¶2, 55(m), 90, 92, 223, 227, 231, 235, 254, 257(k); *Schiller* 2d Am. Complt. ¶128; *Dinler* 3d Am Complt. ¶77; *Abdell* 3d Am. Complt. ¶46; *Adams* 3d Am. Complt. ¶23(k); *Araneda* Am. Complt., ¶ 24(k); *Xu* 2nd Am. Complt. ¶96; *Drescher* 1st Am. Complt. ¶127; *Phillips* 1st Am. Complt. ¶83; *Galitzer* 2nd Am. Complt. ¶76; *Sloan* 2d Am. Complt. ¶82; *Coburn* 2d Am. Complt. ¶84; *Bastidas* 2d Am. Complt. ¶95; *Jusick* 1st Am. Complt. ¶89; *Rigby* Complt. ¶75; *Manders* Complt. ¶81; *Sikelianos* 1st Am. Complt. ¶72; *Kennedy* Complt. ¶21(k); *Eastwood* 1st Am. Complt. ¶30(k); *Tikkun* Am. Complt. ¶¶ 3(iii), 44(c), 45, 120, 174(xi); *Portera* 1st Am. Complt. ¶¶3, 45; *Rechtschaffer* 1st Am. Complt. ¶¶2, 44; *Grosso* 3d Am. Complt. ¶¶ 96(iii), 100(iii), 104; *Winkleman* 1st Am. Complt. ¶¶22, 39-43.
[26] *MacNamara* 2d Am. Complt., ¶257(k); *Schiller* 2d Am. Complt. ¶128; *Dinler* 3d Am Complt. ¶77; *Winkleman* 1st Am. Complt. ¶¶39-43.

### B.  Violation Of §160.10 Does Not Give Rise To A Federal Claim Cognizable Under §1983.

Plaintiffs allege that defendants violated CPL §160.10 when they decided to fingerprint RNC arrestees whose top charge was a violation. Assuming *arguendo* that defendants did violate CPL §160.10 by doing so, a violation of §160.10 does not give rise to any constitutional deprivation under §1983.  Section 1983 does not provide a remedy for violations of state law, but only to vindicate rights created by the Constitution or federal statute. *Baker v. McCollan*, 443 U.S. 137, 146 (1979).  More specifically, as the Supreme Court recently held, violation of a state criminal procedural statute does not does amount to violation of a federal constitutional right. *Virginia v. Moore*, 553 U.S. 164 (2008) (violation of state statute mandating a summons rather than arrest for a person driving with a suspended license was not a violation of the Fourth Amendment); *Griffin v. Kelly*, 92-cv-8623, 1994 U.S. Dist. LEXIS 153 (S.D.N.Y. Jan. 11, 1994) (violation of CPL's sealing statute, §160.50, is not a Fourth Amendment violation because the statute does not create a liberty interest in privacy).

Even beyond the scope of the Fourth Amendment, the Second Circuit and this Court have held that violation of a New York State criminal procedure statute does not give rise to a constitutional claim cognizable under §1983. *See Watson v. City of New York*, 92 F.3d 31, 37-38 (2d Cir. 1996) ("[a]mple precedent establishes that a state rule of criminal procedure [such as New York's "speedy arraignment" statute, CPL §140.20(1)] does not create a liberty interest that is entitled to protection under the federal Constitution"); *see also Grandal v. City of New York*, 966 F.Supp. 197 (S.D.N.Y. 1997) (Scheindlin, J.) (violation of New York's sealing statute, CPL §160.50, did not violate due process or equal protection rights of plaintiff). Indeed, in the Consolidated RNC cases, Judge Francis applied this principle and refused to allow some plaintiffs to amend their complaints to add federal claims based on a violation of another CPL

section – CPL §160.50, New York's sealing statute relating to the return or destruction of an accused's fingerprints. *Schiller v. City of New York*, No. 04 CV 7922, 2008 U.S. Dist. LEXIS 4253, at *30-34 (S.D.N.Y. Jan. 23, 2008) (Sullivan, J.).

In sum, even assuming *arguendo* that defendants violated CPL §160.10 by fingerprinting RNC arrestees charged only with violations, such violation of a state criminal procedure rule cannot be the basis of a federal constitutional claim. Accordingly, plaintiffs' federal claims based on a violation of CPL §160.10 should be dismissed.

### C. Under New York State Law, No Claim Exists For Money Damages For A Violation Of CPL §160.10.

Several plaintiffs also assert violation of CPL §160.10 as a ***state-law*** claim. Those claims should likewise be dismissed. First, §160.10 does not contain an express cause of action for money damages. Second, New York courts have not previously implied a private right of action under New York state law for violation of §160.10. Third, assuming *arguendo* that defendants violated the statute, the Court should not now create a private cause of action for the reasons set forth below.

The New York Court of Appeals has held that if a statute contains no express cause of action (as is the case with CPL §160.10), one may be implied or read into the statute when (1) plaintiff is one of the class for whose particular benefit the statute was enacted; (2) recognition of a private right of action would promote the legislative purpose of the statute; and (3) to do so would be consistent with the legislative scheme. *Sheehy v. Big Flats Community Day, Inc.*, 73 N.Y.2d 629, 633-34 (1989); *Burns Jackson Miller Summit & Spitzer v. Lindner*, 59 N.Y.2d 314, 315 (1983).

Applying the *Sheehy* test here, it is clear that plaintiffs do not meet any of the test's three prongs. First, neither a plain reading of CPL §160.10 nor the legislative history of the statute

suggests that CPL §160.10 was enacted for the benefit of arrestees charged with certain crimes. (*See* Dougherty Decl., Ex. O, NYLS' Governor's Bill Jacket 1928 Chapter 875).  Rather, the purpose of enacting Code of Criminal Procedure §940 (CPL §160.10's predecessor) in 1928 was to centralize crime statistics in New York State and to create a state-wide Bureau of Identification – to create a "database" of fingerprints for the benefit of law enforcement, rather than protect the privacy of arrestees charged with minor offenses. (*Id.*)  That places plaintiffs outside of the class of persons that CPL §160.10's predecessor statute was enacted to benefit – namely, law enforcement authorities.

Second, allowing plaintiffs to bring a private cause of action for violation of CPL §160.10 would do little to promote the legislative purpose of the statute (the second *Sheehy* factor).  The legislative purpose of CPL § 160.10 is to protect public safety by assuring police that an arrestee in custody is not wanted by the authorities for prior crimes.  Allowing a plaintiff to bring a civil suit for money damages for violation of CPL §160.10 would hardly advance the purpose of the NYPD behind CPL §160.10 which is to protect public safety.

Third, plaintiffs cannot meet the third *Sheehy* factor, namely, they cannot show that creating a private cause of action would be consistent with the legislative scheme.  The New York Court of Appeals has noted that "[i]t is not always easy to distinguish this 'consistency' prong from the second *Sheehy* prong, which centers on 'promotion' of the legislative goal . . . . The two prongs may overlap . . . ." *Uhr v. East Greenbush Central School Dist.*, 94 N.Y.2d at 40.

In *Sheehy*, the issue was whether a private right of action in favor of intoxicated minors could fairly be implied from the statutory prohibition, contained in Penal Law §260.20(4), on furnishing alcoholic beverages to underage minors.  Resolution of that issue turned on the third

prong of the three-part test, i.e., whether creation of such a right would be consistent with the legislative scheme. Pointing to the causes of action expressly provided by both the Dram Shop Act (General Obligations Law § 11-101) and other provisions of the General Obligations Law, the New York Court of Appeals held that the claimed private right of action was not consistent with the "scheme" the Legislature had "deliberately adopted . . . for affording civil damages to those injured by the negligent or unlawful dispensation of alcohol." *Sheehy*, 73 N.Y.2d at 635. As the Court wrote, "[w]here the Legislature has not been completely silent but has instead made express provision for civil remedy, albeit a narrower remedy than the plaintiff might wish, the courts should ordinarily not attempt to fashion a different remedy, with broader coverage . . . ." *Id.* at 636.

In this case, as in *Sheehy*, there is already a process in place to address fingerprints for violations.  Here, fingerprints for violations are returned or destroyed pursuant to statute.  CPL §160.50, a sealing statute, provides that upon termination of a criminal proceeding in favor of the accused, all fingerprints taken of the accused must be either destroyed or returned to him or his attorney. CPL §160.50 (McKinney's 2011). Similarly, CPL §160.55 provides in material part that upon termination of a criminal proceeding by conviction for a violation,  the fingerprints shall be destroyed or returned. (McKinney's 2011).  It would be inconsistent with the legislative scheme of the CPL to create  a claim for money damages for "unlawful" fingerprinting when the CPL already provides for fingerprints for violations to be returned or destroyed.  Plaintiffs here have already had their remedy: shortly after the RNC, NYPD expunged the fingerprints of those RNC arrestees for whom the top charge was a violation. (56.1 ¶ 164).  As *Sheehy* cautions, this Court should not "attempt to fashion a different remedy, with broader coverage," than already allowed.  Thus, plaintiffs cannot meet the third prong of the Sheehy test, i.e., cannot show that a

private cause of action for violation of §160.10 would be consistent with the CPL's legislative scheme.

Significantly, defendants have been unable to locate any case law applying the *Sheehy* test to CPL §160.10, which is reason enough for this Court not to recognize a state-law claim for violation of the statute. "In the absence of any guidance from state courts, federal courts are hesitant to imply private rights of action from state criminal statutes." *Watson v. City of New York*, 92 F.3d 31, 36 (2d Cir. 1996); *In Re Integrated Resources*, 851 F.Supp. 556, 564 (S.D.N.Y. 1994). Indeed, New York courts have repeatedly refused to imply state-law private causes of action for violations of other provisions of the Criminal Procedure Law. *See, e.g., Watson*, 92 F.3d at 36-38 (reversing trial court for allowing jury to award money damages for implied private right of action under CPL §140.20(1)); *Sylvester v. City of New York*, 385 F.Supp.2d 431, 439-440 (S.D.N.Y. 2005) (holding that violation of CPL §160.50 did not give rise to state-law civil claim for damages, noting that "§160.50 does not explicitly provide for a cause of action for damages if it is violated – and no case has provided for damages solely on the basis of an alleged violation of CPL § 160.50"); *Lino v. City of New York*, 32 Misc. 3d 1207A (N.Y.Sup.Ct. June 24, 2011) (to same effect);[27] *Anderson-Haider v. State of New York*, 29 Misc.3d 816 (Ct. Cl. 2010) (violation of CPL §720.35 did not create private right of action for damages).

Finally, subsection 2 of §160.10 was added in 1970 without any comment when New York's Code of Criminal Procedure was recodified as the Criminal Procedure Law and former §940 restyled as §160.10. The New York Legislature has amended §160.10 four times since its codification in 1970, and has never seen fit to create a private cause of action for violation of §160.10. This in itself suggests that the Legislature never intended CPL §160.10 to create such a

---

[27] In the *Lino* case, plaintiffs were represented by Christopher Dunn, Esq., of the New York Civil Liberties Union – who is also counsel for plaintiffs in the *Schiller* and *Dinler* RNC cases.

claim. *See, e.g., Uhr*, 94 N.Y.2d 32, at 40-41 (1999) (Legislature's failure to amend Education Law §905 to provide for a private cause of action was strong evidence that Legislature did not intend to create a private cause of action for violation of the statute). For these reasons, plaintiffs cannot claim that creating a private right of action for violation of CPL §160.10 would promote the legislative purpose of the statute, as reflected in §160.10's legislative history.

In sum, assuming arguendo that defendants violated CPL §160.10, any such violation does not create – nor should this Court create – a private right of action for money damages, and thus plaintiffs' claim should be dismissed.[28]

### D. Assuming *Arguendo* that A Private Right of Action For Money Damages Exists Under CPL §160.10, Defendants Did Not Violate The Statute.

CPL §160.10 provides as follows:

1.      Following an arrest, or following the arraignment upon a local criminal court accusatory instrument of a defendant whose court attendance has been secured by a summons or an appearance ticket under circumstances described in sections 130.60 and 150.70, the arresting or other appropriate police officer or agency ***must take or cause to be taken*** fingerprints of the arrested person or defendant if an offense which is the subject of the arrest or which is charged in the accusatory instrument filed is:
(a) A felony; or
(b) A misdemeanor defined in the Penal Law; or
(c) A misdemeanor outside the Penal Law which would constitute a felony if such person had a previous judgment of conviction for a crime; or
(d) Loitering for the purpose of engaging in a prostitution offense as defined in subdivision two of section 240.37 of the Penal Law.

2.      In addition, a police officer who makes an arrest for ***any offense***, either with or without a warrant, ***may take or cause to be taken*** the fingerprints of the arrested person if such police officer:
(a) Is unable to ascertain such person's identity; or
(b) Reasonably suspects that the identification given by such person is not accurate; or

---

[28] Moreover, because New York State courts have not yet recognized a private cause of action for violation of §160.10, this Court may decline pendent jurisdiction over this state-law claim, dismissing it without prejudice to plaintiffs bringing it in state court. *See* 28 U.S.C. §1367(c)(1) (federal court may decline supplemental jurisdiction where a claim "raises a novel . . . issue of state law").

      (c) Reasonably suspects that such person is being sought by law enforcement officials for the commission of some other offense.

(McKinney's 2011) (emphasis added).

First, nothing in CPL §160.10 ***prohibits*** a police officer from fingerprinting arrestees charged with a violation.  Second, fingerprinting all RNC arrestees was justified by the language of §160.10[2][a-b], which allows police officers to fingerprint arrestees for any offense if the officer is (a) unable to ascertain the arrestee's identity, or (b) reasonably suspects that the identification given by the arrestee is not accurate. CPL §160.10[2](a-b).  The RNC presented a unique challenge to the NYPD in that it was believed that those individuals coming to the City to engage in unlawful conduct were told to bring fake identification with them, or no identification at all.  (56.1 ¶¶ 124-135, 200-214).  Moreover, as set forth in the accompanying Declaration of Brian Jenkins it was all too simple in 2004 to create fake driver's licenses and other forms of identification, leaving fingerprints as a vastly more reliable means of identification than documents that can be easily forged or fabricated. (56.1 ¶¶ 136-145; Jenkins Decl.).  During the RNC, the NYPD could, under CPL §160.10[2], "reasonably suspect" that the identifications produced by arrestees, if produced at all, were inaccurate and unlikely to help NYPD ascertain the arrestee's true identity.  Due to the unique nature of the event and the threats posed, it was reasonable for the NYPD to decide to fingerprint all RNC and that decision under the circumstances falls within subsection 2 of the statute.

For the foregoing reasons, this Court should grant defendants summary judgment dismissing plaintiffs' federal and state law claims based upon §160.10.

### E.  Defendants Kelly, Esposito And The City Are Entitled To Governmental Immunity.

In the event the Court finds that the Policies violated provisions of state law that echo the Federal constitutional amendments and theories of liability, and/or finds that the Policies violated CPL §160.10 such that plaintiffs can assert a private cause of action for that violation, Commissioner Kelly, Chief Esposito, and the City are entitled to governmental immunity from suit under New York state law.

Under New York law, governmental immunity attaches "when official action involves the exercise of discretion or expert judgment in policy matters, and is not exclusively ministerial." *Haddock v. City of New York*, 75 N.Y.2d 478, 484 (1990). The rationale is that "municipal officers and employees should be free to exercise judgment in carrying out their official duties unhampered by fear of second-guessing and retaliatory lawsuits." *Id.*  Here, Commissioner Kelly and Chief Esposito, in adopting the Policies, were not acting in a purely ministerial fashion, but rather, using their discretion and their expert judgment in policy matters, and are thus entitled to governmental immunity from any state-law claims based on the Policies or CPL §160.10.  Per *Haddock*, plaintiffs are not entitled to second-guess whether these two defendants, or the NYPD more generally, could have addressed anticipated disorder at the RNC in some other manner.

Governmental immunity also extends here to the City.  The governmental immunity doctrine shields municipalities from liability for decisions about how to allocate the limited resources available to it for carrying out functions that benefit the general public.  *Balsam v. Delma Engineering Corp.*, 90 N.Y.2d 966, 968 (1997).  New York courts recognize that decisions about resource allocation, such as police protection, generally should be left to the discretion of legislators and other policymakers, who act in the general public's interest, rather

than to litigants, who act in their own, or to the judiciary.  *Cuffy v. City of New York*, 69 N.Y.2d 255, 260 (1987); *De Long v. County of Erie*, 60 N.Y.2d 296, 305 (1983) ("[T]he proper allocation of public resources and available police services is a matter for the executive and legislative branches to decide").  Beyond the allocation of police resources, courts have granted governmental immunity to a governmental entity on state-law claims where that entity adopts a policy that is reasonable in light of alternative choices.  *See, e.g.*, *Zambrana v. N.Y.C. Transit Authority*, 14 A.D.3d 23, 786 N.Y.S.2d 488 (1st Dep't 2004) (in negligence action, granting governmental immunity to the City Transit Authority where Transit Authority's policy of keeping subway doors unlocked while the train was moving reasonably balanced passenger's ease of escape with danger of passengers being injured moving between cars); *Mei v. City of New York*, 06 Civ. 00296, 2006 U.S. Dist. LEXIS 75871, at * 40-41 (McMahon, J.) (granting governmental immunity to the City where the City's water-management policy of filling a reservoir until it spilled over into a river "is precisely the type of discretionary policymaking that is protected by governmental immunity").

As with governmental immunity for municipal employees, governmental immunity for the City "preclude[s plaintiffs from] second-guessing the considered planning decisions" of the City.  *Jackson v. N.Y.C. Transit Authority*, 30 A.D.3d 289, 290, 818 N.Y.S.2d 32 (1st Dep't 2006).  Indeed, the New York Court of Appeals recently granted the Port Authority governmental immunity in connection with the 1993 bombing of the World Trade Center, holding that the allocation of police resources for security that the agency had in place before the bombing was reasonable in light of other possible approaches:

> Despite the injurious results of the [1993 bombing], the policy of the governmental immunity doctrine seeks to promote the proactive, deliberate, and informed security procedures that were developed here. For example, the Port

Authority solicited numerous expert opinions on the security risks and measures to be considered before allocating its police resources. While the Port Authority's decision-making could have proceeded along different acceptable paths of action, in this case, it reached a reasoned discretionary conclusion to heighten security in sectors of the WTC considered more susceptible to harmful attack. *This is the type of assiduous behavior that governmental agencies should be encouraged to undertake in rendering informed decisions that involve the balancing of burdens and risks, competing interests, and allocation of resources.*

*In the Matter of World Trade Center Bombing Litigation*, 2011 NY Slip Op 6501, 2011 N.Y. LEXIS 2971, at *46-47 (Sept. 22, 2011) (emphasis added).  *See also Pope v. State*, 19 A.D.3d 573, 796 N.Y.S.2d 548 (2d Dep't 2005) (dismissing negligence claim brought against state university and granting university governmental immunity for on-campus security measures where "the [State's] decision regarding the level of security to be provided . . . was based on the exercise of its reasoned judgment which entitled it to governmental immunity").

For these reasons, Commissioner Kelly, Chief Esposito, and the City are each entitled to governmental immunity on plaintiff's state-law claims relating to the Policies and the alleged violation of CPL §160.10.

## VI.    DEFENDANTS ARE ENTITLED TO QUALIFIED IMMUNITY

As shown above, the Policies did not violate Plaintiffs' constitutional rights.  At any rate, Defendants are entitled to qualified immunity.  Government officials performing discretionary functions, generally are shielded "from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)); *Ashcroft v. al-Kidd*, 131 S. Ct. 2074, 2080 (2011). Qualified immunity recognizes that "it is inevitable that law enforcement officials will in some cases reasonably but mistakenly [take actions that may be later found unlawful]; in such case those officials -- like other officials who act in ways they reasonably believe to be lawful --

should not be held personally liable." *Anderson v. Creighton*, 483 U.S. 635, 641 (1987).  The

qualified immunity doctrine "gives ample room for mistaken judgments" by protecting "all but

the plainly incompetent or those who knowingly violate the law." *Hunter v. Bryant*, 502 U.S.

224, 228-29 (1991) (quoting *Malley v. Briggs*, 475 U.S. 335, 341 (1986)). This accommodation

for reasonable mistakes exists because "officials should not err always on the side of caution"

because they fear being sued. Id. at 229.

The two questions involved in a qualified immunity inquiry are: (1) whether a plaintiff

has alleged or established facts which establish that the official's conduct violated a

constitutional right (*County of Sacramento v. Lewis*, 523 U.S. 833, 841 (1998)); and (2) whether

the right was "clearly established" at the time of the alleged incident that a reasonable official

would have known his or her conduct was unlawful (*Saucier v. Katz*, 533 U.S. 194, 201-02

(2001)).  However, the Supreme Court has held that judges have "discretion in deciding which of

the two prongs of the qualified immunity analysis should be addressed first . . ." *Pearson*, 555

U.S. at 236.

In analyzing prong one of the qualified immunity analysis, if no constitutional right has

been violated based on the established allegations, there is no need for further inquiry concerning

qualified immunity.  *Saucier*, 533 U.S. at 201.  As for prong two, "[a] right is clearly established

if (1) the law is defined with reasonable clarity, (2) the Supreme Court or the Second Circuit has

recognized the right, and (3) 'a reasonable defendant [would] have understood from the existing

law that [his] conduct was unlawful.'" *Young v. County of Fulton*, 160 F.3d 899, 903 (2d Cir.

1998). "The question is not what a lawyer would learn or intuit from researching case law, but

what a reasonable person in the defendant's position should know about the constitutionality of

the conduct." *McCullough v. Wyandanch Union Free Sch.*, 187 F.3d 272, 278 (2d Cir. 1999); *see*

*also Pearson*, 555 U.S. at 244-25 ("if judges [could] disagree on a constitutional question, it is unfair to subject police [officials] to money damages for picking the losing side of the controversy.").   In other words, where reasonably competent officials could disagree as to whether the conduct at issue would violate clearly established rights, the qualified immunity defense is available. *Malley v. Briggs*, 475 U.S. 335, 341 (1986).

While "clearly established" does not mean that there must be a case directly on point, "existing precedent must have placed the statutory or constitutional question beyond debate." *Anderson v. Creighton*, 483 U.S. 635, 640 (1987).  The Supreme Court has repeatedly told lower courts "not to define clearly established law at a high level of generality." *Ashcroft*, 131 S. Ct. at 2084.  For example, the general proposition, "that an unreasonable search or seizure violates the Fourth Amendment is of little help in determining whether the violative nature of particular[ized] conduct is clearly established." *Id.* (citing *Saucier*, 533 U.S. at 201-02); *see also Anderson*, 483 U.S. at 640 ("… The contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right.").  In other words, "if the law did not put the [official] on notice that his conduct would be clearly unlawful, summary judgment based on qualified immunity is appropriate."  *Saucier*, 533 U.S. at 202.  "For executive officers in general . . . qualified immunity represents the norm."  *Anderson*, 483 U.S. at 642.

As discussed above, the Policies did not violate the Constitution but even if the Court determines Plaintiffs' rights under the First, Fourth or Fourteenth Amendments were violated by the Policies, Defendants are entitled to qualified immunity because the rights Plaintiffs allege were violated by the Policies were not clearly established at the time the City adopted and implemented the Policies.  *See African Trade & Info. Ctr*, 294 F.3d 355, 362-64 (2d Cir. 2002) (granting qualified immunity where rights under First Amendment and equal protection clause

were not clearly established and the existence of the rights at issue were open questions within the Second Circuit).  Moreover, qualified immunity would also shield any mistaken judgments made regarding whether the Policies violated Plaintiff's rights.

### NO PERSONAL INVOLVEMENT

It appears that Plaintiffs contend that Mayor Michael Bloomberg, Chief Patrick Devlin and Chief John Colgan were personally involved in the decision to adopt the Policies and therefore should be subject to liability if they are deemed unconstitutional.  Plaintiffs claims against these individual defendants fail because they were not personally involved in the decision to adopt the Policies.  Indeed, Chief Esposito testified that he and "ultimately" Commissioner Kelly were responsible for adopting the Policies – and no one else.  (56.1 ¶ 156).

It is well established that "personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983." *Williams v. Smith*, 781 F.2d 319, 323 (2d Cir. 1986) (internal quotations and citations omitted). An individual can only be held liable on a § 1983 claim if that individual "participates directly in the alleged constitutional violation or if that [individual] creates a policy or custom under which unconstitutional practices occurred." *Bellamy v. Mt. Vernon Hosp.*, 07 Civ. 1801 (Scheindlin, J.) 2009 U.S. Dist. LEXIS, 54141, at *27-28 (S.D.N.Y. June 26, 2009).  In cases where plaintiffs have been unable to point to evidence of an individual defendants personal involvement, summary judgment is warranted. *See, e.g., Cea v. Ulster County*, 309 F. Supp. 2d 321, 328 (N.D.N.Y. 2004) (granting summary judgment on Section 1983 claim where there were no allegations that defendant detective was present during the incident); *Show v. Patterson*, 955 F. Supp. 182, 188 (S.D.N.Y. 1997) (granting summary judgment where plaintiff failed to submit any evidence of personal involvement).

## REMAINING STATE LAW CLAIMS

Plaintiffs also make state law claims based on the Policies.  With the exception of a state law claim based on violation of CPL § 160.10, these claims are based on provisions of state law which echo the Federal constitutional amendments and theories of liability.  Accordingly, these claims are also subject to summary judgment.

## CONCLUSION

For all of the aforementioned reasons, Defendants respectfully submit that because the NYPD's decisions to adopt the No-Summons Policy and to fingerprint all RNC arrestees survives any level of constitutional scrutiny under the Fourth, First and Fourteenth Amendments and under state law there is no triable issue of fact as to the constitutionality of the Policies.

Dated:  New York, New York
       October 3, 2011

                                   Respectfully submitted,

                                   MICHAEL A. CARDOZO
                                   Corporation Counsel of the City of New York
                                   *Attorney for Defendants*

By:             _____

                                   Jeffrey A. Dougherty
                                   Peter G. Farrell
                                   Fred M. Weiler
                                   Special Federal Litigation Division
                                   100 Church Street, Room 3-143
                                   New York, New York 10007
                                   Tel:    212-788-8342
                                   Fax:    212-788-9776

- 60 -