UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------------- x

MICHAEL SCHILLER, *et al.*,

                                   Plaintiffs,

         -against-

CITY OF NEW YORK, *et al.*,

                                 Defendants.

------------------------------------------------------------------------- x
------------------------------------------------------------------------- x

04-CV-7922 (RJS) (JCF)

RNC CONSOLIDATED CASES                                  (RJS) (JCF)

------------------------------------------------------------------------- x

**DEFENDANTS' MEMORANDUM OF LAW IN OPPOSITION TO PLAINTIFFS'
MOTIONS FOR PARTIAL SUMMARY JUDGMENT ON THEIR FALSE ARREST
CLAIMS AT CHURCH AND FULTON STREETS AND STATE-LAW
<u>FINGERPRINTING CLAIMS</u>**

 

MICHAEL A. CARDOZO
Corporation Counsel of the
City of New York
*Attorney for Defendants*
100 Church Street
New York, New York 10007
Tel: (212) 788-1817
Fax: (212) 788-9776

                   *Of Counsel*:       Fred M. Weiler, Esq.
                                           Cheryl L. Shammas, Esq.
                                           Peter G. Farrell, Esq.

Dated:    New York, New York
            November 3, 2011

**TABLE OF CONTENTS**

**Page**

TABLE OF AUTHORITIES ................................................................................................. iii

PRELIMINARY STATEMENT .......................................................................................... 1

ARGUMENT .......................................................................................................................... 2

I.     PLAINTIFFS SHOULD BE DENIED SUMMARY JUDGMENT ON THEIR FALSE ARREST CLAIMS ........................................................................... 2

     A.     It Was Objectively Reasonable For Chief Monahan To Believe That The Marchers Committed Unlawful Conduct As A Unit And Could be Arrested As A Unit, As The *Carr* Case Allows ........................................................... 2

     B.     Chief Monahan Had Probable Cause To Arrest All Plaintiffs For Blocking Pedestrian Traffic ............................................................................. 6

         1.     *Plaintiffs Obstructed The Northern Sidewalk Of Fulton Street* ................................. 6

         2.     *Plaintiffs Obstructed The Northern Sidewalk Of Fulton Street Intentionally Or Recklessly* ........................... 11

     C.     Chief Monahan Had Probable Cause To Arrest All Plaintiffs For Refusing To Obey A Lawful Order To Disperse ........................................ 12

     D.     Chief Monahan Had Probable Cause To Arrest All Plaintiffs For Parading Without A Permit ................................................................................ 16

         1.     *A Parading Permit Is Required Even For Marches On Public Sidewalks* ........................ 17

         2.     *Under New York Law, The Mens Rea For Parading Without A Permit Was Unsettled As Of 2004, But In Any Event, It Was Objectively Reasonable For Chief Monahan To Believe That*

**Page**

*Plaintiffs Knew That The WRL March Lacked A Permit*......................................................18

3.   *It Was Objectively Reasonable For Chief Monahan To Believe That All The Marchers Were Parading, Despite The Presence Of Journalists And "Bystanders" Among The Marchers* ...........................................................19

II.   PLAINTIFFS IN THE *SCHILLER*, *DINLER*, AND *MACNAMARA* CASES SHOULD BE DENIED SUMMARY JUDGMENT ON THEIR STATE-LAW FINGERPRINTING CLAIMS ....................................21

CONCLUSION..............................................................................................28

## TABLE OF AUTHORITIES

<u>**Cases**</u>                                                                                              <u>**Pages**</u>

*Abdell v. City of New York,*
   2008 U.S. Dist. LEXIS 48078 (June 25, 2008) ................................................................ *passim*

*Allen v. City of New York,*
   2007 U.S. Dist. LEXIS 15 (S.D.N.Y. Jan. 3, 2007)..................................................................17

*Calderola v. Calabrese,*
   298 F.3d 156 (2d Cir. 2002)......................................................................................................11

*Carr v. District of Columbia,*
   587 F.3d 401 (D.C. Cir. 2009) ...........................................................................................2, 3, 4, 5

*Carter v. City of New York,*
   427 F. Supp. 2d 307 (S.D.N.Y. 2004)..................................................................................4, 5

*Davis v. Mississippi,*
   394 U.S. 721 (1969)....................................................................................................................26

*Fidler v. Murphy,*
   203 Misc. 51, 113 N.Y.S.2d 388 (Sup. Ct. Onondaga Cty. 1952)..............................24, 25, 26

*Galapo v. City of New York,*
   95 N.Y.2d 568 (2000) ................................................................................................................13

*Goodman v. Liebovitz,*
   96 Misc. 2d 1059, 410 N.Y.S.2d 502 (Sup Ct. N.Y. Co. 1978) .............................................26

*Gow v. Bingham,*
   57 Misc. 66, 107 N.Y.S.2d 1011 (Sup Ct. Kings Co. 1907)............................22, 23, 24, 25, 26

*Hawkins v Kuhne,*
   153 A.D. 216, 137 N.Y.S. 1090 (2d Dep't 1912)........................................................23, 24, 26

*Lyons v. City of Seattle,*
   214 Fed. Appx. 665 (9th Cir. 2006)...................................................................................14,15

*Martinelli v. County of Oneida,*
   2001 U.S. Dist. LEXIS 2435 (N.D.N.Y. 2001) .......................................................................10

*Najieb v. UFCW Local Union 888,*
   2006 U.S. Dist. LEXIS 59508 (E.D.N.Y. Aug. 23, 2006)......................................................26

**Cases**                                                                                             **Pages**

*People v. Arbeiter,*
    169 Misc. 2d 771, 630 N.Y.S.2d 915 (App. Term 1st Dep't 1996) ..........................................11

*People v. Barrett,*
    13 Misc. 2d 929, 821 N.Y.S.2d 416 (N.Y. Crim. Ct. 2006) ...............................................10, 18

*People v. Bezjak,*
    11 Misc. 3d 424, 812 N.Y.S.2d 829 (Crim. Ct. N.Y. Cty. 2006) ......................................18, 19

*People v. Carcel,*
    3 N.Y.2d 327 (1932) ...................................................................................................16

*People v. Cecere,*
    70 Misc. 2d 510, 334 N.Y.S.2d 83 (City Ct. N.Y. Batavia 1972) ..........................................17

*People v. Delhall,*
    131 A.D.2d 870, 517 N.Y.S.2d 228 (2d Dep't 1987)................................................................10

*People v. Galpern,*
    259 N.Y. 279 (1932) ...................................................................................................14

*People v. Jackson,*
    856 N.Y.S.2d 25, 2007 N.Y. Slip Op. 52383U (N.Y. Crim. Ct. Dec. 18, 2007).....................12

*People v. Jones,*
    9 N.Y.3d 259 (2007) ..............................................................................................9, 10

*People v. Karns,*
    81 Misc. 2d 186, 365 N.Y.S.2d 725 (City Ct. N.Y.  Rochester 1975) ....................................17

*People v. Munoz,*
    10 Misc. 3d 1052A, 862 N.Y.S.2d 810 (N.Y. Crim. Ct. 2005) ...............................................10

*People v. Namer,*
    11 Misc. 3d 409, 812 N.Y.S.2d 824 (Crim. Ct. N.Y. Cty. 2006) ...........................................18

*People v. Nixon,*
    248 N.Y. 182 (1928) ................................................................................................8, 9

*People v. Pettigrew,*
    69 Misc. 2d 985, 332 N.Y.S.2d 33 (Dist. Ct. Suffolk Co. 1972)......................................11, 14

*People v. Scott,*
    58 Misc. 2d 455, 295 N.Y.S.2d 724 (Sup. Ct. Rockland Co. 1968)........................................14

**Cases**                                                                                              **Pages**

*People v. Todaro,*
   26 N.Y.2d 325, 310 N.Y.S.2d 303 (1970) ............................................................................14

*Posr v. Killackey,*
   2003 U.S. Dist. LEXIS 12755 (S.D.N.Y. Dec. 17, 2003) ...................................................9, 12

*Provost v. City of Newburgh,*
   262 F.3d 146 (2d Cir.  2002)................................................................................................10

*Richardson v. New York City Health and Hospitals Corp.,*
   2009 U.S. Dist. LEXIS 25247 (S.D.N.Y. Mar. 25, 2009) ........................................................11

*Salim v. Proulx,*
   93 F.3d 86 (2d Cir. 1996)................................................................................................13, 14

*Thom v. New York Stock Exchange,*
   306 F. Supp. 1002 (S.D.N.Y. 1969)...............................................................................25, 26

*United States v. Amerson,*
   483 F.3d 73 (2d Cir. 2007)...................................................................................................26

*United States v. Kelly,*
   55 F.2d 67 (2d Cir. 1932)....................................................................................................26

*United States v. Nelson,*
   2011 U.S. Dist. LEXIS 36483 (S.D.N.Y. Mar. 30, 2011) .......................................................12

*United States v. Ortiz-Gonzalbo,*
   1997 U.S. App. LEXIS 34511 (2d Cir. 1997) ......................................................................26

*Velaire v. City of Schenectady,*
   862 F. Supp. 774 (N.D.N.Y. 1994) ......................................................................................10

| **Statutes** | **Pages** |
| --- | --- |
| 38 NYCRR § 19-02 | 20 |
| 42 U.S.C. § 1983 | 4, 22 |
| Code of Criminal Procedure §940 | 23, 24 |
| Criminal Penal Law §160.10 | *passim* |
| Criminal Penal Law §160.10[2] | 25 |
| Criminal Penal Law §240.00 | 17 |
| Criminal Penal Law §240.20(5) | *passim* |
| Criminal Penal Law §240.20(6) | *passim* |
| N.Y. Admin. Code § 10-110 | 16-21 |

## **PRELIMINARY STATEMENT**

Defendants have made a separate motion for summary judgment to dismiss the false arrest claims made by plaintiffs arrested at Church and Fulton Streets in the *Abdell*, *Schiller*, *Macnamara*, *Pagoda*, *Meehan*, and *Botbol* cases. (See *Schiller* Docket Entry ("DE") 565-567, 576). Defendants incorporate herein the facts and law argued in those motion papers, including the videotape and documentary evidence cited in defendants' Local Rule 56.1 Statement of Undisputed Facts ("Defs. 56.1") in support of that motion (*Schiller* DE 566). This memorandum of law will focus on arguments made in plaintiffs' moving papers.

Plaintiffs arrested at Church and Fulton Street, who move for summary judgment on their false arrest and state-law fingerprinting claims, submit two memoranda of law in support of their motions: one submitted by plaintiffs in *Abdell* ("*Abdell* Br."), and one submitted by plaintiffs in *Schiller* ("*Schiller* Br."). (Plaintiffs arrested at Church and Fulton Streets in *Macnamara*, *Pagoda*, *Meehan*, and *Botbol* join in on the arguments made in both the *Schiller* and *Abdell* Briefs).  Between the *Abdell* and *Schiller* Briefs, plaintiffs argue the following with respect to their arrests at Church and Fulton Streets:

- Chief Monahan lacked individualized probable cause to arrest plaintiffs for any reason (1) because he had no knowledge of what any particular plaintiff was doing when he ordered arrests (*Schiller* Br., p. 17), or (2) because he could not have reasonably believed that the marchers were engaging in unlawful conduct as a cohesive unit (*Abdell Br.*, pp. 22-24).

- Plaintiffs did not obstruct, or intend to obstruct, pedestrian or vehicular traffic as "obstruction" is defined under New York law, (1) because plaintiffs simply say so (*Schiller* Br., p. 19) or (2) because videotape evidence supposedly shows that there was sufficient room on the Fulton Street sidewalk for pedestrians to walk alongside or through the mass of marchers (*Abdell* Br., p. 19).

- Chief Monahan did give not a dispersal order that he could reasonably believe was audible to the marchers (*Abdell Br.*, pp. 26-28), no plaintiff heard any order to disperse (*Schiller* Br., p. 20), and even if Chief Monahan gave a dispersal order, he did not give marchers any opportunity to disperse. (*Schiller* Br., pp. 19-21, *Abdell Br.*, pp. 26-28).

- Plaintiffs should not have been arrested for parading without a permit because (1) no permit is required for walking on a sidewalk (*Schiller Br.*, p. 21), (2) plaintiffs lacked the required *mens rea* for violating the parading ordinance (*Schiller Br.*, p. 21-22), and (3) Chief Monahan could not have known that everyone in the march was "actually parading." (*Abdell Br.*, p. 26).

Plaintiffs in *Schiller*, *Dinler*, and *Macnamara* also move for summary judgment on *state-law* claims for unlawful fingerprinting based on an alleged violation of Criminal Procedure Law §160.10 (*Schiller* Br., pp. 23-25); defendants address that part of plaintiffs' motion in Part II *infra*.

As set forth fully below, plaintiffs' arguments are flatly contradicted by evidence in the record as well as legally meritless. Accordingly, plaintiffs should be denied summary judgment on their false arrest and state-law fingerprinting claims, and defendants' motion for summary judgment on these claims should be granted.

## ARGUMENT

## I. PLAINTIFFS SHOULD BE DENIED SUMMARY JUDGMENT ON THEIR FALSE ARREST CLAIMS

### A. It Was Objectively Reasonable For Chief Monahan To Believe That The Marchers Committed Unlawful Conduct As A Unit And Could be Arrested As A Unit, As The *Carr* Case Allows

Plaintiffs acknowledge that pursuant to *Carr v. District of Columbia*, 587 F.3d 401 (D.C. Cir. 2009), police can arrest a group observed engaging in unlawful conduct as a cohesive unit. Specifically, plaintiffs state: "When Monahan says that the plaintiffs 'were all acting in concert to disobey the law,' he implicitly recognizes the necessity of meeting *Carr* and *Barham*'s requirement that, to justify the arrests on Fulton Street, he had to believe that plaintiffs 'operated as a cohesive unit.'" (*Abdell Br.*, p. 22) (quoting *Carr*, 587 F.3d at 409). Plaintiffs then, however, erroneously argue that "[w]hen Monahan stopped the march from proceeding on

2

a public sidewalk that had remained open for use by the public . . . he could not have reasonably believed that every person arrested on the sidewalk was acting in concert to obstruct the sidewalk." (*Id.*) Defendants argue that the marchers consisted of protesters, photographers, and innocent passers-by, and thus that Chief Monahan could not have reasonably believed that each and every marcher was acting unlawfully.

Plaintiffs' arguments must be rejected for a number of reasons. First, both defendants (in their Motion for Summary Judgment Dismissing False Arrest Claims of Church-Fulton Plaintiffs, Weiler Declaration , Exh. A) and plaintiffs (Spiegel Moving Declaration, Exhs. A and B) have submitted videotape footage that shows the marchers moving eastward as a unit. Second,  Chief Monahan saw a large group of people assembling to engage in the march; he saw the march begin; and he saw marchers cross Church Street and proceed on Fulton Street carrying a banner. (Defs. 56.1, ¶¶ 30, 94, 101-105, 114-115).   In addition, plaintiff Hedemann held himself out as the leader of the march to Chief Monahan, and repeatedly assured Chief Monahan on behalf of *all* the marchers that they would obey all police directives, including police instructions not to block pedestrian traffic. (Defs. 56.1, ¶¶ 31, 49-61).  When asked how he could make sure all marchers would comply with the rules of the march, Hedemann told Chief Monahan that he had marshalls or organizers who would make sure that the march proceeded in an orderly fashion.   (Defs. 56.1, ¶¶ 60-61). Chief Monahan believed that everyone he saw engaging in unlawful conduct on Fulton Street had been read and had heard warnings by Inspector Galati via bullhorn (Defs. 56.1, ¶¶ 133-134), warnings that many plaintiffs do not dispute hearing before the march began (Defs. 56.1, ¶ 82).  Finally, of the 227 people arrested at Church and Fulton Streets, plaintiffs can only identify 10 plaintiffs who they claim were not

"participating" in the march. (*Abdell Br.*, pp. 9-10) (plaintiffs Krassan, Cohen, Spritzer, Stephens, Paterson, Palmer, Cook, Turner, Judd, and Schiller).[1]

Given all these facts, it was objectively reasonable for Chief Monahan to believe that the individuals he arrested were part of a cohesive unit, and that he had probable cause to arrest the marchers as a group.  The fact an individual plaintiff may have been a "journalist" rather than a "protester" is irrelevant to the *Carr* analysis. The issue is whether Chief Monahan could reasonably believe under the circumstances that the marchers were acting as a cohesive unit; the undisputed videotape and other evidence in the record demonstrate that Chief Monahan was indeed reasonable in that belief.  Moreover, the undisputed dispersal orders issued by Chief Monahan remove any doubt about whether probable cause existed to arrest the group of marchers.

Plaintiffs also argue that *Carter v. City of New York*, 427 F. Supp. 2d 307 (S.D.N.Y. 2004), "re-affirms the centrality of the requirement that police officers who arrest a group of persons have knowledge of the illegal activity of each person arrested." (*Abdell* Br., p. 23). However, Carter never addressed the dichotomy between arresting a group and arresting an individual: the Court's probable cause analysis did not hinge on any requirement that when police observe a group engaging in unlawful conduct, they must observe what each individual participant is doing prior to arresting the group.  Plaintiffs in *Carter* made no such argument. Instead, the Court focused on *group conduct* as the basis of any individual plaintiff's arrest, finding that there was probable cause to arrest a group of firefighters for trespassing.  427

---

[1] Except for plaintiffs Krassan, Cohen, and Spritzer, these plaintiffs were allegedly photographers, filmmakers, or videographers who admittedly were there to document the march, and all 10 of these plaintiffs were indisputably among the group of marchers committing unlawful conduct.

F.Supp.2d at 321.  Here, Chief Monahan *did* have knowledge of the illegal conduct of the group, which *is* knowledge of the illegal activity of each individual.  In sum, nothing in *Carter* calls into question *Carr* and the notion that police can arrest a mass of demonstrators for unlawful conduct without knowing exactly what each participant in the demonstration was doing before his or her arrest.

       *Carter* is distinguishable in other ways as well. First, *Carter* never addressed the dichotomy between arresting a group and arresting an individual. Second, just as the *Carter* court rejected plaintiffs' arguments that they thought they were "authorized" to be in the Restricted Zone, this Court should reject any arguments by plaintiffs that this was an unconditionally sanctioned march. The police warned the marchers, both before and during the march, that the march lacked a permit and that marchers that did not comply with police directives would be subject to arrest.  (Defs. 56.1, ¶¶ 75(b), 77-81, 83, 95).

       With respect to Church and Fulton Streets, plaintiffs here claim that "[b]y contrast [with the *Carter* case], some of the plaintiffs were engaged in . . . a march on a sidewalk that was open for use by the public, others were journalists and photographers who were reporting on the march, and some were pedestrians making their way through the marchers." (*Abdell* Br., pp. 23-24). But this contrast with *Carter* is illusory because from the perspective of the police at Church and Fulton Streets, *all of the plaintiffs were doing the same thing.* The issue is not what any individual meant to do, thought, or believed as they walked with the marchers, but rather whether Chief Monahan could reasonably believe that plaintiffs were part of a group that disobeyed police warnings and instructions and engaged in unlawful conduct. For these reasons, plaintiffs' reliance on *Carter* is misplaced.

**B.**     **Chief Monahan Had Probable Cause To Arrest All Plaintiffs For Blocking Pedestrian Traffic**

Plaintiffs' arguments that there was no probable cause to arrest them for blocking pedestrian traffic on the northern sidewalk of Fulton Street boil down to the following: (1) the group was not *completely* blocking the sidewalk, because plaintiffs' videoclips supposedly show people passing alongside and through the marchers; and (2) plaintiffs did not intend to block the sidewalk (*Abdell* Br., p. 19; *Schiller* Br., p. 19). These arguments are legally baseless, and the undisputed evidence in the record contradicts plaintiffs' assertions.

**1.     *Plaintiffs Obstructed The Northern Sidewalk Of Fulton Street***

First, plaintiffs argue that they could not have been obstructing pedestrian traffic on the northern sidewalk of Fulton Street because their own video evidence "show[s] that people were walking in a manner that left significant open space on the sidewalk, and that the people walking on the sidewalk easily passed by stationary photographers." (*Abdell* Br., p. 7; *Abdell* 56.1 Statement, ¶¶ 13-14; Spiegel Moving Declaration, Exhibit A and B; *cf.* Defendants' Motion for Summary Judgment Dismissing False Arrest Claims of Church-Fulton Plaintiffs, Weiler Declaration, Exh. A (Video Compilation)). Plaintiffs claim that their videoclips "depict a crowded, but easily usable, New York City sidewalk." (Abdell Br., p. 7).

Plaintiffs' characterization of what the video evidence in the record depicts on the Fulton Street sidewalk is simply false. Anyone who plaintiffs claim could "freely" move among the marchers is shown weaving through the oncoming flow of marchers with difficulty, or even fighting their way upstream, like salmon. (Defs. 56.1, ¶ 115; Spiegel Declaration, Exhibit A, TARU #71). Plaintiffs' claim that there was no obstruction based upon videoclips showing "journalists" who are weaving among the marchers or hopping onto and off the Fulton Street sidewalk, is meritless. People who stood on the sidewalk or ventured through the marchers to

document the march did so by their own choosing, and their willingness to do so is not evidence of a lack of obstruction. (*Id.*) The "significant open space" on the sidewalk alongside the marchers simply does not exist, as some people are shown in the videoclips virtually teetering on the curbstone. (*Id.*)

In addition, plaintiffs Becker, DeMott, Dogget, Ekberg, Janney, Joseph, Logan, Petrick, and Steyert *admitted* at their depositions that it would have been difficult for anyone to walk against the flow of the marchers that day. (Defs. 56.1, ¶¶ 115). Plaintiff Jeffery Cohen testified at his deposition that while he was on the Fulton Street sidewalk, he was "swallowed up" by marchers and tried to cross to the south sidewalk of Fulton Street because he felt "claustrophobic." (*Abdell* Rule 56.1 Counterstatement, ¶ 36). Likewise, plaintiff Katherine Krassan, who was with Cohen, recalls being engulfed by the marchers streaming onto the sidewalk. (*Id.*, ¶ 67). At their depositions or in CCRB testimony, a number of officers – Assistant Commissioner Messner, Chief Monahan, Inspector Galati, Inspector Shea, Captain Shea, Lt. Rivers, Lt. O' Sullivan, Lt. Venice, Officer Martinoff, and Officer Steven Toth – specifically recalled seeing pedestrians walking westward on Fulton Street being forced to cross to the southern sidewalk of Fulton Street to avoid the approaching mass of marchers. (Defs. 56.1, ¶ 115). Thus, plaintiffs argument that they did not significantly obstruct the northern sidewalk of Fulton Street is belied by the undisputed evidence in these cases. Moreover, the same evidence discussed above more than satisfies the disorderly conduct statute's "public inconvenience, annoyance, or alarm" standard.[2]

---

[2] Plaintiffs also mischaracterize TARU #62 when they claim that the video evidence shows that the banner that Hedemann had promised to have marchers carry parallel to the sidewalk *is* parallel to the sidewalk at the point in time when Chief Monahan can be heard yelling that the banner was blocking the sidewalk. (*Abdell* Rule 56.1 Statement, ¶ 16). In fact, TARU #62 does *not* show the banner at all when Monahan can be heard shouting warnings about the banner;

Plaintiffs further argue that under New York law, probable cause to arrest for disorderly conduct requires that the obstruction must be serious and amount to more than a "mere inconvenience." (*Schiller Br.*, pp. 18-19). Relying on *People v. Nixon*, 248 N.Y. 182 (1928), plaintiffs argue that in *Nixon*, "the New York Court of Appeals has held that no violation exists where protesters occupy an entire sidewalk, thereby forcing other pedestrians into the street." (*Schiller* Br., p. 18). That is an outright distortion of the facts of *Nixon.* In that case, *20* defendants (not hundreds, as here) occupied *half* of a *12-foot-wide* sidewalk – not, as here, hundreds occupying nearly the *entire* northern sidewalk of Fulton Street, which appears from the record videotape evidence to be even narrower than 12 feet wide. 248 N.Y. at 183-185.  In other words, pedestrians in *Nixon* would have had 6 feet to walk around the marchers, nothing like the amount of space left by the marchers on the northern sidewalk of Fulton Street.  In short, the situation of pedestrians forced into the street by a group of hundreds occupying the entirety of a narrow sidewalk is hardly analogous to the situation in *Nixon*.

Moreover, the Court of Appeals in *Nixon* was concerned with quite a different scenario than the one on Church and Fulton Streets:

> Men and women constantly congregate or walk upon the streets in groups, quite oblivious of the fact that in some degree they are thereby causing inconvenience to others using the street.  A public meeting may have aroused such interest that groups of men and women continue the discussion while walking up and down the street.  Groups linger in quiet social converse after the religious edifice where services have been held is emptied.  School children and college youths, laborers, athletic "fans" and church members, perhaps even judges, do at times congregate or walk upon the streets in numbers sufficient to cause other pedestrians to stand aside or step into the roadway.  Surely such conduct is not always "disorderly" and does not always tend to breach the peace.

when the camera first shows the banner after Monahan's warnings, the banner is indeed stretched widthwise across the sidewalk. (Defs. 56.1, ¶ 114; Spiegel Declaration, Exhibit A, TARU #62, 4:01).

248 N.Y.2d at 620.   New York law calls for an obstruction to be more than a "mere inconvenience" because "[o]therwise, any person who happens stop on a sidewalk – whether to greet another, to seek directions or simply to regain one's bearings – would be prosecuted under [Penal Law §240.20(6)]."  *People v. Jones*, 9 N.Y.3d 259, 262 (2007).   Plaintiffs here cannot credibly claim that they stopped on Fulton Street greet one another, to ask for directions, or linger after attending church or a sporting event. The WRL was a unified march of hundreds moving in a single direction across Church Street and down Fulton Street. Thus, the concerns underlying the Court of Appeals' decision in *Nixon* and its progeny are simply not present here.

Moreover, the argument that someone could have squeezed part the marchers if they wanted to was squarely rejected in *Posr v. Killackey*, 2003 U.S. Dist. LEXIS 12755 (S.D.N.Y. Dec. 17, 2003).  In *Posr*, plaintiff, suing for false arrest under Penal Law §240.20(5), had blocked the doorway of a courthouse during a physical confrontation with police officers, causing people who wished to enter the courthouse to refrain from doing so out of fear.  *Id.* at ** 1-4.  Posr claimed that there was no obstruction because someone trying to enter the courthouse could have gone around him and the officers. *Id.* at *13. The Court disagreed, holding that there was probable cause to arrest Posr for obstructing pedestrian traffic: "[T]he issue of whether pedestrians could have made it through the door is of no moment . . . . It does not matter that a hardy pedestrian might have physically been able to squeeze past Posr and the officers to get inside of the courthouse." *Id.* at **13-14.

Other cases cited by plaintiffs on the issue of obstruction are likewise readily distinguishable, either on their facts or because, as Criminal Court cases, they involved a challenge to the facial sufficiency of the charging instrument rather than probable cause to

arrest.[3]  *See Jones,* 9 N.Y.3d at 262 (2007) ("[f]ailure to assert sufficient non-hearsay allegations

is a jurisdictional defect" and the People "were obliged to set forth a prima facie case" in its

charging instrument); *People v. Munoz,* 10 Misc.3d 1052A, 862 N.Y.S.2d 810 (N.Y. Crim. Ct.

2005) (dismissing charging instrument as facially deficient where deponent "observed hundreds

of individuals marching' but made absolutely no mention of defendant's conduct, or even, "at the

very minimum that this defendant was personally observed along with the other 'approximately

300 individuals' present at that time and place"); *People v. Barrett*, 13 Misc.2d 929, 821

N.Y.S.2d 416 (N.Y. Crim. Ct. 2006) (dismissing charging instrument for failure to state *prima*

*facie* case where there were no allegations of defendant's *mens rea* or facts to evidence it).

*People v. Delhall*, 131 A.D.2d 870, 517 N.Y.S.2d 228 (2d Dep't 1987), involved someone

arrested and charged with disorderly conduct for simply standing next to and conversing with

four other people on the sidewalk – hardly comparable to the conduct of the sheer mass of

marchers on the Fulton Street sidewalk.  *Provost v. City of Newburgh*, 262 F.3d 146 (2d Cir.

2002), is even farther afield: the case did not even involve obstruction of the sidewalk, but rather

someone charged with disorderly conduct for yelling at a police officer to get his attention.

 In any event, even under the New York courts' "more than a mere inconvenience"

standard, plaintiffs' violated Penal Law 240.20(5) by occupying nearly the entire sidewalk by the

hundreds and forcing pedestrians to walk in an active roadway.  In short, even as New York

---

[3] The dismissal of a charging instrument by a criminal court "does not . . . establish the absence of probable cause." *Velaire v. City of Schenectady*, 862 F.Supp. 774, 780 (N.D.N.Y. 1994); *see also Martinelli v. County of Oneida*, No. 99 Civ. 1494, 2001 U.S. Dist. LEXIS 2435 (N.D.N.Y. 2001), at *22 (dismissal of charging instrument for facial insufficiency "does not nullify the existence of probable cause.")

courts have defined "obstruction" for purposes of Penal Law §240.20(5), plaintiffs cannot credibly argue that the WRL march created a "mere inconvenience" to pedestrians.[4]

## 2.   *Plaintiffs Obstructed The Northern Sidewalk Of Fulton Street Intentionally Or Recklessly*

Second, plaintiffs argue that they did not "intend" to block pedestrian traffic. (*Schiller* Br., p. 19; *Schiller* 56.1 Statement, ¶¶ 12, 29-30, 51; Abdell 56.1 Statement, ¶¶ 43, 53, 93, 103, 117, 123-124, 128-129, 132-133, 137-138)   As a threshold matter, the *mens rea* for Penal Law §240.20(5) is not just intent, but recklessness, as its plain text makes clear. *See* Penal Law  §240.20(5) (McKinney's 2011); *see also Abdell v. City of New York*, No. 05 Civ. 8453 (RJS)(JCF), 2008 U.S. Dist. LEXIS 48078 (June 25, 2008), at **7-8 (the culpable mental state required under the statute is intent or recklessness); *People v. Pettigrew*, 69 Misc.2d 985, 332 N.Y.S.2d 33, 38 (Dist. Ct. Suffolk Co. 1972) (same).  In addition, plaintiffs' actual intentions are not relevant to analyzing probable cause under Penal Law §240.20(5).  *See, e.g., Richardson v. New York City Health and Hospitals Corp.*, No. 05 Civ. 6278 (RJS), 2009 U.S. Dist. LEXIS 25247 (S.D.N.Y. Mar. 25, 2009), at **24-25 (stating that the probable cause inquiry is not governed by the plaintiffs' actual intentions or what officers knew of plaintiffs' intentions); *Calderola v. Calabrese*, 298 F.3d 156, 162 (2d Cir. 2002) (to same effect); *see also People v. Arbeiter*, 169 Misc.2d 771, 630 N.Y.S.2d 915, 017 (App. Term 1st Dep't 1996) ("[s]incere beliefs are not an excuse for unlawful conduct").  In any event, Chief Monahan had direct proof of, and could also reasonably infer, that plaintiffs intentionally or recklessly violated Penal Law §240.20(5).

---

[4] Plaintiffs continually characterize the WRL march was as "peaceful" (*Abdell* Br., p. 3, 10, 23, 24). However, the WRL march was not peaceful, but rather disorderly as defined by Penal Law §240.20(5). To the extent that plaintiffs use "peaceful" to mean "non-violent," one can commit disorderly conduct even when acting non-violently. *See, e.g., People v. Pettigrew*, 69 Misc.2d 985, 332 N.Y.S.2d 33 (Dist Ct. Suffolk Co. 1972).

Intent is "the product of the invisible operation of the mind" – "incapable of direct proof in the absence of an express declaration by the perpetrator or admission by the [person]." *See People v. Jackson*, 856 N.Y.S.2d 25, 2007 N.Y. Slip Op. 52383U, at *5 (N.Y. Crim. Ct. Dec. 18, 2007). In the case of the WRL march, police did, in fact, have "direct proof" of the group's intent: Hedemann told Chief Monahan that the marchers planned to commit civil disobedience by proceeding to Madison Square Garden to stage a die-in, or to stage a die-in if stopped by police before reaching the Garden. (Defs. 56.1, ¶¶ 31-48). Police may also reasonably *infer* intent from a person's acts, his conduct, and the surrounding circumstances. *Jackson, supra*; *see also United States v. Nelson*, 2011 U.S. Dist. LEXIS 36483, *15 (S.D.N.Y. Mar. 30, 2011); *Posr v. Killackey*, 2003 U.S. Dist. LEXIS 12755, *14 (S.D.N.Y. July 25, 2003). Here, Chief Monahan could infer both intent and recklessness from the marchers' obstruction of the sidewalk from several circumstances: his own observations (Defs. 56.1, ¶¶ 110-121), his knowledge that Inspector Galati had warned all the marchers before the march began about blocking pedestrian traffic (Defs. 56.1, ¶¶ 133-134), and his belief that Hedemann's marshalls or organizers were supposed to be ensuring an orderly march. (Defs. 56.1, ¶¶ 59-61). In his view, the marchers had been sufficiently warned not to block the Fulton Street sidewalk, and could only be acting intentionally or recklessly, rather than negligently. Accordingly, Chief Monahan was reasonable in his belief that plaintiffs acted with the requisite mental state under Penal Law § 240.20(5).

## C. Chief Monahan Had Probable Cause To Arrest All Plaintiffs For Refusing To Obey A Lawful Order To Disperse

Plaintiffs joining in the *Abdell* Brief do not dispute that Chief Monahan gave at least one dispersal order to the marchers, nor can they, given that their own videotape evidence (TARU #62) shows as much. (Spiegel Declaration, Exhibit A; *Abdell* Br., p. 11; *Abdell* 56.1 Statement, ¶ 20). However, plaintiffs claim that the dispersal order was not loud enough to be

heard by the marchers and that police did not give the marchers an adequate opportunity to comply. (*Abdell Br.*, pp. 27-28). Plaintiffs joining in the *Schiller* Brief do not dispute that at least one dispersal order was given, but instead claim that they did not *hear* any order to disperse (*Schiller* Br., pp. 4, 6, 7, 20; *Schiller* 56.1 Statement, ¶¶ 11, 27-28, 50). All of these arguments are factually and legally unsupportable.

      With respect to whether Chief Monahan's dispersal order was loud enough for all marchers to hear, TARU #62 shows Chief Monahan yelling the dispersal order, and other warnings about blocking the sidewalk, at the top of his lungs, directing his voice over the heads of the people then at the front of the march. Other officers at the scene testified that they heard Chief Monahan "yelling" or "screaming" at marchers to disperse after stopping the march; no one complied. (Defs. 56.1, ¶ 125, 128-129). Thus, it was reasonable for Chief Monahan to assume that his dispersal order could have been heard by all the marchers when he issued the order.

      Plaintiffs also argue that Chief Monahan's dispersal order – "you are now blocking pedestrian traffic, if you do not disperse, you will be placed under arrest" (Defs. 561, ¶124) – was not a "real" one because it did not track the language contained in the NYPD's Legal Guidelines for the RNC. (*Abdell Br.*, p. 12). The Legal Guidelines, however – like the NYPD's Patrol Guide – are merely guidelines, without the force of law, and do not set any type of standard for assessing the lawfulness of a dispersal order under Penal Law § 240.20(6). An exact analogy can be made with the NYPD Patrol Guide, violation of which courts have found not to be violations of the law. *See e.g. Galapo v. City of New York*, 95 N.Y.2d 568, 574-75 (2000) (holding that the Patrol Guide "is not a body of law nor regulation establishing clear legal duties that should serve as a basis for civil liability of municipalities"); *Salim v. Proulx*, 93 F.3d

86, 92 (2d Cir. 1996) (violations of police rules regarding backup and radios not relevant to excessive force).

Despite plaintiffs' claim that Chief Monahan's dispersal order was not a "real" one, plaintiffs do not argue that they did not understand the dispersal order or what Chief Monahan meant by the word "disperse." In addition, there is no magic language that the police are required to use in order to disperse a disorderly group. Words such as "move," "move on," "move along," or words to such effect have been found to be constitute a dispersal order. *See, e.g., People v. Todaro,* 26 N.Y.2d 325, 310 N.Y.S.2d 303 (1970) ("move on" and "get out of here"); *People v. Scott,* 58 Misc.2d 455, 295 N.Y.S.2d 724 (Sup. Ct. Rockland Co. 1968) ("move along"); *People v. Pettigrew,* 69 Misc.2d 985, 332 N.Y.S.2d 33 (Dist. Ct. Suffolk Co. 1972) ("move on"); *People v. Galpern,* 259 N.Y. 279 (1932) ("move on").

Moreover, plaintiffs' reliance on their claims that they did not hear any dispersal orders is of no import. The case law is clear that just because someone did not hear a dispersal order does not make the dispersal order unreasonable under the Fourth Amendment. As the Ninth Circuit held in *Lyons v. City of Seattle,* 214 Fed. Appx. 655 (9th Cir. 2006), a case involving the adequacy of dispersal orders given by police, it is irrelevant whether each plaintiff heard the dispersal order; "[w]hat is relevant is whether the police issued the orders and reasonably believed there was a 'fair probability' that the plaintiffs heard at least one of the orders, and voluntarily disobeyed." *Id.* at 656.

In *Lyons,* plaintiffs argued that police did not have probable cause to believe that they disobeyed dispersal orders because, they claim, they either did not hear the orders, or they did not did not have an opportunity to comply with them. *Id.* The Ninth Circuit, affirming the lower court's grant of summary judgment, flatly rejected these arguments, reasoning as follows:

14

> If an officer orally orders a deaf man to disperse, and the man simply smiles at the officer, it is still reasonable for the officer to believe there is a "fair probability" the man has refused the dispersal order even though in truth he did not. There is no evidence that the police knew or suspected the plaintiffs did not hear the orders.

*Id.* at 658.

Plaintiffs' argument that they did not hear any dispersal orders from Chief Monahan is thus legally irrelevant, and there is no dispute that Chief Monahan did give at least one dispersal order to the marchers on the Fulton Street sidewalk.

Plaintiffs next argue that it was an impossibly brief interval between Chief Monahan's dispersal order and his arrest orders. (*Abdell* Br., p. 28). But the fact is that no one moved in response to Chief Monahan's dispersal order. (Defs. 56.1, ¶¶ 124-129). Plaintiffs try to paint a picture of innocent marchers stepping on the sidewalk who were all of a sudden surrounded by orange mesh, as if nothing happened between those moments. However, as plaintiffs admit (*Abdell* Rule 56.1 Statement, ¶¶ 15-21), Chief Monahan issued *repeated* warnings to the marchers that they were blocking the sidewalk and told them that if they continued to do so, they would be placed under arrest. (Defs. 56.1, ¶¶ 121-122). He also knew, based on his discussions with plaintiff Hedemann, that the marchers were intent on engaging in civil disobedience. (Defs. 56.1, ¶¶ 31-48).

For all the reasons set forth above, Chief Monahan had probable cause to believe that plaintiffs violated Penal Law §240.20(6). Accordingly, plaintiffs should be denied summary judgment on their claim that defendants lacked probable cause to arrest them for violating Penal

Law 240.20(6), and defendants' motion for summary judgment in their favor on the same claim should be granted.[5]

## D.   Chief Monahan Had Probable Cause To Arrest All Plaintiffs For Parading Without A Permit

Plaintiffs do not dispute that the WRL was a "march" or "procession" within the meaning of New York Administrative Code ("§10-110"), nor can they, as the undisputed videotape confirms this fact.  Plaintiffs do not dispute (with a few minor exceptions) that they were participants in the WRL march, or that the march did not have a permit. For these reasons alone, the Court should conclude that plaintiffs violated §10-110, deny plaintiffs' motions for summary judgment, and grant summary judgment in defendants' favor.

Instead, plaintiffs argue that (1) the marchers were walking on the sidewalk, which is not a "roadway" within the meaning of §10-110, such that the marchers were not subject to any permit requirement at all (*Schiller* Br., p. 21); (2) the marchers lacked the requisite *mens rea* for parading without a permit because they did not know there was no permit for the march (*id.*); and (3) Chief Monahan could not have reasonably believed that *all* the marchers were "parading," since there were supposedly bystanders and journalists intermingled with

---

[5] Michael Schiller argues that we was not "congregating" within the meaning of Penal Law §240.20(6) because he was "merely present at the Fulton Street march in his capacity as a journalist." (*Schiller* Br., p. 20). However, like others "present" on Fulton Street during the march, he was part of a mass of marchers; he does not claim he was standing alone or with a small cluster of people on the sidewalk. Schiller's reliance on *People v. Carcel*, 3 N.Y.2d 327 (1932), which involved only two people picketing with placards near the entrance to the United Nations building, is entirely misplaced.  The court in *Carcel* held that two people do not make a "congregation" within the meaning of Penal Law §240.20(6)'s predecessor statute: "The term 'congregating' implies and is usually applicable to the coming together of a considerable number of persons, or a crowd, and a crowd has been defined as a throng, multitude or great number of persons. The term 'congregates with others,' as used in [Penal Law §240.20(5)'s predecessor statute], requires at the very least three persons assembling at a given time and place." 3 N.Y.2d at 33 (citations omitted). Here, the undisputed video evidence shows Schiller among the hundreds of marchers (Schiller 56.1 Counterstatement, ¶ 6), and he cannot seriously claim that he was with less than three people on the Fulton Street sidewalk.

participants in the march (*Abdell* Br., p. 26.)  Each of these arguments is either legally meritless or flatly contradicted by undisputed evidence in the record.

**1.**     ***A Parading Permit Is Required Even For Marches On Public Sidewalks***

          Plaintiffs' argument that §10-110 does not apply to parades or marches that take place on sidewalks is simply wrong. This Court has found that for purposes of §10-110, it is immaterial whether a march takes place on the street or the sidewalk: both are public places and are covered by the statute, or, at the very least, it would be reasonable for a police officer believe that §10-110 applied to sidewalk marches. *Allen v. City of New York*, 03 Civ. 2829, 2007 U.S. Dist. LEXIS 15, at *19-20 (S.D.N.Y. Jan. 3, 2007) (awarding qualified immunity to officer defendants on the basis it was reasonable to believe that §10-110 applied to sidewalk marches). Indeed, to the extent that plaintiffs argue that the sidewalk is not a "public place" under the purview of §10-110, this is simply not the case.  *See People v. Cecere*, 70 Misc.2d 510, 334 N.Y.S.2d 83, 89 (City Ct. N.Y. Batavia 1972) (noting, in connection with Penal Law §240.00, that "if the 'highways' are a public place, then certainly the sidewalks and fronts of residences, would be a public place"); *People v. Karns*, 81 Misc.2d 186, 365 N.Y.S.2d 725 (City Ct. N.Y. Rochester 1975) (relying upon Websters Unabridged Dictionary definition of "street" as "[a] public thoroughfare, usually paved . . . *including* the sidewalk or sidewalks") (emphasis added).

Plaintiffs also cite to the RNC Legal Guidelines drafted by the NYPD in advance of the RNC ("Legal Guidelines") for their argument that marches on public sidewalks do not require permits under §10-110.  (*Schiller Br.*, p. 21). As stated in Point IC *supra*, however, the Legal Guidelines, however – like the NYPD's Patrol Guide – are merely guidelines, without the force of law, and do not set any type of standard for assessing the lawfulness of a dispersal order under Penal Law §240.20(6).

17

In short, the fact that plaintiffs were marching on the Fulton Street sidewalk rather than in the street does not exempt them from §10-110's permit requirement.

2.    ***Under New York Law, The Mens Rea For Parading Without A Permit Was Unsettled As Of 2004, But In Any Event, It Was Objectively Reasonable For Chief Monahan To Believe That Plaintiffs Knew That The WRL March Lacked A Permit***

Plaintiffs also contend that that they did not have the requisite *mens rea* to have committed a violation of §10-110 because none of the plaintiffs were aware that the WRL march lacked a permit. (*Schiller* Br., p. 21). Whether §10-110 is a strict liability statute or has a *mens rea* requirement is not settled law in New York. Thus, the Court should not read any mens rea requirement into the statute. Although the court in *People v. Bezjak*, 11 Misc.3d 424, 812 N.Y.S.2d 829 (Crim. Ct. N.Y. Cty. 2006) held that §10-110 could only be enforced against persons who were aware that the parade in question (in that case, a Critical Mass bicycle ride) lacked a permit, another New York case decided at the same time as *Bezjak* held that the no showing of *mens rea* is required to sustain a charge for parading without a permit. *See People v. Namer*, 11 Misc.3d 409, 812 N.Y.S.2d 824 (Crim. Ct. N.Y. Cty. 2006) (rejecting the notion that a *mens rea* requirement should be read into the parading ordinance because §10-110 is a merely "violation," and not a "crime").[6] Significantly, both *Bezjak* and *Namer* were decided after in 2006, *after* the 2004 RNC; in 2004, New York law was unsettled as to whether one must read a *mens rea* requirement into §10-110. Even if this Court were to follow *Bezjak* instead of *Namer*, and even if this Court were also to find that plaintiffs did not have the requisite *mens rea* to have

---

[6] Plaintiffs also cite to *People v. Barrett*, 13 Misc. 3d 929 (Crim. Ct. N.Y. Cty. 2006). While the court in *Barrett* agreed with the reasoning in *Bezjak* in *dicta*, the case involved the facial sufficiency of the charging instrument. The court also found at most that the criminal complaints were facially insufficient, and thus never reached the *mens rea* issue. In any event, *Barrett* did not overrule *Namer*, so there is still no consensus in New York on the required *mens rea* for the charge of parading without a permit.

18

violated §10-110, defendants would have to be entitled to qualified immunity because in 2004, a *mens rea* requirement under §10-110 was not clearly established.

But even if rejects a qualified immunity defense and adopts *Bezjak* as the applicable law, the fact remains that many plaintiffs at Church and Fulton Streets knew, either before the march began or as the march proceeded, that the WRL march did not have a permit. WRL's own press materials noted that "[n]o permits have been granted for this march nor have they been sought." (Defs. 56.1, ¶¶ 17-18.)  More than 60 plaintiffs knew before the march began, either from police warnings or otherwise, that the march lacked a permit. (Defs. 56.1, ¶¶ 20-21, 75(b), 82-83, 89; Spiegel Declaration, Exhibit A, TARU #138).  *Cf. Bezjak*, 11 Misc.3d at 435 ("knowledge [of the lack of a permit] can be reasonably inferred from the repeated and loud messages broadcast by a police van in the park").  Inspector Galati and other police officers, both before and during the march, warned the marchers by bullhorn that the march did not have a permit.  (Defs. 56.1 ¶¶ 75(b), 77-81, 95).  Moreover, the legal test for probable cause to arrest for parading without a permit is not whether a given plaintiff *knew* there was no permit for the march, but whether the Chief Monahan could have reasonably *believed* that the marchers knew that there was no permit for the march.  He could have, based on his knowledge that police, both before and during the march, repeatedly warned the marchers that the march did not have a permit. (Defs. 56.1, ¶¶ 75(b), 77-81, 95).

### 3. It Was Objectively Reasonable For Chief Monahan To Believe That All The Marchers Were Parading, Despite The Presence Of Journalists And "Bystanders" Among The Marchers

Finally, in the *Abell* Brief, plaintiffs rely on their "no individualized probable cause argument" (See Point IA, supra) to claim that Chief Monahan could not have reasonably believed that all marchers had been parading. (*Abdell* Br., p. 26).  Plaintiffs claim that because the WRL march was an undifferentiated jumble of protesters, videographers, journalists, and

19

pedestrians, plaintiffs argue, Chief Monahan could not have reasonably believed that the marchers were all committing unlawful conduct as a cohesive unit.  However, for the reasons cited in Point IA *supra* – and especially in light of undisputed videotape evidence in the record – it was objectively reasonable for Chief Monahan to have believed that all the marchers were participating in a parade together.

When enforcing §10-110,[7] there is no requirement that an officer determine whether the participants in a parade possess a "commonality of purpose."  Notably, plaintiffs cite no law in support of this argument, and defendants are unaware of any controlling authority to support this proposition.  Rather, based upon the principles of Fourth Amendment jurisprudence, probable cause is an objective test based upon whether a reasonable officer could believe that a crime has occurred or is occurring.  §10-110 does not require police officers to speculate as to whether each participant is on the same page as the others – it only has to appear to the officer that the group of participants is "parading" or "marching," that is, the officer need only discern a group of people physically participating together in a parade.  Whether people had motivations for marching or parading is irrelevant to §10-110 – it only matters what a reasonable officer would have believed.

Even in the event there was such a requirement, it would be apparent to any reasonable police officer at Church and Fulton Streets that the *conduct* of the plaintiffs reflected a commonality of purpose, no matter what may actually have been going through their heads at the time. (Defs. 56.1, ¶¶ 106-109). To  even a casual viewer of the undisputed videotape evidence from Church and Fulton Streets, it strains credulity to claim that plaintiffs were not

---

[7] When defendants refer to §10-110, they also refer to the related statute, 38 NYCRR §19-02.

"parading" or "marching" as contemplated by §10-110. Under the circumstances, it would be reasonable for a police officer to believe that the participants had a common purpose.

In sum, there was probable cause to arrest all plaintiffs for parading without a permit, such that their motions for summary judgment on that claim should denied and defendants' motion for summary judgment on that claim granted.[8]

## II. PLAINTIFFS IN THE *SCHILLER, DINLER,* AND *MACNAMARA* CASES SHOULD BE DENIED SUMMARY JUDGMENT ON THEIR STATE-LAW FINGERPRINTING CLAIMS

Plaintiffs in *Schiller, Dinler,* and *Macnamara* claim that the act of fingerprinting RNC arrestees whose top charge was a violation ran afoul of New York Criminal Procedure Law ("CPL") §160.10, and that this alleged violation of §160.10 is the basis for a claim *under state law* (*Schiller* Br., pp. 23-25).[9] By way of a separate Motion for Summary Judgment to Dismiss All of Plaintiffs' Claims Based on the No-Summons Policy and Fingerprinting Policy that defendants submitted on October 3, 2011, defendants are seeking dismissal of plaintiffs' *federal and state* claims based on the City's policy of fingerprinting RNC arrestees whose top charge was a violation. (*Schiller* DE 578-585, which collectively include defendants' motion papers). In their moving Memorandum of Law (*Schiller* DE 584), defendants made the following argument for dismissal of plaintiffs' fingerprinting claims: (1) violation of CPL §160.10 does not

---

[8] Should the Court find that defendants lacked probable cause to arrest plaintiffs for any of the charges discussed in Part I *supra,* defendants remind the Court that in their own summary judgment motion, they have moved for qualified immunity for the individual officers involved in plaintiffs' arrests. In addition, defendants have argued in that motion there was probable cause to arrest the marchers at Church and Fulton Streets for obstruction of governmental administration, based on their refusal to obey police warnings, including dispersal orders.

[9] Defendants note that in plaintiffs' respective Notices of Motion for summary judgment, plaintiffs arrested at East 16th Street in the *Bastidas, Grosso,* and *Tikkun* purport to seek summary judgment on state-law claims for violation of CPL §160.10 – yet their complaints do not contain a *state law* cause of action related to fingerprinting. Accordingly, those plaintiffs' "claim" fails as a matter of law.

rise to a federal claim cognizable under §1983; (2) under New York State law, no private right of action for money damages exists for a violation of CPL §160.10; and (3) assuming *arguendo* that such a private right of action exists based on a violation of CPL §160.10, defendants did not violate the statute, and in any event were entitled to governmental immunity for such a violation. (*Schiller* DE 584, pp. 46-56).  Defendants incorporate by reference those arguments into this opposing memorandum of law as the bases for why plaintiffs are not entitled to summary judgment on their state-law claims based on an alleged violation of §160.10, and why defendants are entitled to summary judgment in their favor. We now turn to the specific arguments asserted in plaintiffs' papers.

In the *Schiller* Brief, plaintiffs argue that "New York courts have long recognized liability for unauthorized printing," citing and relying upon three cases from New York State courts from 1907, 1912, and 1952. (*Schiller* Br., pp. 24-25).  As set forth below, these cases are distinguishable from the RNC cases, and, more importantly -- as this Court noted more than 40 years ago -- are antiquated and no longer viable law.

In *Gow v. Bingham*, 57 Misc. 66, 107 N.Y.S.2d 1011 (Sup Ct. Kings Co. 1907), a criminal defendant who had been indicted by a grand jury for grand larceny and forgery appeared at the district attorney's office prepared to be arraigned and have bail set. While waiting in the district attorney's office, the police took Gow to be photographed and have "measurements and imprints" made of his body to preserve them in the criminal records.  57 Misc. at 68. Once he pled not guilty and was released on bail, Gow applied for a writ of mandamus compelling the police to destroy the photographs, records, and "impressions" made of his body as having been unlawfully taken. *Id.* at 69.  While the *Gow* court suggested in *dicta* that the police could be liable in a civil action for damages based on unlawful fingerprinting, the

court ultimately denied Gow his remedy of mandamus. *Id.* at 78. The court reasoned that a possible unlawful fingerprinting claim could exist solely based on the fact that, as of 1907, there was no statutory authority for fingerprinting someone charged with a crime:

> No statute has been found which, in express terms, authorizes any member of the police force of this city to deprive any person of his liberty of action or invade his right of personal immunity to the extent of requiring him to submit to having his photograph taken, and measurements and impressions of his body made, for the purpose of preserving them in the criminal records of that department, simply because such a person has been indicted, charged with a criminal offense.

57 Misc. at 71.  Such is no longer the case: in 1928 the New York Legislature enacted Code of Criminal Procedure §940 (CPL §160.10's predecessor) to centralize crime statistics in New York State and to create a "database" of fingerprints for the benefit of law enforcement. (*Schiller* DE 584, p. 49; *Schiller* DE 583, Exh. O).  Indeed, according to this Court, Gow is now outdated: "[T]he dictum in the *Gow* case, which ultimately held that petitioner had mistaken his remedy, may be read as indicating that fingerprinting was a sufficient intrusion into personal liberty to require legislative authorization. Such authorization was subsequently provided in criminal cases, see N.Y. Code Crim. Proc. §940 (McKinney Supp. 1969) . . . ." *Thom v. New York Stock Exchange*, 306 F. Supp. 1002, 1008 (S.D.N.Y. 1969), n. 18.  In other words, the 1928 enactment of CPL §160.10's predecessor, Code of Criminal Procedure §940, undercuts the rationale of the *Gow* court, which relied on the absence of New York statutory authority at the time for fingerprinting arrestees.

The enactment of Code of Criminal Procedure in 1928 is also fatal to another case on which plaintiffs rely, *Hawkins v Kuhne*, 153 A.D. 216, 137 N.Y.S. 1090 (2d Dep't 1912). Plaintiff Hawkins was arrested for the felony of embezzlement and fingerprinted, an act not authorized by statute at the time; he brought an action for assault against the police captain who

ordered him fingerprinted.  153 A.D.2d at 217.  After a jury awarded plaintiff damages, the defendant police captain appealed the verdict.  *Id.*  In stark contrast to defense counsel in these RNC cases, defense counsel in *Hawkins* conceded in their brief that, in light of the *Gow* decision, "'[w]e do not question that an assault was committed on the plaintiff.'"  *Id.* at 219.  Defense counsel's only argument was that the police captain did not commit the assault, or in the alternative, that the question of whether he had or someone else had was an issue for the jury and not the court to determine – an argument that the court rejected in affirming the jury verdict.  *Id.* The *Hawkins* court never analyzed the issue of whether fingerprinting could constitute an assault, given defense counsel's admission in that case (compelled by *Gow*) that it did.  However, just as with the *Gow* case on which defense counsel and the court relied,  the notion that fingerprinting could amount to an actionable assault is undercut by enactment of Code of Criminal Procedure §940, which did (and does, as recodified as CPL §160.10) authorize fingerprinting arrestees.  In other words, both *Gow* and *Hawkins* are distinguishable from the RNC cases because they rely for their holdings on the pre-1928 absence of statutory authority to fingerprint arrestees.

It is true that in *Fidler v. Murphy*, 203 Misc. 51, 113 N.Y.S.2d 388 (Sup. Ct. Onondaga Cty. 1952), a jury awarded plaintiff damages for assault based on fingerprinting an arrestee charged with resisting arrest; as of 1952, the Code of Criminal Procedure §940, which had been enacted in 1928, did not authorize fingerprinting for that misdemeanor.  Again, the essence of the assault claim was that the fingerprinting for resisting arrest was not authorized by statute *at all*, with the court relying on *Hawkins, supra.*  Indeed, the court in *Fidler* framed the question as "whether . . . . fingerprinting . . . *in a case not provided for by law* would constitute an action for assault." 203 Misc. at 53 (emphasis added).

But unlike in *Fidler*, and as defendants argued in their Motion for Summary Judgment to Dismiss All of Plaintiffs' Claims Based on the No-Summons Policy and Fingerprinting Policy, fingerprinting RNC arrestees whose top charge was a violation has a statutory basis. (*Schiller* DE 584, pp. 52-53). CPL §160.10 does not have a blanket prohibition on fingerprinting arrestees charged with violations; rather, police may do so if they are (1) unable to ascertain the arrestee's identity, (2) reasonably suspect that the identification given by the arrestee is not accurate; or (3) reasonably suspect that the arrestee is being sought by law enforcement officials for the commission of some other offense.  CPL §160.10[2] (McKinney's 2011).  As defendants fully set forth in their moving papers (*Schiller* DE 584), the NYPD anticipated that people coming to engage in unlawful conduct related to the RNC would use false identification or no identification at all, and could, under CPL §160.10[2], "reasonably suspect" that the identifications produced by arrestees, if produced at all, were inaccurate and unlikely to help NYPD ascertain the arrestee's true identity.  (*Schiller* DE 584, pp. 52-53; *Schiller* DE 581). This statutory authority, CPL §160.10 – which was enacted in its present form many years after the 1952 *Fidler* case – makes *Fidler* as distinguishable from the RNC cases as *Gow* and *Hawkins*.

More importantly, over 40 years ago, this Court seriously questioned the continued viability of *Gow*, *Hawkins* and *Fidler* in light of subsequent developments in federal and state case law on fingerprinting.  In *Thom v. New York Stock Exchange*, 306 F. Supp. 1002, 1008 (S.D.N.Y. 1969), *aff'd*, 425 F.2d 1074 (2d Cir. 1970), plaintiffs challenged the constitutionality of a New York statute that required employees of member firms registered with the SEC to be fingerprinted as a condition of employment. Plaintiffs claimed that the law constituted, *inter alia*, an invasion of privacy under the 14th Amendment's Due Process Clause

and the Fourth Amendment. *Id.* at 1002. The court granted defendants' motion to dismiss the

complaint, and in the course of doing so surveyed societal and legal developments in

fingerprinting since *Gow*, *Hawkins*, and *Fidler* had been decided:

> Plaintiffs' contention that fingerprinting is an affront to their
> dignity and an invasion of their privacy is without substance. The
> day is long past when fingerprinting carried with it the stigma or
> any implication of criminality. Federal and state courts alike, in
> upholding fingerprinting requirements, have rejected any such
> view. Our Court of Appeals, almost forty years ago, in upholding
> the right of federal agents to take fingerprints after arrest upon
> probable cause, *even in the absence of statutory authority*,
> observed, "Fingerprinting is used in numerous branches of
> business and of civil service, and is not in itself a badge of crime."
> (quoting *United States v. Kelly*, 55 F.2d 67, 70 (2d Cir. 1932).

*Thom*, 306 F. Supp. at 1007-1008 (emphasis added). *See also Goodman v. Liebovitz*, 96 Misc.2d

1059, 410 N.Y.S.2d 502, 506 (Sup Ct. N.Y. Co. 1978) ("[t]o the degree that respondent or some

others might find [fingerprinting] offensive, it is unfortunate, but the realities of a modern urban

society of mobile citizens have made certain governmental procedures both justifiable and

acceptable to the general population").

Fingerprinting incident to arrest – as opposed to rounding up suspects in a dragnet

and fingerprinting them before charging them with a crime – has long been held not to violate

the Fourth Amendment. *See Davis v. Mississippi*, 394 U.S. 721, 727 (1969); *United States v.*

*Ortiz-Gonzalbo*, 1997 U.S. App. LEXIS 34511, at *7-8 (2d Cir. 1997); *United States v. Kelly*, 55

F.2d 67, 70 (2d Cir. 1932); *United States v. Amerson*, 483 F.3d 73, 86 n.14 (2d Cir. 2007);

*Najieb v. UFCW Local Union 888*, No. 6 CV 3676, 2006 U.S. Dist. LEXIS 59508 (E.D.N.Y.

Aug. 23, 2006), at **9-10 ("[p]ut simply, there is no constitutional right not to be fingerprinted")

(quotations and citation omitted). Thus, it would be anomalous for this Court, nearly 60 years

after *Fidler*, to recognize a private action for assault under state law based on fingerprinting

when federal courts have refused to find that fingerprinting *per se* – even in the absence of statutory authority – violates the Fourth Amendment.

In sum, there is no private cause of action under New York state law for violation of CPL §160.10, nor should this Court create one. (*See Schiller* DE 584).  For these reasons, and others set forth in defendants' memorandum of law in support of their Motion for Summary Judgment to Dismiss All of Plaintiffs' Claims Based on the No-Summons Policy and Fingerprinting Policy, this Court should deny plaintiffs summary judgment on their state-law claims based upon CPL §160.10, and grant defendants' motion for summary judgment on plaintiffs' fingerprinting claims.

## CONCLUSION

For the foregoing reasons, defendants respectfully request that this Court deny plaintiffs' motions for summary judgment on their false arrest and state-law fingerprinting claims, grant defendants' motion for summary judgment on these claims, and award defendants costs, fees and such other and further relief as the Court deems just and proper.

Dated:          November 3, 2011
                New York, New York

MICHAEL A. CARDOZO
Corporation Counsel of the City of New York
*Attorney for Defendants*
100 Church Street
New York,  N.Y. 10007
Tel:  (212) 788-1817
Fax: (212) 788-9776

By: _____
        Fred M. Weiler, Esq.
        Cheryl L. Shammas, Esq.
        Peter G. Farrell, Esq.

28