UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
--------------------------------------------------------------------- x

MICHAEL SCHILLER, *et al.,*,

                           Plaintiffs,

              -against-

CITY OF NEW YORK, *et al.,*,

                        Defendant(s).

04-CV-7922 (RJS) (JCF)

--------------------------------------------------------------------- x
--------------------------------------------------------------------- x

RNC CONSOLIDATED CASES          (RJS) (JCF)

--------------------------------------------------------------------- x

**DEFENDANTS' REPLY MEMORANDUM OF LAW IN FURTHER SUPPORT OF THEIR
MOTION FOR SUMMARY JUDGMENT TO DISMISS PLAINTIFFS'
<u>FALSE ARREST CLAIMS AT CHURCH AND FULTON STREETS</u>**

MICHAEL A. CARDOZO
Corporation Counsel of the City of New York
*Attorney for Defendants*
100 Church Street
New York,  New York 10007
Tel:  (212) 788-1817
Fax: (212) 788-9776

Fred M. Weiler, Esq.
Cheryl L. Shammas, Esq.
Peter G. Farrell, Esq.

Dated:     New York, New York
            November 23, 2011

**TABLE OF CONTENTS**

Page

TABLE OF AUTHORITIES ................................................................................................. iii

PRELIMINARY STATEMENT ........................................................................................... 1

ARGUMENT

      POINT I

           IT WAS OBJECTIVELY REASONABLE FOR
           CHIEF MONAHAN TO BELIEVE THAT THE
           MARCHERS COMMITTED UNLAWFUL
           CONDUCT AS A COHESIVE UNIT AND
           COULD BE ARRESTED AS A UNIT ....................................................... 2

           A.  Chief Monahan And Inspector Galati
               Reasonably Believed That Plaintiff (And
               Apparent Organizer Of The March) Ed
               Hedemann Agreed To The March's Conditions
               On Behalf Of All The Marchers .......................................... 3

           B.  Chief Monahan's Knowledge That Inspector
               Galati And Other Officers Gave Warnings To
               The Marchers As A Group Led Him To
               Reasonably Believe That All The Marchers
               Were Acting With The Requisite Mental State
               Under Penal Law §240.20(5)..................................................... 6

           C.  *Barham, Papineau,* And *Vodak* Are
               Distinguishable From The Instant Cases, And
               The *Carr* Case Is Not Limited By Its Holding
               Solely To Riotous Conduct.................................................... 6

      POINT II

           THE FIRST AMENDMENT'S "CLEAR AND
           PRESENT DANGER" TEST DOES NOT APPLY
           TO THE WRL MARCH, AND CHIEF
           MONAHAN WAS NOT CONSTITUTIONALLY
           REQUIRED TO GIVE THE MARCHERS "FAIR
           NOTICE" AND AN OPPORTUNITY TO
           DISPERSE BEFORE ARRESTING THEM ........................................... 11

**Page**

    A.   The First Amendment "Clear And Present Danger" Standard Does Not Apply Here Because That Test Applies Only to "Pure Speech" And Not To Expressive Conduct Like A March ........................................................................ 12

    B.   The Constitution Does Not Require That Police Issue A Dispersal Order To A Non-Violent Group Before Making Arrests ................................ 14

POINT III

    IT WAS OBJECTIVELY REASONABLE FOR CHIEF MONAHAN TO BELIEVE THAT PLAINTIFFS OBSTRUCTED THE FULTON STREET SIDEWALK ............................................ 16

POINT IV

    IT WAS OBJECTIVELY REASONABLE FOR CHIEF MONAHAN TO BELIEVE THAT PLAINTIFFS VIOLATED THE PARADING STATUTE ................................................................. 19

POINT V

    IT WAS OBJECTIVELY REASONABLE FOR CHIEF MONAHAN TO BELIEVE THAT PLAINTIFFS OBSTRUCTED GOVERNMENTAL ADMINISTRATION BY DISOBEYING POLICE ORDERS ................................................................... 21

POINT VI

    CHIEF MONAHAN AND INSPECTOR GALATI ARE ENTITLED TO QUALIFIED IMMUNITY ................. 23

CONCLUSION ................................................................... 25

## <u>TABLE OF AUTHORITIES</u>

<u>Cases</u>                                                                                   <u>Pages</u>

*Barham v. Ramsey,*
    434 F.3d 565 (D.C. Cir. 2006) ................................................................................ *passim*

*Beal v. City of New York,*
    No. 92 Civ. 0718, 1994 U.S. Dist. LEXIS 5269 (S.D.N.Y. Apr. 22, 1994) ........................... 25

*Carr v. District of Columbia,*
    587 F.3d 401 (D.C. Cir. 2009) ................................................................................ *passim*

*Cox v. Louisiana,*
    379 U.S. 536 (U.S. 1965) (*Cox* I) .................................................................................. 13

*Cox v. Louisiana,*
    379 U.S. 559 (U.S. 1965) (*Cox* II) ............................................................................ 12, 13

*Washington Mobilization Committee v. Cullinane,*
    566 F.2d 107 (D.C. Cir. 1977) ................................................................................ 11, 15

*Dellums v.Powell,*
    566 F.2d 167 (D.C. Cir. 1977) ..................................................................................... 8

*Devenpeck v. Alford,*
    543 U.S. 146 (2004) ................................................................................................. 21

*Dickerson v. Napolitano,*
    604 F.3d 732 (2d Cir. 2010) ...................................................................................... 21

*Glassberg v. Staples the Office Superstore,*
    No. 08 CV 2832, 2010 *U.S. Dist. LEXIS* 103096 (E.D.N.Y. Sept. 13, 2010) ...................... 18

*Husbands ex rel. Forde v. City of New York,*
    335 Fed. Appx. 124 (2d Cir. 2009) ................................................................................ 4

*Illinois v. Andreas,*
    463 U.S. 765 (1983) .................................................................................................. 4

*Jeffreys v. City of New York,*
    426 F.3d 549 (2d Cir. 2005) ...................................................................................... 19

*Lennon v. Miller,*
    66 F.3d 416 (2d Cir. 1995) ........................................................................................ 22

**Page**

*Marcavage v. City of New York,*
No. 05 CV 4949, 2010 U.S. Dist. LEXIS 107724(RJS) (S.D.N.Y. Sept. 29, 2010) .............. 23

*Martinez v. Simonetti,*
202 F.3d 625 (2d Cir. 2000) ........................................................................... 4

*Merring v. Town of Tuxedo,*
No. 07 CV 10381, 2009 U.S. Dist. LEXIS 61444 (S.D.N.Y. March 31, 2009) ............... 18, 19

*Papineau v. Parmley,*
465 F.3d 46 (2d Cir. 2006) ............................................................................ 8

*People v. Stumpp,*
129 Misc.2d 703, 493 N.Y.S.2d 679 (District Ct. Suffolk Co. 1985) .................................... 23

*People v. Tichenor,*
89 N.Y.2d 769 (1997) ................................................................................... 13

*Renzende v. Citigroup Global Markets,*
No. 09 CV 9392, 2011 U.S. Dist. LEXIS 45480 (S.D.N.Y. March 11, 2011) ....................... 19

*Schiller v. City of New York,*
No. 04 Civ. 7922, 2008 U.S. Dist. LEXIS 4253 ..................................................... 15

*Scott v. Harris,*
550 U.S. 372 (2007) ..................................................................................... 18

*Vodak v. City of Chicago,*
639 F.3d 738 (7th Cir. 2011) .................................................................. *passim*

*Ybarra v. Illinois,*
444 U.S. 85 (1979) ............................................................................. 3, 24, 25

*Young v. County of Fulton,*
160 F.3d 899 (2d Cir. 1998) ........................................................................... 24

*Zellner v Summerlin,*
494 F.3d 344 (2d Cir. 2007) ........................................................................... 18

## Statutes

N.Y. Penal Law §195.05 ......................................................................... 2, 21, 22

N.Y. Penal Law §240.20(2) ............................................................................. 13

N.Y. Penal Law §240.20(5) ....................................................................... *passim*

**Page**

N.Y. Penal Law §240.20(6)..................................................................................... 3

N.Y.C. Charter §435(a) ................................................................................... 22, 23

NYC Admin. Code § 10-110 ...................................................................... 13, 14, 19

## PRELIMINARY STATEMENT

Defendants respectfully submit this reply memorandum of law in further support of their motion for summary judgment on plaintiffs' false arrest claims at the Church and Fulton Street arrest location. This consolidated reply brief responds to three memoranda of law submitted by plaintiffs in opposition to defendants' motion for summary judgment: one by plaintiffs in *Abdell* ("*Abdell* Opp. Br."), one by plaintiffs in *Schiller* ("*Schiller* Opp. Br."), and one by plaintiffs arrested at Church and Fulton Streets in *Macnamara ("Macnamara* Opp. Br."). Plaintiffs *in Pagoda, Meehan,* and *Botbol* join in the arguments made in all three briefs.[1] Collectively, plaintiffs argue the following with respect to their arrests at Church and Fulton Streets:

- Chief Monahan lacked probable cause to arrest plaintiffs for any reason because he could not have reasonably believed that the marchers were engaging in unlawful conduct as a cohesive unit (*Abdell* Opp Br., pp. 4-6, 11-18; *Schiller* Opp. Br., pp. 14-20; *Macnamara* Opp. Br., pp. 20-23).

- Because the WRL march was First Amendment activity, police could only have stopped or dispersed the WRL march if there was a "clear and present danger" of imminent violence, which there was not at Church and Fulton Streets (*Abdell* Opp. Br., pp. 9-10; *Macnamara* Opp Br., p. 15).

- Absent imminent harm of the WRL march turning violent, the Constitution required police at Church and Fulton Streets to give "fair notice and a meaningful opportunity to disperse" to the group of marchers before arresting them (*Macnamara* Opp Br., pp. 10, 18-23).

---

[1] Plaintiffs arrested at Church and Fulton Streets in the *Abdell, Schiller, Macnamara, Pagoda, Meehan,* and *Botbol* cases have made their own motions for summary judgment on their false arrest claims. Defendants incorporate herein the facts and law argued in their papers opposing those motions (*Schiller* Docket Entry ("DE") 596, 597) and in defendants' Local Rule 56.1 Counterstatements of Undisputed Facts filed in each of these six cases in opposition to plaintiffs' summary judgment motions. (*Abdell* DE 284; *Schiller* DE 599; *Macnamara* DE 475; *Pagoda* DE 117; *Meehan* DE 117; *Botbol* DE 203). For the Court's convenience, defendants also submit herewith a Reply 56.1 Statement that sets forth defendants' undisputed facts and states whether a fact is undisputed by plaintiffs or the reasons why the Court should deem the fact to be undisputed. In addition, defendants incorporate herein arguments made in their Reply Memorandum of Law in Further Support of Defendants' Motion for Partial Summary Judgment Regarding the Arrest Claims of Plaintiffs Arrested on East 16th Street.

- Plaintiffs, by virtue of their own testimony and video evidence in the record, did not actually obstruct or intend to obstruct pedestrian traffic on the northern sidewalk of Fulton Street as "obstruction" is defined under New York Penal Law 240.20(5) (*Abdell* Opp. Br., pp. 2-3; *Schiller* Opp. Br., pp. 16-17)

- Plaintiffs should not have been arrested for parading without a permit because (1) no permit is required for walking on a sidewalk (*Schiller* Opp. Br., p. 18), and (2) police consented to the march proceeding without a written permit by allowing the march to proceed, and as a legal matter could not have "revoked" such permission to march without notice to the marchers. (*Schiller* Opp. Br., p. 26).

- Plaintiffs should not have been arrested for obstruction of governmental administration ("OGA") because (1) Inspector Galati did not warn the marchers they would be subject to arrest for violating *all* the march's conditions (*Abdell* Opp. Br., p. 19), (2) Chief Monahan could not have reasonably believed that Inspector Galati's pre-march warnings were audible to all marchers (*Abdell* Opp. Br., p. 20; *Schiller* Opp. Br., pp. 20-21), and (3) the directive to walk two abreast given to marchers at Church and Fulton Streets is not the type of "lawful order" required under Penal Law §195.05. (*Schiller* Opp. Br., pp. 20-22).

As set forth fully below, plaintiffs' arguments are flatly contradicted by undisputed evidence in the record and are legally meritless. Accordingly, defendants should be granted summary judgment dismissing plaintiffs' false arrest claims, and plaintiffs' motions for summary judgment on these claims should be denied.[2]

## ARGUMENT

## I.   IT WAS OBJECTIVELY REASONABLE FOR CHIEF MONAHAN TO BELIEVE THAT THE MARCHERS COMMITTED UNLAWFUL CONDUCT AS A COHESIVE UNIT AND COULD BE ARRESTED AS A UNIT

At the outset, contrary to plaintiffs' hyperbole, defendants are not seeking "a radical re-writing of Fourth Amendment jurisprudence" (*Macnamara* Opp. Br., p. 2), are not asking this

---

[2] In the *Schiller* Opposing Brief, plaintiffs frame their arguments as an opposition to qualified-immunity arguments that defendants made in their moving papers for Chief Monahan and other officers at Church and Fulton Streets. *See, e.g., Schiller* Opp. Br., p. 7 (noting the two-step inquiry for qualified immunity, plaintiffs "proceed to the second (and dispositive) issue of whether the defendants violated rights that were clearly established as of August 2004"). However, though phrased in "clearly established" language, plaintiffs' arguments in the *Schiller* Opposing Brief appear identical to those made in the other two briefs disputing that Chief Monahan had probable cause to arrest plaintiffs; the issue of Chief Monahan's objectively reasonable belief remains the core issue on these motions. Defendants address qualified immunity in Point VI, *infra*.

Court to "carve out a 'group probable cause' exception to the Fourth Amendment," (*id.*, p. 3), and are not arguing a "radical departure from bedrock Fourth Amendment jurisprudence" (*id.*, p. 10).  The term "group probable cause" has been bandied about by both sides to the RNC litigation as a shorthand reference to the principle that, as stated in *Carr v. District of Columbia,* 587 F.3d 401 (D.C. Cir. 2009), police may arrest a group of people seen committing unlawful conduct as a cohesive unit without having to know precisely what each individual was doing before his or her arrest.  Indeed, defendants agree that "nothing in *Carr* undercuts the requirement that there be individualized probable cause to arrest a person for allegedly violating Penal Law §240.20(5), Penal Law §240.20(6) and/or the Parade Permittting Scheme." (*Macnamara* Opp. Br., p. 14).  The point is, when police arrest a group committing unlawful conduct, and when police can reasonably believe that a particular person was part of that group, that *is* particularized probable cause as required by *Ybarra v. Illinois*, 444 U.S. 85 (1971).

Plaintiffs attack the factual basis for Chief Monahan's belief that the marchers were acting as a cohesive unit, and more generally discuss "group arrest" cases such as *Cullinane, Dellums, Barham, Papineau, Carr*, and *Vodak*.  Defendants first address plaintiffs' argument that Chief Monahan could not have reasonably believed the group of marchers was acting as a single unit, then turn to plaintiffs' treatment of the case law referred to above.

**A.     Chief Monahan And Inspector Galati Reasonably Believed That Plaintiff (And Apparent Organizer Of The March) Ed Hedemann Agreed To The NYPD's Conditions For The March On Behalf Of All The Marchers**

Plaintiffs' claim that nothing in the record shows that "Hedemann agree[ed] to anything on behalf of all the marchers" or "remotely impl[ies] that he had the authority to agree to anything on behalf of all the marchers," such that defendants "had no basis for believing that Hedemann could or did agree to NYPD's conditions on behalf of marchers, or have any peacekeepers do so." (*Abdell* Opp. Br., p. 17) (quotations and citations omitted).  As a threshold matter, it is

irrelevant what Hedemann thought while he was discussing the march with Chief Monahan and Inspector Galati: whether *he* thought he was the march's leader speaking for all the marchers, or whether *he* thought he had authority to speak on behalf of all the marchers.   The issue is whether *Chief Monahan and Inspector Galati* reasonably believed that Hedemann could agree, and was agreeing, to conditions for the march on behalf of all the marchers. As set forth fully below, undisputed evidence in the record fully supports Chief Monahan's objectively reasonable belief.[3]

First, Hedemann assured Inspector Galati that he had marshalls or peacekeepers to ensure that all the marchers would comply with the conditions that Inspector Galati and Hedemann were discussing. As Inspector Galati testified at his deposition:

> [Hedemann assured me that] . . . they were going to walk, you know, in a manner that was legal, that he knew his rights, that, you know, if they decided to walk one or two at a time that they could walk anywhere they wanted to.
>
> I asked him, you know, how are you going to keep the rest of the people . . . to comply with what he said. He . . . said he had marshalls, he showed me bands or things he had pinned to his shirt, there were several other individuals that had them.
>
> *He assured me that they were going to be the marshalls of this event and that they were going to assure that nobody did anything that they weren't supposed to do.*

(Declaration of Fred M. Weiler In Support of Defendants' Motion for Summary Judgment to Dismiss Plaintiffs' False Arrest Claims at Church and Fulton Streets ("Weiler Moving Decl."), Exh. L,  Galati Depo. 105:17-106:8) (emphasis added)).

---

[3] While defendants occasionally refer to Chief Monahan and not Inspector Galati, both of them were involved in the decision to arrest the WRL marchers (Defendants' Moving Rule 56.1 Statement of Undisputed Facts ("Defs. 56.1"), ¶ 130).    The Court can read references to Chief Monahan's knowledge and reasonable belief as references to Inspector Galati's knowledge and reasonable belief as well, because under the "common knowledge" doctrine, whatever Galati knew or believed at the time can, for purposes of probable cause, be imputed to Chief Monahan, and *vice versa.   See Husbands ex rel. Forde v. City of New York*, 335 Fed. Appx. 124, 127 (2d Cir. 2009) ("[w]here here law enforcement authorities are cooperating in an investigation . . ., the knowledge of one is presumed shared by all") (*quoting Illinois v. Andreas*, 463 U.S. 765, 771 n.5 (1983); *see also Martinez v. Simonetti*, 202 F.3d 625, 634 (2d Cir. 2000) ("police officers, in making probable cause determinations, are "entitled to rely on the allegations of fellow police officers.")

In addition, Chief Monahan testified before the Civilian Complaint Review Board that when he warned Hedemann that the marchers would be arrested if they blocked pedestrian traffic during the march, Hedemann replied:

> "Well, we're just gonna walk on the streets, like everyone has a right to walk on the streets. We know how not to block traffic. I have marshalls here." And he points to a bunch of guys that he had with arm bands.

(Weiler Moving Decl., Exh. AA, Monahan CCRB, p. 10).  Finally, plaintiffs, in their *Abdell* and *Macnamara* Rule 56.1 Counterstatements (¶ 61), "do not dispute that WRL had designated people to help keep the march together and to facilitate a . . . procession that would not obstruct pedestrian traffic." (*See Abdell* DE 281, *Macnamara* DE 470).

As for whether Chief Monahan or Inspector Galati could reasonably believe that Hedemann was the march's leader authorized to speak on behalf of all the marchers, there is ample undisputed testimony in the record to support that belief.  First, when Inspector Galati arrived in the vicinity of Church and Fulton Streets and saw a crowd gathering,

> I spoke to some people and they stated that there was going to be a protest and I had asked if there was an organizer and I was pointed out to an individual who later did tell me that he was the organizer of this protest.
> Q: And do you know this person's name?
> A: I don't know his exact – I think it was Hetterman [*sic*], maybe, if that's correct, but he was the tall slender individual in his 50s or 60s.

(Weiler Moving Decl., Exh. L, Galati Depo. 102:4-14).  And as Chief Monahan testified, when he arrived on the scene, "Galati told me he spoke to the leader and the leader intended to march until he got on the floor of the Convention." (Weiler Moving Decl., Exh. BB,  Monahan  Depo. 155:20-22). Second, Chief Monahan and Inspector Galati were not alone in their beliefs that Hedemann was the representative of all of the marchers. Plaintiffs in *Macnamara* testified that based on their own observations, they believed Hedemann was "negotiating" the terms of the march on behalf of all of the marchers. (Weiler Moving Decl., Exh. II, Raimondi Depo. 316:16-20 (Hedemann "was the person

negotiating with the police about the march route in the negotiations that I observed"); Exh. S, Harak

Depo. 40:2-11 (recalling Hedemann "negotiating with officers")).

In sum, Chief Monahan, as well as Inspector Galati, reasonably believed that

Hedemann was agreeing to obey the law, and comply with police directives, on behalf of all of the

marchers.

**B.     Chief Monahan's Knowledge That Inspector Galati And Other Officers Gave Warnings To The Marchers As A Group Led Him To Reasonably Believe That All The Marchers Were Acting With The Requisite Mental State Under Penal Law §240.20(5)**

Plaintiffs claim that the undisputed fact that Inspector Galati gave warnings to the

marchers "says nothing about whether people arrested acted as a 'cohesive unit.'" (*Abdell* Opp. Br.,

p. 17).   However, that fact *does* bear on whether Chief Monahan reasonably believed that the

marchers were acting with the requisite *mens rea* for disorderly conduct.   This is because when Chief

Monahan saw the group obstructing pedestrian traffic, it was reasonable for him to believe that the

marchers were not doing so accidentally.   Because Chief Monahan and Inspector Galati were aware

that the marchers had been warned as a group, and because they had reason to believe those orders

were audible to the marchers, particularly given that Inspector Galati, Inspector Shea, and Lt.

O'Sullivan had each given repeated warnings to the group, Chief Monahan reasonably believed that

the group was acting intentionally or recklessly, the requisite mental state for New York Penal Law

§240.20(5).

**C.     *Barham, Papineau,* And *Vodak* Are Distinguishable From The Instant Cases, And The *Carr* Case Is Not Limited By Its Holding Solely To Riotous Conduct**

Plaintiffs do not take issue with *Carr*'s holding that "there are limited circumstances

under which the police may lawfully arrest a group of persons even when the police do not know the

specific lawful acts committed by particular individuals." (*Abdell* Opp. Br., p. 12).   The parties *do*

disagree about whether such "limited circumstances" existed at Church and Fulton Streets, with

plaintiffs trying to narrow *Carr's* holding to riotous conduct as opposed to obstruction of pedestrian traffic. (*Abdell* Opp. Br., pp. 10-14; *Macnamara* Opp. Br., pp. 12-13; *Schiller* Opp. Br., pp. 9-11, 13). As a preliminary matter, defendants will first distinguish several cases relied upon by plaintiffs that supposedly set forth the constitutional limits of group arrests.[4]

According to plaintiffs, *Barham v. Ramsey,* 434 F.3d 565 (D.C. Cir. 2006), stands for the proposition that police "cannot deal with the crowd as a unit unless [they] first issue[ ] an order to disperse and then provide[ ] a reasonable opportunity to comply." (*Schiller* Opp. Br., p. 12 (quoting *Barham*, 434 F.3d at 576)).[5] Plaintiffs overstate that holding, as the D.C. Circuit Court later noted in *Carr*: "As useful as the dispersal order tactic may be in certain situations, [*Barham* does not] establish it as a constitutional prerequisite before every group arrest." *Carr*, 587 F.3d at 410 (footnote omitted). In *Barham*, police swept up and arrested persons in a public park without giving a dispersal order; however, because people had been flowing in and out of the park all day, the court found it unreasonable for police, absent a dispersal order, to assume that people congregating *in the park later that day* were the same people who had committed unlawful acts *outside the park earlier in the day*. 434 F.3d at 569. The *Barham* Court stated that "undisputed evidence reveals [the police] arrested an undifferentiated mass of people on the basis of crimes committed by a handful of individuals who were never identified." *Id.* at 568.

The facts of *Barham* are sharply at odds with the WRL march, at which Chief Monahan reasonably believed that the people arrested on the Fulton Street sidewalk were the same people he had contemporaneously seen committing unlawful conduct. There was no spatial or

---

[4] Defendants note at because the law regarding under what circumstances it is constitutional to arrest a group was not clearly established in 2004, defendants are entitled to qualified immunity. *See* Point VI, *infra*.

[5] Defendants fully address this supposed "dispersal order requirement" in Part II(B), *infra*.

temporal gap, as there was in *Barham*, to make that belief unreasonable, nor any suggestion that people were flowing freely into and out of the WRL march, as was the case with the public park in *Barham*.  Nor, as in *Barham*, was the unlawful conduct during the WRL march committed by a "handful of people" who were never identified.[6] Rather, no dispersal order was necessary on the Fulton Street sidewalk to separate the "innocents" from the lawbreakers because Chief Monahan had observed their unlawful conduct.[7]

Plaintiffs' reliance on *Papineau v. Parmley*, 465 F.3d 46 (2d Cir. 2006), is also misplaced (*Schiller* Opp. Br., pp. 8-9).  *Papineau* involved a group of Native American protesters who entered a highway to hand out leaflets to motorists, *then left and joined other protesters who had been congregating on private property* for weeks as part of a protest.  465 F.3d at 52. Shortly thereafter, police issued a dispersal order to those persons on the private property and subsequently arrested many of the protesters on that private property.  *Id*. at 53-54.  The individual police officers sought qualified immunity on the basis that some of the protesters in the group had earlier committed disorderly conduct under Penal Law §240.20(5) by entering the highway and obstructing vehicular traffic. *Id*. at 58-59.  The Second Circuit denied the officers qualified immunity, noting that there was a serious question about whether the officers could reasonably believe that any of the people arrested on private property had actually been seen earlier in the public roadway committing disorderly conduct.  *Id*. at 60.

---

[6] As in *Barham,* the court in *Dellums v. Powell,* 566 F.2d 167 (D.C. Cir. 1977), another D.C. Circuit case relied upon by plaintiffs, noted that the record in that case indicated that "not all of the arrestees were . . . obstructive . . . [and] only a small minority of the demonstrators were involved in any mischief," such that police had to give a dispersal order, and time to comply with it, to the group. 566 F.2d at 181, n. 31. However, at Church and Fulton Streets, more than a mere handful of marchers were engaged in unlawful conduct: it was objectively reasonable for Chief Monahan to believe that *all* of the marchers were engaged in the same unlawful conduct (obstructing pedestrian traffic, parading, and OGA), rather than extrapolating from the acts of a few "bad eggs."

[7] In addition, Chief Monahan gave at least one dispersal order and no one complied (*see* Point II(B), *infra*).

Both *Barham* and *Papineau,* then, involved problems of time and location not present at the WRL march, problems that led those courts to deny qualified immunity for the officers involved. In *Barham*, the Court held that police could not arrest *everyone* in the public park even if they had probable cause to arrest *some* of them based on conduct earlier in the day at another location, because some "innocents" could have already been in the park before others entered and committed unlawful conduct there. Likekwise, in *Papineau*, the Court held that police could not arrest everyone on private property without knowing that any of the people there had committed disorderly conduct at *another place and an earlier time*. By contrast, at Church and Fulton Streets, the unlawful conduct took place on the same street on which arrests were made, and Chief Monahan was present and personally observed the group engaging in unlawful conduct. This is not analogous to people flowing in and out of a public park (*Barham*) or people moving from a public roadway to private property (*Papineau*). For these reasons, plaintiffs' reliance on *Barham* and *Papineau* is misplaced.

Also distinguishable is *Vodak v. City of Chicago,* 639 F.3d 738 (7th Cir. 2001), a qualified-immunity decision on which plaintiffs also rely. In that case, involving a march through Chicago, police arrested marchers present on Chicago Avenue for willfully disobeying a "return-or-disperse" order issued by police at Oak and Michigan Avenues. The Court found that police could not have reasonably believe the persons arrested had the requisite *mens rea* for disobeying the return-or-disperse order:

> The defendants argue that a reasonable police officer would think that anyone found on Chicago Avenue after the return-or-disperse order issued at Oak and Michigan was willfully violating that order. But that would not be a *reasonable* belief. . . . [T]here was no prescribed march route, and there was no mechanism . . . for conveying a command to thousands of people stretched out on Oak Street between the inner drive and Michigan Avenue. How could the police at the intersection of Chicago and Michigan even know that the crowd on Chicago consisted of persons returning from Oak Street, rather than persons who marching north on Lake Shore Drive had turned left at Chicago rather than continuing on to Oak or North?

639 F.3d at 746.

The facts at Church and Fulton Streets are completely different from those in *Vodak*. First, in *Vodak*, as in *Barham* and *Papineau*, there was a temporal and spatial gap between the unlawful group conduct and arrests. Second, unlike the marchers in *Vodak*, who were told nothing before the march by police, Inspector Galati and other officers gave warnings to the assembled marchers at Church and Fulton Streets, explicitly instructing them that there was no permit for the march, that marchers had to walk no more than two abreast, and that if the marchers blocked pedestrian traffic, they would be subject to arrest. Third, in addressing the marchers' alleged failure to disperse, the *Vodak* Court acknowledged that "[a]ll this [about the adequacy and effect of the return-or-disperse order] would be of no consequence had the police had [an independent] reason for arresting the crowd on Chicago Avenue." 639 F.3d at 745. Here, Chief Monahan certainly had more than one reason, aside from failure to obey a dispersal order, to arrest the marchers: disorderly conduct, parading without a permit, and OGA.

As for *Carr*, in their opposing briefs, plaintiffs vigorously attempt to distinguish the case from what occurred at Church and Fulton Streets, trying to cabin in *Carr*'s holding that (1) a showing of particularized probable cause "is satisfied if [police] officers have grounds to believe all arrested persons were part of the unit observed violating the law" and (2) "if police have probable cause to believe that the group they are arresting is committing or has committed a crime, no more is necessary." *Carr,* 587 F.3d at 407-410. Plaintiffs' primary argument is that *Carr* involved a riot, at which police witnessed violence and lawbreaking, "whereas this is a case about a peaceful march on a public sidewalk in which nobody was seen doing anything but walking on a sidewalk." *Abdell* Opp. Br., p. 13; *see also Macnamara* Opp. Br., p 12).

This is a distinction without a difference. While the *Carr* Court did note that neither *Cullinane* and *Barham* involved rioting or encouraging a riot, nothing in *Carr* limits its holding to

violent or riotous conduct.  Indeed, the *Carr* Court repeatedly uses phrases such as "if the group is observed *violating the law*" (587 F.3d at 406), "part of the unit observed *violating the law*" (*id.* at 407), "the crowd acted *unlawfully* as a unit" (*id.* at 408), "if [police have probable cause to believe] the group they are arresting *is committing or has committed a crime*" (*id.* at 410) (emphases added) – not "act[ing] *violently* as a unit."  Even non-violent conduct can "violate the law" or be "unlawful" within the meaning of *Carr*. Moreover, even *Cullinane* recognized that if a demonstration is "substantially infected with violence *or obstruction*," the police "may deal with the crowd as a unit." 566 F.2d at 120 (emphasis added). *See also, Id.* at 121 (police might be able to testify that "there was probable cause to believe that the group as a whole was violating the law by violence *or obstruction*") (emphasis added).  In short, *Carr*'s holding that one may arrest a group seen engaging in unlawful conduct without knowing the specific conduct of each particular person in the group is not restricted to violent or riotous situations.

**II.    THE FIRST AMENDMENT'S "CLEAR AND PRESENT DANGER" TEST DOES NOT APPLY TO THE WRL MARCH,  AND CHIEF MONAHAN WAS NOT CONSTITUTIONALLY REQUIRED TO GIVE THE MARCHERS "FAIR NOTICE" AND AN OPPORTUNITY TO DISPERSE BEFORE ARRESTING THEM**

Plaintiffs argue that because the WRL march was peaceful activity protected by the First Amendment, the march could only be stopped or dispersed if the there was a "clear and present danger" of riot, disorder, or other immediate threat to public safety.  (*Abdell* Opp. Br., pp. 8-10). Plaintiffs' claim that their conduct does not fall within the "clear and present danger" test because they were doing nothing more than walking on the sidewalk and "not a single video [depicts] a hint of anger or hostility, nor of a desire to break the law or invite a confrontation with the police." (*Abdell* Opp. Br., p. 9).  In the *Macnamara* Opposition Brief, plaintiffs, while never expressly relying on a "clear and present danger" test, make a related argument that hinges on imminent violence as a factor in whether police can treat a group as a unit: "[A]bsent imminent harm of [an] assembly's turning violent or causing some other serious public ramification beyond mere annoyance," plaintiffs

claim, police cannot treat a group engaging in unlawful conduct as a unit "without first providing fair notice and a meaning fully opportunity to disperse." (*Macnamara* Opp. Br., p. 18).

As demonstrated *supra* and further set forth below, both arguments – which hinge on actual or imminent violence at Church and Fulton Streets – are legally flawed.  First,  the "clear and present danger test" does not apply to expressive *conduct* such as marches; at Church and Fulton Streets, Chief Monahan did not have to wait for the marcher to become violent or tumultuous before ordering plaintiffs' arrests for disorderly conduct and parading without a permit.   Second, the Constitution does not require police to give persons engaged in disorderly conduct or parading without a permit a dispersal order before arresting them for violation of those statutes.  Finally, even assuming *arguendo* that the Constitution does impose such a dispersal-order requirement, Chief Monahan indeed gave the marchers at Church and Fulton Streets proper notice of their unlawful conduct before arresting them, gave the marchers a proper dispersal order, and gave them an opportunity for them to comply with the dispersal order before arresting them.

### A.   The First Amendment "Clear And Present Danger" Standard Does Not Apply Here Because That Test Applies Only to "Pure Speech" And Not To Expressive Conduct Like A March

Much as plaintiffs would like emphasize the peaceful and non-violent nature of the WRL march, the Supreme Court, in *Cox v. Louisiana*, 379 U.S. 559 (1965), made clear that the First Amendment's "clear and present danger" test does not apply to circumstances in which speech and conduct are mixed, but rather than applies only in the context of "pure speech."  In *Cox*, 2,000 people paraded in front of a courthouse to protest the arrest of 23 students the previous day.  379 U.S. at 564-65.  Plaintiffs were arrested and charged with violating a statute that prohibited picketing near courthouses, which was enacted to avoid having protesters influence judges.  *Id*.  Plaintiffs challenged the statute as unconstitutional under the First Amendment, both facially and as applied to them.  *Id*. at 564-566.  The Supreme Court upheld the statute as facially constitutional as "a valid law dealing with

conduct subject to regulation" and noted that "the fact that free speech is intermingled with such conduct does not bring with it constitutional protection." *Id.* at 564. In analyzing whether the statute as applied to plaintiffs was unconstitutional, the Supreme Court rejected the use of a "clear and present danger" test because the protest in front of the courthouse was not "speech in its pristine form" but rather "conduct of a totally different character." *Id.* at 564-566. *Cox* can be read as recognizing that early First Amendment cases involving "clear and present danger" involved the *secondary effects* of speech – the archetypical speaker on a soapbox attracting an unruly crowd – rather than conduct with an expressive element, such as the WRL march here.[8]

Moreover, as the Supreme Court noted in *Cox*, even in the absence of imminent violence, the First Amendment does not entitle demonstrators to violate disorderly conduct laws such as New York's Penal Law §240.20(5): "Nothing we have said here . . . is to be interpreted as sanctioning riotous conduct in any form *or demonstrations, however peaceful their conduct or commendable their motives*, which conflict with properly drawn statutes and ordinances designed to promote law and order [and] regulate traffic." *Cox,* 379 U.S. at 574 (emphasis added).

Much as plaintiffs want to distinguish themselves as "peaceful protesters," *Cox* makes clear that plaintiffs' reliance on "peaceful" does not insulate their non-violent unlawful conduct. Pursuant to *Cox,* any conduct – whether peaceful *or* riotous – is unprotected by the First Amendment when it clashes with statutes designed to promote order and regulate traffic (such as Penal Law §240.20(5) and A.C. §10-110). This is consistent with the Supreme Court's much-quoted language in *Cox v. Louisiana*, 312 U.S. 536, 554-55 (U.S. 1965) ("*Cox* I") that "[o]ne would not be justified in ignoring the familiar red light because this was thought to be a means of social protest." And under

---

[8] The New York Court of Appeals rejected a "clear and present danger" test argued by a defendant convicted of disorderly conduct under Penal Law §240.20(2). The Court reasoned that the statute did not restrict "pure speech," but only speech coupled with an intent to create a risk of public disorder, "which the State has the authority and responsibility to prohibit, prevent, and punish." *People v. Tichenor*, 89 N.Y.2d 769, 775 (1997).

that principle, once plaintiffs engaged in conduct that violated Penal Law §240.20(5) and A.C. §10-110, they lost all First Amendment protection and cannot argue for a "clear and present danger" test to be applied.

In short, because the WRL march was expressive conduct, rather than "pure speech," the "clear and present danger" test simply does not apply to the WRL march.  Chief Monahan did not have to wait for all marchers to become violent or tumultuous before ordering their arrests.

**B.     The Constitution Does Not Require That Police Issue A Dispersal Order To A Non-Violent Group Before Making Arrests**

In further reliance upon the non-violent nature of the WRL march, plaintiffs in the *Macnamara* Opposition Brief argue that absent "imminent harm" that a "peaceful" demonstration will turn violent, under the First Amendment and the Fourteenth Amendment's Due Process Clause, police cannot arrest demonstrators without first giving them "fair warning" of their unlawful conduct in the form of a "lawful, clearly audible dispersal order" and a "meaningful opportunity to disperse." (*Macnamara* Opp. Br., p. 19).   Not only is this argument legally baseless, but even assuming *arguendo* there was such a constitutional requirement (which there is not), Chief Monahan satisfied it at Church and Fulton Streets by repeatedly warning the marchers that they were obstructing pedestrian traffic, by issuing a dispersal order reasonably calculated to be audible to the marchers, and by giving the marchers sufficient time to comply with the dispersal order.

With respect to the "fair notice" requirement, defendants first note that for arrests made pursuant to Penal Law §240.20(5) and A.C. 10-110, neither the precise words, nor the concept of, "fair notice" appear on the face of the statutes, nor have New York courts read "fair notice" into those statutes.

In support of their argument that they were entitled to "fair notice" before they were arrested, plaintiffs again cite to the D.C. Circuit cases of *Cullinane*, *Dellums*, and *Barham* for the proposition that either "fair notice" of unlawful conduct or an order to disperse must be given to a

crowd that is obstructive before arrests can be made of the group. (*Macnamara* Opp. Br., pp. 10-11). However, as the D.C. Circuit Court made clear in *Carr*, "[a]s useful as the dispersal order tactic may be in certain situations, neither *Cullinane, Dellums,* nor *Barham* establish it as a constitutional prerequisite before every group arrest." *Carr*, 587 F.3d at 410.  Indeed, as the *Carr* Court further stated, "[w]e did not hold [in *Dellums*] that a dispersal order is required for any group arrest." *Id.*, n.5; *Vodak v. City of Chicago*, 639 F.3d 738, 745 (7th Cir. 2011) (noting that had police had a reason for arresting the crowd, a dispersal order "would be of no consequence"); *Cullinane*, 566 F.2d at 121 (where police testimony shows that "there was probable cause to believe that the group as a whole was violating the law," no dispersal order is required).  Indeed, this Court has refused to read a dispersal order requirement into Penal Law §240.20(5). *Schiller  v. City of New York*, No. 04 Civ. 7922 (RJS) (JCF), 2008 U.S. Dist. LEXIS 4253, at **26-28 (S.D.N.Y. Jan. 23, 2008) (rejecting RNC plaintiffs' argument that §240.20(5) was facially unconstitutional because it does not require a dispersal order).

As discussed in Point I(C) *supra*, "[o]nce police have probable cause to believe that the group they are arresting is committing or has committed a crime, no more is necessary." *Carr,* 587 F.3d at 410.   To impose the requirement of a dispersal order "would allow the putative [lawbreakers] to escape." *Id.*  This would be counterproductive to the efforts of police who, when faced with obstructive groups, may wish to both "quell a disruptive situation *and* arrest those responsible for it." *Id.* (emphasis in original).

At Church and Fulton Streets, Chief Monahan was permitted and entitled to arrest the marchers without first issuing "fair warning" of the group's unlawful conduct or a dispersal order because he had probable cause to believe that the group as a cohesive unit was committing disorderly conduct, parading without a permit, and obstructing governmental administration. Nonetheless, even assuming *arguendo* that the Constitution requires fair warning or a dispersal order before arresting a

group engaged in unlawful conduct, Chief Monahan satisfied these conditions. Before ordering arrests, he repeatedly warned marchers that they were obstructing pedestrian traffic; he issued at least one dispersal order to the marchers in a loud voice; and no one moved in response to that dispersal order. (Defs. 56.1, ¶¶ 121-130). Accordingly, by ordering the arrests of the marchers on the Fulton Street sidewalk, Chief Monahan did not violate the First Amendment, Fourth Amendment, or the Due Process Clause of Fourteenth Amendment.

### III.   IT WAS OBJECTIVELY REASONABLE FOR CHIEF MONAHAN TO BELIEVE THAT PLAINTIFFS OBSTRUCTED THE FULTON STREET SIDEWALK

Defendants have previously addressed plaintiffs' claims that there was no sidewalk obstruction in defendants' Memorandum of Law in Opposition to Plaintiffs' Motions for Summary Judgment on Their False Arrest Claims at Church and Fulton Streets and State-Law Fingerprinting Claims dated November 3, 2001, at pages 6-12. Defendants also address such claims in defendants' accompanying Reply 56.1 Statement of Undisputed Facts. Defendants respectfully refer the Court to those documents, and rather than restate those arguments, defendants will highlight here for the Court certain key problems with plaintiff's alleged evidence of non-obstruction.

First, it is undisputed that Chief Monahan and other officers saw pedestrians approaching the marchers from Broadway forced into the roadway to cross to the southern sidewalk of Fulton Street and avoid the marchers. At their depositions or in CCRB testimony, a number of officers – Assistant Commissioner Messner, Chief Monahan, Inspector Galati, Inspector Shea, Captain Shea, Lt. Rivers, Lt. O' Sullivan, Lt. Venice, Officer Martinoff, and Officer Steven Toth – specifically recalled seeing pedestrians walking westward on Fulton Street being forced to cross to the southern sidewalk of Fulton Street to avoid the approaching mass of marchers. (Defs. 56.1, ¶ 115). *Plaintiffs do not dispute that testimony with either their own testimony or any videotape.* Thus, Chief Monahan's and Inspector Galati's observation of oncoming pedestrians crossing the street to

avoid the march is an undisputed fact that adds to the reasonableness of their beliefs that the march was obstructing pedestrian traffic.

Second, plaintiffs Becker, DeMott, Dogget, Ekberg, Janney, Joseph, Logan, Petrick, and Steyert *admitted* at their depositions that it would have been difficult for anyone to walk against the flow of the marchers that day. (Defs. 56.1, ¶ 115).[9]  Plaintiff Jeffery Cohen testified at his deposition that while he was on the Fulton Street sidewalk, he was "swallowed up" by marchers and tried to cross to the south sidewalk of Fulton Street because he felt "claustrophobic." (Weiler Opp. Decl.,  Exh. E, Cohen Depo. 11:2-4, 70:19-21, 75:17-20, 76:21-23).  Likewise, plaintiff Katherine Krassan, who was with Cohen, recalls being engulfed by the marchers streaming onto the sidewalk. (Weiler Opp. Decl., Exh. U, Krassan Depo. 22:17-20, 25:16-22, 28:5-12).

Third, the most relevant video evidence in this case is footage that depicts the march from what would have been Chief Monahan's perspective.  It is what *Chief Monahan* observed from his vantage point near the corner of Church and Fulton Streets and what *Chief Monahan* observed as he went to the front of the march (*see, e.g.,* Defendants' Video Compilation, Chapters 2, 5, 6, 7) that contributed to his decision to arrest the marchers – not what could be seen from the perspective of someone close to the front of the march filming while walking backwards (e.g., plaintiffs Burns or Hernandez). In addition, it is unclear from plaintiffs' videoclips whether the persons plaintiffs characterize as "pedestrians" shown weaving their way against the tide of marchers are indeed people who were simply trying to walk westward on Fulton Street – i.e., "pedestrians" in the sense of persons with no interest in either joining or documenting the march – as opposed to marchers who "doubled back" from walking eastward and would be more willing than a pedestrian uninvolved with

---

[9] In fact, in  the *Abdell* Local Rule 56.1 Counterstatement (¶ 115 ), *Abdell* plaintiffs  quote this testimony from Ekberg, Janney, Joseph and Logan even while disputing that they blocked pedestrian traffic – apparently ignoring the fact that inconveniencing pedestrians *is* obstruction.

the march to tolerate the inconvenience created by the mass of marchers occupying the Fulton Street sidewalk.[10]

Finally, because plaintiffs' version of events at Church and Fulton Streets is blatantly contradicted by the undisputed evidence, this Court should not adopt plaintiffs' version of the facts. As the Supreme Court held, "[w]hen opposing parties tell two different stories, one of which is blatantly contradicted by the [videotape] record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." *Scott v. Harris*, 550 U.S. 372, 380 (2007). *See also Zellner v Summerlin*, 494 F.3d 344, 371 (2d Cir. 2007) ("[i]ncontrovertible evidence relied on by [a party moving for summary judgment], such as a relevant videotape whose accuracy is unchallenged, should be credited by the court on such a motion if it so utterly discredits the opposing party's version that no reasonable juror could fail to believe the version advanced by the moving party"). Indeed, in the wake of the Supreme Court's decision in *Scott v. Harris*, two courts in this Circuit have granted summary judgment to a defendant based on video evidence that contradicts the plaintiff's version of events. *See., e.g., Glassberg v. Staples the Office Superstore*, No. 08 CV 2832, 2010 U.S. Dist. LEXIS 103096 (E.D.N.Y. Sept. 13, 2010), *aff'd and adopted*, 2010 U.S. Dist. LEXIS 103102 (E.D.N.Y. Sept. 29, 2010), at **11-12 (in trip-and-fall case, granting defendant store summary judgment where videotape showed that object plaintiff tripped over was open and obvious, citing *Scott v. Harris*); *Merring v. Town of Tuxedo*, No. 07 CV 10381, 2009 U.S. Dist. LEXIS 61444 (S.D.N.Y. March 31, 2009), at **36-39 (in §1983 action,

---

[10] For example, plaintiffs claim that the Burns videoclip shows that "pedestrians . . .were able to walk in either direction on the sidewalk." (*Abdell* Rule 56.1 Statement, ¶ 13). However, the Burns clip (at 2:41-3:13) shows videographers and photographers who had already been moving eastward on the sidewalk doubling back to presumably obtain better shots or angles of the march. The Burns clip (at 3:13-3:16) does depict a person saying to the camera "Sorry," and walking westward on the sidewalk – yet this is someone depicted earlier on the clip marching eastward and then doubling back.

granting summary judgment for defendants where patrol-car videotape contradicted plaintiff's version of events, citing *Scott v. Harris*). Here, defendants' videotape evidence (Defendants' Video Compilation, Chapters 2, 5, 6, 7) "blatantly contradict[s]" plaintiffs' version of the facts" such that "no reasonable jury could believe" that plaintiffs were not obstructing the Fulton Street sidewalk. Accordingly, on the issue of obstruction, this Court can and should find, based on the video evidence alone, that plaintiffs created the type of obstruction under Penal Law §240.20(5) that provided probable cause for their arrests.[11]

## IV.   IT WAS OBJECTIVELY REASONABLE FOR CHIEF MONAHAN TO BELIEVE THAT PLAINTIFFS VIOLATED THE PARADING STATUTE

Plaintiffs argue that they should not have been arrested for parading without a permit (1) because no permit is required for walking on a sidewalk (*Schiller* Opp. Br., p. 18), and (2) police consented to the march proceeding without a written permit by allowing the march to proceed, and could not have revoked such permission to parade without notice to the marchers. (*Schiller* Opp. Br., p. 26). Both arguments are legally unsupportable and contradicted by undisputed facts in the record.

First, as defendants have already argued in their moving memorandum of law (pp. 23-24) and in their memorandum of law opposing plaintiffs' motions for summary judgment (pp. 17-18), a permit is indeed required for marches on a sidewalk. Defendants will not repeat those arguments here.

---

[11] With perhaps their weakest argument, and with no evidentiary support other than their own opinions, plaintiffs argue that Monahan's testimony that he saw marchers obstruct pedestrian traffic as a group is "simply not credible." (*Abdell* Opp. Br., p. 17). In other words, plaintiffs claim, Monahan is lying. However, on summary judgment, it is not this Court's role to make credibility assessments. *Jeffreys v. City of New York*, 426 F.3d 549, 553 (2d Cir. 2005); *Renzende v. Citigroup Global Markets*, No. 09 CV 9392, 2011 U.S. Dist. LEXIS 45480, at *35 (S.D.N.Y. March 11, 2011). The undisputed video evidence, along with admissions of various plaintiffs combined with Chief Monahan's undisputed testimony, leads to the conclusion that Chief Monahan did reasonably believe that there was obstruction in violation of 240.20(5) and that plaintiffs, by disobeying police warnings and directions, had violated A.C. §10-110 and Penal Law §195.05.

Second, plaintiffs claim that "police gave their consent and allowed the Fulton Street march to proceed without a pre-obtained permit" such that Chief Monahan could not arrest the marchers for parading without a permit without "clearly revoking" such permission and allowing the marchers to stop parading. (*Schiller* Opp. Br., p. 19). Plaintiffs' strategy with this argument is clear: they wish to equate what the police did during the WRL march with what police did in *Vodak*. In *Vodak*, the Seventh Circuit stated that "the Fourth Amendment does not permit the police to say to a person go ahead and march and then, five minutes later, having revoked the permission to march without notice to anyone, arrest the person for having marched without police permission." *Vodak*, 639 F.3d at 746-747. Such conduct, the *Vodak* Court held, would be an "indefensible sort of entrapment." *Id.* (quotation and citation omitted).

*Vodak*, however, is distinguishable for one key reason: at Church and Fulton Streets, after announcing to the WRL marchers *by bullhorn before the march began* that there was *no permit* for the march, police only allowed the marchers to parade if they followed certain conditions: walking two abreast, not crossing against traffic signals, and not blocking pedestrian or vehicular traffic.[12] Explicitly stated in Inspector Galati's warnings was the fact that if marchers violated those conditions (and the law), they would be subject to arrest. (Defendants' Video Compilation, Chapter 1; Defs. 56.1, ¶ 75(c)). Thus, Chief Monahan and Inspector Galati reasonably believed that everyone was on notice that it was an unpermitted march and if the marchers broke the rules, they would be arrested. In light of the warnings given by Chief Monahan and Inspector Galati both before and during the march, this is simply not a case of entrapment, or a case of arresting everyone for doing something that the police said was acceptable to do.

---

[12] Plaintiffs' claims that officers waved them across Church Street, that officers told them to get on the Fulton Street sidewalk, and that officers were "escorting" the marchers or "sanctioning" the march are irrelevant because any "permission" the police gave the WRL marchers to proceed was conditioned on marchers obeying police directives at the risk of arrest.

In *Vodak*, by contrast, police gave marchers *unconditional* permission to march, not even telling the marchers that they needed a permit for the march at all.  639 F.3d at 741.  Chief Monahan, however, did not give unconditional permission for the marchers to parade without a permit. Rather, the march at all times was contingent on the marchers complying with the directives announced by police. Marchers were told that they would be subject to arrest for failure to comply with those directives, and Chief Monahan provided additional notice by telling marchers that they were obstructing pedestrian traffic even before issuing any dispersal orders.

## V.   IT WAS OBJECTIVELY REASONABLE FOR CHIEF MONAHAN TO BELIEVE THAT PLAINTIFFS OBSTRUCTED GOVERNMENTAL ADMINISTRATION BY DISOBEYING POLICE ORDERS

Plaintiffs argue that there was no probable cause to arrest them for OGA because (1) Inspector Galati did not tell the marchers that they would be subject to arrest for violating *all* the conditions of the march (*Abdell* Opp. Br., p. 19), (2) Chief Monahan could not have reasonably believed that Inspector Galati's pre-march warnings were audible to all marchers (*Abdell* Opp. Br., p. 20), and (3) the directive to walk two abreast given to marchers at Church and Fulton Streets is not the type of "lawful order" required under Penal Law §195.05. (*Schiller* Opp. Br., pp. 20-22).[13] These arguments are either legally meritless or contradicted by undisputed facts in the record.

First, plaintiffs break down Inspector Galati's warnings and argue that while he announced "If you obstruct pedestrian or vehicular traffic, I have to inform you, you will be subject to arrest," he did not say "If you do not march two abreast, you will be arrested." (Abdell Opp. Br.,

---

[13] In the *Schiller* Opposition Brief, plaintiffs make much of the fact that "[n]one of the plaintiffs was ever charged with OGA, and this is the first time defendants have invoked OGA as the basis for the arrests at Fulton Street." (*Schiller* Opp. Br., p. 20).  However, the fact that plaintiffs were not charged with OGA does not mean defendants lacked probable cause to arrest them for OGA. *See Devenpeck v. Alford*, 543 U.S. 146 (2004).  It is well established that "probable cause is based on the facts warranting arrest and not the statute pursuant to which a plaintiff was charged." *Dickerson v. Napolitano*, 604 F.3d 732, 751-752 (2d Cir. 2010) (affirming dismissal of false arrest claim where there was probable cause to arrest plaintiff for violations beyond those included in the charging instrument).

pp. 19-20). However, after warning all the marchers that the march lacked a permit, Inspector Galati announced that "[y]ou must comply with *all of the rules* or else you will be subject to arrest" (Defs. 56.1, ¶ 75(c)) – then enumerated what those rules were, one of which was that marchers had to walk no more than two abreast.  Thus, regardless of whether Inspector Galati used the words "subject to arrest" in connection with each warning, all of his warnings constituted lawful, non-arbitrary orders based on NYPD's authority, under §435(a) of the New York City Charter, to keep the City's sidewalks clear for pedestrian traffic.

Second, plaintiffs argue that "no reasonable police officer could have believed that Galati's announcements were heard by everyone" (*Abdell* Opp. Br., p. 20), relying solely  only on the alleged fact that some plaintiffs claim they did not hear Galati's warnings. *See also Schiller* Opp Br., pp. 20-21 ("[d]efendants present no evidence that every person arrested on Fulton Street heard . . . any of the 'orders.'")  However, as defendants have already shown in their prior papers, the alleged fact that some people did not hear the warnings does not undermine the reasonableness of Chief Monahan's belief that all the marchers did. In addition, saying "I didn't hear an order" is not the same thing as denying that an order was given.  Inspector Galati sent Lt. O'Sullivan down Church Street to repeat warnings to the assembled marchers, and also had Inspector Shea repeat warnings by bullhorn to the assembled marchers. (Defs. 56.1, ¶¶ 76-81).

Finally, plaintiffs argue that the directive to "walk single or double file, so that you do not obstruct pedestrian traffic" was not the type of "lawful" order required by case law under the OGA statute, Penal Law §195.05.  In *Lennon v. Miller*, 66 F.3d 416, 424 (2d Cir. 1995), the Second Circuit explained that under OGA, the "official function" of the police being interfered with must be one that is "authorized by law."  Here, one of NYPD's "official functions" is indeed authorized by law in the New York City Charter:

> The police department and force shall have the power and it shall be their duty to . . . disperse . . . assemblages which obstruct the free passage of public streets,

sidewalks, parks and places . . . regulate, direct, control and restrict the movement of vehicular and pedestrian traffic for the facilitation of traffic and the convenience of the public . . . .

N.Y. City Charter §435(a) (2009).[14] *See Marcavage v. City of New York*, No. 05 CV 4949, 2010 U.S. Dist. LEXIS 107724 (RJS) (S.D.N.Y. Sept. 29, 2010), at *31 (granting defendants summary judgment where there was probable cause to arrest for OGA based on N.Y. City Charter §435(a)); *People v. Stumpp*, 129 Misc.2d 703, 493 N.Y.S.2d 679 (District Ct. Suffolk Co. 1985) (convicting defendant for OGA where he refused to allow police to inspect books and records of a tavern, where Alcoholic Beverage Control Law §106(15) required police to make such inspections). Thus, all four of the police directives at issue here – not to cross against traffic signals, not to block pedestrian or vehicular traffic, to walk no more than two abreast, and (once the march was stopped) to disperse – were "lawful" and non-arbitrary orders aimed at fulfilling NYPD's power and duty under §435 of the City Charter to keep vehicular and pedestrian traffic flowing on the City's streets and sidewalks.

## VI.   CHIEF MONAHAN AND INSPECTOR GALATI ARE ENTITLED TO QUALIFIED IMMUNITY

As shown above, Chief Monahan and Inspector Galati police had probable cause to arrest the group for its unlawful conduct, and therefore plaintiffs' constitutional rights were not violated. In addition, those same undisputed facts, at a minimum, are sufficient to establish that there was "arguable probable cause" for plaintiffs' arrests, thus entitling Chief Monahan and Inspector Galati to qualified immunity. Rather  than repeat the legal standard for qualified immunity that defendants have already set forth in detail in their moving papers, defendants emphasize here that (1) under what circumstances the arrest of a group would be unconstitutional was not clearly established at the time of the RNC, and (2) officers of reasonable competence could disagree on whether there was probable cause to arrest plaintiffs at Church and Fulton Streets.

---

[14] Available at http://www.nyc.gov/html/charter/downloads/pdf/citycharter2009.pdf.

First, with the exception of *Ybarra* and *Papineau*, none of the cases relied on by plaintiffs concerning group arrests – *Cullinane* (D.C. Cir. 1977), *Dellums* (D.C. Cir. 1977), *Barham* (D.C. Cir. 2006), and *Vodak* (7th Cir. 2011) – are from the U.S. Supreme Court or the Second Circuit. It is well settled that for qualified immunity purposes, a right is "clearly established" if, *inter alia*, "the Supreme Court or the Second Circuit has recognized the right." *Young v. County of Fulton*, 160 F.3d 899, 903 (2d Cir. 1998). And because *Papineau*, which *is* a Second Circuit case, was decided in 2006, two years after the RNC, it was not clearly established law at the time of the RNC. In short, as of the time of the RNC, there were no decisions in either the Second Circuit or U.S. Supreme Court that, under the Fourth Amendment, set forth the conditions under which the arrest of a group would be unconstitutional.

This leaves only the Supreme Court's 1979 *Ybarra* decision as what plaintiffs' claim was "clearly established law" on group arrests before the RNC. In *Ybarra*, the Supreme Court held that "a person's mere propinquity to others independently suspected of criminal activity does not, without more, give rise to probable cause," and that the Fourth Amendment "cannot be undercut or avoided by simply pointing to the fact that coincidentally there exists probable cause to search or seize another . . . ." *Ybarra*, 444 U.S. at 91. Defendants recognize that is valid constitutional law. *Ybarra*, however, is clearly distinguishable and cannot be conceptually stretched to cover the WRL march. In *Ybarra*, a warrant was issued to search "Greg" the bartender (and no one else) for heroin at the bar where "Greg" bartended. *Id.* at 87-88. The police, however, decided to search all the bar's patrons, even though doing so went well beyond the scope of the warrant, and even though they had no basis for doing so other than that the patrons were in "mere propinquity" to Greg. *Id.* at 91. Here, however, Chief Monahan witnessed an entire group engaging in unlawful conduct *as a unit*; he did not, as in *Ybarra*, order the arrests of people who were apparently doing nothing wrong but were only in proximity to people violating the law. This is not a case of "guilt by association," and nothing in

*Ybarra* offers guidance to police about the proper circumstances under which they may arrest a group of individuals all seen engaging in unlawful conduct together.

Second, even assuming *arguendo* that probable cause was lacking for the arrests of plaintiffs at Church and Fulton Street, officers of reasonable competence could disagree on whether there was probable cause for the arrests.  In the context of group arrests, the Second Circuit has acknowledged the reasonableness of mistakes that officers can face.  *See, e.g., Beal v. City of New York*, No. 92 Civ. 0718, 1994 U.S. Dist. LEXIS 5269 (S.D.N.Y. Apr. 22, 1994).

Accordingly, (1) because law on the circumstances under which the arrest of a group would be unconstitutional was not clearly established before the RNC, and (2) because officers of reasonable competence could disagree on whether there was probable cause for plaintiffs' arrests, Chief Monahan, Inspector Galati, and all individual defendant-officers at Church and Fulton Streets are entitled to qualified immunity on plaintiffs' federal and state-law false arrest claims.

## CONCLUSION

For the foregoing reasons, defendants respectfully request that this Court grant defendants' motion for summary judgment dismissing plaintiffs' false arrest claims, deny plaintiffs' motions for summary judgment on these claims, and award defendants costs, fees and such other and further relief as the Court deems just and proper.

Dated: November 23, 2011
        New York, New York

MICHAEL A. CARDOZO
Corporation Counsel of the City of New York
Attorney for Defendants
100 Church Street,
New York, N.Y. 10007
Tel: (212) 788-1817
Fax: (212) 788-9776

By: _____
        Fred M. Weiler, Esq.
        Cheryl L. Shammas, Esq.
        Peter G. Farrell, Esq.