UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------------------x
VALARIE KAUR BRAR,

Plaintiff,

-against-

The CITY OF NEW YORK, THE HUDSON RIVER
PARK TRUST, P.O. JOSE ANDRADE, P.O. WILLIAM
HAUT, P.O. NEIL RODRIGUEZ, P.O. MICHAEL
CARRIERI, P.O. TANISHA DIAZ, P.O. JASON WOLF,
P.O. KATHLEEN CURNYN, SGT. ARTHUR
SMARSCH, MAYOR MICHAEL BLOOMBERG,
POLICE COMMISSIONER RAYMOND KELLY, CHIEF
JOSEPH ESPOSITO, CHIEF NICHOLAS ESTAVILLO,
ASST. CHIEF BRUCE SMOLKA, DEPUTY CHIEF
THOMAS PURTELL, DEPUTY COMMISSIONER
JOHN COLGAN, CHIEF PATRICK DEVLIN, INSP.
THOMAS GRAHAM, DEPUTY CHIEF TERENCE
MONAHAN, INSP. JAMES SHEA, DEPUTY INSP.
THOMAS GALATI, CHIEF JAMES O'NEILL, INSP.
JAMES ESSIG, LT. BRIAN JACKSON, DEPUTY
COMMISSIONER STEPHEN HAMMERMAN, ASST.
DEPUTY COMMISSIONER THOMAS DOEPFNER, LT.
DANIEL ALBANO, DEPUTY INSPECTOR KERRY
SWEET, SENIOR COUNSEL RUBY MARIN-JORDAN,
SGT. EDMUND SHERIDAN, SGT. STEPHANIE
MOUNT, LT. DANIEL IECAMPO, CAPT. JOSEPH
DOWNING, CAPTAIN PAUL DEENTREMONT, and
P.O.s JOHN and JANE DOE #1-50, individually and in
their official capacities (the names John and Jane Doe
being fictitious, as the true names are presently unknown),

05 CV 1572 (RJS)(JCF)

Defendants

.
-------------------------------------------------------------------------x

## DEFENDANTS' LOCAL RULE 56.1 STATEMENT OF UNDISPUTED FACTS[1]

---

[1] Defendants submit these facts for purposes of this motion only. Additionally, defendants submit these with citations to the documents and with only select supporting documents, rather than providing copies of all supporting documents at this time.

## Facts Related To Security, Public Safety
## And Traffic Flow Concerns Around The City

1.      The Republican National Convention ("RNC" or "Convention") was held at Madison Square Garden ("MSG") from Monday, August 30, 2004 through Thursday, September 2, 2004. Declaration of Bruce Smolka ("Smolka Dec.") (Submitted in Supp. of Defs' Mot. for Summ. J. in *Marcavage v. City of New York*, 05 Civ. 4949(RJS)(JCF), DE # 73-2 at ¶ 2).

2.      The NYPD was the lead local law enforcement agency with responsibility for security and public safety during the Convention.  Smolka Dec. at ¶ 2.

3.      The NYPD began preparing and planning for the Convention in early 2003 and continued up and through the Convention.  Smolka Dec. at ¶ 2.

4.      The NYPD anticipated that the sheer size of the RNC event would place a tremendous strain on the department's resources and severely impact vehicular and pedestrian traffic flow throughout the City. Smolka Dec. at ¶ 4.

5.      Prior to the RNC, plans for widespread civil disobedience throughout New York City during the RNC were heavily publicized via the internet and the media.  (Hankin Dep. pp. 75:8-14. Hardesty Dep. pp. 102-104:1-1, Eric Corley Dep. pp. 53: 19-25, Giuliani Dep. pp. 46:23-47:03).

6.      Throughout the RNC, the NYPD was responsible for the safety and security of the City, its inhabitants, protesters and visitors, and its buildings and property.  (Smolka Dec. at ¶ ¶ 2, 12, Monahan Dep. pp. 35-36, 123, Galati Dep. pp. 201-02).

7.      RNC protesters denominated August 31, 2004, or "A-31" as a Day of Rage or a "Day of Civil Disobedience."  (DeEntremont Dep. p. 192:17-24; 194:1-4, Monahan Dep. pp. 78-80; 278-79; 287-88; 414-415, Galati Dep. p. 239:10, Esposito Dep. pp. 1370-1372: 5-24; 1377-1378:10-16; 1389-1390:25-24; 1393:4-22).

8.     The NYPD had been advised of the possibility of violence and city-wide disorder on August 31, 2004.  (Monahan Dep. pp. 78-80; 348-349; 428-29; 439, Galati Dep. pp. 239:12; 568:11, J. Shea Dep. p. 91).

9.     Officers were advised that, on August 31st, there would be disturbances throughout the City at different locations at different times by different groups.  (Galati Dep. p. 240:11, Monahan Dep. pp. 428-429; 437- 43).

10.     Officers were advised that, on August 31st, these incidents could take the form of "disruptions" to traffic, "breaking of property" and "attacks on police officers."  (Galati Dep. p. 240:17-21).

11.     The NYPD did face city-wide disorder on August 31, 2004.  (Galati Dep. pp.91-92; 98-100, Monahan Dep. pp. 146-51; 266-67, J. Shea Dep. p. 92:19).

**FACTS RELATED TO PLAINTIFF VALARIE KAUR BRAR AND HER ARREST**

12.     In August, 2004, plaintiff Valarie Kaur Brar was a resident of California and travelled to New York specifically for the Republican National Convention ("RNC" or the "Convention") to be a legal observer for the National Lawyers Guild (the "NLG") (Brar Dep. 9:9-11, 24-25; 10:1-4).

13.     Plaintiff's plan was to document protests during the RNC.  (Brar Deposition, Exhibit A, "The Cost of Dissent:  Arrest of a Legal Observer" [hereinafter, "Pl. Stmt"] at 2). (Brar Dep. 8:8-13; 9:24 – 10:4) (Brar Dep. 9:4-6).

14.     Plaintiff only documents protests and demonstrations that are unpermitted and are acts of civil disobedience.  (Brar Dep. 22:22-34:2).

15.     Plaintiff arrived in New York on August 29, 2004 and intended to stay there for for the duration of the Convention. (Brar Dep. 9:9-11; "The Cost of Dissent: Arrest of a Legal Observer" at 2 [hereinafter, "Pl. Stmt").

16.     On the evening of August 30, 2004, plaintiff received a call by an individual identified as "S", asking if plaintiff could be a legal observer for a protest that was scheduled to take place the next morning on August 31, 2004. (Pl. Stmt at 2).

17.     The person "S" also asked Brar to meet him the next morning at 7:00 A.M. to discuss plans by a group to engage in civil disobedience. (Pl. Stmt at 2).

18.     On the morning of August 31, 2004, at approximately 7:15 A.M., Brar met with "S" and a group of protesters in Union Square to discuss the group's plans. (Pl. Stmt at 2).

19.     The group discussed their plans to block the intersection of a street in the Financial District for 20 minutes. (Pl. Stmt at 2-3).

20.     "Everyone knew that [the Wall Street area] . . . needed to be shut down. . . . It would make all the sense in the world that you would try and shut that down." (Bigwood Dep. 40:7-41:15).

21.     The group did not obtain a permit from the City. (Diaz Dep. 24:16-19)

22.     The demonstrators had been planning their unlawful conduct for at least a few days. (Bigwood Dep. 40:7-23; 41:6-15).

23.     Plaintiff and the group took the subway downtown to the protest location (South William Street and Mill Lane) at approximately 8:00 A.M. (Pl. Stmt at 3).

24.     Prior to the group's arrival, defendants Sergeant Sefanie Mount and Police Officer Tanisha Diaz, along with other members of the NYPD, were already present at the location. (Mount Dep. 44:21-45:9); (Diaz Dep. 30:3-4, 12-16; 32:12-15).

25.     At approximately 8:20 A.M., the group including plaintiff arrived at the location. (Pl. Stmt at 3).

26.     Non-party witnesses Jeremy Bigwood and Eartha Melzer knew of the planned protest.  (Bigwood Dep. 40:7-23).

27.     Bigwood and Melzer went to South William Street and Mill Lane to document the protest.  (Bigwood Dep. 41:16-42:25).

28.     Bigwood and Melzer stopped on the corner of the intersection.  (Bigwood Dep. 42:11-15).

29.     Plaintiff stood on the corner holding her video camera, and waited there together with Eartha and Bigwood  (Pl. Stmt at 3); (Brar Tr: 98:2-7) (identifying "E" as fellow arrestee, and non-party witness Eartha Melzer).

30.     Sergeant Mount observed the group arrive on the block and believed them to be part of a protest that was going to take place that morning.  (44:21-45:9).

31.     Sergeant Mount observed the group that was on the corner start off small, then grow bigger as more people showed up on the corner.  (Mount Dep. 47:22 48:14).

32.     As Sergeant Mount observed the group on the corner, she became more aware that the group was somewhat together.  (Mount Dep. 48:14-18).

33.     At approximately 8:27 AM, the protest began after one of the protesters, "M", jumped into the middle of South William Street in front of a car and yelled, "We're having a party! A party for capitalism! We're going to celebrate what capitalism does for us!" (Pl. Stmt at 3); Photographs, Annexed to the Declaration of Cheryl L. Shammas ("Shammas Decl.") as **Exhibit A**).

34.     Brar began to film the protest.  (Pl. Stmt at 3).

35.     Bigwood took many photos of the incident.  (Bigwood Dep. 43:16-44:3).

36.     The protester who jumped in front of the car, "M", then handed a flyer to driver, wrapped a feather boa around his neck, and began dancing around in the street.  (Pl. Stmt at at 3)

37.     The car that "M" jumped in front became blocked and could not "go further".  (Pl. Stmt at 3).

38.      "The car inche[d] ahead but can't go further".  ("Protesting the RNC" at 3)

39.     Traffic became backed up on South William Lane, at least 12 cars back.  (Diaz Dep. 42:3-7) (Bigwood Dep. 52:1-3) (Photographs, Ex. A.)

40.     Others in the group began to run strings of yarn across the street of South William street.  (Pl. Stmt at 3) (Diaz Dep. 33:12-22) (Photographs, Ex. A.)

41.     People in the group opened shopping bags and a briefcase, removed balls of yarn, and ran them around signposts, running back and forth several times across South William Street at the corner of Mill Lane.  (Mount Dep. 49:5-50:11).

42.     The group was tying off the street with yarn.  (Mount Dep. 49:19-20).

43.     An individual from the group wearing a feather boa took out a big banner and proceeded into the middle of South William Street, at the intersection of Mill Lane, and started yelling or chanting. (Mount Dep. 50:13-22).

44.     At the same time, others in the group were chanting and dancing in the street around the people who were going back and forth across the street, stringing the yarn.  (Diaz Dep. 38:15-39:20).

45.     Other people from the group were running and dancing or skipping in Mill Lane. (Mount Dep. 51:6-12).

46.     Mill Lane was open to vehicular traffic.  (Mount Dep. 51:13-17).

47.     Because the intersection of South William Lane became blocked, vehicular traffic was therefore unable to enter Mill Lane (Mount Dep. 51:18-52:13).

48.     In addition to obstructing vehicular traffic, the yarn also posed a safety concern to police and civilians.  (Mount Dep. 55:12-56:25; 59:19-25; 60:11-20) (Diaz Dep. 48:4-25).

49.      An elderly woman who had been walking on the sidewalk South William Street tripped on the yarn and almost fell.  (Mount Dep. 55:12-56:25; 59:19-25).

50.     The yarn also got caught around Officer Diaz's ankle and abraded her skin.  (Diaz Dep. 48:4-25) (Mount Dep. 60:11-20).

51.     Everyone who was at the location appeared to be part of the protest.  (Diaz Dep. 62:2-63:18).

52.     Everyone was all over the place, all over the street.  (Diaz Dep. 62:12-21).

53.     Police attempted to clear the streets.  (Mount Dep. 52:20-53:5; 54:5-8) (Diaz Dep. 33:12-22) (Pl Stmt at 7).

54.     As police were attempting to clear the streets, plaintiff "stay[ed] on the street".  (Pl. stmt at 4).

55.     Bigwood did not want to get arrested so he left the scene and walked down the block.  (Bigwood Dep. 45:13-23).

56.     At her deposition, Brar denied that she stood in the street.  (Brar Dep. 107:24-108:13).

57.     Bigwood took pictures with his telephoto from afar.  Some of those photos included pictures of plaintiff standing in the street, while the street is blocked and as police were attempting to clear it.  Plaintiff is the female in the first and third photographs wearing the jeans

and red t-shirt.  (Bigwood Dep. 43:16-44:; 45:11-20) (Photographs, Annexed to the Shammas Decl. as **<u>Exhibit B</u>**)

58.     Prior to plaintiff's arrest, Sergeant Mount observed Brar standing in the street, on Mill Lane.  Sergeant Mount is the female officer depicted in the second photograph on the far left who is wearing jeans and a white t-shirt.  (Photographs, Ex. B.)

59.     Prior to Plaintiff's arrest, and as police were trying to clear up the streets, Officer Diaz, who was only a few feet away, observed Brar standing in Mill Lane.  (Diaz Dep. 51:10-25); (Ex. B).

60.     Brar stood within feet, and in the direct purview of several officers, including officers who were clearing the street or apprehending protesters.  (Ex. B).

61.     Officer Diaz was instructed by a higher-ranking officer to arrest plaintiff Brar. (Diaz Dep. 50:6-14).

62.     Sergeant Mount did not specifically direct officers to make arrests.  (56.1 at ¶ 67:5-12).

63.     As Officer Diaz approached plaintiff, a male officer began to place plaintiff under arrest.  (Diaz Dep. 53:23-25; 54:23-55:6).

64.     Sergeant Mount began doing many things at one time to clear the streets and assist with the arrests, including assisting officers apprehend individuals; escort arrestees to the curb; keep arrestees with their belongings; observe the scene.  (Mount Dep. 60:2-10).

65.     Sergeant Mount attended to the arrestees that were assigned to officers under her direct supervision.  (Mount Dep. 61:6-8).

66.     Sergeant Mount or somebody at her instruction began writing down the names and their descriptions of the arrestees, including plaintiff Brar.  (Pl. Stmt at 4) (Mount Dep. 61:21-24).

67.     Approximately 12-14 people were arrested.  (Mount Dep. 6523-66:3).

68.     The group that was present on the block was engaged in illegal activity.  (Brar Dep. 20:11-16).

69.     The group engaged in "civil disobedience".  (Pl. Stmt at 13).

70.     The arrestees were escorted to the southeast corner of South William Street and Mill Lane (Mount Dep. 53:14-20).

71.     Officer Diaz remained at the arrest location for the entirety of the incident and did not leave the location until after plaintiff Brar was arrested.  (Diaz Dep. 66:24 – 67:12).

**Van To Pier 57**

72.      Plaintiff was placed in a police van with the other arrestees to be escorted to Pier 57.  (Pl. Stmt at 5).

73.     In the van, the arrestees were "jovial, laughing, talking nonsense."  (Pl. Stmt at 5).

74.     In the van, one of the arrestees slipped her hands out of her handcuffs and used her cell phone. (Pl. Stmt at 5).

75.     Plaintiff gave her name and her parents' number to that arrestee so that her parents could be contacted and know where she was.  (Pls. Stmt at 5).

**FACTS RELATED TO PLAINTIFF'S DETENTION**

**Pier 57**

76.      Plaintiff is photographed with her arresting officer, Tanisha Diaz, and is smiling. (Brar Dep. 79:5-11) (Polaroid, Annexed to Shammas Decl. as **Exhibit C**).

77. The Pier was almost empty for the duration of plaintiff's detention (Brar Dep. 28:25:-29:5).

78. While at Pier 57, plaintiff had access to, and did access, fresh water and a bench to lay down on.  (Pl. Stmt at 8).

79. While at Pier 57, an officer asked plaintiff if she was okay, and plaintiff responded "Yes".  (Pl. Stmt at 9).

80. Pier 57 also had portable bathrooms.  (Pl. Stmt at 10).

81. Many of the women who were arrested with plaintiff had been arrested before in protests in Miami, Chicago, San Francisco and said that the Pier 57 was nice, commenting that it had portable bathrooms and fresh water.  (Pl. Stmt at 10).

82. Plaintiff estimates that she was arrested at approximately 8:30 A.M. and did not get to Pier 57 until at least 45 minutes to two hours thereafter.   (Brar Dep. 61:16-25).

83. Plaintiff left Pier 57 at approximately 2 P.M. that same day.  (Pl. Stmt at 10).

84. Plaintiff's total time at the Pier ranged from 3.5 hours to 4 hours and 45 minutes. (Brar Dep. 61:16-25) (Pl. Stmt at 10).

85. Plaintiff was escorted to Central Booking.  (Pl. Stmt at 11).

**Central Booking**

86. At Central Booking, plaintiff went through medical screening and completed medical paperwork in which she denied, *inter alia*, that was sick, injured, taking any prescribed medication, or evidencing any acute medical or mental problems.  (Plaintiff's Pre-Arraignment Screening Correctional Health Services Form, Annexed to Shammas Decl. as **Exhibit D**).

87. Plaintiff was given an ice pack for her hand.  (Pl. stmt at 12).

88.     Plaintiff was asked by an officer if she wanted to go the hospital, but plaintiff declined, saying "No, I don't need to."  (Pl. stmt at 12).

89.     Plaintiff was placed in a holding cell with a TV that was turned on, benches, gym pads on the floor, and a toilet, "top facilities".  (Pl. Stmt at 11, 14).

90.     Plaintiff was offered a choice of sandwich (bologna or cheese sandwiches), milk and Frosted Flakes cereal.  (Pl. Stmt at 11).

91.     Plaintiff was offered food every two hours.  (Pl. Stmt at 13).

92.     Plaintiff used the phone to call her parents.  (Pl. Stmt at 14).

93.     Plaintiff used the phone a second time to call her friend who is a legal observer.  (Pl. Stmt at 15).

94.     One of plaintiff's friends also contacted the National Lawyers Guild ("NLG") on plaintiff's behalf to advise them of plaintiff's arrest.  (Pl. Stmt at 14).

95.     Plaintiff's friend told her not to worry and that there were two NLG lawyers "working to get [her] out right now."  (Pl. Stmt at 15).

96.     Plaintiff signed a medical form, entitled "Medical Treatment of Prisoner" in which she indicated her refusal of medical aid.  (Medical Treatment of Prisoner form, Annexed to the Shammas Decl. as **Exhibit E**).

97.     Plaintiff was released at 12:30 A.M., approximately 16 hours following her arrest.  (Brar Dep. 11:9-12) (Pl. Stmt at 16).

**FACTS RELATED TO PLAINTIFF'S CHARGES AND DISPOSITIONS**

98.     Plaintiff was charged with disorderly conduct, received a Desk Appearance Ticket ("DAT") and was released.  (Pl. Stmt at 16).

99.     Approximately one year prior to her arrest, plaintiff was arrested in 2003 during a protest in San Francisco, California for engaging in a civil disobedience by "holding the street in the intersection of Third and Folsom" to block it in order to protest the war.  (Brar Dep. 11:13-12:7)

100.     During Brar's 2003 arrest, she was handcuffed and jailed  (Brar Dep. 15:18-20; 16:2-8)

## FACTS RELATED TO PLAINTIFF'S FIRST AMENDMENT ACTIVITIES

101.     A week following plaintiff's 2004 RNC arrest that is the subject of this action, plaintiff posted a 21-page article on-line on a public website describing her arrest and detention. (Pl. Stmt)

102.     Plaintiff has publically spoken or written about her arrest and detention on at least three additional occasions following her arrest:  in Audrey Magazine; in InDigest; and in prepared remarks to college students.  (www.audreymagazine.com/audreys-women-of-influence-valarie-kaur-founder-of-groundswell-at-auburn-seminary/;     www.indigestmag.com/kaur2.html; www.news.standord.edu/news/2013/june/kaur-baccalaureate-remarks-061513.html).

## FACTS RELATED TO THE CITY'S FACILITATION OF
## FIRST AMENDMENT ACTIVITY

103.     During the week of the RNC, the NYPD tried to facilitate First Amendment activity by, for example, escorting unpermitted marches to proceed from Union Square to the demonstration zone on Eighth Ave/32nd Street.  (Dieckmann Dep. p. 56:5-13, Galati Dep. pp. 348-349:2-9; 357-359: 14-6).

104.     As the Second Circuit noted, there were 800,000 individuals who protested in New York City during the Republican National Convention. *See In re City of New York*, 607 F.3d 923, 930 (2d Cir. 2010).

105.   As this Court noted, approximately 1800 people were arrested during the RNC. *See MacNamara v. City of New York*, 275 F.R.D. 125, 132 (S.D.N.Y. 2011). That is approximately .2 % of the total number of protesters in New York City during the RNC.

106.   The NYPD anticipated that New York City (the "City") would see a volume of protest activity not seen in decades.  Smolka Dec. at ¶ 7.

107.   NYPD had information that potentially hundreds of thousands of protesters would come to the City to protest the Convention.  Smolka Dec. at ¶ 7.

108.   Organizers of the United for Peace and Justice anti-war march predicted that 250,000 people would participate in their march and rally alone.  Smolka Dec. at ¶ 7.

109.   The NYPD also anticipated that individuals with opposing viewpoints would seek to express their messages.  Smolka Dec. at ¶ 7.

110.   The City and the NYPD welcomed those seeking to exercise their First Amendment rights and sought to facilitate the exercise of those rights regardless of viewpoint.  Smolka Dec. at ¶ 8.

111.   In order to facilitate planned protest events and accommodate other types of protest activities in and around the MSG area – the site of the Convention – part of the NYPD operational plan included the creation of a demonstration area beginning at 31st Street and 8th Avenue (directly adjacent to the southwest corner of MSG).  Smolka Dec. at ¶ 8.

112.   The area encompassed the entire width of the roadway of 8th Avenue and was designed to extend as far south as necessary to accommodate large numbers of demonstrators. Smolka Dec. at ¶ 8.

113.   Several events were planned during the week of the RNC in this demonstration area. Smolka Dec. at ¶ 8.

114. The NYPD issued a number of sound permits for these events and also arranged for the placement of a stage at the northern end of the demonstration for any group that chose to use it during an event or protest. Smolka Dec. at ¶ 8.

115. In addition, individuals wishing to exercise their First Amendment rights, regardless of viewpoint, could do so at any time during the RNC within the demonstration area. Smolka Dec. at ¶ 8.

116. In one instance, a large group of several thousand individuals who had previously not applied for or requested a parade permit were escorted by NYPD from Dag Hammerskold Plaza near the United Nations across Manhattan and into the demonstration area. Smolka Dec. at ¶ 8.

117. To create the demonstration area at that location, the NYPD blocked off vehicle traffic on 8th Avenue (a main vehicle thoroughfare) in midtown. Smolka Dec. at ¶ 9.

118. To assure that everyone who wished to exercise their First Amendment rights in the demonstration area could do so, NYPD officers constantly monitored and were prepared to expand that zone on short notice by blocking off additional blocks of 8th Avenue. Smolka Dec. at ¶ 9.

119. In fact, the demonstration area was used by thousands of individuals during the RNC. Smolka Dec. at ¶ 9.

120. The NYPD actively sought to assure that the demonstration area was safe for anyone who sought to express himself or herself regardless of viewpoint. Smolka Dec. at ¶ 10.

121. The demonstration area was monitored constantly by officers to assure that individuals assembled there could express themselves without concern that other individuals in the area (who may have had differing views) would retaliate or take other action against them. Smolka Dec. at ¶ 10.

122. In addition, the NYPD understood that political conventions are potential terrorist targets and had to prepare for the possibility of groups and individuals who sought to engage in criminal conduct that could significantly endanger public safety. Smolka Dec. at ¶ 11.

123. Because MSG was the main venue for the RNC, and NYPD expected that it would be a main object of protest and demonstration activity, a variety of security measures were required in and around MSG. Smolka Dec. at ¶ 11.

124. The purpose of the security measures taken in the vicinity of MSG was, among other things, to protect the President, Vice President, and numerous others who attended the Convention. Smolka Dec. at ¶ 12.

125. As many as 50,000 people were expected to participate including approximately 2509 delegates, 2344 alternates, 15,000 members of the media/press, 15,000 donors, governors, congressional delegations and staff, and 15,000 family, friends and other RNC visitors. Smolka Dec. at ¶ 12.

126. In addition, the NYPD was responsible for ensuring the safety of the City's own citizens, its visitors, and its buildings and property, while at the same time minimizing inconvenience to commuters, businesses and residents in the vicinity of MSG. Smolka Dec. at ¶ 12.

127. In an effort to keep the streets safe and unobstructed, police did not issue summons to arrestees during the RNC. By Opinion and Order dated September 30, 2012, docketed in all RNC cases, this Court upheld the constitutionality of the City's No-Summons Policy. *See Dinler v. City of New York*, No. 04-civ. 7922, at \*26 (S.D.N.Y. Sept. 30, 2012) (RJS)(JCF).

## FACTS RELATED TO THE CONDITIONS AT PIER 57

### Selection Of Pier 57 For Use During The RNC

128.  In 2004 Charles D. DeRienzo was a Deputy Commissioner of Administration with the NYPD and reported to NYPD Commissioner Raymond Kelly.   DeRienzo Dep. 10:14-17, 14:5-7.

129.  In early March of 2004, DeRienzo and NYPD Deputy Inspector Thomas Pelligrino were tasked with finding a location for use as a temporary holding facility in the event of arrests during the RNC.  (DeRienzo Dep. 15:4-7, 22:22-23:3; Pellegrino Dep. 7:13-23).

130.  DeRienzo and Pellegrino were instructed that the location of the facility needed to be in Manhattan and close to where the Republican National Convention was going to be as well as close to the courts in Manhattan.  DeRienzo Dep. 19:18-22, 22:8-13; *see also* Pellegrino Dep. 9:20-22.

131.  While no specific number of anticipated RNC arrestees was ever conveyed to DeRienzo or Pellegrino, they were told to prepare for the possibility of a large number of arrests. DeRienzo Dep. 17:5-13; Pellegrino Dep. 8:12-13.

132.  At one point during this search for a suitable facility, Pier 57 was brought to the attention of DeRienzo as a possibility.  DeRienzo Dep. 31:23-24.

133.  The NYPD conducted a preliminary site survey of Pier 57 to determine, among other things, what space at pier 57 was available, the costs involved, the construction issues,  and any potential environmental issues or concerns.  Pellegrino Dep. 32:2-33:13.  Pellegrino Depo, Ex. 1.

134.  The NYPD determined that there was ample space in the Pier for its use as a post arrest staging site during the RNC.  Pellegrino Dep. 33:19-23.

135.  The Metropolitan Transit Authority specifically informed Pellegrino in response to his questioning that there were no environmental concerns associated with the facility, and specifically represented that there were no lead paint or asbestos issues associated with the Pier that the NYPD needed to be concerned with.  Pellegrino Dep. 41:19-44:20.

136.  When  the NYPD originally  walked through Pier 57 with representatives from the MTA, they were told that there were no asbestos concerns at the Pier, and that all necessary abatement had been completed.  Yanosik Dep. 42:21-43:10.

137.  No environmental concerns were identified in the NYPD's preliminary site survey. Pellegrino Dep. 33:24-34:7.  Pellegrino Dep. Ex. 1.

138.  The terms of the agreement between the HRPT and the NYPD governing the NYPD's use of Pier 57 were memorialized in a Memorandum Of Understanding ("MOU") which was signed by authorized representatives of the parties on July 9, 2004 and July 28, 2004 respectively.  MOU at Bates 14099-14101.

139.  The MOU did not grant the NYPD use of the second floor or basement (caisson) area of Pier.  *Id.*

140.  The NYPD did not have access to the basement or the 2nd floor.  Colgan Dep. 768:14-17, 1044:15-16 (no need to go to caisson or 2nd floor).

**Preparation Of Pier 57 For Use During The RNC**

141.  Deputy Inspector Michael Yanosik  ("Yanosik") was in charge of making Pier 57 fit for housing arrestees and acted as the liaison between the NYPD and HRPT.  Yanosik Dep. 21:22-23, 36:2-14.

142.  In 2004 Yanosik was the commanding officer of the maintenance section of NYPD, and had been since 2001. (Yanosik Dep. 13:3-5, 15:11-16).

143. Yanosik oversaw 230-240 employees (including civilians), including carpenters, plumbers, steamfitters, locksmiths and the like and was responsible for maintaining any facilities owned by NYPD (Yanosik Dep. 15:21-16:16)

144. The NYPD began working to make improvements to Pier 57 on or about the beginning of August, 2009. Yanosik Dep. 32:5-6.

145. During the approximately four weeks available to the NYPD between acquiring the right to use Pier 57 and the beginning of RNC operations, the NYPD took numerous steps to modify and make repairs to the Pier. Yanosik Dep. 19:2-11. *See also* Pellegrino Dep. 67:7-23.

146. Inspector Yanosik worked with architects, his own NYPD staff, and the Criminal Justice Bureau ("CJB") to coordinate the preparation of Pier 57. Yanosik Dep. 22:3-12.

147. CJB approved the NYPD's plans for the changes to Pier 57 necessary for its use as a post arrest staging site during the RNC. Yanosik Dep. 22:3-12.

148. Yanosik had experience with the construction of prisoner processing centers "hospitable to both the police officers assigned to it and the prisoners being lodged therein." Yanosik Dep. 25:2-6.

149. Among the improvements the NYPD made to Pier 57 were: the installation of electrical outlets and portable toilets, creating security barriers between that part of the Pier used by the NYPD to house RNC arrestees and the far greater area that was not, the construction of holding cells and property rooms, and the installation of communications and telephone lines. Yanosik Dep. 84:17-22. Yanosik Dep. Exhibit 4 at Bates No 90712 *et seq*.

150. The NYPD ensured that all of the fire extinguishers in the facility were fully charged and certified. Pellegrino Dep. 67:15-19.

151.   The NYPD also constructed and/or rehabbed rooms for property storage and for use by medical staff.  DeRienzo Dep. 27:15-19.

152.   NYPD installed door alarms.  (Yanosik Dep. 38:6-15)

153.   The Pier's air conditioning system was repaired by Defendants prior to the RNC and was operational throughout that time. (Yanosik Dep. 29:8-15, Colgan Dep. 214:18-25)

154.   During the course of preparing Pier 57 to house any RNC arrestees, Yanosik, Yanosik's supervisors (including Inspector Morris, and Chief Colgan) as well as CJB personnel, and "maintenance, electricians, and plumbers" conducted "many, many walk-throughs" of Pier 57, including a walkthrough with employees of MTA. Yanosik Dep. 27:4-9, 42:25-43:3

155.   It was Inspector Yanosik's general practice to have any materials he or his employees suspected of containing asbestos sent to an outside laboratory for analysis.  Yanosik Dep. 114:2-25, 46:22-47:10.

156.   Inspector Yanosik never became aware of anything in Pier 57 that was toxic or could be dangerous to the occupants of Pier 57, including the police officers or the prisoners.  Yanosik Dep. 43:11-18, 51:14-21, 57: 2-7, 115:2-12.

157.   No member of the NYPD ever brought a concern regarding asbestos at Pier 57 to Inspector Yanosik's attention.  Yanosik Dep. 50: 7-12.

158.   Arrestees at Pier 57 had no contact with fireproofing material or any other traditionally potential asbestos containing material.  Yanosik Dep. 51:23-52:5.

159.   Inspector Yanosik was never made aware during the RNC of any area in Pier 57 in which arrestees were present that contained asbestos or could have possibly exposed arrestees or NYPD employees to asbestos.  Yanosik Dep. 48:19-23.

160.  Chief Colgan requested that Inspector Yanosik conduct an assessment of the PASS for asbestos-containing material and lead paint.  Colgan Dep. 215:2-7

161.  Chief Colgan was informed by Inspector Yanosik that there were no asbestos or lead related issues with the area at Pier 57 that the NYPD was going to use during the RNC.  Colgan Dep. 218:23-219:22.

162.  Based upon his own visual assessment of the Pier, Chief Colgan did not believe there were asbestos or lead related issues within the area of Pier 57 that the NYPD used during the RNC.  Colgan Dep. 229: 8-20, 230:2-231:10.

163.  Before the cells at Pier 57 were constructed, Chief Colgan communicated with a warden at the Department of Correction to ensure that the square footage allotted for each prisoner in the intake and holding cells was consistent with or more than what was afforded by the Department of Correction.  *See*  Colgan Dep. 683:16-21.

164.  Inspector Yanosik ordered a generator installed at the Pier in order to provide back-up source of electricity.  Yanosik Dep. 37:23-25.  Pellegrino Dep. 68:15-24.

165.  Prior to installing the generator, the NYPD had an electrical company test the entire electrical system of Pier 57.  Pellegrino Dep. 68:15-24.

166.  The NYPD repaired all the needed lights at Pier 57 and added others. Yanosik Dep. 97:9-10.  Pellegrino Dep. 67:20-23.

167.  The NYPD contracted with a fencing company to construct the pens according to NYPD's specifications. Pellegrino Dep. 68:6-10.

168.  The NYPD made repairs to those rooms at the Pier that were being used during the RNC.  Yanosik Dep. 38:2-15.

169.   The NYPD created signage at Pier 57 wherever it was necessary.  Yanosik Dep. 38:2-15.

### Selection Of 125 White Street For Use During The RNC

170.   In the year leading up to the RNC, Deputy Inspector (the captain) John O'Connell was tasked with locating potential sites for arrest processing during the RNC.  9/17/07 O'Connell Dep. 37:14-19, 40:14-41:5.

171.   After looking at several different facilities, Insepctor O'Connell recommended that the NYPD use part of a building at 125 White Street that was owned and operated by the New York City Department of Correction.  9/17/07 O'Connell 50:21-24.

172.   The facility at 125 White Street was normally used by the DOC to house prisoners awaiting court appearances.  9/17/07 O'Connell 51:23-52:2

173.   The reasons Inspector O'Connell recommended the 125 White facility, and why he felt it fit the NYPD's needs, included its proximity to the courthouse at 100 Centre Street, the fact that arrestees could be transported to the courthouse via an enclosed walkway rather than having to exit the building, and the overall good physical condition of the facility.  9/17/07 O'Connell 51:14-52:15.

### Preparation of 125 White Street For Use During The RNC

174.   The only repairs that were necessary to the facility at 125 White Street prior to the RNC were minor electrical repairs.  7/31/07 Yanosik Dep. 33:19-34:8.

175.   Those repairs were supervised by Lieutenant Greg Mangini, who reported to Inspector Yanosik.  7/31/07 Yanosik Dep. 33:9-34:10.

176.   At least one of the cells designated for use as a pre-search cell was painted prior to the RNC.  9/5/07 Czark Dep. 35:15-19.

177.  Any work that was done at the 125 White Street facility was done consistent with DOC security standards.  4/25/06 Colgan Dep. 60:18-21.

178.  Those standards were shared with the NYPD by the DOC's own Building and Maintenance sections.  4/25/06 Colgan Dep. 60:18-24.

### Daily Operations of the PASS During the RNC

### Intake at the PASS and Logistics of Cells

179.  During the RNC, Pier 57 served as a Post Arrest Staging Site (the "PASS"), as opposed to a Mass Arrest Processing Center ("MAPC").  The PASS was a temporary holding facility for post arrest staging.  This encompassed, *inter alia*, intake and identification of arrestees, invoicing of arrestees' property, searching and scanning arrestees, and the completion and review of arrest paperwork.  *See* 10/26/04 Colgan City Council Testimony ("City Council Hrg.") 29:4-7; 4/25/06 Colgan Dep. 160:11-161:11; 5/2/06 Colgan Dep. 612:24-613:24; 616:24-617:20.

180.  The PASS was a secondary arrest site; there was no data entry performed at the PASS and arrest numbers were not generated at the PASS.  Colgan Dep. 244:3-245:2.

181.  When arrestees arrived at the PASS they were escorted off their busses with their arresting officers.  Barriers were also set up along an intake shoot so people did not fall off the curb after exiting the bus.  4/27/06 Colgan Dep. 482:5-483:10.

182.  After disembarking from their busses, arrestees were asked if they needed to use a bathroom, if they needed water, and if they needed to see a doctor.  If an arrestee indicated he or she needed to use the facilities, needed water, or wanted to see a physician, they were given that opportunity.  City Council Hrg. 68-69: 24-7; 4/27/06 Colgan Dep. 480:18-481:7.

183.  The PASS facility was designed to hold approximately 2000 arrestees at any one time. *See* 7/31/07 Yanosik Dep. 67:12-16, 90:24-92:3; Ex. 5 to 7/31/07 Yanosik Dep., Bates Nos. 000090691-94.

184.  There were eleven cells at the PASS, which were used as either intake cells or holding cells.  10/26/04 Colgan City Concl. Tst. 29:7-14; 90:19-25, 91:2-25, 92:2-3; Ex. 5 to 7/31/07 Yanosik Dep., Bates Nos. 000090691-94 (final schematics of PASS); 5/2/06 Colgan Dep. 619:13-25, 620:2-25, 621:14, 631:21-25, 632:2-15, 633:10-22, 765:15-22; 7/31/07 Yanosik Dep. 90: 17-25, 91:2-23.

185.  The intake cells were used during the intake phase of the post arrest staging process. Arrestees were placed in intake cells upon arrival at the PASS, and before they were searched. 5/2/06 Colgan Dep. 619:13-25, 620:2-25, 621:14, 631:21-25, 632:2-15, 633:10-22; 7/5/07 Giordano Dep. 102:4-25, 103:2-16; 7/31/07 Yanosik Dep. 90: 17-25, 91:2-23, Ex. 5 to 7/31/07 Yanosik Dep., Bates Nos. 000090691-94 (final schematics of PASS).

186.  After an arrestee had their property vouchered and they were searched and scanned by a magnometer they were placed in a holding cell. 5/2/06 Colgan Dep. 619:13-25, 620:2-25, 621:14, 624:19-25, 625:2-11, 631:21-25, 632:2-15, 633:10-22; 7/5/07 Giordano Dep. 102:4-25, 103:2-16; 7/31/07 Yanosik Dep. 90: 17-25, 91:2-23, Ex. 5 to 7/31/07 Yanosik Dep., Bates Nos. 000090691-94 (final schematics of PASS).

187.  Before the cells at the PASS were constructed, Chief Colgan communicated with a warden at the Department of Corrections to ensure that the square footage allotted for each arrestee in the intake and holding cells was consistent with or more than what was afforded by the Department of Corrections in their facilities.  5/2/06 Colgan Dep. 682-683: 5-21.

188.  The smaller cells at the PASS had a capacity to hold approximately sixty (60) arrestees. 10/26/04 Colgan City Council Tst. 29:7-9; 5/2/06 Colgan Dep. 687:18-25, 688:2-7, 17-25, 689:2-4.

189.  The cells were divided into two parts: an entry sally port and the main cell area, which was used to hold arrestees.  5/2/06 Colgan Dep. 688:20-25; Ex. 4 to 7/31/07 Yanosik Dep., Bates No. 000090716-17 (diagrams of PASS and "typical holding area"); Ex. 5 to 7/31/07 Yanosik Dep., Bates Nos. 000090691-94 (final schematics)

190.  All of the cells at the PASS contained a minimum of 620 square feet of space for arrestees in the holding area.  The largest cells had 947 square feet of space for arrestees in their holding area.  There was at least three (3) feet of space between the cells and the ceilings were at least ten (10) feet high.  Ex. 4 to 7/31/07 Yanosik Dep., Bates Nos. 000090716-17; Ex. 5 to 7/31/07 Yanosik Dep., Bates Nos. 000090691-94 (final schematics).

191.  Four out of five of the intake cells contained a minimum of 620 square feet of space for arrestees in the holding area.  The fifth intake cell contained 947 square feet of space for arrestees in its holding area.  Yanosik Dep., Ex. 5, Bates No. 000090693 (diagram labeling intake cells).

192.  All of the holding cells or outgoing cells contained at least 947 square feet of space for arrestees in their holding areas.  Yanosik Dep., Ex. 5, Bates No. 000090693 (diagram labeling outgoing cells); 5/2/06 Colgan Dep. at 624:19-625:25 (indicating holding cells were used to house arrestees waiting for transport to next stage of arrest processing).

193.  Every cell contained two or three steel benches.  The benches had the capacity to seat about thirty (30) people and were bolted to the floor of the cells.  5/2/06 Colgan Dep. at 689:14-

24; 7/5/07 Giordano Dep. at 210:9-20; 7/31/07 Yanosik Dep. at 66:8-11, Ex. 6 to Yanosik Dep., Bates No. 91241 (photo of benches).  RNC Video # 1116 at 6:30-6:40.

<u>**Cleanliness of Cells At The PASS**</u>

194.   Before the PASS became operational, the Building Maintenance Section of the Facility Management Division of the NYPD ("Building Maintenance Section"), mechanically cleaned the floors of the PASS with a mechanical sweeper.  10/26/04 Colgan City Concl. Tst. 32:10-14, 61:21-24; 4/25/06 Colgan Dep. 236:7-25, 237:2-4, 260:14-16, 261:5-25, 262:2-25, 263:2-7; 5/2/06 Colgan Dep. 756:22-25, 757:2-15; 7/5/07 Giordano Dep. 211: 13-25, 212:2-8; 7/31/07 Yanosik Dep. 36:21-25, 37:2-25, 38:2-22.

195.   A truck mounted vehicular mechanical broom mechanically swept the floors.  10/26/04 Colgan City Concl. Tst. 32:10-14, 61:21-24; 4/25/06 Colgan Dep. 236:7-25, 237:2-4, 260:14-16, 261:5-25, 262:2-25, 263:2-7; 5/2/06 Colgan Dep. 756:22-25, 757:2-15; 7/5/07 Giordano Dep. 211: 13-25, 212:2-8; 7/31/07 Yanosik Dep. 36:21-25, 37:2-25, 38:2-22.

196.   The floors of the PASS were also hosed down by the Building Maintenance Section. 10/16 City Council Hrg. at 32; 5/2 Colgan Dep. 757-758: 16-5, 759: 9-15;  4/25/06 Colgan Dep. 185:18-23, 260:14-16, 261:5-25, 262:2-25, 263:2-7.

197.   The floors of the PASS were also swept with a broom and mopped with Pine Sol and disinfectant before the RNC.  7/31/07 Yanosik Dep. 36:21-25, 37:2-25, 38:2-22.

198. Captain Yanosik, who was then the commanding officer of the NYPD building maintenance section, arranged for the mechanical sweeping, cleaning, and hosing down of the floors at the PASS.  <u>See</u> 5/2/06 Colgan Dep. 757:16-25, 758:2-5; 7/31/07 Yanosik Dep. 36:21-25, 37:2-25, 38:2-22; 10/9 Grimes Dep. 19:20-23; 4/25 Colgan Dep.  page 260:14-25; page

261:2-9; 10/16 City Council Hrg. at page 61; 4/25 Colgan Dep. 260:14-25; page 261:2-9; 10/16 City Council Hrg. at page 61.

199. During the course of the RNC, the floors of the PASS and the floors of the cell space were regularly cleaned. Personnel from the NYPD building maintenance section manually cleaned the floors of the arrestee cells with a chemical disinfectant. 10/26/04 Colgan City Concl. Tst. 61:21-25, 62:2, 4/25/06 Colgan Dep. 185:18-23; 10/26/04 Colgan City Concl. Tst. 61:21-25, 62:2, 4/25/06 Colgan Dep. 185:18-23; 5/2/06 Colgan Dep. 758:22-25, 759:2-25,760:-2-8; 7/5/07 Giordano Dep. at p. 174.

200. The cells contained garbage cans and their trash can liners were changed when the cells were cleaned out. 10/9/07 Grimes Dep. 19:11-17, 57:20-22.

201. Arrestees themselves negatively impacted the sanitary conditions at the PASS. For example, arrestees littered their cells with food, wrappers from protein bars, cereal boxes and milk. 7/5/07 Giordano Dep. 200:5-11, 209:16-25, 211:13-15, 212:2-8, 214:19-25, 214:2; 10/9/07 Grimes Dep. 19:11-14,57:23-25, 58:2-3; 7/5/07 Giordano Dep. 209:16-25, 211:13-15, 212:2-8, 214:19-25, 214:2; 10/9/07 Grimes Dep. at pp. 19:12-14.

202. A number of arrestees were dirty when they entered the PASS. 7/5/07 Giordano Dep. 211:13-15, 212:2-8, 214:19-25, 214:2.

203. Some arrestees played games with their food by tearing it up and moving it around on the floor of their cells. 7/5/07 Giordano Dep. 209:16-25.

204. Other arrestees used their food as pillows or used it to design a peace sign on their cell floors or played games with their food. 7/5/07 Giordano Dep. 209:17-25; 10/9/07 ; plaintiff Larson 10/16/07 Dep. 167:2-9; plaintiff Hershey-Wilson 11/14/06 Dep. 153; plaintiff Elfrank-Dana Dep. 167:9-23; plaintiff Doxtader 11/14/07 Dep. 104:4-6; plaintiff Porto 10/11/07 Dep.

67:17-68:18; plaintiff Z. Miller 10/3/07 Dep. 193:14-24; plaintiff Black 2/26/07 Dep. 287:20-288:5; plaintiff Barrus 5/15/07 Dep. 87:2-5.

205.   The cells were emptied out on a daily basis so that the cells could be swept and mopped.   10/26/04 Colgan City Concl. Tst. 61:21-25; 4/25/06 Colgan Dep. 262:2-25, 263:2-7; 7/5/07 Giordano Dep. 174:4-10, 18-25, 175:2-9, 200:5-11, 284:19-25, 285:2-14; 10/9/07 Grimes Dep. 19:8-14, 57:5-13.

206.   Police officers were assigned to enter the cells and clean them on a continuous basis. 7/5/07 Giordano Dep. 284:19-25, 285:2-25, 286:2-16; 10/9/07 Grimes Dep. 18:23-25,19:2-14, 57:5-13.

207.   Officer James Grimes was assigned to one of the cell areas inside the PASS during the entire week of the RNC.   As part of his duties, Officer Grimes was responsible for sweeping the cell floors and emptying trash from the garbage can within the cell.   10/9/07 Grimes Dep. 11:25, 12:2-15, 18:23-25,19:2-14, 57:5-13.

208.   Inspector Giordano also personally entered the cells to inspect them for cleanliness and to ensure there was no contraband or anything else inside them that could harm arrestees.   7/5/07 Giordano Dep. 285:22-25, 286:2-16.

209.   The NYPD coordinated with the Department of Sanitation to ensure that refuse and recycling would be immediately be removed from the PASS upon request.   Ex. 11 to 5/28/08 DeRienzo Dep., Bates No. 00009812 (letter from Dep.t. of Sanitation to DeRienzo).

210.   In response to concerns raised by arrestees, on or about September 1, 2004, durable carpeting was installed in the holding cells at the PASS.   10/26/04 Colgan City Concl. Tst. 29:23-25, 30:2; 4/25/06 Colgan Dep. 184:21-25, 185:2-8; 5/10/06 Colgan Dep. 1173:11-17;

7/5/07 Giordano Dep. 202:25, 203:2-25, 204:2-3, 215:25, 216:2-13; 5/28/08 DeRienzo Dep. 104:3-14; 7/31/07 Yanosik Dep. 62:24-25, 63:2-25, 64:2-6.

**Air Flow and Temperature At The PASS**

211.   Prior to the RNC the existing ventilation and exhaust fans at the PASS were surveyed and repaired to ensure proper ventilation.  4/25/06 Colgan Dep. 260:14-16, 260:14-16, 261:5-25, 262:2-25, 263:2-7; 5/2/06 Colgan Dep. 693: 11-4; 7/31/07 Yanosik Dep. 36:21-25, 37:2-25, 38:2-22; 5/28/07 De Rienzo Dep. 80:24-25, 81:2-15, Ex. 7, Bates No. 000014090 – 92 (letter dated 6/22/04 from De Rienzo to Connie Fishman referencing repair of fans).

212.   The eleven (11) pre-existing ventilation and exhaust fans were operative 24-hours a day during the RNC.  10/26/04 Colgan City Concl. Tst. 29:15-18

213.   During the course of the RNC, additional floor mounted circulating fans were installed. 4/25/06 Colgan Dep. 260:14-16, 261:5-25, 262:2-25, 263:2-6.

214.   The floor-mounted, standing fans were outside of the cell area and were operational throughout the RNC.  10/9/07 Grimes Dep. 35:23-25, 36:2-15.

215.   In addition to the floor mounted fans and built-in fans, air conditioning was also placed in the two medical suites operated by Health and Hospital Corporation where arrestees were offered medical treatment.  4/25 Colgan Dep. 260: 14-25; 261: 5-14.

216.   In fact, during the period of the RNC, according to data obtained from the National Oceanographic and Atmosphere Administration, daytime temperatures at JFK airport during the RNC ranged from 79º to 85º during the day (La Guardia Airport did record one daytime high of 90º during that period), and 65º to 73º at night.  See Coluccio Report at pp. 18-19.

217. Furthermore, an indoor air quality assessment conducted by the NYPD Occupational Safety and health Section on September 1, 2004 between 2 PM and 3 PM found temperatures at various points at the Pier ranging from 76.8º to 83.5º. (Collucio Report at pp. 16-17).

### Air Quality At The PASS

218. Prior to the RNC, several walkthroughs inside Pier 57 were done to ensure the safety inside Pier 57. Yanosik Dep. 27:2-9.

219. During one of those pre-RNC walkthroughs, an MTA official represented that there were no concerns related to Pier 57. Yanosik Dep. 42:-25, 43:2-10.

220. On our about August 30, 2004, a concern was raised to the NYPD about the indoor air quality conditions inside Pier 57. Colgan 173: 11-21; Rasheed Dep. 18:20-25, 19:2-11).

221. Specifically, the NYPD was made aware of a concern related to potential exposure to asbestos containing material ("ACMs") inside Pier 57. Rasheed Dep. page 15:23-25, 16:2-15; Colgan Dep. 174:7-12.

222. In response to that concern, an indoor air quality assessment of Pier 57 was authorized to be performed. Colgan Dep. 173:11-21, 174:19-24; Rasheed Dep. 65:7-10; DeRienzo Dep. 108:23-25, 109:2-15; Yanosik Dep. 79:16-25, 80:2-6.

223. That same day, the NYPD hired an outside contractor to conduct the air quality testing. Rasheed Dep. 19:15-25; 20:2-5; Yanosik Dep. 74:7-22; 10/16 City Council Hrg. at 33.

224. The outside firm hired by the NYPD to conduct the air quality test was Airtek Environmental. Rasheed Dep. 45:2-4.

225. Airtek Environmental is certified by the New York State Department of Health to perform air quality testing. Rasheed Dep. 17:17-25, 18:2-3.

226. Airtek Environmental is also accredited by the American Industrial Hygienist to perform air quality testing. Rasheed Dep. 17:17-25, 18:2-3.

227. Airtek Environmental sent a technician to Pier 57 on August 30, 2004. Rasheed Dep. 20:6-13.

228. Airtek's technician conducted ambient and personal asbestos air sampling and analysis within Pier 57 in order to determine airborne asbestos fiber concentrations. Rasheed Dep. 21:6-18; Letter from Amir Rasheed to Chief of Personnel, dated September 3, 2004 ("9/3/04 Rasheed Letter") at page 2.

229. Airtek's testing was supervised by the NYPD. Yanosik Dep. 79:16-25; 80:2-6, 83:3-13; Rasheed Dep. 20:6-9.

230. The indoor air quality test consisted of two types of monitoring; area air monitoring and personal air monitoring. Rasheed Dep. 16:4-18; 17:10-16; Rasheed Letter, p. 2.

231. Area air monitoring is regulated by the EPA and New York's DEP. Rasheed Dep. 16:19-23.

232. All testing was conducted in accordance with regulatory protocols. 9/3/04 Rasheed Letter, p. 2.

233. Personal air monitoring is regulated by federal OSHA. 10/10 Rasheed Dep. 16:19-23.

234. Airtek Environmental performed air monitoring at four different locations inside Pier 57. Rasheed Dep. 32:11-17; 42:3-22.

235. Two of those locations were fixed. Rasheed Dep. 32:18-22, 39:19-22.

236. One of the fixed location where samples were taken from was the middle of the arrest processing area. Rasheed Dep. 42:3-14, 65:16-19).

237.  The other fixed location from where samples were taken was in front of the facility command post.  Rasheed Dep. 42:15-22, 65:20-22).

238.  The other two locations were involved personal sampling.  Rasheed Dep. 39:11-22).

239.  Personal air sampling was accomplished by having two NYPD officers wear portable air pumps for a period of time while performing their normal work inside Pier 57.  Rasheed Dep. 39:11-18, 23-25, 40:2-13, 43:21-25, 44:2-5.

240.  The NYPD officers involved in the personal sampling were told to move around the pier and not be stationary.  Rasheed Dep. 90:6-14.

241.  The two NYPD officers performing the personal sampling were also monitored by the Airtek technician for quality control purposes.  Rasheed Dep. 90:17-25, 91:2-6.

242.  The two NYPD officers' time records were also checked for further quality assurance purposes.  Rasheed Dep. 91:12-25, 92:2-4.

243.  A total of six samples were taken from Pier 57 and were sent to a laboratory for analysis.  Rasheed Dep. 75:2-12).

244.  Samples 1 and 2 were taken from the fixed locations.  Rasheed Dep.  77:13-19.

245.  Samples 3 and 4 were taken from the personal air monitors.  Rasheed Dep. 77:13-19.

246.  Two additional blank samples were also taken as control samples.   Rasheed Dep. 75:2-12.

247.  The air samples were analyzed via Phase Contrast Microcopy (PCM).  9/3/04 Rasheed Letter at page 2.

248.  The results of the air quality test were faxed to the NYPD the next day – August 31, 2004.  Rasheed Dep. 73:3-25.

249. The permissible exposure level for asbestos in a fixed location according to NYC Department of Environmental Protection is 0.05 fibers per cubic centimeter. Rasheed Dep. 86:16-21; 9/3/04 Rasheed Letter at page 1.

250. Test results for samples 1 and 2 collected from inside Pier 57 from the fixed locations were 0.001 fibers per cubic centimeter. Rasheed Dep. 37:6-14; 84:8-25; 85:2-11; 9/3/04 Rasheed Letter at page 4.

251. For personal samples, the permissible exposure level according to OSHA, is 0.1 fibers per cubic centimeter. Rasheed Dep. 36:21-25; 86:22-25; 9/3/04 Rasheed Letter at page 1.

252. Test results for the samples collected from the personal air monitors were 0.011 fibers per cubic centimeter. Rasheed Dep. 37:6-14; 84:8-25; 85:2-11; 9/3/04 Rasheed Letter at page 4.

253. The results from both the fixed and personal samples were well below permissible exposure levels. Rasheed Dep. 36:12-20; 87:4-8; Letter from Amir Rasheed to PO Michael Moloney, dated September 7, 2004 ("9/7/04 Rasheed Letter") at page 1).

254. In addition to the indoor air quality assessment conducted by Airtek Environmental, the NYPD also performed a test of the general air quality inside Pier 57. Rasheed Dep. 22:18-23; 23:9-25; 10/16 City Council Hrg. at page 32.

255. The NYPD tested the air quality inside Pier 57 for carbon dioxide, carbon monoxide, hydrogen sulfide, combustible gases, temperature, and relative humidity. Rasheed Dep. 24:2-5; Letter from Amir Rasheed to Chief of Personnel, dated September 2, 2004 ("9/2/04 Rasheed Letter") at page 1; 10/16 City Council Hrg. at page 32).

256. This test was performed by NYPD employee Shakeel Ansari, an industrial hygienist on September 1, 2004. Rasheed Dep. 24:9-13; 98:16-20; 9/2/04 Rasheed Letter at page 1; Ansari Dep. 30:2-7; 32:18-25.

257.  The indoor air quality was conducted inside and around Pier 57 area at five different locations.  9/2/04 Rasheed Letter at page 1; 5/20 Ansari Dep., Exhibit 1.

258.  Those locations were the supervisor's parking area, the RMP area, the prisoner intake area, the property section, and the cell area.  Rasheed Dep. 98:10-15; 9/2/04 Rasheed Letter at page 2; 5/20 Ansari Dep., Exhibit 1).

259.  The locations were selected based on the volume of activities in those areas.  Ansari Dep. 59:2-13; 60:8-13).

260.  These locations were also chosen because no fans were being operated in those areas at the time, thus eliminating the possibility of dilution of the samples.  Ansari Dep. 72:4-25; 73:13-25).

261.  Sergeant Scala from the NYPD accompanied Mr. Ansari while he conducted the indoor air quality test inside and around Pier 57.  9/2/04 Rasheed Letter at page 1; 5/20 Ansari Dep., Exhibit 1; Ansari Dep. 39:14-24.

262.  The test was performed using direct reading instruments called DSI Q Track. Rasheed Dep. 99:2-8; 9/2/04 Rasheed Letter at page 1; Ansari Dep. 18:7-16; 19:4-8.

263.  The machine is designed to give an instant measurement of carbon monoxide, carbon dioxide, hydrogen sulphide, combustible gases, temperature, and relative humidity levels. Rasheed Dep. 99:9-17; 9/2/04 Rasheed Letter at page 1; Ansari Dep. 20:12-16.

264.  Another machine called the Triple Gas Meter was also used as part of the indoor air quality testing.  Ansari Dep. 23:16-18.

265.  The Triple Gas Meter tested for hydrogen sulfide and the presence of other combustible gases.  Ansari Dep. 23:19-24).

266. The test for carbon monoxide, carbon dioxide, temperature, and relative humidity was first administered using a DSI Q Track. Ansari Dep. 24:12-17.

267. The tests were administered consistent with the American Society of Heating, Refrigeration, and Air Conditioning Engineers (ASHRAE) and the New York State Department of Labor Public Employees Safety and Health (NYSDOL). Rasheed Dep. 99:13-25; 9/2/04 Rasheed Letter at page 2).

268. The acceptable level of carbon dioxide according to ASHRAE is 1,000 parts per million. Rasheed Dep. 101:2-13; 9/2/04 Rasheed Letter at page 2.

269. The supervisor's parking area tested at 268 parts per million. (9/2/04 Rasheed Letter at page 2; 5/20 Ansari Dep., Exhibit 1).

270. The RMP area tested at 302 parts per million. (9/2/04 Rasheed Letter at page 2; Ansari Dep. Exhibit 1.

271. The prisoner's intake area tested at 288 parts per million. 9/2/04 Rasheed Letter at page 2; 5/20 Ansari Dep., Exhibit 1.

272. The property section area tested at 300 parts per million. 9/2/04 Rasheed Letter at page 2; 5/20 Ansari Dep., Exhibit 1.

273. The cell area tested at 276 parts per million. 9/2/04 Rasheed Letter at page 2; 5/20 Ansari Dep., Exhibit 1.

274. None of the locations tested inside Pier 57 exceeded the acceptable level for carbon dioxide. Rasheed Dep. 101:14-15; 9/2/04 Rasheed Letter at page 2.

275. The acceptable level of carbon monoxide according to NYSDOL is 35 parts per million. Rasheed Dep. 101:17-19; 9/2/04 Rasheed Letter at page 2.

276. The supervisor's parking area tested at 2 parts per million. 9/2/04 Rasheed Letter at page 2; 5/20 Ansari Dep., Exhibit 1.

277. The RMP area tested at 2 parts per million. 9/2/04 Rasheed Letter at page 2; 5/20 Ansari Dep., Exhibit 1.

278. The prisoner's intake area tested at 3 parts per million. 9/2/04 Rasheed Letter at page 2; 5/20 Ansari Dep., Exhibit 1.

279. The property section area tested at 2 parts per million. 9/2/04 Rasheed Letter at page 2; 5/20 Ansari Dep., Exhibit 1.

280. The cell area tested at 2 parts per million. 9/2/04 Rasheed Letter at page 2; 5/20 Ansari Dep., Exhibit 1.

281. None of the locations tested inside Pier 57 exceeded the acceptable level for carbon monoxide. 9/2/04 Rasheed Letter at page 2.

282. The acceptable range for relative humidity according to ASHRAE is between 30 to 60 percent. Rasheed Dep. 101:20-25; 9/2/04 Rasheed Letter at page 2.

283. The supervisor's parking area tested at 48.4%. 9/2/04 Rasheed Letter at page 2; 5/20 Ansari Dep., Exhibit 1.

284. The RMP area tested at 43.5%. 9/2/04 Rasheed Letter at page 2; 5/20 Ansari Dep., Exhibit 1.

285. The prisoner's intake area tested at 40.6%. 9/2/04 Rasheed Letter at page 2; 5/20 Ansari Dep., Exhibit 1.

286. The property section area tested at 39.9%. 9/2/04 Rasheed Letter at page 2; 5/20 Ansari Dep., Exhibit 1.

287.  The cell area tested at 39.2%.  9/2/04 Rasheed Letter at page 2; 5/20 Ansari Dep., Exhibit 1.

288.  None of the locations tested inside Pier 57 exceeded the acceptable level for relative humidity.  9/2/04 Rasheed Letter at page 2.

289.  The acceptable range for temperature according to ASHRAE is between 74-78 degrees Fahrenheit.  Rasheed Dep. 100:5-17; 9/2/04 Rasheed Letter at page 2.

290.  The supervisor's parking area tested at 76.8 degrees Fahrenheit.  9/2/04 Rasheed Letter at page 2; 5/20 Ansari Dep., Exhibit 1.

291.  The RMP area tested at 79.6 degrees Fahrenheit.  9/2/04 Rasheed Letter at page 2; 5/20 Ansari Dep., Exhibit 1.

292.  The prisoner's intake area tested at 80.5 degrees Fahrenheit.  9/2/04 Rasheed Letter at page 2; 5/20 Ansari Dep., Exhibit 1.

293.  The property section area tested at 82.7 degrees Fahrenheit.  9/2/04 Rasheed Letter at page 2; 5/20 Ansari Dep., Exhibit 1.

294.  The cell area tested at 83.5 degrees Fahrenheit.  9/2/04 Rasheed Letter at page 2; 5/20 Ansari Dep., Exhibit 1.

295.  None of the measured temperatures were considered harmful or dangerous according to applicable standards.  Ansari Dep. 78:10-22.

296.  After the testing for carbon dioxide, carbon monoxide, relative humidity, and temperature were completed, the same five locations were tested for hydrogen sulfide and other combustible gases. Ansari Dep. 24:12-20.

297.  The testing for hydrogen sulfide and other combustible gases was performed with a Triple Gas Meter.  Ansari Dep. 24:12-20.

298. The acceptable range for hydrogen sulfide according to NYSDOL is 2 mg/m3. 9/2/04 Rasheed Letter at page 2.

299. The supervisor's parking area tested at 0. 9/2/04 Rasheed Letter at page 2; 5/20 Ansari Dep., Exhibit 1.

300. The RMP area tested at 0. 9/2/04 Rasheed Letter at page 2; 5/20 Ansari Dep., Exhibit 1.

301. The prisoner's intake area tested at 0. 9/2/04 Rasheed Letter at page 2; 5/20 Ansari Dep., Exhibit 1.

302. The property section area tested at 0. 9/2/04 Rasheed Letter at page 2; 5/20 Ansari Dep., Exhibit 1.

303. The cell area tested at 0. 9/2/04 Rasheed Letter at page 2; 5/20 Ansari Dep., Exhibit 1.

304. None of the locations tested inside Pier 57 exceeded the acceptable level for hydrogen sulfide. 9/2/04 Rasheed Letter at page 2; 5/20 Ansari Dep., Exhibit 1; Ansari Dep. 23:25; 24:2-5.

305. The supervisor's parking area also tested at 0 for combustible gases. 9/2/04 Rasheed Letter at page 2; 5/20 Ansari Dep., Exhibit 1.

306. The RMP area also tested at 0 for combustible gases. 9/2/04 Rasheed Letter at page 2; 5/20 Ansari Dep., Exhibit 1.

307. The prisoner's intake area also tested at 0 for combustible gases. 9/2/04 Rasheed Letter at page 2; 5/20 Ansari Dep., Exhibit 1.

308. The property section area also tested at 0 for combustible gases. 9/2/04 Rasheed Letter at page 2; 5/20 Ansari Dep., Exhibit 1.

309.  The cell area also tested at 0 for combustible gases.  9/2/04 Rasheed Letter at page 2; 5/20 Ansari Dep., Exhibit 1.

310.  None of the locations tested inside Pier 57 exceeded the acceptable level for combustible gases.  5/20 Ansari Dep. at page 23:25; 24:2-5.

311.  All of the indoor air quality measurements were found to be well within the established guidelines.  9/2/04 Rasheed Letter at page 1; 5/20 Ansari Dep. 78:10-22; 10/16 City Council Hrg. at page 33.

312.  In or about October 2004, an outside firm -- TRC Environmental Corporation -- was commissioned to "perform a "human health risk assessment" evaluating the potential health impacts associated with the use of Pier 57 during the RNC.  TRC Report at p. 1.

313.  Three "air" samples and twelve "wipe" samples were collected from Pier 57 and analyzed for, among other things, asbestos.  TRC Report at p. 2.

314.  Asbestos was not detected in any of the samples analyzed by TRC.  TRC Report at p. 2.

315.  Dr. Robert Powitz, hired by plaintiffs in the RNC cases, conceded that NYPD air monitoring found no asbestos at Pier 57 and that this was consistent with his own expectations (Powitz Dep. at 263:22-265:1).

316.  Dr. Powitz also acknowledged that diesel and gasoline – which people are always exposed to – are not carcinogens.  (Powitz Dep. 337:1-3).

317.  Defendants' expert witness, Vincent Coluccio concluded after visiting the Pier himself:

> I personally observed the floor of the PASS to be unpainted and a video entered into the case record reflects the fact that the PASS floors were unpainted…
>
> The case record contains no empirical data on the presence of settled or airborne dust lead in the PASS, and based upon my

> review of the record I have not identified any processes that would
> have generated airborne respirable dust lead within the PASS
> sufficient to have posed a risk of lead exposure to RNC arrestees or
> other personnel within the PASS.

Coluccio Report at p. 13.

318.  Air quality testing conducted at the PASS by NYPD OSHA during the RNC found that levels of carbon dioxide, carbon monoxide, hydrogen sulfide and methane were either undetected or within safe limits.  (Coluccio Report at 16-17)

### Availability Of Water and Food At The PASS

319.  Water was available to all arrestees at all times while they were at the PASS.  10/26/04 Colgan City Concl. Tst. 29:9-12; 5/2/06 Colgan Dep. 677:17-18; 7/5/07 Giordano Dep. 202:5-16; 5/28/08 DeRienzo Dep. 42: 8-11; 43:7-23; 7/5/07 Giordano Dep. 93:2-22; 100:13-22; 7/31/07 Yanosik Dep. 36:21-25, 37:2-25, 38:2-22, 103:22-25, 104:2-6, Ex. 6 to 7/31/07 Yanoski Dep., Bates No. 91235 (photo of water coolers illustrating access through cells; Video RNC No. 1116 at 6:41-7:00, 8:40-8:50, 10:05-11:15.

320.  Water was maintained in 5-gallon bottles and stored along the walls outside the cells. 4/27/06 Colgan Dep. 486:8-24; 10/9/07 Grimes Dep. 38:22-24; 7/31/07 Yanosik Dep. 36:21-25, 37:2-25, 38:2-22, 103:22-25, 104:2-6, Ex. 6 to 7/31/07 Yanoski Dep., Bates No. 91235 (photo of water coolers illustrating access through cells).

321.  Water coolers for the arrestees were attached to the outside of their cells.  5/2/06 Colgan Dep. 689:25, 690:2-6; 10/9/07 Grimes Dep. 38:22-25, 39:2:13; 7/31/07 Yanosik Dep. 36:21-25, 37:2-25, 38:2-22, 103:22-25, 104:2-6, Ex. 6 to 7/31/07 Yanoski Dep., Bates No., Bates No. 91235 (photo of water coolers illustrating access through cells).

322.  Plaintiffs were given unrestricted access to water coolers and cups inside the PASS and the MAPC.  Yanosik Dep. at 37:25-38:5, 103:22-104:6, Grimes Dep. 19:24-20:12.

323. The spigot of the water cooler was accessible through an opening in the chain link fence of the cells. 5/2/06 Colgan Dep. 689:25, 690:2-6; 10/9/07 Grimes Dep. 38:22-25, 39:2:13; 7/31/07 Yanosik Dep. 36:21-25, 37:2-25, 38:2-22, 103:22-25, 104:2-6, Ex. 6 to 7/31/07 Yanoski Dep., Bates No., Bates No. 91235 (photo of water coolers illustrating access through cells).

324. When arrestees arrived at the PASS and entered their holding cells they were given a cup for water. 7/5/07 Giordano Dep. 93:2-22; 100:13-22; 10/9/07 Grimes Dep. 40:6-15.

325. The water for the PASS was ordered by NYPD staff under Inspector Morris and the NYPD ordered an excess of water. More specifically, 499 five-gallon bottles of water were ordered for use at the PASS during the RNC. 5/28/08 DeRienzo Dep. 86:7-15; 5/2/06 Colgan Dep. 677:15-24; 7/31/07 Yanosik Dep. 81:21-22, 83:18-20, Exhibit 4 to 7/31/07 Yanosik Dep., Bates No. 000090714 (invoices for five-gallon bottled water); 4/27/06 Colgan Dep. 486:8-2; 7/31/07 Yanosik Dep. 81:21-22, 83:18-20, Exhibit 4 to 7/31/07 Yanosik Dep., Bates No. 000090714 (invoices for five-gallon bottled water); 10/9/07 Grimes Dep.19:24-25, 20:2-12, 34:15-18

326. The water coolers were routinely replaced and replenished. 4/27/06 Colgan Dep. 486:8-24.; 10/9/07 Grimes Dep. 19:24-25, 20:2-12, 34:15-18, RNC Video No. 1116 at 10:05-11:15.

327. NYPD employees of all ranks assisted in providing arrestees with water and additional cups. (10/26 City Council Hrg. at page 69; 5/4 Colgan Dep., Exhibit 30, Bates Stamp No. 15661).

328. Some of the staff from the Manhattan Court Section under Deputy Inspector John O'Connell were assigned to work at the PASS and were tasked with changing empty water coolers and distributing food to arrestees. 9/17/07 O'Connell Dep. 93:22-25, 94:2-10.

329. Water coolers were also placed in the medical examining areas for arrestees who were being medically treated. 5/4 Colgan Dep., Exhibit 27.

330. Food was available to the arrestees at the PASS. *See* 4/27/06 Colgan Dep. 485:7-9; 5/28/08 DeRienzo Dep. 42:10-14, 43:18-23; 10/26 City Council Hrg. at page 29; 5/2 Colgan Dep. at page 679:9-18; 1/9 Okada Dep. 35:5-7, 16-19; 5/28 DeRienzo Dep. 41:6-10; 42:12-14; 10/9 Grimes Dep. 21:22-25, 22:2-5.

331. The Nutritional Services Division within the Department of Corrections provided food arrestees at the PASS and to 125 White Street during the RNC. 1/9/08 Okada Dep. at p. 35:5-7, 16-19; 4/27/06 Colgan Dep. 485:7-25, 486:2-6.

332. Deputy Warden George Okada from the Department of Corrections also ensured that food was provided to RNC arrestees at the PASS through coordination with Inspector Morris. 5/2/06 Colgan Dep. 678:4-20; 1/9/08 Okada Dep. 35:5-7.

333. Deputy Warden Okada was not advised of any problems with food delivery during the week of the RNC. Okada Dep. 36:25-37:4

334. A choice of food was available in order to accommodate the numerous dietary restrictions of the arrestees, including vegan diets. 1/9/08 Okada Dep. 35:5-7, 36:25, 37:2-20; 10/9/07 Grimes Dep. 21:22-25, 22:2-25, 23:2-25, 24:2-16.

335. Cereal, fruit, apples, sandwiches, protein bars and milk were distributed to arrestees at the PASS. 10/9/07 Grimes Dep. 21:22-25, 22:2-25, 23:2-25, 24:2-16; 1/9/08 Okada Dep. 35:5-7, 36:25, 37:2-20.

336. Food was distributed to the arrestees at the PASS as soon as it was brought into the facility. See 4/27/06 Colgan Dep. 485:21-486:4; 10/9/07 Grimes Dep. at pp. 21-24; 5/4 Colgan

Dep., Exhibit 30, Bates Stamp Nos. 15662, 15669, 15674, 15676; Grimes Dep. at page 21:22-25; 22:9-12, 19-25; 23:2; Giordano Dep. 206:21-207:23.

337.   Additional food was available to arrestees upon their request.   Grimes Dep. 23:11-24:16.

### Restroom Facilities At The PASS

338.   Restroom facilities were available to all arrestees at the PASS.   10/26/04 Colgan City Concl. Tst. 68:24-25, 69:2-5; 4/27/06 Colgan Dep. 480:12-25, 481:2-14.

339.   Arrestees were offered the opportunity to use a restroom as soon as they arrived at the PASS.   10/26/04 Colgan City Concl. Tst. 68:24-25, 69:2-5; 4/27/06 Colgan Dep. 480:12-25, 481:2-14.

340.   Additionally, when arrestees were first taken to a holding cell they were offered another opportunity to use the facilities.   5/2/06 Colgan Dep. 619:13-25, 620:2-25, 621:2-14; 7/5/07 Giordano Dep. at p. 93: 2-18, 100:13-22.

341.   Portable toilets were available to arrestees at the PASS when they were in both intake and holding cells.   7/31/07 Yanosik Dep. 36:21-25, 37:2-25, 38:2-22., 101:25, 102:2-23, Ex. 6 to 7/31/07 Yanosik Dep., Bates No. 91229 (photograph of portable toilets); 7/5/07 Giordano Dep. 202:5-16, RNC Video No. 1116 at 3:45-4:00, 5:05-5:35, 6:00-6:15

342.   There were two portable toilets in each cell except for the largest cell, which contained six portable toilets.   7/31/07 Yanosik Dep. 36:21-25, 37:2-25, 38:2-22., 101:25, 102:2-23, Ex. 6 to 7/31/07 Yanosik Dep., Bates No. 91229 (photograph of portable toilets). RNC Video No. 1116 at 3:45-4:00, 5:05-5:35, 6:00-6:15

343.   The portable toilets were located in the entry sally port area of the cells..   This served safety and security concerns because it ensured officers did not have to unnecessarily enter the

cell area every time an arrestee needed to use the restroom, it prevented arrestees from escaping, and it ensured only one arrestee was in the bathroom at a time. 7/31/07 Yanosik Dep. 36:21-25, 37:2-25, 38:2-22., 101:25, 102:2-23, Ex. 6 to 7/31/07 Yanosik Dep., Bates No. 91229 (photograph of portable toilets); Colgan Dep. 688:17-25, 689:2-13; 7/31/07 Yanosik Dep. 102:11-103:13; Bates No. 91234;

344.   An officer was stationed by the portable toilets at all times to ensure arrestees who were in the cells could access the restrooms whenever they needed. Giordano Dep. 282:15-20.

345.   NYPD officers who were assigned to monitor the portable toilets also checked them to ensure there was enough toilet paper inside. Giordano Dep. 282:15-18.

346.   A contractor cleaned each of the portable toilets on a daily basis during the RNC. 4/25/06 Colgan Dep. 260:14-16, 261:5-25, 262:2-25, 263:2-7.

347.   Hand wipes were also available inside the portable toilets. 5/4/06 Colgan Dep. 972:19-25, 973:2-4.

**Access To Medical Care At The PASS**

348.   Medical care was available to RNC arrestees while they were at the PASS. 10/26/04 Colgan City Concl. Tsty. 22:6-12, 29:23-24, 43:18-23; 4/27/06 Colgan Dep. 471:11-19; 10/9/07 Grimes Dep. 31:18-20; 5/28/08 DeRienzo Dep. 37:11-38:10, 42:4-7; (Brar's Medical Treatment of Prisoner Form).

349.   During the RNC, there were at least three doctors at the PASS at all times. 10/26/04 Colgan City Concl. Tsty. 22:6-12, 43:2-5, 68:19-21; Colgan 4/27/06 Dep. 472:8-24, 473:23-25, 474:2-5.

350. The three doctors assigned to the PASS during the RNC included two Heath and Hospitals Corporation ("HHC") physicians and an NYPD surgeon. Colgan 4/27/06 Dep. 473:23-25, 474:2-5.

351. There was also at least one HHC Registered Nurse on duty at all a times during the RNC. 10/26/04 Colgan City Concl. Tst. 22:6-12, 43:2-5, 68:21-22.

352. There were two medical suites at the PASS known as HHC 1 and HHC 2, which were staffed by HHC physicians and a HHC nurse at all times during the RNC. 10/26/04 Colgan City Concl. Tst. 68:13-24; 4/27/06 Colgan Dep. 472:8-20, 473:23-25, 474:2-8; 5/2/06 Colgan Dep. 734:16-25. RNC Video No. 1116 at 9:10-9:38.

353. The medical suites, HHC 1 and HHC 2, were air conditioned. 4/25/06 Colgan Dep. 260:14-16, 261:5-25, 262:2-25, 263:2-6.

354. Separate medical areas for male and female prisoners were established at the PASS to ensure privacy. 10/26/04 Colgan City Concl. Tst. 29:12-18.

355. HHC was in charge of administering medical care but was assisted on a daily basis during the RNC by an NYPD surgeon. 4/27/06 Colgan Dep. 473:9-25, 474:2-12; 5/2/06 Colgan Dep. 734:16-25, 735:7-13.

356. The NYPD Deputy Chief Surgeon and other NYPD surgeons assisted the HHC physicians at the PASS on a daily basis. 10/26/04 Colgan City Concl. Tst. 29:18-23, 4/27/06 Colgan Dep. 473:9-25, 474:2-12; 5/2/06 Colgan Dep. 734:16-25, 735:7-13.

357. When arrestees arrived at the PASS and were coming off the bus into intake they were asked by a ranking officer if they needed to see a doctor or needed medical treatment. 10/26/04 Colgan Concl. Tst. 68:24-25, 69:2-9; 4/27/06 Colgan Dep. 476:11-24, 480:12-25, 481:2-14; 4/27/06 Colgan Dep. at pp. 476, 480-81; 5/2/06 Colgan Dep. at p. 612; 7/5/07 Giordano Dep. at

p. 207; 4/27 Colgan Dep. at page 480, lines 12-25; 481:8-14; 7/5 Giordano Dep. at 206:21-25; page 207:2-23.

358.   Arrestees who requested medical assistance while they were at the PASS received it. 10/26/04 Colgan City Concl. Tst. 22:6-12; 43:18-23; 4/27/06 Colgan Dep. 476:11-20,  , 480:12-25, 481:2-14; 5/2/06 Colgan Dep. at p. 612; 7/5/07 Giordano Dep. at p. 207; 7/5 Giordano Dep. at page 232, lines 17-25; page 233, lines 2-5; page 234, lines 7-13; 5/4 Colgan Dep., Exhibit 30, Bates Stamp No. 15656; Barrus Dep. 91:20-92:4.

359.   Additionally, arrestees who appeared to need medical attention received it.   7/5/07 Giordano Dep. 206:21-25, 207:2-25, 208:2-25, 209:2-6; 232:17-25, 233:2-18, 234:7-13.

360.   If an arrestee was in need of medical attention a supervisor was contacted and the arrestee was brought to a medical suite.  7/5/07 Giordano Dep. at pp. 232-233.

361.   Pursuant to Patrol Guide Procedure No. 210-04, which was effective during the RNC, any prescription medications in an arrestee's possession were required to be removed from the arrestees' possession and invoiced.  *See* 7/27/07 Czark Dep. 29:4-18, 35:16-25; Ex. 1 to 7/27/06 Czark Dep. (Patrol Guide Procedure No. 210-04, "Prisoners Requiring Medical/Psychiatric Treatment").

362.   Pursuant to that Patrol Guide Policy, if an arrestee needed medication during the course of his or her arrest processing, they would need to go to a hospital to obtain that medication, even if medication was taken from them and vouchered.  *See* 7/27/06 Czark Dep. 23:5-9, 26:8-25, 27:1-3; Ex. 1 to 7/27/06 Czark Dep. (Patrol Guide Procedure No. 210-04, "Prisoners Requiring Medical/Psychiatric Treatment").

363.   Arrestees who needed hospital services were transported to hospitals.  (5/4 Colgan Dep., Exhibit 30, Bates Stamp Nos. 15663, 15673).

## Conditions At The MAPC

### Cell Logistics At The MAPC

364.   Deputy Inspector John O'Connell was the Operations Commander of the Manhattan Court Section during the RNC.  9/17/07 O'Connell Dep. 15:25, 16:2-10.

365.   Captain Andrew Savino was the Criminal Justice Bureau representative at the MAPC during the RNC.  9/21/07 Savino Dep. 5:7-9, 10:11-22.

366.   When arrestees arrived at the MAPC they were escorted from their busses to pre-search cells, where they were housed until they were searched.  Colgan Dep. 619:19 -621:14.

367.   Arrestees were separated by gender at the MAPC.  9/17/07 O'Connell Dep. 109:5-8, 16-23.

368.   The pre-search cells had the capacity to hold approximately forty to fifty individuals. 9/5/07 Czark Dep. 31:2-25, 32:2-4.

369.   The pre-search cells contained benches and the cells were painted prior to the RNC. 9/5/07 Czark Dep. 35:8-11, 15-19; 9/17/07 O'Connell Dep. 51:12-18.

370.   After being searched, arrestees were placed in post-search cells, which had the capacity to hold approximately ninety (90) arrestees.  9/5/07 Czark Dep. 38:6-20.

371.   The post-search cells also contained benches.  9/5/07 Czark Dep. 39:19-23.

372.   Telephones were located outside of each of the post-search cells.  9/5/07 Czark Dep. 61:16-62:5.

373.   An officer was assigned to each of the phones at all times to ensure that arrestees had access to the telephones.  9/5/07 Czark Dep. 62: 6-11.

374.   Arrestees were permitted to make as many phone calls as they wanted.  9/5/07 Czark Dep. at pp. 62-63: 25-6.

## Restroom Facilities At The MAPC

375. The post-search cells contained toilets and sinks. The toilets were enclosed by partitions. The sinks could be used if an arrestee needed water and for washing. 9/5/07 Czark Dep. 40:9-25, 41:2-4, 15-17.

## Availability Of Food And Water At The MAPC

376. Food was also made available to arrestees when they were at the MAPC. Lieutenant Christopher Czark, who was a platoon commander at the MAPC was in constant contact with the Department of Corrections staff to alert them of arrestee head counts so they could supply a sufficient amount of food. 9/5/07 Czark Dep. 11:17-25, 12:2-8, 19:12-19.

377. Water was available to arrestees when they were in the post-search cells and arrestees were given cups and milk upon their request. 9/5/07 Czark Dep. 40:18-25; 9/17/07 O'Connell Dep. 67:3-11.

378. When arrestees were in the post-search cells they were frequently given food. 9/5/07 Czark Dep. 48:6-10.

379. Food was available to arrestees at the MAPC at all times during the RNC. 9/17/07 O'Connell Dep. 119:22-25, 120:2-17.

380. The food available to arrestees at the MAPC during the RNC included bologna sandwiches, cheese sandwiches, peanut butter and jelly sandwiches, soy patties, and peaches. During the RNC, after Lieutenant Czark contacted the Department of Corrections to ensure a variety of food was available after learning that various arrestees had dietary restrictions, including vegetarian diets, lactose intolerance, and peanut allergies. 9/5/07 Czark Dep. 48:11-25, 49:2-11.

## Availability Of Medical Care And Medical Screenings At The MAPC

381.   All arrestees received a medical screening while they were at the MAPC.  9/5/07 Czark Dep. 63:21-24, 64:8-12, 9/17/07 O'Connell Dep. 170:22-25, 171:2-11.

382.   Arrestees were screened at a medical station that was staffed 24-hours a day by Emergency Medical Technicians ("EMTs") from the New York City Fire Department and supervised by an NYPD doctor.  9/5/07 Czark Dep. 63:25, 64:2-7, 66:11-13, 16-20, 81:7-12, 9/17/07 O'Connell Dep. 171:12-13, 186:20-25, 187:2-3.

383.   When arrestees received their medical screenings a form called a "Pre-Arraignment Medical Screening Correctional Health Services" was completed.  (Plaintiff's Pre-Arraignment Screening form, Ex. D).

384.   The form required assessments of whether the arrestee was sick or injured. (Ex. D).

385.   Additionally, inquiries or assessments of mental health issues, past medical history, menstrual concerns for female arrestees, recent hospitalizations, and drug and alcohol use were made.  (Ex. D).

386.   If an arrestee requested medication during their medical screening, consistent with NYPD medical policies, they were brought to a hospital to obtain any medication they needed. 9/5/07 Czark Dep. 64:17-22, 126:15-23.

387.   On one occasion there was an exception made to this policy for an arrestee that had HIV/AIDS medication on his person and indicated that he needed to take it with regularity.  The medication was vouchered and it was administered by the doctors at the MAPC.  9/5/07 Czark Dep. 125:7-25, 126:2-5.

388. At least five or six RNC arrestees requested to go to the hospital when they were at the MAPC and they were brought to a hospital. 9/5/07 Czark Dep. 64:23-25, 65:2-5, 76:5-11; Dudek Dep. 130:24-132:3, 140:17-20; Portera Dep. 138:14-141:16.

389. During the RNC, there were separate cells available for arrestees experiencing mental health problems or physical health problems. Medical care was available to these arrestees if they needed it, including hospitalization if it was necessary. 9/17/07 O'Connell Dep. 127:10-16, 128:8-25, 129:2-9.

## FACTS RELATED TO THE HANDCUFFING OF ARRESTEES

390. Prior to the RNC, officers attended two days of training on the use of flexcuffs. Deposition of Thomas Graham at 98:3-25; 99:2.

391. At that training officers were told not to tighten the flexcuffs any tighter than you would tighten a normal cuff. Graham Dep. at 98:3-25; 99:2.

392. In accordance with the Mass Arrest Processing Plan (the "MAPP"), after arriving at the PASS, an arrestees' handcuffs were removed during the intake process. 4/27/06 Colgan Dep. 482:5-25, 483:2-10; 5/2/06 Colgan Dep. 760:9-23; 7/5/07 Giordano Dep. 96:2-24.

393. Many arrestees' handcuffs were removed when they were brought to an intake cell at the PASS. 4/27/06 Colgan Dep. at 482:5-25, 483:2-10; 5/4/06 Colgan Dep. at 940-41; 5/2/06 Colgan Dep. 760:9-23.

394. Another point during intake when, arrestees' handcuffs might be removed was when their property was being vouchered. 4/27/06 Colgan Dep. at 482:5-25, 483:2-10; 7/5/07 Giordano Dep. at 93:2-18, 94:2-11, 96:2-24.

395. Additionally, if an arrestee needed to use a restroom during the intake process their handcuffs would be cut off. 5/2/06 Colgan Dep. at 545:10-20.

396.     When arrestees went through the search and scan stations at the PASS they were no longer handcuffed.  5/4/06 Colgan Dep. 940:10-25, 941:2; Giordano Dep. 249:14-25, 250:2-4.

397.     If an arrestee complained about the tightness of their cuffs and that issue was brought to the attention of the NYPD staff at the PASS, the cuffs would be cut off.  7/5/07 Giordano Dep. 250:4-16. Drescher Dep. 52:11-15; Doxtader Dep 89:5-16; Esquival Dep. at 77:19-25; Hernandez Dep. at 113:4-7; Henry Dep. at 113:3-5; Heifetz Dep. at 61:1-7; Kyne Dep. at 158:17-24; Kern Dep. at 119:4-5; Lara Dep. at 115:13-18; L. Martin Dep. at 54:4-8; Manders Dep. at 115:15-23; Melchor Dep. at 195:8-9; Meehan Dep. 80:11-14; J. Parrott Dep. at 92:1-5; Pardew Dep. at 160:25-161:10, 165:8-10; Pagoda Dep. at 234:13-19; Rose Dep. at 111:19-112:4; Rochfort Dep. at 177:12-13; K. Roberts Dep. at 167:3-9 ; Rivera Dep. at 95:15-96:3; Rosin Dep. at 198:8-17; Steyert Dep. at 135:3-8; Vreeland Dep. at 74:14-16 ; G. Sensiba Dep. 68:14-25; Sexton Dep. 65:2-23;   Shekarzie Dep. 121:16-23, 134:14-22; Tejada Dep. 33:15-34:5; Tremayne Dep. 100:18-25; Viertel Dep. at 156:3-5  ; Vendetti Dep. at 12:7-9; Landwehr Dep. at 39; Brar  Dep. 28:12-14, 29:15-30:16; Bushong Dep. 166:9-167:6; 192:5-12; D. Burns Dep. 146:14-147:15; Chandra Dep. at p. 137:8-137, 140:14-23;141:19-20; Crook Dep. at 25:11-22, 124-124:23-4; Dwyer Dep. at 66-67:15-25; 68:1-9; M. Epstein Dep. 86-88:8-9; Ellisen Dep. 115:1-5, 117-118:12-5; T. Gaster Dep 43-44:19-25;p. 45:1-25; Ghosh Dep. 42:4-22; Hall Dep. at pp. 116-117: 18-15;  Hark Dep. 52: 17-23; Harden-Jones Dep. 151: 3-15; D. Hill Dep. 2-20; Jusick Dep. 77: 8-25; M. Lee Dep 80: 15-21, 84:18-85:8;  Lovecchio Dep. at p. 60: 1-14; Pelszynski Dep. at p. 114:3-115:10. Petrello Dep.  11:24-12:25; Pietri Dep. 55:15-56:12; Podber Dep. 86:10-87:1; Weikart Dep. 177: 9-16. White Dep. 55: 2-18; Biddle, E. Dep. 33:12-25, Concepcion Dep. 148:1 – 149:21; Conley Dep. 108:12 – 109:1; Corley Dep. p.12:24 – 13:8; Doggett Dep. 126:2-18; Freas Dep.75:5-12, 81:2 -82:5; Galitzer Dep. 19:4-22:20; Garbini Dep.

116:23 -120:16; O-Reilly Rowe Dep.123:9-124:2, 125:8 -129:8; Ogden-Nussbaum Dep.168:5-14; Noonan Dep.10:13-24; Ortiz Dep. 36:12-21.

398.    Police officers assigned to the PASS during the RNC were responsible for cutting the plastic flexcuffs off of the RNC arrestees.  7/5/07 Giordano Dep. 101:3-8.

399.    Arrestees were not re-cuffed when they were being taken from an intake cell to a holding cell.  10/9/07 Grimes Dep. 25:7-25.

**FACTS RELATED TO DEPARTMENT POLICY ON USE OF FORCE**

400.     All uniformed members of service are trained in the proper use of force and are taught, among other things, that they are required to use the minimum force necessary at the scene of an incident and that use of "excessive force is not tolerated".  (Patrol Guide 203-11 "Use of Force")

401.     Persons taken into custody shall be rear cuffed at the earliest opportunity to reduce the potential for resistance, which may cause injuries.  Id.

402.    Under the Patrol Guide, "All uniformed members of the service are responsible and accountable for the proper use of force under appropriate circumstances. Members of the service are reminded that the application of force must be consistent with existing law and with New York City Police Department Values, by which we pledge to value human life and respect the dignity of each individual. Depending upon the circumstances, both federal and state laws provide for criminal sanctions and civil liability against uniformed members of the service, when force is deemed excessive, wrongful or improperly applied.  *Id.*

## FACTS RELATED TO THE CITY'S EFFORTS TO ENSURE THAT ARRESTS WERE LAWFUL

403.     Prior to the RNC, members of the NYPD were instructed to make every effort to ensure that only those who violated the law were arrested.  (RNC Executive Summary at Bates p. 07082).

404.     The NYPD also designated an area at Pier 57 for attorneys from the NYPD's Legal Bureau, from the Criminal section Unit.  (Marin-Jordan Dep. 15:9-13)

405.     Attorneys from this unit focus primarily on criminal law issues and enforcement issues, providing advice to officers at all levels of the Department on criminal law issues; providing training at various venues in the Department; assigned to attend events to the extent legal counsel is necessary at events.  (Doepfner Dep. 9:10-16; 10:4-19)

406.     During the RNC, Legal Bureau attorneys were present daily at Pier 57 to advise and assist police personnel in ensuring that arrests were made with probable cause. (Marin-Jordan Dep. 18:7-12)

407.     Attorneys would review the circumstances of an arrest with officers to assist in determining whether there was probable cause existed.  (Marin-Jordan Dep. 22:22-23:14).

408.     If a member of the Legal Bureau identified an arrest that was not supported by probable cause, then the attorneys would assist in voiding the arrest.  (Marin-Jordan Dep. 18:13-17; 23:10-14)

409.     By Order dated January 18, 2008 (entered in *MacNamara v. City of New York*, No. 04-Civ. 9216) (DE # 255), this Court affirmed the findings of Magistrate Judge Francis that: (1) "plaintiffs [in the RNC cases] had proffered 'no evidence' establishing probable cause to believe that a fraud or crime had been committed by Legal Bureau attorneys"; and (2) that

"'plaintiffs [had] not shown probable cause to believe that the Legal Bureau [had] engaged in fraud' during the RNC" (emphasis added).  (Order dated 1/18/08 at 3.)

410.    In that same Order, this Court also rejected plaintiffs' assertion of a purportedly "plausible theory" regarding the existence of widespread fraud and that "plaintiffs have failed to proffer sufficient evidence demonstrating that the entirety of communications between Legal Bureau representatives and arresting officers  at Pier 57 were made 'with an intent to further an unlawful act.'"  (*Id.* at 9.)

411.    Additionally, the Court also held that, even if the arresting officer "falsely attested to 'observing' unlawful acts by arrestees, there is no crime-fraud, and further, "there is no evidence in the record indicating that such entries were made at the direction of Legal Bureau representatives."  (*Id.* at 10)